Lori V. Berke (#015628)
Anelisa Benavides (#036446)
**BERKE LAW FIRM, PLLC**
1601 N. 7th Street, Suite 360
Phoenix, AZ 85006
Phone: (602) 254-8800
Fax: (602) 254-8808
lori@berkelawfirm.com
anelisa@berkelawfirm.com

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Stephan Shere,<br><br>Plaintiff,<br><br>vs.<br><br>City of Phoenix, et al.,<br><br>Defendants. | Case No. 2:23-CV-02657-PHX-JJT (ESW)<br><br>**DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

Pursuant to LRCiv 56.1(a), Defendants City of Phoenix, Michael Sullivan, Christopher A. Gitsch and Eric Elliott Summerville (collectively "Defendants"), through undersigned counsel, submit this Statement of Facts in support of their Motion for Summary Judgment, which is filed concurrently herewith.

1. Plaintiff Stephan Shere (hereinafter "Plaintiff") resides in Maricopa County, Arizona and filed this action under 42 U.S.C. § 1983 and Arizona state law. **[Doc. 24, ¶¶ 1–7.]**

2. Defendant City of Phoenix is a governmental entity that employed the individual Defendants at all relevant times. **[Doc. 41, ¶ 8.]**

3. Defendant Michael Sullivan (hereinafter "former Interim Chief Sullivan") served as Interim Chief of the Phoenix Police Department at the time of the October 4, 2022

incident that is the subject of this lawsuit. **[Declaration of Michael Sullivan at ¶ 2, attached as Exhibit 1.]**

4. Former Interim Chief Sullivan commenced employment with the Phoenix Police Department on September 12, 2022, and is no longer employed by the City of Phoenix. **[Exhibit 1 at ¶ 2.]**

5. Defendant Christopher A. Gitsch (hereinafter "Officer Gitsch") is a Phoenix Police Officer hired by the City of Phoenix on September 14, 2000. **[Deposition of Officer Gitsch at 11:17-24, attached as Exhibit 4.]**

6. Defendant Eric Elliot Summerville (hereinafter "Officer Summerville") is a Phoenix Police Officer hired by the City of Phoenix on September 09, 2019. **[Deposition of Officer Summerville at 7:13-15, attached as Exhibit 9.]**

7. Former Interim Chief Sullivan, Officer Summerville and Officer Gitsch are sued in both their official capacity and individual capacity. [**Doc. 24, ¶¶ 8, 11, 12.]**

8. Interim Chief Sullivan was never personally served with Plaintiff's notice of claim and does not recall ever seeing it prior to this lawsuit being filed. **[Declaration of Michael Sullivan at ¶ 8, attached as Exhibit 1].**

9. On August 5, 2024, Defendants filed a Motion to Dismiss all claims asserted in Plaintiff's Second Amended Complaint. **[Doc. 25.]**

10. The Court granted in part and denied in part Defendants' Motion to Dismiss. In its Order entered on December 26, 2024, the Court dismissed (1) Count III - Failure to Intervene claim in its entirety, and (2) Count I - Excessive Force claim against Defendants Daniel Joseph Snyder, Alex Beaver, Brittany Bartimoccia, Jacob Lewis, Charles C. Allen, and Jennifer Lorrain Beberniss, brought pursuant to 42 U.S.C. § 1983. **[Doc. 36 at 10.]**

11. The surviving claims are (1) Count I – a Fourth Amendment Excessive Force claim against Officer Gitsch and Officer Summerville, brought pursuant to 42 U.S.C. § 1983; (2) Count II - 42 U.S.C. § 1983 *Monell* claim against the City of Phoenix and former Interim Chief Defendant Sullivan alleging failure to train in de-escalation techniques and the use of non-lethal force; (3) Count IV - Gross Negligence claim against the City of Phoenix and

former Interim Chief Defendant Sullivan; and (4) Count V - Negligent Hiring, Supervision, Retention, and/or Training against the City of Phoenix and former Interim Chief Defendant Sullivan brought pursuant to Arizona state law. **[Doc. 36 at 10.]**

12. Prior to the October 4, 2022 incident that is the subject of this lawsuit, Plaintiff had been diagnosed with manic depression as a juvenile, a diagnosis that was later changed to major depressive disorder. **[Deposition of Plaintiff Stephan Shere at 9:14-16, 10:3-20, attached as Exhibit 2.]**

13. Prior to the October 4, 2022 incident that is the subject of this lawsuit, Plaintiff was also diagnosed with post-traumatic stress disorder ("PTSD") in 2020. **[Exhibit 2 at 9:12-16.]**

14. Plaintiff's PTSD diagnosis was based on multiple preexisting experiences, including abandonment, childhood trauma, the loss of his father, and seeing his sister's father in a coma. **[Exhibit 2 at 9:14-22.]**

15. Plaintiff began experiencing panic attacks in his early 30's and was experiencing panic attacks approximately three times per week on average leading up to the October 4, 2022 incident. **[Exhibit 2 at 32:2-17.]**

16. Prior to October 4, 2022, Plaintiff had engaged in self-harm on multiple occasions, including an incident when he was approximately 12 years old where he used a knife while threatening self-harm; an incident in March 2019 where he cut his arm severely enough to require surgical repair of tendons, ligaments, muscle, and nerves; and an incident in November 2020 where he placed a rope around his neck during an argument with his girlfriend, which he described as a suicide attempt, although "not a full suicide attempt." **[Exhibit 2 at 84:9-24, 88:4-89:7, 90:1-11, 96:12-24, 97:7-11.]**

17. Since approximately 2020, Plaintiff has been prescribed lorazepam, propranolol, and venlafaxine for anxiety and related mental-health conditions, including PTSD and depression. **[Exhibit 2 at 7:14-9:16.]**

18. On October 4, 2022, Plaintiff experienced panic attacks throughout the day and took lorazepam at least three times. **[Exhibit 2 at 70:8-25, 71:1-18.]**

19. On October 4, 2022 at approximately 18:58:18, Plaintiff's half-sister, Lexus Haskins (hereinafter "Haskins"), called 911 to request that police respond to her brother's apartment because he was suicidal. She specifically reported that Plaintiff had texted her a photo of himself with a gun in his mouth, followed by a smiley face emoji. **[Computer-Aided Dispatch Record and Declaration at COP 001174, attached as Exhibit 3; Deposition of Lexus Haskins at 7:19-24, 61:4-16, 68:13-19, attached as Exhibit 5; Text Message from Plaintiff to Haskins at COP000152, attached as Exhibit 6.]**

20. Plaintiff was intoxicated by alcohol at the time of the incident and, when asked at his deposition if he was also high on marijuana, he responded, "Probably, yes." He estimated that he had consumed approximately half of a 750-milliliter bottle of whisky before police arrived. **[Exhibit 2 at 69:21-24, 124:15-20.]**

21. Plaintiff also texted Haskins a video of himself putting a gun in his mouth, wearing a black glove, and depressing the trigger. **[Exhibit 5 at 73:19-74:11; Video Plaintiff sent to Haskins, attached as Exhibit 16.]**

22. Haskins responded to the texted photograph by repeatedly telling Plaintiff to stop and stating that it was "scary" and "not funny." **[Exhibit 5 at 68:10-69:13; Exhibit 6 at COP 000152.]**

23. Seeing Plaintiff put a gun in his mouth made Haskins worry that "he was not well." **[Exhibit 5 at 74:15-18.]**

24. Plaintiff sent Haskins a second text stating, "Hopefully Inger shot and die tonight." **[Exhibit 5 at 65:10-15; Exhibit 6 at COP 000151.]**

25. Haskins interpreted that text as meaning that Plaintiff felt like he wanted to die that night. **[Exhibit 5 at 65:16-23.]**

26. The Phoenix Police Department's computer-aided dispatch ("CAD") record reflects that on October 4, 2022, at 18:58:18,[1] a Priority 1 call was received through the 911

[1] The City of Phoenix Police Department's CAD records and body worn camera video use military time.

system and assigned the code "901X Suicide Attempt," concerning a suicidal subject at 6800 East Mayo Boulevard, Apartment 1308. **[Exhibit 3 at COP 001174; Exhibit 4 at 70:3-8; 911 Call, attached as Exhibit 19.]**

27. The 901X code is used for suicidal subjects but does not necessarily indicate that the subject has actually attempted suicide, rather it encompasses subjects who are threatening suicide, are suicidal, or are attempting suicide. **[Exhibit 4 at 64:5-65:8; Deposition of Sergeant Jacob Lewis at 100:2-10, attached as Exhibit 7; Exhibit 9 at 92:18-93:5.]**

28. The dispatcher advised responding officers that Plaintiff was threatening suicide, had sent his sister a photograph of himself with a gun in his mouth, that the gun appeared to be a handgun, and that Plaintiff's accompanying text stated "you'll be better off without me." **[Exhibit 3 at COP 001174; Radio Traffic Recording at 0:00:03-0:00:45, attached as Exhibit 26.]**

29. Dispatch information transmitted to the responding officers further noted that the subject had threatened suicide before but had never attempted it. **[Exhibit 3 at COP 001174; Exhibit 26 at 0:00:03-0:00:45.]**

30. Before making contact with Plaintiff, Officer Gitsch and Officer Beaver were aware that Plaintiff had sent his sister a photograph showing a gun in his mouth with a message indicating suicidal intent. **[Exhibit 4 at 66:13-24, 70:23-71:1; Deposition of Officer Alex Beaver at 67:14-68:11, 123:18-124:13, attached as Exhibit 11.]**

31. Officers Gitsch and Beaver responded to the call together in a two-officer marked patrol unit and were the first officers to arrive on scene. **[Exhibit 9 at 38:6-16; Exhibit 11 at 23:15-20.]**

32. At approximately 19:12:04, Officers Gitsch and Beaver arrived at the front door of Plaintiff's apartment. [**Officer Beaver's Body Worn Camera (hereinafter "BWC" Video at 19:12:04, attached as Exhibit 8.]**

33. At approximately 19:12:05, Officer Gitsch knocked on Plaintiff's apartment door, stepped back, and drew his Taser . **[Exhibit 8 at 19:12:05.]**

34. Officer Beaver also had his firearm drawn, and Plaintiff's dog could be heard barking inside the apartment. **[Exhibit 8 at 19:12:05.]**

35. The officers heard someone "fiddling with the lock" as if they were trying to open the door and after a brief delay during which the door handle moved up and down, at approximately 19:12:52, Plaintiff opened the door only four to six inches and remained only partially visible in the doorway. **[Exhibit 4 at 87:7-13; Exhibit 8 at 19:12:52; Exhibit 11 at 22:20-23:2.]**

36. The officers observed Plaintiff wearing black clothing, black gloves, a helmet, and what appeared to be a tactical-style vest, with a karambit-style knife hanging around his neck. **[Exhibit 4 at 24:15-22, 79:19-80:5, 148:10-14; Exhibit 7 at 16:22-18:10; Exhibit 8 at 19:12:52; Exhibit 11 at 28:16-21, 30:12-25, 33:8-24, 34:3-21.]**

37. During the initial contact, Plaintiff stood bladed behind the partially opened door with his left hand concealed from the officers' view. **[Exhibit 4 at 25:21-26:8; 211:10-13; Exhibit 8 at 19:12:52.]**

38. Because Plaintiff had reportedly sent his sister a photograph showing a gun, Officer Gitsch believed Plaintiff could be holding the gun in his concealed left hand. **[Exhibit 4 at 25:21-26:8; 211:14-20.]**

39. Officer Gitsch also noticed the karambit knife and was concerned that it was positioned for a quick draw. **[Exhibit 4 at 24:17-25:19.]**

40. A karambit is a handheld dagger-type knife with a deeply inwardly curved sharp blade, typically paired with a finger ring, that is intended for close-quarter fighting and is particularly effective at slashing, stabbing, and hooking flesh. **[Declaration and Report of Defendants' Police Practices Expert, Kenneth R. Wallentine, at COP 000156 attached as Exhibit 12, *1; Photograph of karambit knife, attached as Exhibit 27.]**

41. Officer Beaver understood the karambit to be a fighting knife that is difficult to remove from the user's hand because of its finger hold and is capable of causing serious injury or death. **[Exhibit 11 at 106:2-12.]**

42. Because the karambit knife was hanging from Plaintiff's neck, Officer Beaver considered it readily available and a danger to the officers. **[<u>Exhibit 11</u> at 106:13-21.]**

43. Officer Gitsch asked Plaintiff, "Are you thinking about hurting yourself?" Plaintiff initially responded, "Doesn't matter. Go away." After Officer Gitsch responded, "Well, we can't do that," Plaintiff changed his answer to, "Actually, I better say no, I'm not thinking about hurting myself. Go away." **[<u>Exhibit 4</u> at 76:3-12; 89:13-16; <u>Exhibit 8</u> at 19:13:06-19:13:12.]**

44. When Officer Gitsch again asked Plaintiff whether he was thinking about hurting himself, Plaintiff twice responded, "Doesn't matter," and then told Officer Gitsch that he could keep asking because "the answer's not going to change." **[<u>Exhibit 8</u> at 19:13:34-19:13:42.]**

45. Officer Gitsch repeatedly told Plaintiff that the officers wanted to help him, including telling Plaintiff, "If you want help, we can give you help." **[<u>Exhibit 4</u> at 93:2-94:6; <u>Exhibit 8</u> at 19:14:08-19:14:59.]**

46. Plaintiff told the officers, "I'm not going to have a conversation with you," "It's my right to not have a conversation with you," and "There's no legal obligation for me to have a conversation with you," and directed the officers to "go away." **[<u>Exhibit 8</u> at 19:13:18-19:13:23, 19:14:48-19:14:54.]**

47. At approximately 19:14:57, Officer Gitsch told Plaintiff, "We're not leaving." Plaintiff responded "Okay, bye," went inside the apartment and shut the apartment door. **[<u>Exhibit 8</u> at 19:14:57-19:14:58.]**

48. After Plaintiff went into his apartment and shut the apartment door, Officer Gitsch remained in the hallway and waited for additional officers to arrive. [**<u>Exhibit 4</u> at 100:6-14.]**

49. During the initial doorway encounter, Officer Beaver waved a person through the hallway, explaining to Plaintiff, "No, I was waiving the person by," and then stating, "They're going that way." **[<u>Exhibit 8</u> at 19:14:19–19:14:35.]**

50. After observing Plaintiff's behavior, Officer Gitsch feared for other people in the area and was concerned that Plaintiff might involve bystanders in a violent encounter. **[Exhibit 4 at 24:7-14.]**

51. Officers are trained that a suicidal subject with access to a weapon may rapidly shift from self-directed harm to outward violence, creating an imminent, unpredictable, and potentially lethal risk to officers and others. **[Exhibit 12 at COP 000160-COP000161, ¶ 3.]**

52. Sgt. Lewis was listening to dispatch while responding to the incident, which reported that Plaintiff was threatening suicide, had sent a photograph showing a gun in his mouth, that the gun appeared to be a handgun, and that Plaintiff had threatened suicide before but had never attempted it. **[Exhibit 7 at 27:8-28:12.]**

53. Officer Summerville also received the dispatch information that Plaintiff was threatening suicide, had sent a photograph showing a gun in his mouth, and had sent a text stating, "you'll be better off without me." **[Exhibit 3 at COP 001174; Exhibit 9 at 32:18-33:19; Exhibit 26 at 0:00:20-0:00:45.]**

54. Sgt. Lewis responded to the scene because of the serious nature of the call and because he understood that Plaintiff was suicidal and potentially armed with a handgun. **[Exhibit 7 at 25:22-26:5.]**

55. Additional responding officers included Officers Brittany Bartimoccia, Eric Summerville and Daniel Snyder, , as well as Sergeant Jacob Lewis (hereinafter "Sgt. Lewis"). **[Exhibit 7 at 19:2-5; Exhibit 9 at 36:11-17.]**

56. Sgt. Lewis was the scene supervisor and the only sergeant on scene. **[Exhibit 7 at 10:8-19.]**

57. As scene supervisor, Sgt. Lewis was responsible for making tactical decisions, including decisions concerning available force options. **[Exhibit 7 at 10:20-11:11.]**

58. Sergeant Lewis retrieved a ballistic shield from his vehicle and directed another officer to retrieve a less-lethal stunbag launcher to ensure multiple layers of less-lethal force were available in hopes of preventing a deadly-force encounter. **[Exhibit 7 at 65:25-66:19, 67:10-14.]**

59. Sergeant Lewis testified that Taser deployments are not always successful and that clothing and probe-related factors can affect their effectiveness. **[Exhibit 7 at 116:12–117:8.]**

60. Plaintiff was wearing heavy clothing. **[Declaration of Officer Christopher A. Gitsch at ¶ 4, attached as Exhibit 31.]**

61. Given Plaintiff's clothing, Sgt. Lewis believed there was a good possibility that a Taser deployment would not work, which was why he also had a stunbag operator available. Sgt. Lewis explained that he wanted multiple layers of less-lethal options because officers could not rely on a Taser alone to stop someone advancing with a knife. **[Exhibit 7 at 116:12–117:8.]**

62. Officer Summerville stood by with a stunbag in case the Taser did not work. **[Exhibit 31 at ¶ 5.]**

63. At approximately 19:23:52, almost ten minutes after Office Gitsch and Officer Beaver had last seen Plaintiff, Plaintiff walked out of his apartment, standing partially in the hallway and holding a black backpack in one hand. **[Officer Gitsch's BWC Video at 19:23:52, attached as Exhibit 10; Exhibit 11 at 38:16-19.]**

64. When Plaintiff reappeared holding a backpack, Officer Gitsch had his Taser raised and aimed toward Plaintiff. While reviewing the recording at his deposition, Officer Gitsch identified the visible green and red lights as the Taser's laser pointers, which indicated the anticipated spread and target of its probes. **[Exhibit 4 at 125:9–23, 128:6–25.]**

65. In addition to the backpack he held in his hand, Plaintiff also wore a crossbody bag. **[Exhibit 11 at 38:16–23; Exhibit 4 at 143:5–12.]**

66. Plaintiff repeatedly ducked behind the entrance alcove in response to Officer Gitsch raising the Taser. Officer Gitsch understood Plaintiff's reactions to indicate that he knew the Taser was an available force option and was attempting to avoid being in a position where it could be deployed against him. **[Exhibit 4 at 228:15–23.]**

67. Before the Taser was deployed, Plaintiff acknowledged the presence of the Taser on several occasions during the encounter. At approximately 19:24:47, while pointing toward the officers, Plaintiff made a partially unintelligible statement that included the words "decided to tase me." **[Exhibit 10 at 19:24:47.]** At approximately 19:25:20, Plaintiff stated, "I actually want to be Tased just to feel it," but then clarified that he meant being tased at Axon, rather than by the officers at the scene. **[Exhibit 10 at 19:25:20–19:25:24; Exhibit 4 at 134:22–135:2.]** Shortly before deployment, Plaintiff asked, "Why, so you can fucking Tase me?" **[Exhibit 10 at 19:30:38; Exhibit 4 at 145:19–24.]** At his deposition, Plaintiff also testified that he had told the officers multiple times, "I don't want to be Tases," and recalled subsequently saying, "Okay. If you want to Tase me, Tase me," while explaining that he did not actually want to be tased. **[Exhibit 2 at 116:5–15.]**

68. Officer Beaver described Plaintiff as "very hostile and aggressive" at this time. **[Exhibit 11 at 38:8–19.]**

69. The backpack in Plaintiff's hand was open, giving Plaintiff access to its interior, but the officers were unable to see what, if anything, was inside. **[Exhibit 11 at 38:20-23.]**

70. Officer Gitsch was concerned that the reported gun could be inside Plaintiff's backpack and that Plaintiff could fire it without first removing it from the bag. **[Exhibit 4 at 220:24–221:10.]**

71. Officer Gitsch estimated that the officers were approximately twelve feet from Plaintiff and believed Plaintiff could fire before they had time to react. **[Exhibit 4 at 220:24–221:10.]**

72. Officer Beaver had drawn his .45-caliber service weapon and was positioned partially behind a wall with the weapon at "low ready", meaning it was held in a position below the target, lower than where the officer would engage if he were to shoot. **[Exhibit 11 at 39:6-41:5.]**

73. Sgt. Lewis also observed that Plaintiff's karambit was hanging on a chain at his midline, where it was available and accessible by either hand. **[Exhibit 7 at 76:3-16.]**

74. Sgt. Lewis described a karambit as a fighting knife specifically designed for hurting, stabbing, and slashing, and testified that its position around Plaintiff's neck made it particularly dangerous and deadly. **[Exhibit 7 at 77:18-78:1.]**

75. Plaintiff's karambit was held in its sheath by retention and could be deployed by pulling downward. **[Exhibit 7 at 113:22-114:11.]**

76. An individual armed with an edged weapon within approximately 21 feet can close the distance quickly enough to stab or slash an officer even when the officer's weapon is already unholstered. **[Exhibit 7 at 114:20-115:6.]**

77. Officer Gitsch estimated that the officers were approximately 12 feet from Plaintiff and testified that an individual armed with a knife can cover approximately 21 feet before an officer can draw from the holster. **[Exhibit 4 at 221:7-20.]**

78. At their distance, Officer Beaver believed Plaintiff could probably reach the officers faster than they could draw and fire. **[Exhibit 11 at 106:22-107:2.]**

79. At approximately 19:23:54, Plaintiff moved out of the officers' sight after officers directed him to come out into the hallway. Officer Gitsch testified that, during this exchange, he had his Taser raised and aimed. Seconds later, Plaintiff said, "Watch this," and his dog emerged into the hallway. **[Exhibit 4 at 125:9–13, 128:6–8; Exhibit 10 at 19:23:52–19:23:57.]**

80. Plaintiff's pit bull then emerged from the apartment and came down the hallway toward the officers. **[Exhibit 4 at 129:6-10; Exhibit 10 at 19:23:57-19:23:59.]**

81. As the pit bull walked out into the hallway, multiple officers visibly recoiled. **[Sgt. Lewis' BWC Video at 19:23:55-19:23:58, attached as Exhibit 28.]**

82. Officer Beaver observed Plaintiff push the dog toward the officers and interpreted Plaintiff's conduct as an attempt to threaten or scare the officers with the possibility that the dog would attack. **[Exhibit 11 at 43:20-44:12.]**

83. In his report, Officer Gitsch wrote that Plaintiff had said, "Let's see what happens," rather than "Watch this." **[Exhibit 4 at 213:10-17.]**

84. At his deposition, Officer Gitsch acknowledged that the body-worn-camera video establishes that Plaintiff actually said, "Watch this," and explained that he had not reviewed his body-worn-camera footage before preparing the report and was attempting to recall the gist of the statement. **[Exhibit 4 at 214:4-6.]**

85. Officer Gitsch testified that he understood "Let's see what happens" and "Watch this" to have the same connotation of a threat in the circumstances, especially when the dog emerged immediately thereafter, causing him to believe that Plaintiff was attempting to cause the dog to attack the officers. **[Exhibit 4 at 164:3-11; 165:4-11; 166:21-167:11, 214:4-6.]**

86. Officer Gitsch was in apprehension of imminent physical injury when Plaintiff sent the pit pull out toward the officers. **[Exhibit 4 at 164:5-6, 165:4-11, 191:8-12.]**

87. Approximately one year before the October 4, 2022 incident, Officer Gitsch had responded to a police call approximately three blocks from Plaintiff's apartment involving a woman whose arm had been mauled by a pit bull, resulting in "horrific" injuries. **[Exhibit 4 at 26:23-27:11, 225:11-226:16; Exhibit 12 at COP 000168, , ¶ 13.]**

88. Officer Gitsch testified that the incident a year prior demonstrated to him that pit bulls can be unpredictable. **[Exhibit 4 at 225:11-226:16.]**

89. Officer Summerville was in apprehension of imminent physical injury and interpreted Plaintiff's statement "Watch this" to mean, "we're about to get attacked by a dog" and "watch this dog attack me and my partners." **[Exhibit 9 at 92:4-17; 93:12-23.]**

90. Officer Summerville is terrified of dogs, especially of pit bulls. **[Exhibit 9 at 92:1-7.]**

91. Before this incident, Officer Summerville had seen several videos of pit bull attacks, which he described as vicious and involving strong bite force. **[Exhibit 9 at 93:19-94:1.]**

92. Officer Beaver felt "absolutely" threatened when Plaintiff's dog emerged, and he interpreted Plaintiff's statement "Watch this" as threatening. **[Exhibit 11 at 107:3-108:21.]**

93. Officer Beaver testified that his immediate fear was informed by prior calls involving pit bulls attacking people. **[Exhibit 11 at 107:8-23.]**

94. As one example, Officer Beaver described a prior call involving an approximately 80-year-old woman who was severely attacked by a pit bull before officers ultimately shot the dog. **[Exhibit 11 at 109:1-110:1.]**

95. Sgt. Lewis testified that he had responded to multiple calls involving pit bulls that had been owned for years without previously displaying aggression but then violently attacked someone, and he also described pit bulls as unpredictable. **[Exhibit 7 at 95:20-96:11.]**

96. The general reputation of pit bulls for aggressive behavior and causing serious injury, combined with the unpredictable nature of an unrestrained dog, reasonably heightened the officers' perception of potential risk. **[Exhibit 12 at COP 000168-000169, ¶ 13.]**

97. Releasing the dog into the hallway introduced an additional uncontrolled variable into an already volatile situation and increased the risk and unpredictability of the encounter. **[Exhibit 12 at COP 000168-000169, ¶ 13.]**

98. After the pit bull approached Officer Beaver, Sgt. Lewis directed Officer Beaver to move back and give his position to the officer equipped with the stunbag. **[Exhibit 11 at 44:13-21.]**

99. Officer Beaver stepped back and holstered his service weapon because he no longer had a clear view of Plaintiff. **[Exhibit 11 at 44:13-21.]**

100. Officer Beaver took Plaintiff's dog by the collar and moved it away from the other officers. **[Exhibit 11 at 44:17-21.]**

101. Securing the dog effectively took Officer Beaver "out of service" because he did not feel he could release it to assist with other police responsibilities. **[Exhibit 11 at 113:14-24.]**

102. Although Plaintiff's pit bull ultimately did not attack anyone, Officer Beaver felt "absolutely" threatened when the dog emerged because he did not know the dog and had previously responded to several calls involving pit-bull attacks. **[Exhibit 11 at 107:3-108:1.]**

103. Officer Beaver explained that the officers could not know in the immediate moment whether the dog would attack and that he feared the dog might harm him or someone else. **[Exhibit 11 at 107:3-108:1.]**

104. Sergeant Lewis testified that probable cause existed to arrest Plaintiff for aggravated assault because Plaintiff said "watch this" and sent his dog toward the officers, who interpreted Plaintiff's conduct as a threat and believed the dog would attack them. **[Exhibit 7 at 95:9-19.]**

105. While Plaintiff was holding the backpack and calling his dog back, Officer Gitsch briefly saw Plaintiff's other hand before it went back behind the wall. Although no weapon was visible in that hand during that brief moment, Officer Gitsch remained concerned that Plaintiff could have a gun concealed in his pocket or at the small of his back. **[Exhibit 4 at 130:23–131:19.]**

106. At approximately 19:24:45, Officer Bartimoccia asked Plaintiff "Are you in there alone?" but Plaintiff did not answer that question. **[Exhibit 7 at 64:21-65:13; Exhibit 10 at 19:24:45-19:24:51.]**

107. The fact Plaintiff lived alone did not establish that no one else was inside the apartment because Plaintiff could have had visitors or another person present. **[Exhibit 7 at 100:19-22.]**

108. Before Plaintiff was detained, the officers were never able to confirm that there were no other occupants inside the apartment. **[Exhibit 7 at 100:11-18.]**

109. Officer Gitsch, the Crisis Intervention Team-certified officer on scene, was used as the single voice communicating with Plaintiff. **[Exhibit 9 at 53:19-23, 55:7-11.]**

110. Crisis Intervention Team ("CIT") training is designed to de-escalate individuals experiencing mental-health crises and help them receive assistance. CIT-trained officers learn communication techniques for interacting with individuals who may be suicidal or unable to act rationally, developing rapport, and guiding them toward treatment or aid. **[Exhibit 4 at 27:19–23; 28:9–19.]**

111. At approximately 19:25:13, Officer Gitsch told Plaintiff that he did not want to Tase or pepperball him, that the officers did not want to shoot him, and that all they wanted to do was talk, but Plaintiff needed to come out into the hallway. [**Exhibit 10 at 19:25:13.]**

112. At 19:28:01, Plaintiff told officers, "You throw down your shield and I'll throw down my backpack," and when Officer Gitsch responded that the officers would not put down the shield, Plaintiff stated, "Ok, then I'm not throwing down my backpack." **[Exhibit 10 at 19:28:01-19:28:04.]**

113. During this exchange, Officer Beaver observed Plaintiff act as though he was reaching for something in the backpack. **[Exhibit 11 at 38:24-39:5.]**

114. Officer Summerville also recalled Plaintiff having an open backpack and putting his hands into it during the encounter. **[Exhibit 9 at 42:5–19.]**

115. Sgt. Lewis directed Officer Summerville to use the stunbag if there was sufficient separation between Plaintiff and the apartment and the opportunity arose. **[Exhibit 7 at 21:13-22:7.]**

116. Sgt. Lewis also directed Officer Gitsch to follow the stunbag deployment with the Taser to help officers safely detain Plaintiff. Although the Taser was ultimately fired first, Sgt. Lewis explained that the purpose of using both tools was to employ a lower level of force, prevent the encounter from becoming a deadly-force encounter, and permit safe detention. **[Exhibit 7 at 67:1–14.]**

117. Sgt. Lewis gave Officer Gitsch the same direction concerning use of the Taser. **[Exhibit 7 at 22:8-16.]**

118. Sgt. Lewis's purpose in directing the officers to deploy the Taser and stunbag was to employ a lower level of force to prevent the encounter from becoming a deadly-force encounter and allow officers to safely detain Plaintiff. **[Exhibit 7 at 67:10-14.]**

119. Despite Sgt. Lewis's direction to employ less-lethal force, Officer Summerville made his own assessment before deploying the stunbag. **[Exhibit 7 at 21:19-22:7; Exhibit 9 at 15:5-16, 36:15-37:2, 94:13-22.]**

120. Officer Gitsch understood Sgt. Lewis's directive and also made his own an independent assessment before deploying the Taser. **[Exhibit 4 at 33:4-14.]**

121. Plaintiff told officers that he had Blackwater-related training. **[Exhibit 2 at 115:13-25.]**

122. Plaintiff initially stated, "I don't have a knife," and seconds later stated, "Actually, yeah, I do have a knife, you're right." **[Exhibit 2 at 109:16-20; Exhibit 10 at 19:26:40-19:26:44.]**

123. At approximately 19:28:15, Plaintiff told the officers, "You can shoot me." **[Exhibit 10 at 19:28:15.]**

124. Plaintiff stated, "I actually want to be tased just to feel it," but subsequently clarified that he meant being tased at Axon, not by the officers on scene. **[Exhibit 9 at 57:18-58:1; Exhibit 10 at 19:25:20-24.]**

125. At approximately 19:29:04, Plaintiff stated, "I'm actually on your side, but I don't care about dying," and when Officer Gitsch asked why, Plaintiff, sounding as if he were crying, responded, "because I don't have anything to live for." **[Exhibit 10 at 19:29:04-19:29:13.]**

126. At approximately 19:30:12, Plaintiff showed officers the crossbody bag he was wearing and then began removing it over his head. **[Exhibit 4 at 143:5-12; Exhibit 10 at 19:30:12.]**

127. At approximately 19:30:18, Plaintiff threw the crossbody bag away from himself and lifted the front of his shirt. **[Exhibit 4 at 143:15-24.]**

128. Plaintiff lifted the front of his shirt but did not turn around so that the officers could see his rear waistband. **[Exhibit 4 at 208:12-21.]**

129. Officer Gitsch testified that the possibility of a gun concealed at the small of Plaintiff's back remained a concern "throughout the entire contact" until officers handcuffed and searched him. Officer Gitsch also explained that Plaintiff repeatedly ducked behind the entrance alcove and did not remain continuously visible, leaving open the possibility that he

could move a concealed gun between his waistband and a pocket. **[Exhibit 4 at 208:19–209:1; 209:12–20.]**

130. Officer Summerville testified that Plaintiff's display of the front of his waistband did not resolve his concern about a concealed weapon because he could not see behind Plaintiff and had received information that Plaintiff had a gun. When asked whether he was concerned about a weapon concealed at the rear waistband, Officer Summerville answered, "Yes, definitely." **[Exhibit 9 at 47:5–23.]**

131. Shortly before the Taser deployment, Officer Gitsch directed Plaintiff to "come over here," and Plaintiff responded, "Why? So you can fucking tase me?" At approximately 19:30:59, Plaintiff yelled, "I'm fucking fine." **[Exhibit 9 at 51:2–9; Exhibit 4 at 145:25–146:2.]**

132. Although Officer Gitsch believed the officers could legally detain Plaintiff at this point, he did not attempt to physically grab him at that time because Plaintiff was armed and Officer Gitsch did not want to push or escalate the situation. **[Exhibit 4 at 90:7-21.]**

133. Officer Gitsch attempted to de-escalate the encounter by repeatedly asking Plaintiff to come into the hallway and speak with the officers, stating, "Just come out here and talk to us," and explaining, "I agree and we want to try and support you," but that Plaintiff would need to "take a few steps out here." **[Exhibit 10 at 19:24:13, 19:26:08–19:26:19, 19:29:43.]**

134. Conversation can be used to try to de-escalate a situation. **[Exhibit 7 at 58:11-18.]**

135. Officer Gitsch made five attempts to call the telephone number that had been given to him that was supposed to belong to the complainant, Lexus Haskins. **[Exhibit 4 at 102:5-12.]**

136. Officer Gitsch's purpose in trying to get Haskins on the phone was that he wanted additional information that could help him develop rapport with Plaintiff and hopefully persuade Plaintiff to go to UPC voluntarily, as well as to obtain information

concerning the reported gun, other possible weapons, whether anyone else might be inside the apartment, and whether Plaintiff's dog was aggressive. **[Exhibit 4 at 214:7-215:2.]**

137. At approximately 19:30:25, Plaintiff stated, "You guys going shoot me. Go for it. I'll shoot myself in the fucking head. I don't give a fuck," and moved out of view again. Officer Gitsch responded that the officers did not want to shoot him and continued asking him to come over. At approximately 19:30:32, Plaintiff stepped partially back into the hallway. **[Exhibit 10 at 19:30:25–19:30:32.]**

138. Officer Beaver described Plaintiff as extremely upset, alternating between crying and yelling and between anger and sadness. **[Exhibit 11 at 138:12–19; 156:6–10.]**

139. Officer Beaver testified that Plaintiff's agitation fluctuated considerably throughout the encounter but was "ramping up" leading up to when the officers used less-lethal force. **[Exhibit 11 at 138:12–19; 156:6–10.]**

140. Beginning at approximately 19:30:38, Plaintiff became increasingly agitated, asking, "Why, so you can fucking tase me?" and continuing to complain about being embarrassed and about his family. Officer Gitsch continued responding that the officers did not want to do that. **[Exhibit 10 at 19:30:38–19:31:00.]**

141. Officer Gitsch observed Plaintiff becoming increasingly agitated and believed Plaintiff was working himself up to get the courage either to charge the officers, quickly pull something out of his bag, or retreat into the apartment. **[Exhibit 4 at 216:14-21.]**

142. Officer Gitsch did not announce in advance that he was about to deploy the Taser. He stated, "Taser, Taser, Taser," as he deployed it. **[Exhibit 4 at 230:3–8.]**

143. Officer Gitsch testified that he believed an advance warning would have been tactically unsound because Plaintiff had repeatedly ducked behind the entrance alcove and had previously ducked out of view when Officer Gitsch raised the Taser. Officer Gitsch believed Plaintiff knew the Taser was an available option and reacted to avoid being in a position where it could be deployed against him. Officer Gitsch explained that announcing the deployment would give Plaintiff an opportunity to duck behind the alcove again or retreat deeper into the apartment. **[Exhibit 4 at 228:11–229:5.]**

144. Officer Gitsch also believed an advance warning could prompt Plaintiff to charge the officers, draw the knife, or produce a concealed firearm, particularly because he was concerned that Plaintiff was working himself up to provoke a deadly-force encounter. Officer Gitsch testified that his decision to deploy without an advance announcement was intended to prevent that outcome and permit officers to take Plaintiff safely into custody. **[Exhibit 4 at 229:6–230:13.]**

145. At approximately 19:31:12, Officer Gitsch deployed his Taser toward Plaintiff. **[Exhibit 10 at 19:31:12.]**

146. Immediately before the Taser was deployed, the karambit remained around Plaintiff's neck and immediately accessible to Plaintiff. **[Exhibit 4 at 261:22-262:3.]**

147. The Taser deployment did not work; it had no effect on Plaintiff. **[Exhibit 4 at 149:8-12.]**

148. Officer Gitsch deployed a second Taser cartridge. **[Exhibit 4 at 34:4-19; 149:8-17.]**

149. The second Taser deployment produced apparent muscular lockup or neuromuscular effect, and Plaintiff fell. **[Exhibit 4 at 34:4-19; 149:12-17.]**

150. Officer Gitsch deployed two Taser cartridges, releasing four probes in total. Two probes struck Plaintiff, one on the left thigh, and the other on the right wrist, and the other two probes missed him. **[Exhibit 31 at ¶ 6.]**

151. Other than the probe-entry sites which are minor, superficial puncture wounds, the Taser deployments did not cause any injury to Plaintiff. **[Exhibit 31 at ¶ 8.]**

152. The purpose in deploying the Taser was to "immediately render [Plaintiff] incapable of reaching a weapon if he had one" and to safely detain Plaintiff. **[Exhibit 4 at 215:24-216:2.]**

153. By the time he decided to deploy the Taser, Officer Gitsch believed Plaintiff might be working himself up to "possibly provoke suicide by cop by forcing a deadly-force encounter." **[Exhibit 4 at 229:19-230:1.]**

154. Officer Gitsch believed that if Plaintiff made a quick movement toward the bag and reached inside for a weapon, the encounter could turn into a deadly-force encounter, which he was attempting to prevent. **[Exhibit 4 at 216:22-217:8.]**

155. Immediately after Officer Gitsch deployed the Taser, Officer Summerville fired one stunbag round toward Plaintiff's torso. **[Exhibit 9 at 16:9-14.]**

156. The single stunbag round Officer Summerville discharged was aimed at and struck Plaintiff in the abdomen. **[Exhibit 31 at ¶ 12.]**

157. Plaintiff did not suffer any injury from the stunbag other than a bruise. **[Exhibit 31 at ¶ 13.]**

158. Plaintiff "began to fall back and eventually fell to his knees." after which officers moved forward and took Plaintiff into custody. **[Exhibit 4 at 148:7-19; Exhibit 9 at 16:9–18; Exhibit 10 at 19:31:14.]**

159. Officer Summerville testified that his purpose was to defuse the situation and obtain safe custody because Plaintiff was becoming increasingly aggressive at close range and could run at the officers with a knife. **[Exhibit 9 at 16:9-15, 94:13-22.]**

160. Approximately nineteen minutes elapsed between the officers' initial contact with Plaintiff at 19:12:04 and the deployment of force at 19:31:12. **[Exhibit 8 at 19:12:04; Exhibit 10 at 19:31:12.]**

161. Officer Gitsch testified that the ballistic shield was positioned over Plaintiff while Plaintiff was seated and that Officer Gitsch secured Plaintiff's arms as officers handcuffed him. Officer Beaver explained that, after the Taser and stunbag deployments, Plaintiff's weapons remained a concern and officers sought physical control to prevent him from accessing them. **[Exhibit 4 at 169:16–23; Exhibit 11 at 131:4–13.]**

162. When Officer Snyder used the ballistic shield to restrain Plaintiff, officers had not yet ruled out the possibility that the reported firearm was concealed on Plaintiff's body. Officer Gitsch testified that he considered a gun concealed in Plaintiff's rear waistband a possibility throughout the encounter until Plaintiff was handcuffed and searched. **[Exhibit 4 at 208:19–209:1; Exhibit 7 at 98:11–19.]**

163. As Officer Snyder approached Plaintiff with the ballistic shield, Plaintiff's head began to rise and struck the shield, causing a laceration to Plaintiff's head. **[Exhibit 7 at 85:22-86:1.]**

164. Plaintiff admits that the laceration to his head was caused by Officer Snyder's ballistic shield. Plaintiff alleges in his Second Amended Complaint that "[t]he shield caused significant injury to Stephan's head," and Plaintiff testified, "I had my head split open by their shield." **[Dkt. 24, ¶¶ 98, 104; Exhibit 2, at 143:2–6.]**

165. The officers successfully placed Plaintiff in handcuffs. **[Exhibit 9 at 57:4-7.]**

166. At the time force was deployed, the firearm reported in the 911 call remained unaccounted for. **[Exhibit 7 at 114:7-19.]**

167. At approximately 19:37:49, Plaintiff was placed in a patrol vehicle. [**Officer Summerville's BWC Video at 19:37:49, attached as Exhibit 17.**]

168. After officers escorted Plaintiff outside toward the patrol vehicles, Officer Summerville told him that the officers cared about him. Plaintiff responded, "No one cares about me," while appearing to cry. **[Exhibit 17 at 19:34:39–19:34:48.]**

169. While being escorted toward the patrol vehicle, Plaintiff repeatedly stated that the Taser did not hurt, saying, "It didn't fucking hurt at all" and "Yeah, it didn't hurt." **[Exhibit 17 at 19:34:20–19:34:38.]**

170. As Plaintiff was being taken into custody, the karambit knife was still hanging from the lanyard around his neck. **[Exhibit 11 at 48:4-8.]**

171. When Plaintiff was taken into custody, officers confiscated the karambit knife and found a second knife in Plaintff's pocket. **[Exhibit 7 at 97:5-12; Exhibit 11 at 48:4-8.]**

172. After being placed in the patrol vehicle, Plaintiff intentionally banged his head against the open vehicle door several times before an officer intervened to stop him from continuing to do that. **[Officer Rezac's BWC Video (COP 000046) at 19:39:39, attached as Exhibit 25.]**

173. After Plaintiff was taken into custody, Officer Bartimoccia located a black handgun in a bedroom being used as an office, which upon close inspection, she believed was an airsoft gun. **[Exhibit 11 at 48:21-25.]**

174. Officer Beaver subsequently examined the gun and observed original blue coloring beneath its black exterior. **[Declaration of Officer Alex Beaver at ¶ 4, attached as Exhibit 30.]**

175. The airsoft gun resembled a real Beretta M9 pistol. **[Exhibit 6 at COP 000152; Exhibit 30 at ¶ 4; Photographs of Airsoft Gun at COP 000103-000104, attached as Exhibit 29.]**

176. In his deposition Plaintiff acknowledged that the fake gun shown in the photograph he sent his sister was designed to look like a real weapon and that his sister did not know it was used for training. **[Exhibit 2 at 81:9–25.]**

177. Officer Beaver later compared the gun depicted in the photograph Plaintiff sent Haskins with the gun found in the apartment and determined that they matched. **[Exhibit 30 at ¶ 6.]**

178. Plaintiff acknowledges that the fake gun, which he referred to as a training gun and testified was used for training, was designed to look somewhat like a real weapon. **[Exhibit 2 at 81:14-21.]**

179. Plaintiff testified that Haskins did not know the gun was fake. **[Exhibit 2 at 81:22-25.]**

180. Between the time Plaintiff sent Haskins the photograph and the time police arrived, Plaintiff did not tell Haskins that he was not thinking about harming himself. **[Exhibit 2 at 83:22-84:4.]**

181. When an officer asked Haskins on the night of the incident whether she thought Plaintiff was going to shoot himself, Haskins answered yes. **[Exhibit 5 at 76:23-78:23; Exhibit 8 at 20:15:27.]**

182. Phoenix Fire Department personnel evaluated Plaintiff at the scene. [**Exhibit 18** at COP 001237-001239.]

183. Phoenix Fire Department personnel documented a head laceration with controlled bleeding. **[Exhibit 18 at COP 001237-001239.]**

184. Phoenix Fire Department personnel transported Plaintiff by ambulance to Mayo Hospital for further evaluation. **[Exhibit 18 at COP 001237-001239.]**

185. Plaintiff was booked into the Maricopa County Jail on seven counts of aggravated assault. **[Exhibit 4 at 107:3-10; 262:4-13.]**

186. The aggravated-assault bookings were based on the officers' perception that Plaintiff's statement "Watch this," followed by the dog coming toward the officers, was intended to place the officers in reasonable apprehension of imminent physical injury. **[Exhibit 4 at 107:11-20; 191:4-17.]**

187. During the encounter, other people passed through the hallway, and residents came out of their apartments to see what was happening. Officers directed residents to return inside, and Officer Summerville observed a woman who appeared upset by Plaintiff's loud yelling and screaming. **[Exhibit 4 at 205:2–6; Exhibit 9 at 85:1–14.]**

188. Sgt. Lewis testified that the hallway was so loud that, from his position toward the back, he did not hear Plaintiff calling his dog back. **[Exhibit 7 at 52:25–53:1.]**

189. Officer Gitsch believed probable cause existed to arrest Plaintiff for disorderly conduct. He identified Plaintiff's unreasonable noise and seriously disruptive behavior in the apartment complex, explaining that other residents were passing through the hallway and the officers had to redirect them away from the area. **[Exhibit 4 at 202:9–13; 204:14–205:25; 206:1–3.]**

190. Officer Summerville identified Plaintiff's increasingly loud yelling and screaming, and the resulting disturbance to nearby residents, as disorderly conduct involving unreasonable noise. **[Exhibit 9 at 84:23–85:14; 94:2–12.]**

191. Officer Summerville also testified that, in addition to aggravated assault, he believed Plaintiff's conduct constituted interference with governmental operations. **[Exhibit 9 at 65:19–25; 84:23–85:4.]**

192. Sgt. Lewis believed probable cause existed to arrest Plaintiff for disorderly conduct. He explained that Plaintiff's shouting had begun disrupting the apartment community, residents were coming out to investigate, and the incident and resulting police presence restricted residents' ability to pass through the hallway and freely access or leave their apartments. **[Exhibit 7 at 105:11–20; 106:2–13.]**

193. Wallentine opined that under these conditions, an armed, non-compliant subject presents a substantially elevated risk to the officers and to bystanders and residents of nearby apartments, compared to an encounter occurring in an open or more controlled environment. **[Exhibit 12 at COP 000169, ¶ 14.]**

194. Officer Gitsch believed probable cause existed to arrest Plaintiff for obstructing, resisting, or opposing police under Phoenix City Code § 23-18 and for obstructing governmental operations under A.R.S. § 13-2402 based on Plaintiff's prevention of contact and detention for urgent psychiatric care, the visible knife, the reported firearm that remained unaccounted for, and Plaintiff's release of the pit bull toward the officers. **[Exhibit 4 at 200:17–201:12; 206:12–16.]**

195. Officer Summerville testified that the initial information about a gun, which officers had not located during the encounter, continued to inform his assessment of the situation. Although he had not personally seen the photograph sent to Plaintiff's sister, he understood that a gun was potentially involved and explained that this information heightened his response because the encounter was not a "regular run-of-the-mill call." **[Exhibit 9 at 75:21–24; 81:2–16; 91:16–21.]**

196. Officer Gitsch was also concerned that Plaintiff could fire the reported gun inside the apartment and injure or kill another occupant of the building. Officer Gitsch explained that a bullet could pass through the apartment door, walls, or floor and that Plaintiff had multiple neighbors. **[Exhibit 4 at 217:9–16; 218:3–6, 21–24.]**

197. The unknown location of the reported firearm, Plaintiff's visible knife, the unknown contents of the backpack, and the confined hallway contributed to the risk and

unpredictability of the encounter and supported the deployment of additional resources and preparation for using less-lethal options. **[Exhibit 12 at COP 000186.]**_

198. Officer Summerville did not give Plaintiff a warning before firing the stunbag and did not recall another officer giving a warning before that deployment. **[Exhibit 9 at 58:17–22.]**

199. The objective of getting Plaintiff safely into custody so he could receive assistance for his mental-health condition played a role in Officer Summerville's decision to use force. **[Exhibit 9 at 94:9-95:3.]**

200. Officer Summerville testified that, before the stunbag deployment, Plaintiff was yelling and screaming and becoming progressively louder and more aggressive. Given the officers' close proximity to Plaintiff, Officer Summerville was concerned that Plaintiff could run at them with a knife. **[Exhibit 9 at 85:11–14; 94:10–21.]**

201. Sgt. Lewis testified that the reported firearm, visible karambit, and Plaintiff's conduct made it unsafe for officers to approach and attempt to detain him. Sgt. Lewis directed the use of the Taser and stunbag for both Plaintiff's safety and officer safety, explaining that the encounter had been escalating and that he wanted to prevent it from developing into a deadly-force situation. **[Exhibit 7 at 94:1–95:8.]**

202. Officer Summerville believed the force used would diffuse the situation and allow officers to safely take Plaintiff into custody without it turning into a deadly force encounter. **[Exhibit 9 at 94:21-24.]**

203. Officer Gitsch graduated from the Arizona Regional Police Academy in February 2001 and continuously held an active Arizona POST certification, including at the time of the October 4, 2022 incident. **[Exhibit 4 at 11:8-21; Exhibit 12 at COP 000183, ¶¶ 1-2; Relevant Portions of Officer Gitsch's Training Transcript and Records at COP 000115, 000117, 000120-121, 000139, 001355, 0001360-1361, attached as Exhibit 22.]**

204. At the time of the incident, Officer Gitsch was CIT-certified and had completed CIT training twice. **[Exhibit 4 at 27:24-28:8; Exhibit 12 at COP 000183, ¶ 2; Crisis Intervention Team Training Roster May 2008 at COP 005580, attached as Exhibit 20.]**

205. Officer Gitsch was part of the initial group of Phoenix police officers to receive CIT training in 2008. **[Exhibit 4 at 27:24-28:8.]**

206. The CIT training, is five full days in length. Each training consists of an introduction of the CIT Program, various speakers on relevant topics, such as de-escalation techniques for first responders and dealing with people with developmental disabilities, psychiatric disorders and PTSD. Each training also includes mini role play sessions and a petition training exercise for Applications for Emergency Admission for Evaluation for people believed to have a mental disorder and are dangers to themselves or others. The CIT training also includes various PowerPoint presentations. **[Exhibit 4 at 27:15–28:23, 29:14-24, 31:17-23; Declaration of Sabrina Taylor, Crisis Intervention Team Training Coordinator at ¶ 5, attached as Exhibit 21.]**

207. Officer Gitsch's initial CIT training was by his request and he later completed the CIT course a second time as a refresher after being encouraged to attend by the officer who started Phoenix's CIT program. **[Exhibit 4 at 31:10-23.]**

208. Officer Gitsch describes the CIT he attended as training for interacting with people in mental crisis, including persons who may be unable to act rationally or may be suicidal and provides officers with methods for speaking with persons in crisis, developing rapport, and leading them toward treatment or aid. **[Exhibit 4 at 28:9-13.]**

209. Officer Gitsch's training records also reflect a three-hour mandatory Crisis Support Training, a 3.5-hour Mental Illness module, a 1.5-hour Health and Wellness module, a three-hour Crisis Communication module, a separate two-hour Crisis Communication module, and a PTSD-related module. **[Exhibit 4 at 55:19-57:12; Exhibit 22 at COP 000116-000119, 000127, 000136-000137, 001353, 001356-001357, 001360-001361.]**

210. The May 2008 CIT training was intended to provide officers with knowledge and skills to better navigate the mental-health system, including training concerning mental illness, available mental-health resources, and responding to individuals who may be in crisis because of mental illness. **[Exhibit 20 at COP 005216-005217.]**

211. At the time of the incident, Officer Gitsch was Taser-certified, had completed basic shotgun and stunbag training, and had completed stunbag shotgun recertification as recently as April 2022. **[Exhibit 4 at 11:8-15; Exhibit 22 at COP 000116, 120, 127, 131, 137-139, 1115-1121.]**

212. Officer Summerville graduated from the Phoenix Police Academy in March 2020 and continuously held an active Arizona POST certification, including at the time of the October 4, 2022 incident. **[Exhibit 12 at COP 000183-000184, ¶¶ 1-5.]**

213. Officer Summerville had received training on the use of the stunbag shotgun and had completed stunbag shotgun recertification as recently as April 2022. **[Exhibit 9 at 15:5-23; Relevant Portions of Officer Summerville's Training Transcript and Records at COP 000141, 000150, attached as Exhibit 23; Training Materials at COP 001381, attached as Exhibit 24.]**

214. The stunbag shotgun recertification course instructs officers to target the arms below the elbow, lower abdomen, buttocks, or legs as the primary target areas. **[Exhibit 24 at COP 003406.]**

215. Before the October 4, 2022 incident, Officer Summerville had responded to 901X suicide-related calls on multiple occasions . **[Exhibit 9 at 31:5-12.]**

216. Officer Summerville's goal when responding to a 901X call, is "to preserve life" and to get the person the necessary help. **[Exhibit 9 at 35:12-36:9.]**

217. Officers receive at least 40 hours of continuing law-enforcement training each year. **[Exhibit 7 at 14:16-24.]**

218. By 2022, Sgt. Lewis had received computer-based and in-person training concerning how to handle or deal with mental-health situations. **[Exhibit 7 at 15:1-17.]**

219. Phoenix police officers receive constitutional-law training at the academy and updated constitutional-law training afterward, perhaps once or twice a year through department trainings. **[Exhibit 4 at 186:4-23; Exhibit 9 at 16:19-17:6; Exhibit 24 at COP 003861-3879, 003886-003897.]**

220. Defendants' police-practices expert Wallentine, opined that the Phoenix Police Department properly trained Officers Gitsch and Summerville and could reasonably rely on their active Arizona POST certifications as indicating that they had completed basic peace-officer training and satisfied Arizona POST standards. [**Exhibit 12** at COP 000183-000185, ¶¶ 1-6.]

221. Relying exclusively on the Taser to detain Plaintiff and prevent access to a weapon would have been inconsistent with police training because Taser deployments can fail or be only partially effective, as demonstrated by the ineffective first deployment here. Coordinated use of multiple less-lethal tools in rapid succession is consistent with accepted training when an initial option is ineffective or unreliable and the subject presents an ongoing threat. Officer Summerville's stunbag deployment complemented the other less-lethal options as part of a coordinated effort to disrupt Plaintiff's actions and permit safe detention. **[Exhibit 12 at COP 000179–000181, ¶¶ 8-11.]**

222. On October 4, 2022, Phoenix Police Department Operations Order 1.5, Response to Resistance, governed the use of force and specifically addressed de-escalation, Taser use, and stunbag shotgun use. **[Exhibit 13, Operations Order 1.5, Response to Resistance.]**

223. Operations Order 1.5 in effect on October 4, 2022 required employees to assess whether de-escalation was possible and, if so, to employ appropriate tactics, including verbal and less-lethal tools, to reduce the potential need to use force or the level of force needed. **[Exhibit 13 at COP 001290.]**

224. Operations Order 1.5 in effect on October 4, 2022 identified communication and the use of time and distance as de-escalation techniques and directed employees, when practical, to collect information, assess risks, request resources, and coordinate a response. **[Exhibit 13 at COP 001291.]**

225. Operations Order 1.5 in effect on October 4, 2022 contains a section entitled "De-Escalation/Escalation Strategies" that reads as follows:

| | |
|---|---|
| | • Deadly Physical Force |
| **H. De-Escalation/ Escalation Strategies** | De-escalation is defined as an employee/s intent to resolve an incident as safely as possible to protect the public and all persons involved by reducing the danger through the use of tactics, techniques, and force options.<br><br>**NOTE**: This can include communicating with subjects and utilizing time and distance to increase the possibility of reducing or eliminating the need for force.<br><br>• Employees will assess situations to determine if de-escalation is possible, and if so, employ appropriate de-escalation tactics to reduce the potential need to use force or to reduce the level of force needed.<br><br>* If force is necessary, employees will assess each incident to determine, based on policy, training, and experience, which response to resistance option will de-escalate the situation, bring the situation under control, and reduce the probability of harm or injury to any involved persons.<br>* When practical, employees will collect information about the incident, assess risks, request resources, and coordinate a response.<br>* It is acceptable and prudent to use elevated tone and intense language that is not personalized to the individual, but rather a tactic to be used to enhance the de-escalation process.<br>* When tactically sound, employees may relocate to a position of advantage that offers cover or allows for greater distance to consider other force options.<br><br>• With de-escalation strategies, there are three possible resolutions, and, in each case, the scene has been de-escalated if the subject no longer poses a danger to the public, innocent persons, and employees.<br><br>* The subject submits and elects to be taken into custody.<br>* Some form of coercion, including verbal negotiations and less-lethal force, is used and the subject submits or can safely be taken into custody, decreasing the need for further force applications.<br>* The situation has been escalated by the subject's actions to the point of extreme violence, likely to result in death or serious physical injury of innocent persons/employees to the point that lethal force must be used to de-escalate the situation. |

**[Exhibit 13 at COP 001291.]**

226. Operations Order 1.5 in effect on October 43, 2022 contains a section entitled "Conducted Electrical Weapon (CEW)" that reads as follows:

4. G. Conducted Electrical Weapon (CEW) - Use is considered a less-lethal tactic.

| | |
|---|---|
| **(1) Guidelines For Use** | • CEWs may be used in situations where distance is necessary to maintain officer safety and the use of CEWs is a reasonable response to resistance, non-compliance, or dangerous/threatening behavior.<br>• The totality of the circumstances, not just the incident at the time, will be considered when deciding to utilize this system.<br>• When the circumstances justifying the use of a CEW no longer exist, the CEW will immediately be discontinued.<br>• CEWs will not be used for any of the following:<br>* Coercion or intimidation<br>**NOTE**: A warning Arc combined with the proper verbal warning may be used in situations that would likely result in a justified deployment of the CEW.<br>* Against a subject who would be in danger of falling from a significant height<br>* When subjects are near flammable liquids and gases<br>• If it is determined an extended cycle is necessary to control a combative suspect, explain the circumstances regarding the decision in the IR.<br>• Only apply the number of cycles reasonably necessary to safely approach the restrain the subject.<br>Non-Target Areas<br>• Head, neck, female breast, and groin<br>Probe Deployment Ranges for Patrol<br>• Maximum range 25 feet<br>• Close quarter cartridge preferred range 4-8 feet<br>• Stand Off cartridge preferred range 11-22 feet |

**[Exhibit 13 at COP 001295.]**

227. A Taser is considered a CEW. Operations Order 1.5(2)(G) identified the head, neck, female breast, and groin as non-target areas for conducted electrical weapons. The thigh and wrist, where the Taser probes landed on Plaintiff, were not among those non-target areas. **[Exhibit 31 at ¶ 9.]**

228. Operations Order 1.5 in effect on October 4, 2022 classified a stunbag shotgun as an Intermediate Control Technique and states as follows:

| | |
|---|---|
| **(5) Direct Impact Munitions** | This policy applies to the following impact munition launchers:<br>* Stunbag Shotgun<br>* 40MM Launcher<br>* PepperBall Launcher (Impact Strikes)<br>* 37MM (TSB approved only)<br><br>* Direct Impact Munitions may be used in situations ranging from passive resistance to aggravated aggression; where distance is necessary to maintain officer safety and the use of a Direct Impact Munition is a reasonable response to resistance, non-compliance, or dangerous/threatening behavior:<br>* The totality of the circumstances, not just the incident at the time, will be considered when deciding to utilize this system.<br><br>• They are not intended to resolve phase two barricades, but rather can be used to alter environments (vehicles/structures) to enhance officer safety, public safety, and improve tactical advantage<br>• When practical, prior to direct munitions usage in phase one barricade situations, the shift commander will consult with a TSB supervisor to ensure best plan of action.<br>• The utilization of direct impact munitions is in compliance with the departments de-escalation policies and standards. (section 1.5.2.H of this order) |

4. H. Intermediate Control Techniques (Continued)

| | |
|---|---|
| **(5) Direct Impact Munitions** (continued) | Target Areas<br>• Arms • Buttocks<br>• Lower abdomen • Legs<br>• Back, excluding the spinal cord area from the base of the skull to the tailbone<br><br>Non-target Areas<br>• Head • Chest<br>• Spine • Neck<br><br>**NOTE**: Shots to non-target areas can result in fatal or serious injury.<br><br>Considerations<br>• Stunbag rounds should not be fired through mediums, such as glass or chain link fences, because the bag may tear, and lead shot may be released.<br>• Optimal ranges for:<br>* Stunbag shotgun has no minimum distance with an effective range between five (5) feet and 20 yards.<br>* 40MM has no minimum distance, with an effective range of 5 yards up to 50 yards.<br>* PepperBall has no minimum distance, with an effective range of 2 yards up to 16 yards.<br><br>Additional Information<br>• For specific guidelines reference the stunbag shotgun, refer to Operations Order 4.25, Firearms Regulations.<br>• For specific guidelines reference the 37mm direct impact munitions, refer to the TSB manual. |

**[Exhibit 13 at COP 001295-0001297.]**

229. Operations Order 1.5 in effect on October 4, 2022 classified Taser use as a less-lethal tactic and permitted its use when distance was necessary for officer safety and the Taser was a reasonable response to resistance, non-compliance, or dangerous or threatening behavior, based on the totality of the circumstances. **[Exhibit 13 at COP 001295; Exhibit 31 at ¶ 9, 11.]**

230. Operations Order 1.5 in effect on October 4, 2022 permitted direct-impact munitions, including stunbag shotguns, in circumstances ranging from passive resistance to aggravated aggression when distance was necessary for officer safety and their use was a reasonable response to resistance, non-compliance, or dangerous or threatening behavior. **[<u>Exhibit 13</u> at COP 001296.]**

231. Operations Order 1.5 in effect on October 4, 2022 identified the head, neck, female breast, and groin as non-target areas for conducted electrical weapons (Taser). The policy prohibited using those weapons for coercion or intimidation, against a subject in danger of falling from a significant height, or when subjects were near flammable liquids or gases. **[<u>Exhibit 13</u> at COP 001295.]**

232. Operations Order 1.5 in effect on October 4, 2022 specified a maximum patrol probe-deployment range of 25 feet, a preferred range of four to eight feet for close-quarter cartridges, and a preferred range of 11 to 22 feet for stand-off cartridges. **[<u>Exhibit 13</u> at COP 001295.]**

233. Operations Order 1.5 in effect on October 4, 2022 classified the stunbag shotgun as an intermediate control technique that may result in injury. The policy directed officers to consider the totality of the circumstances when deciding whether to use direct-impact munitions, including a stunbag shotgun. **[<u>Exhibit 13</u> at COP 001295–001296.]**

234. Operations Order 1.5 in effect on October 4, 2022 designated the head, spine, chest, and neck as non-target areas. **[<u>Exhibit 13</u> at COP 001297; [<u>Exhibit 31</u> at ¶ 12.]**

235. Operations Order 1.5 in effect on October 4, 2022 specified that the stunbag shotgun had no minimum deployment distance and an effective range between five feet and 20 yards. It instructed officers not to fire stunbag rounds through materials such as glass or chain-link fences because the bag could tear and release lead shot. **[<u>Exhibit 13</u> at COP 001297.]**

236. On October 4, 2022, Phoenix Police Department Operations Order 4.15, Individuals with Mental or Physical Disabilities, governed interactions with persons in a

behavioral or mental-health crisis. **[Operations Order 4.15, Individuals with Mental or Physical Disabilities at COP 001311-001318, attached as Exhibit 14.]**

237. Operations Order 4.15 identified signs that a person may have a mental illness, including feelings of intense depression or anxiety, thoughts of suicide, and disorganized thoughts and speech, and instructed officers to be aware that persons with mental illness may be a danger to themselves or others. **[Exhibit 14 at COP 001311.]**

238. Operations Order 4.15 provided that a CIT officer may be requested when patrol officers are on a call involving a person who appears to be in crisis because of mental illness. **[Exhibit 14 at COP 001311.]**

239. Operations Order 4.15 provided that when a person was a danger to himself or another and the appropriate disposition was treatment, officers should detain the person for involuntary treatment pursuant to A.R.S. § 36-525. **[Exhibit 14 at COP 001312.]**

240. By contrast, where a person was not a danger to himself or another but transport was inappropriate, Operations Order 4.15 encouraged officers to contact the Maricopa Crisis Line and a mobile crisis team could assist only if the situation was not dangerous and the person would voluntarily speak with the mobile team. **[Exhibit 14 at COP 001312-001313.**

241. While Operations Order 4.15 in effect on October 4, 2022 generally prioritized treatment over charges for minor, non-domestic-violence crimes, it also directed officers to assess the totality of the circumstances, including the community's best interests, and exercise their judgment in selecting the appropriate disposition: arrest and booking or, with supervisory approval, transport to a treatment facility. **[Exhibit 14 at COP 001311.]**

242. In fact, Operations Order 4.15 directed officers to proceed with arrest and booking when that was the appropriate disposition for a minor crime or when a more serious crime or domestic-violence crime had occurred. The policy explained that violent offenders should not escape criminal punishment or be transported to a facility where they could further victimize patients and staff. **[Exhibit 14 COP 001312.]**

243. Sgt. Lewis testified that individuals booked into jail undergo a screening questionnaire addressing mental health and that the Maricopa County Sheriff's Office has

mental-health professionals on staff, so he expected Plaintiff to receive the mental-health services he needed after booking. **[Exhibit 7 at 88:15–22.]**

244. Officer Gitsch testified that arrestees undergo psychiatric assessment and, based on his CIT training, he understood that psychiatric care is available to individuals in custody. **[Exhibit 4 at 207:3–9, 233:21–234:4.]**

245. Officer Summerville testified that the jail provides mental-health services and that he was satisfied Plaintiff would receive the assessment and care he needed there. **[Exhibit 9 at 94:22–95:3.]**

246. Because mobile crisis responders are unarmed, they cannot enter a scene until it is a "Code 4," meaning the subject can no longer harm himself or others and the scene has been secured. **[Exhibit 4 at 84:11-25.]**

247. Here, Plaintiff was armed with a dangerous knife and potentially armed with a gun and remained capable of harming himself and others, therefore, the mobile crisis team could not respond to the scene and provide mental-health assistance until the scene had been secured. **[Exhibit 4 at 84:11-25; Exhibit 11 at 18:2-20.]**

248. Sergeant Lewis would not have contacted an in-person crisis team under the circumstances because Plaintiff was armed and the scene unsafe for non-law-enforcement crisis personnel. **[Exhibit 7 at 63:1-21.]**

249. In an armed mental-health crisis, Sergeant Lewis would instead utilize a CIT-certified officer which they had there. **[Exhibit 7 at 63:1-21.]**

250. A non-sworn crisis intervention team would not have entered the apartment hallway because of the potential for violence and the presence of weapons. **[Exhibit 7 at 96:14-24.]**

251. Operations Order 4.15 in effect on October 4, 2022 provided that mobile crisis teams could assist only when the situation was not dangerous and the person would voluntarily speak with the mobile team. **[Exhibit 14 at COP 001313.]**

252. Former Interim Chief Sullivan was not present during the October 4, 2022 incident. **[Exhibit 1 at ¶ 7.]**

253. Former Interim Chief Sullivan commenced employment with the City of Phoenix Police Department twenty-two days prior to this incident. **[Exhibit 1 at ¶ 2.]**

254. At the time of the October 4, 2022 incident, the Phoenix Police Department employed approximately 2,600 sworn officers. **[Exhibit 1 at ¶ 3.]**

255. The Phoenix Police Department's sworn rank structure, in ascending order, consisted of police officer, including patrol officers and detectives; sergeant; lieutenant; commander; assistant chief; executive assistant chief; and chief of police. **[Exhibit 1 at ¶ 4.]**

256. Within the Department's patrol chain of command, sergeants directly supervised patrol officers, and lieutenants supervised sergeants and their squads. The chief exercised department-wide oversight through intervening supervisory and command levels and did not serve as the direct, day-to-day supervisor of patrol officers or patrol sergeants. **[Exhibit 1 at ¶ 5.]**

257. On May 21, 2025, the United States Department of Justice withdrew in its entirety its June 13, 2024 report with respect to the City of Phoenix and the Phoenix Police Department. **[Exhibit 15 at COP 003318.]**

258. In its May 21, 2025 withdrawal notice, DOJ stated that "[t]he current Justice Department does not have faith in the previously reported findings in this case" and withdrew the June 13, 2024 findings report in its entirety. **[Exhibit 15 at COP 003318.]**

DATED this 1st day of October, 2026.

BERKE LAW FIRM, PLLC

By *s/Lori V. Berke*
Lori V. Berke
Anelisa Benavides

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Robert T. Mills
Sean Anthony Woods
Mills & Woods Law PLLC
5055 N. 12th Street, Suite 101
Phoenix, Arizona 85014
rmills@millsandwoods.com
swoods@millsandwoods.com

*Attorneys for Plaintiff*

*s/Anelisa Benavides*