Lori V. Berke (#015628)
Anelisa Benavides (#036446)
**BERKE LAW FIRM, PLLC**
1601 N. 7th Street, Suite 360
Phoenix, AZ 85006
Phone: (602) 254-8800
Fax: (602) 254-8808
lori@berkelawfirm.com
anelisa@berkelawfirm.com

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Stephan Shere,<br><br>Plaintiff,<br><br>vs.<br><br>City of Phoenix, et al.,<br><br>Defendants. | Case No. 2:23-CV-02657-PHX-JJT (ESW)<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Fed. R. Civ. P. 56, Defendants City of Phoenix, Michael Sullivan, Christopher A. Gitsch and Eric Elliott Summerville (collectively "Defendants"), through undersigned counsel, move for summary judgment on all of Plaintiff's remaining claims. This Motion is supported by the following Memorandum of Points and Authorities and Defendants' Statement of Facts in Support of their Motion for Summary Judgment, filed concurrently herewith.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION.

This case arises from a nineteen-minute police encounter in a confined apartment hallway with an intoxicated, suicidal, armed, and noncompliant subject who had sent his sister a photograph and video of himself with what appeared to be a handgun in his mouth.

Officers responding to this Priority 1 suicide call encountered Plaintiff Stephan Shere (hereinafter "Plaintiff") partially concealed behind his apartment door, wearing tactical-style clothing, with a deadly karambit knife around his neck, one hand hidden from view, and a pit bull behind him. Despite the officers' sustained de-escalation efforts, including repeated statements that they wanted only to help and talk, Plaintiff cursed at officers, refused commands, expressed indifference to dying, stated he would "shoot [him]self in the fucking head," released his pit bull into the hallway after saying "watch this," and continued agitated, noncompliant conduct in the hallway of the apartment complex. Officers ultimately deployed layered less-lethal force, deploying a Taser and a single stunbag round, to end a volatile encounter before it escalated into a deadly-force confrontation. The apparent handgun was only later discovered to be an airsoft gun that had been painted black to resemble a real gun.

## II. FACTS.

### A. Claims.

The claims remaining in this case after the Court's ruling on Defendants' Motion to Dismiss are: (1) Count I – a Fourth Amendment Excessive Force claim against Phoenix Police Officer Gitsch and Phoenix Police Officer Summerville, brought pursuant to 42 U.S.C. § 1983; (2) Count II – a 42 U.S.C. § 1983 *Monell* claim against the City of Phoenix and former Interim Phoenix Chief of Police Sullivan alleging failure to train in de-escalation techniques and the use of non-lethal force; (3) Count IV – a Gross Negligence claim against the City of Phoenix and former Interim Chief Sullivan; and (4) Count V – a Negligent Hiring, Supervision, Retention, and/or Training claim against the City of Phoenix and former Interim Chief Sullivan brought pursuant to Arizona law. (SOF ¶ 11.)

### B. Background.

Prior to the October 4, 2022 incident that is the subject of this lawsuit, Plaintiff was diagnosed with manic depression (diagnosis later changed to major depressive disorder) and post-traumatic stress disorder ("PTSD") and had engaged in self-harm on multiple occasions, including suicide attempts. (SOF ¶¶ 12-16.) Plaintiff was experiencing panic attacks

approximately three times per week, and on October 4, 2022, Plaintiff experienced panic attacks throughout the day, took lorazepam at least three times, and consumed approximately half a bottle of whisky. (SOF ¶¶ 15, 18, 20.) Plaintiff had also ingested marijuana and was "[p]robably" high at the time of the subject incident. (SOF ¶ 20.)

**C. The October 4, 2022 Incident – Pre-Arrival Events.**

On October 4, 2022, at approximately 18:58:18, Plaintiff's half-sister, Lexus Haskins (hereinafter "Haskins"), called 911 to report that Plaintiff was threatening to commit suicide, and that he had texted her a photograph with a gun in his mouth. (SOF ¶ 19.) Plaintiff also sent Haskins a video showing him putting the gun in his mouth and depressing the trigger, and a separate text that Haskins interpreted as expressing a desire to die that night. (SOF ¶¶ 21, 24–25.) Haskins thought Plaintiff was going to shoot himself that night. (SOF ¶ 181.)

Haskins' 911 call was classified as a Priority 1 suicide call. (SOF ¶ 26.) The dispatcher advised responding officers that Plaintiff was threatening suicide, had sent his sister a photograph of himself with a gun in his mouth, that the gun appeared to be a handgun, and that Plaintiff's accompanying text stated, "you'll be better off without me." (SOF ¶ 28.) Dispatch information further noted that the subject had threatened suicide before but had never attempted it. (SOF ¶ 29.)

Phoenix Police Officers Gitsch and Beaver were the first officers to arrive on scene. (SOF ¶ 31.) Additional responding officers included Brittany Bartimoccia, Eric Summerville, and Daniel Snyder, as well as Sgt. Jacob Lewis (hereinafter "Sgt. Lewis"). (SOF ¶ 55.) Before contacting Plaintiff, Officer Gitsch and Officer Summerville had received information that Plaintiff had sent his sister a photograph showing a gun in his mouth with a message indicating suicidal intent. (SOF ¶¶ 30, 53.)

**D. Initial Contact with Plaintiff.**

Officers Gitsch and Beaver arrived at Plaintiff's apartment at approximately 19:12:04, and Officer Gitsch knocked, stepped back, and drew his Taser while Officer Beaver had his firearm drawn. (SOF ¶¶ 32–34.) The officers heard a dog barking inside the apartment as the door handle jiggled up and down as if someone was attempting to open the door.

(SOF ¶ 34-35.) A few moments later, Plaintiff opened the door only four to six inches and stood partially concealed behind it with his left hand out of view. (SOF ¶¶ 35, 37.) He wore black clothing, black gloves, a helmet, and what appeared to be a tactical-style vest, with a karambit knife hanging around his neck. (SOF ¶ 36.) A karambit knife is a handheld dagger-type knife with a deeply inwardly curved sharp blade, typically paired with a finger ring, that is intended for close-quarter fighting and is particularly effective at slashing, stabbing, and hooking flesh. (SOF ¶ 40.) Given the reported firearm, Officer Gitsch believed Plaintiff could be holding the gun in his concealed hand, and the officers considered the visible karambit knife readily accessible and capable of causing serious injury or death. (SOF ¶¶ 38–42.)

When Officer Gitsch asked whether Plaintiff was thinking about hurting himself, Plaintiff initially answered, "Doesn't matter. Go away," before stating, "Actually, I better say no, I'm not thinking about hurting myself." (SOF ¶ 43.) When asked again, Plaintiff twice answered, "Doesn't matter," and said the answer would not change. (SOF ¶ 44.) Officer Gitsch repeatedly told Plaintiff that the officers wanted to help him, including stating, "If you want help, we can give you help." (SOF ¶ 45.) Plaintiff closed the apartment door at approximately 19:14:58, and Officer Gitsch remained in the hallway while awaiting additional officers. (SOF ¶¶ 47–48.) Officer Gitsch did not attempt to physically grab Plaintiff because he was armed and Officer Gitsch did not want to escalate the situation. (SOF ¶ 132.) Plaintiff closed the apartment door at approximately 19:14:58 remaining inside the apartment, and the officers remained outside the apartment while additional personnel responded. (SOF ¶¶ 47–48.)

### E. <u>Extended De-Escalation Efforts.</u>

Sgt. Lewis served as scene supervisor and retrieved a ballistic shield and arranged for a stunbag launcher so that multiple layers of less-lethal force would be available. (SOF ¶¶ 56–58.) As scene supervisor, Sgt. Lewis was responsible for making tactical decisions, including decisions concerning available force options. (SOF ¶ 57.) Officer Gitsch was certified in Crisis Intervention Team ("CIT") training and served as the single voice

communicating with Plaintiff. (SOF ¶¶ 109, 204.) CIT training is designed to de-escalate individuals experiencing mental-health crises and help them receive assistance. CIT-trained officers learn communication techniques for interacting with individuals who may be suicidal or unable to act rationally, developing rapport, and guiding them toward treatment or aid. (SOF ¶ 110.) Officer Gitsch attempted to de-escalate the situation by repeatedly asking Plaintiff to come into the hallway and speak with the officers, stating, "Just come out here and talk to us," and explaining, "I agree and we want to try and support you," but that Plaintiff would need to "take a few steps out here." (SOF ¶ 133.)

Officer Gitsch also made five attempts to call the telephone number that had been given to him that was supposed to belong to Haskins, to seek information that could assist communication and clarify the reported firearm, other weapons, possible occupants of the apartment, and the dog's aggressiveness. (SOF ¶¶ 136–136.) Officer Bartimoccia directly asked Plaintiff whether he was alone, but Plaintiff did not answer. (SOF ¶ 106.) The officers were never able to confirm whether anyone else was inside the apartment until after Plaintiff had been detained. (SOF ¶ 108.)

**F. <u>Plaintiff's Exit from Apartment, Release of Dog and Officers' Response.</u>**

At approximately 19:23:52, Plaintiff reappeared partially in the hallway holding an open backpack whose contents the officers could not see. (SOF ¶¶ 63, 69.) In addition to the backpack, Plaintiff wore a crossbody bag. (SOF ¶ 65.) Officer Gitsch was concerned that the reported gun could be inside the backpack and could be fired without being removed from the bag, particularly given the approximately twelve-foot distance between Plaintiff and the officers. (SOF ¶¶ 70–71.) After the officers directed Plaintiff to come into the hallway to speak with them, Plaintiff moved out of their sight while Officer Gitsch had his Taser raised and aimed at him. (SOF ¶ 64.) Seconds later, Plaintiff said, "Watch this," and his pit bull emerged from the apartment and proceeded toward the officers. (SOF ¶¶ 79-80.) Multiple officers visibly recoiled upon seeing the dog. (SOF ¶ 81.) Officers Gitsch, Summerville, and Beaver interpreted Plaintiff's statement and the dog's emergence as threatening and feared an imminent attack. (SOF ¶ 82.) Their concerns were informed by prior experience with, or

knowledge of, pit bull attacks. (SOF ¶¶ 85–93.) Sgt. Lewis testified that probable cause existed to arrest Plaintiff for aggravated assault because Plaintiff said, "Watch this," and sent his dog toward the officers, who interpreted his conduct as a threat and believed the dog would attack them. (SOF ¶ 104.) The dog ultimately did not attack anyone, and Officer Beaver secured it by the collar and moved it away from the other officers. (SOF ¶¶ 100, 102.)

Officer Gitsch continued asking Plaintiff to step into the hallway to speak with the officers. (SOF ¶ 133.) He assured Plaintiff that they did not want to Tase, pepperball, or shoot him and that they only wanted to talk. (SOF ¶ 111.) Plaintiff said he wanted to experience being tased, although he clarified that he meant at Axon rather than by the officers on scene. (SOF ¶ 124.) He initially denied having a knife but acknowledged it seconds later, stating, "Actually, yeah, I do have a knife, you're right." (SOF ¶ 122.) Plaintiff conditioned putting down the backpack on the officers' putting down the ballistic shield, which Officer Gitsch told him would not happen. (SOF ¶ 112.) During this exchange, Officer Beaver observed Plaintiff act as though he was reaching for something in the backpack, and Officer Summerville recalled Plaintiff putting his hands inside it. (SOF ¶¶ 113–114.) Plaintiff subsequently told the officers, "You can shoot me," stated that he did not care about dying, and explained that he had nothing to live for. (SOF ¶¶ 123, 125.)

At approximately 19:30:18, Plaintiff threw the crossbody bag away from himself and lifted the front of his shirt revealing the front of his waistband, but he did not turn around to expose his rear waistband. (SOF ¶¶ 127–128.) That display did not resolve Officer Gitsch's or Officer Summerville's concern that a firearm could be concealed elsewhere on Plaintiff's body, particularly in his rear waistband. (SOF ¶¶ 129–130.) Plaintiff repeatedly ducked behind the entrance alcove and did not remain continuously visible, leaving open the possibility that he could move a concealed gun between his waistband and a pocket. (SOF ¶ 129.) At approximately 19:30:25, Plaintiff threatened, "I'll shoot myself in the fucking head," and moved out of view again before stepping partially back into the hallway. (SOF ¶ 137.) He then became increasingly agitated, complained about his family and being embarrassed, and challenged the officers' requests that he approach them. (SOF ¶¶ 131, 138–141.)

**G. Use of Less-Lethal Force and Arrest.**

Plaintiff's agitation was "ramping up" before force was used, and Officer Summerville described Plaintiff as becoming progressively louder and more aggressive while close enough to run at the officers with his knife. (SOF ¶¶ 139, 200.) Plaintiff's shouting disturbed nearby residents, who came out to investigate, and officers had to redirect residents away from the encounter. (SOF ¶¶ 187, 189–192.) Officer Gitsch and Sgt. Lewis believed probable cause existed to arrest Plaintiff for disorderly conduct based on his unreasonable noise and disruptive behavior. (SOF ¶¶ 189, 192.) Officer Gitsch also believed probable cause existed to arrest Plaintiff for obstructing, resisting, or opposing police and obstructing governmental operations, and Officer Summerville believed Plaintiff's conduct constituted interference with governmental operations. (SOF ¶¶ 191, 194.) Sgt. Lewis was concerned that the escalating encounter could develop into a deadly-force situation and directed Officers Gitsch and Summerville to use their less-lethal options if an opportunity arose so that the officers could safely detain Plaintiff. (SOF ¶¶ 115–118, 201.) Officer Gitsch was prepared to deploy his Taser, while Officer Summerville stood by with a stunbag launcher in case the Taser did not work. (SOF ¶¶ 62, 64.)

At approximately 19:31:12, after approximately nineteen minutes of interaction, Officer Gitsch deployed his Taser. (SOF ¶¶ 145, 160.) The first deployment had no effect, and Officer Gitsch fired a second cartridge, which produced apparent muscular lockup. (SOF ¶¶ 147–149.) Officer Summerville fired one stunbag round toward Plaintiff's torso immediately after the Taser deployment. (SOF ¶ 155.) As Plaintiff fell to his knees, the officers moved forward to take him into custody. (SOF ¶ 158.) Plaintiff still had the karambit knife around his neck, and the reported firearm remained unaccounted for. (SOF ¶¶ 161–162.) Officer Snyder used the ballistic shield to restrain Plaintiff while the officers sought physical control to prevent him from accessing weapons. (SOF ¶¶ 166, 170.) As Officer Snyder approached with the shield, Plaintiff's head began to rise and struck it, causing a head laceration; responding fire personnel documented controlled bleeding. (SOF ¶¶ 163, 183.) The officers

handcuffed Plaintiff, confiscated the karambit knife, and found a second knife in his pocket. (SOF ¶¶ 165, 171.)

While being escorted toward the patrol vehicle, Plaintiff repeatedly stated that the Taser did not hurt and, when Officer Summerville told him the officers cared about him, Plaintiff responded, "No one cares about me," while appearing to cry. (SOF ¶¶ 168–169.) After being placed in the vehicle, Plaintiff repeatedly banged his head against the open door until an officer intervened to stop him. (SOF ¶ 172.)

### H. Post-Arrest: Fake Firearm Discovery and Medical Attention.

After Plaintiff was detained, Officer Bartimoccia located a black handgun in Plaintiff's apartment that, upon close inspection, she believed was an airsoft gun. (SOF ¶ 173.) Officer Beaver subsequently determined that it matched the gun in the photograph Plaintiff had sent Haskins. (SOF ¶ 177.) Plaintiff acknowledged that the fake gun, which he referred to as a training gun and testified was used for training, was designed to resemble a real weapon. (SOF ¶ 178.) He also acknowledged that Haskins did not know it was fake and that, before police arrived, he had not told her he was not thinking about harming himself. (SOF ¶ 180.)

Phoenix Fire Department personnel evaluated Plaintiff, documented a head laceration with controlled bleeding, and transported him to Mayo Hospital for further evaluation. (SOF ¶¶ 182–184.) Plaintiff was subsequently booked into the Maricopa County Jail on seven counts of aggravated assault based on the officers' perception that his statement, "Watch this," followed by the dog approaching them, was intended to place them in reasonable apprehension of imminent physical injury. (SOF ¶¶ 185–186.)

### I. Training and Supervision of Officers Gitsch and Summerville.

Both Officers Gitsch and Summerville held active Arizona POST certifications at the time of the incident and had completed stunbag training, including stunbag shotgun recertification as recently as April 2022. (SOF ¶¶ 203, 211–213.) Phoenix police officers receive at least forty hours of continuing law-enforcement training annually. (SOF ¶ 217.) The Department's use-of-force policy required officers to assess whether de-escalation was possible and, when appropriate, employ tactics to reduce the need for force or the level of force

required. (SOF ¶ 223.) Those tactics included communication, time, and distance, as well as collecting information, assessing risks, requesting resources, and coordinating a response when practical. (SOF ¶ 224.)

At the time of the incident, Officer Gitsch was Crisis Intervention Team ("CIT")-certified and had completed the course twice, including a refresher course. (SOF ¶¶ 204, 207.) CIT training is designed to help officers de-escalate encounters with individuals experiencing mental-health crises, including persons who may be suicidal or unable to act rationally. It teaches communication techniques for developing rapport and guiding individuals toward treatment or assistance. (SOF ¶¶ 110, 208.) The five-day course includes instruction on de-escalation techniques, psychiatric disorders, and PTSD, along with role-play exercises and training concerning applications for emergency admission for mental-health evaluation. (SOF ¶ 206.) Officer Gitsch also completed additional training in crisis support, mental illness, and crisis communication. (SOF ¶ 209.) During this encounter, Officer Gitsch served as the CIT-certified officer and the single voice communicating with Plaintiff. (SOF ¶ 109.)

### J. City of Phoenix Policies and Former Interim Chief Sullivan's Role.

The City's use-of-force policy in effect at the time of the October 4, 2022 incident contained a section entitled "De-Escalation/Escalation Strategies," which directed officers to assess whether de-escalation was possible and, if so, employ appropriate tactics to reduce the potential need for force or the level of force required. (SOF ¶¶ 223–225.) The policy permitted Tasers and direct-impact munitions when distance was necessary for officer safety and their use was a reasonable response to resistance, noncompliance, or dangerous or threatening behavior under the totality of the circumstances. (SOF ¶¶ 229–230, 233.) For Taser deployments, the policy identified the head, neck, female breast, and groin as non-target areas. (SOF ¶ 231.)

The Taser probes struck Plaintiff's thigh and wrist, neither of which was a designated non-target area. (SOF ¶¶ 150, 227.) For stunbag rounds, the policy identified the head, spine, chest, and neck as non-target areas. (SOF ¶ 234.) Officer Summerville's stunbag round struck Plaintiff's abdomen, which was not a designated non-target area. (SOF ¶¶ 156, 234.)

The City's mental-health policy in effect at the time of the incident directed detention for involuntary treatment when a person posed a danger to himself or another and treatment was the appropriate disposition, but directed arrest and booking when that was the appropriate disposition for a minor offense or when a more serious or domestic-violence offense had occurred. (SOF ¶¶ 239, 241–242.) Mobile crisis teams could assist only when the situation was not dangerous and the person would speak with them voluntarily. (SOF ¶ 251.) Because Plaintiff was armed with a knife, potentially armed with a gun, and remained capable of harming himself or others, the scene was unsafe for unarmed crisis personnel until secured. Sgt. Lewis instead utilized a CIT-certified officer, Officer Gitsch. (SOF ¶¶ 109, 246–250.)

Former Interim Chief Sullivan commenced employment with the Phoenix Police Department twenty-two days before the October 4, 2022 incident and was not present during the incident. (SOF ¶¶ 252–253.) The chief exercised department-wide oversight through intervening supervisory and command levels and did not directly supervise patrol officers or patrol sergeants in their day-to-day work. (SOF ¶ 256.)

On May 21, 2025, the United States Department of Justice ("DOJ") withdrew its June 13, 2024 report concerning the City of Phoenix and the Phoenix Police Department in its entirety, stating that the current Justice Department did not have faith in the previously reported findings. (SOF ¶¶ 257–258.)

Former Interim Chief Sullivan was never personally served with Plaintiff's notice of claim and does not recall seeing it before this lawsuit was filed. (SOF ¶ 8.)

## III. LEGAL ARGUMENT.

### A. Standard for Summary Judgment.

A court must grant summary judgment "if the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material only if it might affect the outcome of the action under the governing substantive law, and a dispute is genuine only if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). The moving party bears the initial burden of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). If the moving party meets its burden with a properly supported motion, the burden then shifts to the non-moving party to present specific facts that show there is a genuine issue for trial. *See Anderson*, 477 U.S. at 248. The non-moving party may not rest upon the pleadings' mere allegations and denials but must present admissible evidence of specific disputed facts. *Id.*

Summary judgment is required when, after adequate time for discovery, the nonmoving party fails to make a showing sufficient to establish an essential element of its claim or defense on which it would bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323. If the record as a whole could not lead a rational trier of fact to find for the nonmoving party, no genuine dispute exists for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B. The Force Used by Officers Gitsch and Summerville Did Not Violate the Fourth Amendment.**

"[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest . . . are properly analyzed under the Fourth Amendment's 'reasonableness' standard" based on the information the officer possessed when the conduct occurred. *Graham v. Connor*, 490 U.S. 386, 395 (1989). When police officers use objectively reasonable force, their actions do not run afoul of the Fourth Amendment. *See Blanford v. Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005).

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.... [T]he "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them.

*Graham*, 490 U.S. at 396–97, 109 S.Ct. at 1872 (internal quotations omitted).

Under the Fourth Amendment objective reasonableness standard, a court evaluating a claim of excessive force must engage in a three-step analysis to balance the gravity of the intrusion on the individual against the government's need for that intrusion. *Espinosa v. City & County of San Francisco*, 598 F.3d 528 (9th Cir. 2010). The first step of the analysis requires the Court to assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the "type and amount of force inflicted." *Espinosa*, 598 F.3d at 537; *Graham*, 490 U.S. at 396-97; *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994).

The *Graham* factors are not exhaustive. The Court must "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir.1994)). The Ninth Circuit "undertake[s] this inquiry with great caution, making 'allowance[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." *Marquez v. City of Phoenix*, 693 F.3d 1167, 1174 (9th Cir. 2012) (quoting *Graham*, 490 U.S. at 396-97).

"The Fourth Amendment does not require omniscience" and a police officer does not need to have absolute certainty that he will be harmed in order to act to protect himself. *Wilkinson v. Torres*, 610 F.3d 546, 553 (9th Cir. 2010). Courts judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396. Thus, courts determining reasonableness focus on the facts and circumstances confronting officers at the time of the use of force. *Id.* at 397. The reasonableness of force must be evaluated from the perspective of a reasonable officer on the scene, accounting for the fact that officers must make split-second judgments in tense, uncertain, and rapidly evolving circumstances. *Marquez*, 693 F.3d at 1174.

Summary judgment is appropriate "if the ... court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable

under the circumstances." *Demarest v. City of Vallejo*, 44 F.4th 1209, 1225 (9th Cir. 2022), citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). "It is also well-established that the Fourth Amendment does not require that police officers 'use the least intrusive degree of force possible,' *Lowry v. City of San Diego*, 858 F.3d 1248, 1259 (9th Cir. 2017) (en banc) (internal quotations and citation omitted), only that any use of force 'be justified by the need for the specific level of force employed.'" *Seidner v. DeVries,* 39 F.4th 591, 596 (9th Cir. 2022) (citing *Rice*, 989 F.3d 1112 (9th Cir. 2021) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010)).

**1. The Nature and Extent of the Challenged Force.**

> Some uses of force can be quantified categorically. The best example is shooting a firearm, which by definition is "deadly force": force that "creates a substantial risk of causing death or serious bodily injury." *Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005) (en banc); *see, e.g., Plumhoff v. Rickard*, 572 U.S. 765, 777, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014) (referring to use of a firearm as "deadly force"); *Tan Lam v. City of Los Banos*, 976 F.3d 986, 997 (9th Cir. 2020) (same).
>
> Most often, however, quantifying a particular use of force requires consideration of the "specific factual circumstances" surrounding the event. *Lowry*, 858 F.3d at 1256. Both "[t]he nature and degree of physical contact" and the "risk of harm and the actual harm experienced" are relevant. _*Williamson*, 23 F.4th at 1152 (citations omitted).

*Seidner*, 39 F.4th at 596-97.

Here, Plaintiff's excessive force claims are limited to Officer Gitsch's deployment of his Taser and Officer Summerville's firing of a single round from the stunbag shotgun toward Plaintiff's torso. (SOF ¶¶ 11, 145–150, 155.) These deployments are properly evaluated as intermediate, less-lethal force. Dart-mode Taser use constitutes an "intermediate, significant level of force" requiring justification by the governmental interests involved. *Bryan*, 630 F.3d at 826. Importantly, *Bryan* recognizes that a Taser can defuse a dangerous situation from a distance, prevent the need for officers to resort to more severe or deadly force, and protect officers, bystanders, and the subject. *Id.* Stunbag rounds likewise require a strong governmental interest sufficient to justify their deployment and although they are not

designed to cause serious injury or death, the Ninth Circuit classifies them as "less-lethal" rather than "non-lethal" weapons because they can cause serious injury or death if they strike sensitive areas of the body, such as the eyes, throat, temple, or groin. *See Glenn v. Washington County*, 673 F.3d 864, 866 (9th Circ. 2011). Consequently, under Fourth Amendment standards, a strong and compelling governmental interest warrants its use. *Id.*

At the time of the October 4, 2022 incident, the City of Phoenix Police Department's use of force policy permitted Taser and stunbag use when distance was necessary for officer safety and the deployment was a reasonable response to resistance, noncompliance, or dangerous or threatening behavior under the totality of the circumstances. (SOF ¶¶ 229–230, 233.) Although both Taser deployments and stunbag deployments are capable of producing injuries, neither the Taser deployment by Officer Gitsch, nor the stungun deployment by Officer Summerville, caused any injury to Plaintiff.

**2. A Substantial Governmental Interest Justified the Challenged Force.**

The governmental interest justifying the level of force used here is evaluated under the *Graham* balancing test, which examines: (1) whether the suspect poses an immediate threat to the safety of the officers or others; (2) the severity of the crime at issue; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *See Glenn*, 673 F.3d at 864. The most important of the *Graham* factors to consider is whether the suspect posed an immediate threat to the safety of the officers or others. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). These factors are not exclusive. Courts examine the totality of the circumstances and consider any additional factors relevant to the particular case. *Id.*

Here, the record establishes a substantial governmental interest in safely taking Plaintiff into custody. During the approximately nineteen-minute encounter, CIT-certified Officer Gitsch led efforts to obtain Plaintiff's cooperation and repeatedly asked him to speak with the officers so they could provide assistance. (SOF ¶¶ 109, 111, 133, 160.) He avoided physically grabbing Plaintiff because Plaintiff was armed and he did not want to escalate the situation. (SOF ¶ 132.) Despite those efforts, Plaintiff became increasingly agitated, his

karambit knife remained immediately accessible, and the reported firearm remained unaccounted for. (SOF ¶¶ 138–141, 146, 166.) The potential danger also extended to others in the apartment complex. (SOF ¶¶ 193, 196.) Residents came out of their apartments to investigate the disturbance, and others passed through the hallway, requiring officers to direct them back inside or away from the encounter. (SOF ¶¶ 187, 189, 192.) Officers also could not rule out the presence of another person inside Plaintiff's apartment, and Officer Gitsch remained concerned that gunfire could pass through the apartment's door, walls, or floor and endanger neighboring occupants. (SOF ¶¶ 108, 196.) Officers are trained that a suicidal subject with access to a weapon may rapidly shift from self-directed harm to outward violence, creating an imminent, unpredictable, and potentially lethal risk to officers and others. (SOF ¶ 51.) Defendants' police practices expert, Kenneth Wallentine, opined that, under these conditions, an armed, noncompliant subject presents a substantially elevated risk to officers, bystanders, and nearby residents compared with an encounter in an open or more controlled environment. (SOF ¶ 193.)

**a. The immediate-threat factor weighs in Defendants' favor.**

A suspect who is armed with a deadly or dangerous weapon and refuses to comply with police commands, poses an immediate threat to the safety of officers. *See Miller v. Clark City*, 340 F.3d 959, 965 (9th Cir. 2003). Although possession of a weapon does not automatically justify force, an armed or reasonably suspected armed person's threatening movements, gestures, or statements may establish an immediate threat without requiring officers to wait until a weapon is pointed at them. *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). The analysis also considers relevant events preceding the use of force because those events may explain why a reasonable officer would perceive later conduct as threatening. *Barnes v. Felix*, 605 U.S. 73, 80–82 (2025).

Here, Plaintiff's movements and statements throughout the approximately nineteen-minute encounter gave the officers concrete reasons to perceive an immediate weapons-related danger. (SOF ¶¶ 38, 70–71, 129–130, 137, 141, 160.) Plaintiff's initial concealment of one hand behind the partially opened door raised Officer Gitsch's concern that he was holding

the reported handgun. (SOF ¶¶ 35, 37–38.) The reported firearm remained unaccounted for when force was deployed, and officers located it only after Plaintiff was taken into custody. (SOF ¶¶ 166, 173.) After spending almost ten minutes inside his apartment outside the officers' view, Plaintiff reappeared partially in the hallway holding an open backpack whose contents the officers could not see. (SOF ¶¶ 63, 69.) In addition to the backpack he held in his hand, Plaintiff wore a separate crossbody bag. (SOF ¶ 65.) Officer Beaver observed Plaintiff act as though he was reaching for something in the handheld backpack, and Officer Summerville recalled Plaintiff putting his hands inside it. (SOF ¶¶ 113–114.) Officer Gitsch was concerned that the backpack could contain the reported firearm and that Plaintiff could fire it without removing it from the bag, before the officers had time to react. (SOF ¶¶ 70–71.) Plaintiff also repeatedly withdrew behind the entrance alcove, preventing continuous observation and leaving open the possibility that he could move a concealed gun between his waistband and a pocket. (SOF ¶ 129.) Officer Gitsch believed Plaintiff's increasing agitation could culminate in his charging the officers, quickly pulling something from his bag, or retreating into the apartment. (SOF ¶ 141.)

At approximately 19:30:12, Plaintiff began removing the crossbody bag over his head, and at approximately 19:30:18, he threw that bag away from himself and lifted the front of his shirt. (SOF ¶¶ 126–127.) He did not turn around to expose his rear waistband. (SOF ¶ 128.) That display did not resolve either Officer Gitsch's or Officer Summerville's concern that a firearm could remain concealed at Plaintiff's rear waistband. (SOF ¶¶ 129–130.)

The significance of the partial waistband display is that it failed to dispel a concern grounded in the reported firearm and Plaintiff's preceding conduct. Cases in the Ninth Circuit have acknowledged that firearms are commonly concealed in a suspect's waistband. *See United States v. Hill*, 545 F.2d 1191, 1193 (9th Cir. 1976) ("We find that the lifting by the officer of Appellant's shirt [for purposes of determining whether he was concealing a firearm in the waistband] was not, under the circumstances, overly intrusive."); *United States v. Dazen*, No. CR-21-08117-001-PCT-DWL, 2023 U.S. Dist. LEXIS 35926, at *14 (D. Ariz. Mar. 3, 2023) (upholding a frisk where an officer, during a consensual encounter, confirmed

the presence of a gun in the suspect's waistband). In fact, "the Ninth Circuit has held the use of *deadly force* is objectively reasonable when a suspect reaches for what the officer perceives to be a firearm in the suspect's waistband." *Perez v. Cty. of Sacramento*, No. 2:21-cv-00356-TLN-JDP, 2023 U.S. Dist. LEXIS 137005, at *10 (E.D. Cal. Aug. 4, 2023) (emphasis added); *see, e.g.*, *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014) (holding it would be "unquestionably reasonable" for an officer to shoot a suspect who "reaches for a gun in his waistband, or even if he reaches there for some other reason."). Likewise, in *Cortesluna*, the Ninth Circuit held that the use of multiple bean bag rounds is appropriate when the plaintiff does not follow directions to keep his hands up and appears to be reaching toward a knife in his pocket. *See* 979 F.3d at 650, 652-53.

Furthermore, the visible karambit knife presented a separate weapons concern independent of the reported firearm. (SOF ¶¶ 73–78.) The karambit hung at Plaintiff's midline, accessible by either hand, and could be drawn from its sheath by pulling downward. (SOF ¶¶ 73, 75.) Officer Gitsch estimated the distance between the officers and Plaintiff at approximately twelve feet. (SOF ¶¶ 71, 77.) Immediately before the Taser deployment, the knife remained around Plaintiff's neck and immediately accessible to him. (SOF ¶ 146.) Its accessibility, considered together with Plaintiff's increasing agitation and the officers' proximity, heightened the concern that Plaintiff could quickly rush the officers with the knife. (SOF ¶¶ 76–78, 139–141, 200.)

The officers sought to prevent the escalating encounter from becoming a deadly-force confrontation by using the Taser and stunbag to obtain safe custody of Plaintiff. (SOF ¶¶ 116–118, 152–154, 201–202.) Plaintiff's statements expressing indifference to death, threatening to shoot himself, and inviting officers to shoot him reinforced that concern. (SOF ¶¶ 123, 125, 137, 153.) His earlier statement, "Watch this," followed by the pit bull's emergence toward officers, caused apprehension of imminent injury and formed part of the encounter's threatening context. (SOF ¶¶ 79–80, 85–86, 89, 92.) Before force was deployed, Plaintiff's agitation increased, and Officer Summerville described progressively louder, more aggressive behavior at close range, where Plaintiff could run at the officers with a knife. (SOF ¶¶

139–141, 200.) Under *Barnes*, these preceding events bear on how the officers reasonably assessed the immediate threat before using force. 605 U.S. at 80–82. These circumstances, considered together with Plaintiff's movements toward and into the backpack and the continuing concern about a concealed firearm, supported intervention to prevent him from accessing a weapon. (SOF ¶¶ 113–114, 129–130, 152, 166.)

The later discovery that the reported gun was an airsoft gun does not establish that officers should have recognized it as fake before taking Plaintiff into custody: the gun resembled a real Beretta M9, and Plaintiff acknowledged that Haskins did not know it was fake. (SOF ¶¶ 173–179.) In *Estate of Strickland v. Nevada County*, the Ninth Circuit upheld the use of deadly force against a mentally ill individual who pointed an apparent firearm toward officers, even though the weapon turned out to be an airsoft replica. 69 F.4th 614, 620–23 (9th Cir. 2023). Here, the same reasonable-mistake analysis the Court applied in *Strickland* supports assessing the reported handgun from the officers' contemporaneous perspective, rather than 20/20 hindsight.

Because Ninth Circuit authority directly addressing armed suicidal suspects who pose danger to others is somewhat limited, this argument looks to persuasive out-of-circuit cases recognizing that such encounters may present dangers beyond self-harm. The Seventh Circuit has held that officers confronting a suicidal man armed with knives had an objectively reasonable basis to act not only to protect him, but also to address "the potential threat to others inherent in the danger that he could emerge in that agitated state with the knives." *Estate of Williams v. Ind. State Police Dep't*, 797 F.3d 468, 479 (2015). The court further rejected any rule requiring officers to wait until a hostile suicidal person attacked others before attempting to defuse the situation. *Id.* Likewise, the Eighth Circuit held that officers reasonably perceived an erratic, impaired woman holding a knife in a stabbing position and refusing commands as ready to use the knife against officers or others, even though she had not yet lunged, because officers need not wait for an actual attack when delay would gravely endanger lives. *See Frederick v. Motsinger*, 873 F.3d 641, 647 (2017).

Plaintiff stood in a confined apartment hallway through which bystanders passed, carried a readily accessible karambit knife, held an open backpack of unknown contents and wore a separate crossbody bag, released a pit bull toward officers, and made suicidal threats involving a reported gun whose location remained unknown when force was deployed. (SOF ¶¶ 63, 65, 69, 73–75, 79–80, 137, 166, 187, 197.) A reasonable officer confronting these circumstances would perceive an immediate threat of serious bodily harm or death to himself, his fellow officers, bystanders, and Plaintiff. Taken together, these facts support a substantial governmental interest in controlling the armed encounter through intermediate force before it escalated to a deadly-force encounter.

Prior to using force, the officers also attempted to determine whether withdrawal offered a safe alternative. Officer Bartimoccia asked Plaintiff, "Are you in there alone?" but he did not answer. (SOF ¶ 106.) Officer Gitsch made five attempts to call the telephone number provided for Haskins, seeking information about possible occupants, the reported firearm, other weapons, and information that might help him establish rapport with Plaintiff. (SOF ¶¶ 135–136.) Before Plaintiff was detained, the officers could not confirm whether anyone else was inside the apartment, and knowing that Plaintiff lived alone did not rule out the presence of a visitor or another occupant. (SOF ¶¶ 107–108.) In *Blanford v. Sacramento County*, the Ninth Circuit held that officers had reasonably considered the danger to possible occupants when an armed, noncompliant individual attempted to access a residence, even though they did not know whether anyone was inside. 406 F.3d 1110, 1116–17 (9th Cir. 2005). Here, the unanswered inquiry and repeated unsuccessful telephone attempts explain why the officers could not treat the apartment as a confirmed, safely contained scene from which they could simply withdraw. That uncertainty strengthened the justification for continuing their assessment.

In light of the circumstances presented, Officer Gitsch reasonably believed the initial Taser deployment was necessary to prevent an increasingly agitated Plaintiff from accessing a weapon, including the karambit knife immediately accessible around his neck or a potential

firearm concealed at his rear waistband or elsewhere. (SOF ¶¶ 129, 141, 146, 152–154.) Officer Gitsch deployed a second Taser cartridge after the first deployment had no effect on Plaintiff. (SOF ¶¶ 147–148.) His objective was to render Plaintiff incapable of reaching a weapon, safely detain him, and prevent the encounter from escalating into a deadly-force confrontation. (SOF ¶¶ 152–154.) The second deployment therefore addressed the continuing weapons-related danger that the unsuccessful first deployment had not resolved. (SOF ¶¶ 146–148, 152, 166.)

Officer Summerville likewise believed the stunbag deployment was necessary to defuse the encounter and obtain safe custody of Plaintiff. (SOF ¶¶ 159, 202.) He testified that Plaintiff was becoming increasingly aggressive, the officers were standing in close proximity, and Plaintiff could run at them with a knife. (SOF ¶ 200.) Officer Gitsch's first Taser deployment had no effect on Plaintiff, while the second produced apparent muscular lockup and Plaintiff fell. (SOF ¶¶ 147–149.) Officer Summerville fired one stunbag round immediately after the Taser deployment, and officers moved forward as Plaintiff fell to his knees. (SOF ¶¶ 155, 158.) The karambit remained around Plaintiff's neck as he was taken into custody, and the reported firearm remained unaccounted for. (SOF ¶¶ 166, 170.) These continuing weapons concerns, together with Plaintiff's escalating aggression at close range, supported Officer Summerville's decision to use the stunbag to obtain safe custody before the encounter became a deadly-force confrontation. (SOF ¶¶ 159, 200, 202.)

The officers prepared multiple less-lethal options because they could not rely on a Taser alone to safely incapacitate Plaintiff. (SOF ¶¶ 58–61.) Because Plaintiff was wearing heavy clothing, Sgt. Lewis believed there was a good possibility that a Taser deployment would not work and therefore ensured that a stunbag operator was available. (SOF ¶¶ 60–61.) He explained that officers could not rely solely on a Taser to stop someone advancing with a knife. (SOF ¶ 61.) Officer Summerville accordingly stood by with the stunbag in case the Taser proved ineffective. (SOF ¶ 62.) That concern materialized when the first Taser deployment had no effect on Plaintiff. (SOF ¶ 147.) Taser deployments can fail or be only partially effective, and Wallentine opined that relying exclusively on the Taser would have

been inconsistent with police training under these circumstances. (SOF ¶ 221.) The coordinated use of multiple less-lethal tools was intended to disrupt Plaintiff's actions and permit safe detention while addressing the ongoing threat. (SOF ¶¶ 116–118, 221.) Officer Summerville fired a single stunbag round immediately after Officer Gitsch deployed the Taser, complementing the Taser as part of that coordinated response. (SOF ¶¶ 155, 221.)

A published authority from the Sixth Circuit provides additional persuasive support for using a Taser to secure an armed and suicidal individual while attempting to avoid the use of deadly force. In *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044–45 (6th Cir. 1992), officers confronted a reportedly suicidal and potentially homicidal man in his apartment who possessed knives and had threatened officers. The court granted qualified immunity for repeated Taser applications, emphasizing the officer's effort to avoid resorting to lethal force. Significantly, the court reached that conclusion despite disputed testimony concerning whether the man threatened officers immediately before the initial deployment. *Id*. Although *Russo* rested on qualified immunity, its reasoning supports the officers' use of less-lethal options to prevent a potentially deadly confrontation here.

The challenged force here is limited to two Taser cartridges and one stunbag round during a brief deployment sequence. The layers of less-lethal options deployed by Officers Gitsch and Summerville were used in hopes of, and were successful in, preventing a deadly-force encounter. The Ninth Circuit recognizes that additional intermediate force is reasonable when initial force has not secured control and the danger persists. In *Cortesluna v. Leon*, 979 F.3d 645, 651–52 (9th Cir. 2020), the court upheld two beanbag shots because the suspect's hands remained near a knife when the second shot was fired. The Supreme Court later granted certiorari on a different officer's conduct in the same case, addressing only the qualified-immunity issue for that officer and not disturbing the Ninth Circuit's ruling as to the beanbag shots. *See Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021). Here, the first Taser deployment addressed Plaintiff's escalating agitation, immediate access to the karambit, and possible access to the unaccounted-for firearm. (SOF ¶¶ 141, 146, 152–154, 166.) Because that deployment had no effect, the weapons-related danger remained unresolved, supporting

Officer Gitsch's second Taser deployment. (SOF ¶¶ 146–148, 152, 166.) Officer Summerville fired a single stunbag round immediately after the Taser deployment, before Plaintiff had been restrained and searched and while the reported firearm remained unaccounted for. (SOF ¶¶ 155, 158, 162, 165–166.) Officer Summerville's continuing concern about the gun and Plaintiff's ability to attack with the knife supported obtaining control promptly to prevent the encounter from becoming a deadly-force confrontation. (SOF ¶¶ 159, 195, 200, 202.) Each deployment thus addressed an unresolved weapons-related threat and the immediate need to secure Plaintiff safely. (SOF ¶¶ 146–148, 152–155, 159, 166, 200–202.)

Considering the continuing danger to Plaintiff, the offices, and bystanders; Plaintiff's escalating conduct; the karambit knife around his neck and missing firearm; and the sustained efforts to obtain voluntary cooperation, the intermediate force used to secure him safely was proportionate to the threat reasonably perceived by the officers and is objectively reasonable under the Fourth Amendment. As such, the totality of the circumstances warrant the granting of summary judgment in favor of Officer Gitsch and Officer Summerville on Plaintiff's 42 U.S.C. § 1983 claim of excessive force.

**b. The Severity of the Crime at Issue.**

The government has an undeniable legitimate interest in apprehending criminal suspects, and that interest "is even stronger when the criminal is . . .suspected of a felony, which is by definition a crime deemed serious by the state." *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003); *see United States v. Hensley*, 469 U.S. 221, 229, 83 L. Ed. 2d 604, 105 S. Ct. 675 (1985) (referring to "the strong government interest in solving crimes and bringing offenders to justice"). Before contacting Plaintiff, Officers Gitsch and Summerville had received dispatch information that Plaintiff was threatening suicide and had sent his sister a photograph showing a gun in his mouth. (SOF ¶¶ 28, 30, 53.) Although the officers initially responded to a suicide-related call, Plaintiff's ensuing conduct provided grounds to suspect aggravated assault involving threatened physical harm to the officers. (SOF ¶¶ 85–86, 89, 104.) Officers interpreted Plaintiff's statement, "Watch this," followed by his release of the

dog toward them, as an intentional effort to place them in reasonable apprehension of imminent physical injury; that conduct formed the basis for the aggravated-assault bookings following his arrest. (SOF ¶¶ 79–80, 85–86, 89, 185–186.) Arizona law recognizes assault based on reasonable apprehension of imminent injury, without requiring actual injury, and elevates that offense to felony aggravated assault when it's committed against a known peace officer.

A.R.S. § 13-1204 provides that a person commits aggravated assault if the person commits assault with a deadly weapon or dangerous instrument. Furthermore, under A.R.S. § 13-1203, a person commits assault by intentionally placing another person in reasonable apprehension of imminent physical injury. An assault against a police officer is an aggravated assault. *See* A.R.S. § 13-1204(8)(a). In addition, Plaintiff's escalating disturbance supported suspicion of disorderly conduct: people passed through the hallway, nearby residents emerged from their apartments to investigate his loud yelling and screaming, and officers directed residents to return inside. (SOF ¶¶ 187, 189–192.) Officer Summerville observed that at least one woman appeared upset by the disturbance. (SOF ¶ 187.)

A.R.S. § 13-1202(A)(2) prohibits threatening or intimidating by word or conduct to "cause physical injury to another person." Here, the principal criminal concern involved potential violence against officers, giving this factor greater weight than a disturbance involving only verbal noncompliance.

At the time force was deployed, the officers had reasonable grounds to believe Plaintiff had committed aggravated assault, disorderly conduct, and obstructing governmental operations. Aggravated assault includes intentionally placing another person in reasonable apprehension of imminent physical injury while knowing or having reason to know that the person is a peace officer. *See* A.R.S. §§ 13-1203(A)(2), 13-1204(A)(8)(a). Plaintiff's statement, "Watch this," followed by releasing his pit bull toward the officers, caused them to believe the dog would attack and supported their belief that Plaintiff intended to place them in apprehension of imminent physical injury. (SOF ¶¶ 82, 85–86, 89, 104, 186.)

Disorderly conduct includes making unreasonable noise or engaging in seriously disruptive behavior with the intent to disturb, or knowledge of disturbing, the peace or quiet of a neighborhood, family, or person. *See* A.R.S. § 13-2904(A)(1)–(2). Plaintiff's increasingly loud yelling and screaming, which drew residents from their apartments and visibly upset at least one resident, supported reasonable grounds to believe he had committed that offense. (SOF ¶¶ 187, 189–192.)

Obstructing governmental operations requires knowingly obstructing, impairing, or hindering a public servant's governmental function, or a peace officer's enforcement of criminal law or preservation of the peace, through the use or threatened use of violence or physical force. *See* A.R.S. § 13-2402(A). Plaintiff's release of the dog, perceived as a threatened attack during the officers' efforts to assess his safety, supported their belief that he had threatened physical interference with those duties. (SOF ¶¶ 82, 85–86, 89, 194.) Phoenix City Code § 23-18 separately prohibits knowingly or willfully obstructing, resisting, or opposing a City officer in performing official duties. Officer Gitsch identified Plaintiff's conduct as grounds for arrest under both provisions, and Officer Summerville likewise believed Plaintiff had interfered with governmental operations. (SOF ¶¶ 191, 194.)

The suspected criminal conduct supports Defendants under the severity-of-the-crime factor, while the grounds for emergency detention further support the governmental interest in safely taking Plaintiff into custody.

**c. Plaintiff Was Actively Attempting to Evade or Resist Arrest.**

Plaintiff's noncompliance must be assessed in the context of his conduct throughout the entire encounter with the officers spanning approximately nineteen minutes. Plaintiff did not comply with Officer Gitsch's repeated requests to come into the hallway, refused to put down his backpack unless officers put down their shield, appeared to reach inside the backpack, did not answer whether anyone else was inside the apartment, and released his pit bull toward officers after saying, "Watch this." (SOF ¶¶ 79–80, 106, 111–114, 131, 133.) In addition to the backpack he held, Plaintiff wore a separate crossbody bag, which he eventually removed and threw away from himself. (SOF ¶¶ 65, 126–127.) Plaintiff repeatedly ducked

behind the alcove in response to Officer Gitsch raising the Taser and became increasingly agitated while the karambit knife remained immediately accessible and the reported firearm remained unaccounted for. (SOF ¶¶ 66, 139–141, 146, 166.) Plaintiff's evasive movements and threatening conduct, considered alongside his accessible knife and suicidal statements, weigh in favor of Defendants' intervention using less-lethal force to obtain safe custody and prevent a deadly-force confrontation. (SOF ¶¶ 66, 85–86, 89, 123, 125, 137, 146, 152–154, 200–202.)

In addition, the Ninth Circuit recognizes that officers may need to take immediate custody of a suicidal person and transport that person for evaluation before the threatened self-harm occurs. In *Luchtel v. Hagemann*, officers received reports that the subject had threatened to kill herself and encountered behavior consistent with a serious mental-health crisis. 623 F.3d 975, 979 (9th Circ. 2010). The Ninth Circuit held that the officers had reasonable cause to detain her for evaluation and were entitled to subdue her, take her into custody, and get her to a hospital for assessment.

Persuasive out-of-circuit authority reaches the same conclusion. In *Fitzgerald v. Santoro*, the Seventh Circuit held that a reported suicide threat, apparent intoxication, and an abruptly terminated call presented an objectively reasonable exigency requiring immediate intervention to prevent serious injury. 707 F.3d 725, 732 (7th Circ. 2013). Officers also need not postpone intervention until the suicidal person begins the final act. The Eighth Circuit has explained that the Fourth Amendment does not require police to wait until a suicidal person raises a gun to their head and that intervention is justified when a prudent officer would believe the person presents an emergent threat. *See Graham v. Barnette*, 5 F.4th 872, 891 (8th Circ. 2021). Most recently, the Sixth Circuit held that suicide prevention is an exigency and explained that a subject's apparent coherence or lack of immediately obvious dangerous behavior does not eliminate that exigency when officers possess other reliable information concerning suicide threats. *See Eurton v. Thomas*, 2026 U.S. App. LEXIS 11868, 11 (6th Cir. 2026).

Here, the officers knew before contacting Plaintiff that he had threatened suicide and sent his sister a photograph showing a gun in his mouth. (SOF ¶¶ 28, 30, 53.) During the encounter, Plaintiff stated that he did not care about dying and had nothing to live for; shortly before force was deployed, he expressly threatened to shoot himself in the head and again moved out of the officers' view. (SOF ¶¶ 125, 137.) At that point, the reported firearm remained unaccounted for, and the karambit knife remained readily accessible to Plaintiff. (SOF ¶¶ 146, 166.) Under these circumstances, the need to secure Plaintiff promptly before he could carry out his threatened self-harm forms part of the totality of the circumstances and weighs in favor of the officers' decision to intervene with less-lethal force.

**d. Plaintiff Cannot Establish Causation as to Any Allegedly Unreasonable Use of Force.**

In a 42 U.S.C. § 1983 action, the plaintiff must demonstrate that the defendant's conduct was the cause of the claimed injury. *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). "To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation." *Harper,* 533 F.3d at 1027; *see also Rizzo v. Goode*, 423 U.S. 362, 731-73, 377 (1976) (to prevail, the plaintiff must demonstrate that he suffered a specific injury as a result of specific conduct of a defendant and show some affirmative link between the injury and that defendant's conduct.). The only injury alleged by Plaintiff is the laceration to Plaintiff's head which he admits was caused by the ballistic shield. (SOF ¶¶ 163–164.) He does not claim to have experienced any pain as a result of the Taser or stunbag. Plaintiff must establish a causal link between a specific allegedly unconstitutional use of force and an injury. In other words, Plaintiff must first demonstrate that one or more of the Taser deployments or the deployment of the stunbag was unconstitutional and that the unconstitutional discharge(s) caused injury. Here, however, there is no evidence in the record that Plaintiff was injured by either use of force at issue or that either inflicted pain on him. Plaintiff repeatedly stated that the Taser did not hurt. (SOF ¶ 169.) His head laceration occurred when his head rose and struck Officer Snyder's ballistic shield, and Plaintiff admits that the shield caused that injury. (SOF ¶¶ 163–164.)

Accordingly, Plaintiff cannot meet his burden to show that any discharge of either the Taser or stunbag caused a compensable injury, and his claim fails as a matter of law.

**e. Officer Gitsch and Officer Summerville are Entitled to Qualified Immunity.**

"Qualified immunity protects public officials from a court action unless their conduct violated a constitutional right that was clearly established at the time." *Felarca v. Birgeneau,* 891 F.3d 809, 819–20 (9th Cir. 2018). The qualified immunity analysis consists of two prongs: (1) whether a constitutional right has been violated; and (2) whether the constitutional right was clearly established at the time of the alleged violation. *Id*. A police officer is entitled to qualified immunity if he did not violate the plaintiff's constitutional rights or if the right was not clearly established such that every reasonable officer in the defendant's position would have known that he was violating a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 239- 43, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009); *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Rico v, Ducart*, 980 F.3d 1292, 1298 (9th Cir. 2020), quoting *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). The plaintiff bears the burden of proof to show that a right was clearly established. *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021). Officers Gitsch and Summerville are entitled to qualified immunity under both prongs.

As to the first prong, as discussed above, Officers Gitsch and Summerville did not violate Plaintiff's Fourth Amendment rights. Their uses of force were objectively reasonable under the circumstances. Therefore, the first prong of qualified immunity should be resolved in the officers' favor.

The Supreme Court has explained the contours of the "clearly established" prong as follows:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," Hunter v. Bryant, 502 U. S. 224, 228, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) (*per curiam*), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,'" al-Kidd, supra, at 741-742, 131 S. Ct.

2074, 179 L. Ed. 2d 1149 (quoting Wilson v. Layne, 526 U. S. 603, 617, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. See Reichle, 566 U. S., at 666, 132 S. Ct. 2088, 182 L. Ed. 2d 985. Otherwise, the rule is not one that "every reasonable official" would know. Id., at 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (internal quotation marks omitted).

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U. S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). This requires a high "degree of specificity." Mullenix v. Luna, 577 U. S. 7, 13, 136 S. Ct. 305, 309, 193 L. Ed. 2d 255, 260 (2015) (*per curiam*). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." Plumhoff, supra, at 779, 134 S. Ct. 2012, 2023, 188 L. Ed. 2d 1056, 1069) (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." Anderson, supra, at 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523.

* * *

We have stressed that the "specificity" of the rule is "especially important in the Fourth Amendment context." Mullenix, supra, at 12, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255, 259 . Probable cause "turn[s] on the assessment of probabilities in particular factual contexts" and cannot be "reduced to a neat set of legal rules." Gates, 462 U. S., at 232, 103 S. Ct. 2317, 76 L. Ed. 2d 527. It is "incapable of precise definition or quantification into percentages." Pringle, 540 U. S., at 371, 124 S. Ct. 795, 157 L. Ed. 2d 769. Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in "the precise situation encountered." Ziglar v. Abbasi, 582 U. S. 120, 151, 137 S. Ct. 1843, 1866, 198 L. Ed. 2d 290, 319 (2017) ). Thus, we have stressed the need to "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." White v. Pauly, 580 U. S. 73, 79, 137 S. Ct. 548, 552, 196 L. Ed. 2d 463, 468 (2017) (*per curiam*); *e.g.,* Plumhoff, supra, at 778-779, 134 S. Ct. 2012, 2023, 188 L. Ed. 2d 1056, 1069. While there does not have to be "a case directly on point," existing precedent must place the lawfulness of the particular arrest "beyond debate." al-Kidd, supra, at 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149, 1159. Of course, there can be the rare "obvious case," where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not

> address similar circumstances. Brosseau v. Haugen, 543 U. S. 194, 199, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (*per curiam*). But "a body of relevant case law" is usually necessary to "'clearly establish' the answer" with respect to probable cause. *Ibid.*

*District of Columbia v. Wesby*, 583 U.S. 48, 63-64 (2018). It is "especially important in the Fourth Amendment context" for the law to be clearly established because "'[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (citation modified) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). Since deciding *Wesby*, the United States Supreme Court has insinuated that constitutional rights can only be clearly established with on-point Supreme Court precedent and that controlling circuit precedent is not sufficient to demonstrate clearly established law. *See Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021).

Under the second prong, it was not clearly established that on October 4, 2022, every reasonable officer would have understood that deploying a Taser and a single stunbag round against a man armed with a very dangerous knife and potentially a gun and other weapons who is an intoxicated, suicidal, noncompliant subject in a confined apartment hallway in close proximity to officers and other residents of the apartment building, violated the Fourth Amendment. In fact, no Ninth Circuit authority remotely so held at the time of this incident.

In *Diamond v. Collinson*, 2026 U.S. App. LEXIS 17995 (9th Cir. 2026), the Ninth Circuit reversed the denial of qualified immunity to police officers who deployed beanbag rounds and a Taser against an armed, intoxicated, suicidal former law-enforcement officer who kept a loaded handgun in his sweatshirt pocket and repeatedly refused commands to show his hands. The court held that "no Ninth Circuit precedent clearly established that deploying less-lethal force (beanbag rounds and TASER) against" such a suspect "violated the Fourth Amendment," and it distinguished cases involving unarmed and compliant individuals. The factual parallels here are striking. Like the plaintiff in *Diamond*, Plaintiff was armed with a karambit knife, intoxicated, suicidal, and repeatedly failed to comply with officers' requests. (SOF ¶¶ 20, 111–112, 125, 131, 137, 146.) Here, officers deployed less-

lethal force after repeated efforts to obtain Plaintiff's cooperation during an approximately nineteen-minute encounter. (SOF ¶¶ 111–112, 131–133, 145, 155, 160.) *Diamond* demonstrates that qualified immunity attaches in precisely these circumstances.

The Ninth Circuit's holding in *Estate of Strickland*, 69 F.4th 614 (9th Cir. 2023), that the immediacy of a perceived firearm threat "outweigh[ed]" all other *Graham* factors, further establishes that no clearly established law was violated here. If officers shooting and killing a mentally ill man holding what turned out to be a replica firearm did not violate clearly established law, then the far less intrusive less-lethal force used against Plaintiff who carried an actual edged weapon and whose reported gun's status was unknown, plainly falls within the protected zone of officer discretion.

Because no existing precedent placed the constitutionality of Officers Gitsch's and Officer Summerville's specific conduct beyond debate, both officers are independently entitled to qualified immunity, and Count I should be dismissed.

### C. Count II – *Monell* claim against the City of Phoenix and Former Interim Chief Sullivan.

#### 1. The Evidence in the Record Does Not Support a *Monell* Claim.

Plaintiff alleges that the City is liable under 42 U.S.C. § 1983 for failure to train in de-escalation techniques and the use of non-lethal force. (SOF ¶11.) "[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)). Municipal liability under 42 U.S.C. § 1983 cannot be predicated on *respondeat superior*; a plaintiff must identify a policy, custom, or failure to train that amounts to "deliberate indifference" and was the "moving force" behind the constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *City of Canton*, 489 U.S. at 388–89. A failure-to-train theory requires proof that the training program was inadequate "in relation to the tasks the particular officers must perform," that the inadequacy was the result of the municipality's deliberate indifference to its inhabitants' rights, and that the inadequacy 'actually caused" the constitutional injury. *Id.* at 390–91. Proof of deliberate indifference ordinarily requires a "pattern of similar constitutional

violations by untrained employees." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). The narrow single-incident exception applies only where "the unconstitutional consequences of failing to train" are "patently obvious" and the violation was "a highly predictable consequence of a failure to equip law enforcement officers" with specific tools. *Id.* at 63–64.

Plaintiff's *Monell* theory fails at every element.

**a. Because There Was No Constitutional Violation, Plaintiff's *Monell* Claim Fails.**

A municipality cannot be liable under Section 1983 absent an underlying constitutional tort. *Chaney v. Wadsworth*, 700 F. App'x 591, 593 (9th Cir. 2017), *quoting Johnson v. City of Seattle*, 474 F.3d 634, 638 (9th Cir. 2007) (*citing Monell*, 436 U.S. at 691, 98 S.Ct. 2018). If no constitutional violation occurred, there can be no municipal liability. As discussed above, Officers Gitsch and Summerville's use of force was objectively reasonable under the Fourth Amendment and did not violate Plaintiff's constitutional rights. Because there was no underlying constitutional violation, the City and Former Interim Chief Sullivan cannot be held liable under *Monell*. As such, Plaintiff's *Monell* claim fails as a matter of law.

**b. Plaintiff Cannot Demonstrate Deliberate Indifference or Moving-Force Causation.**

A plaintiff alleging a policy of failure to train officers must show (1) that plaintiff was deprived of a constitutional right; (2) the local government entity had a training policy that amounts to deliberate indifference to constitutional rights of persons with whom its officers are likely to come into contact; and (3) the plaintiff's constitutional injury would have been avoided had the local government unit properly trained those officers. *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007). To demonstrate deliberate indifference, a plaintiff must show that the municipality had "notice that a course of training is deficient in a particular respect," because without such notice, a municipality "can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62. Finally, there must be evidence to demonstrate that the supervision was "sufficiently inadequate" to amount to "deliberate indifference." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). It is "ordinarily necessary" to demonstrate a

pattern of similar constitutional violations by untrained employees to prove deliberate indifference for purposes of showing a claim for failure to train and supervise.

Absent proving a pattern of similar conduct, a plaintiff must show that the inadequacy in this area of training was so obvious that the defendant municipality should have known that unlawful conduct by its officers was predictable. *See Connick*, 563 at 63– 64. Therefore, to establish *Monell* liability for inadequate training or supervision, Plaintiff must identify the specific deficiency in the City's training program or supervision policy *and* establish it directly caused the alleged constitutional violation. *City of Canton*, 489 U.S. at 389. Here, there is no evidence of any deficiencies in the City's training or supervision, let alone any that rise to the level of deliberate indifference, nor is there any evidence of a pattern of constitutional violations that would have put the City on notice of a need for additional training or supervision.

First, a pattern of similar constitutional violations is ordinarily necessary to demonstrate that municipal policymakers knew their training was deficient in a particular respect and nevertheless disregarded the consequences. *Connick*, 563 U.S. at 62–63. Plaintiff's reliance on the June 2024 DOJ report does not dispense with that showing. The DOJ withdrew the report in its entirety on May 21, 2025. (SOF ¶ 257.) In its May 21, 2025 withdrawal notice, DOJ stated that "[t]he current Justice Department does not have faith in the previously reported findings in this case" and withdrew the June 13, 2024 findings report in its entirety. (SOF ¶ 258.) Moreover, the report's issuance after the October 2022 encounter does not itself establish that the City had notice of an actionable deficiency beforehand. Plaintiff must identify sufficiently similar pre-incident violations demonstrating notice of the particular training omission allegedly responsible for his injury. Absent that showing, generalized allegations of systemic deficiencies do not establish deliberate indifference.

Furthermore, the officers' documented qualifications undermine the contention that the City failed to equip them to address this encounter. Officer Gitsch completed CIT training twice, including instruction concerning communication with suicidal individuals and developing rapport. (SOF ¶¶ 204, 207–208.) Both Officers Gitsch and Summerville held active

Arizona POST certifications and completed stunbag shotgun recertification training as recently as April 2022, and Officer Gitsch was Taser-certified. (SOF ¶¶ 203, 211–213.) The City's applicable policies expressly addressed de-escalation, communication, time and distance, coordinated responses, and interactions with persons experiencing mental-health crises. (SOF ¶¶ 222–224, 236–240.) Defendants' police practices expert, Ken Wallentine opined that the Phoenix Police Department properly trained both officers and could reasonably rely on their active Arizona POST certifications as indicating that they had completed basic peace-officer training and satisfied Arizona POST standards. (SOF ¶ 220.) These records provide affirmative evidence of training directed to the very tasks Plaintiff claims the officers were unprepared to perform.

In addition, Plaintiff has not identified any specific omission in the City's training or its constitutional consequences. Whether additional instruction might have produced a different outcome in this particular encounter is not sufficient to establish a failure to train claim. *See City of Canton*, 489 U.S. at 390–91. In fact, the evidence in the record further undermines the asserted causal connection. During the approximately nineteen-minute encounter, Officer Gitsch served as the single CIT-certified communicator, repeatedly sought Plaintiff's cooperation, avoided physically grabbing him to prevent escalation, and attempted to obtain information that could help develop rapport and persuade Plaintiff to accept voluntary treatment. (SOF ¶¶ 109, 132–136, 160.) The officers prepared multiple less-lethal options to prevent a deadly-force encounter and ultimately used those options while the karambit knife remained accessible to Plaintiff and the reported firearm remained unaccounted for. (SOF ¶¶ 58–62, 116–118, 145–146, 155, 166, 201.)

This evidence supports a decision driven by the perceived risks of the particular encounter rather than an absence of crisis-response or de-escalation training. Plaintiff must identify the deficient instruction and demonstrate how correcting it would have prevented the alleged constitutional violation. Mere disagreement with the officers' ultimate tactical decision does not establish that the lack of municipal training was the moving force behind Plaintiff's alleged injury. *Id.* at 391. In fact, Plaintiff has never identified *any* specific training or

supervisory deficiency. *See Connick*, 563 U.S. 51, 131 S. Ct. 1350, 1354, 179 L. Ed. 2d 417 (2011) (holding that a *Monell* claim for failure to train requires evidence of "an obvious need for specific training").

As such, Plaintiff's *Monell* claim also fails under the theory of failure to train.

**c. Former Interim Chief Sullivan Cannot Be Held Liable Under *Monell* In His Individual Capacity.**

Former Interim Chief Sullivan is sued in his personal capacity as Interim Chief. Under the Ninth Circuit's framework, supervisors may be liable under § 1983 only for "(1) their own culpable action or inaction in the training, supervision, or control of subordinates; (2) their acquiescence in the constitutional deprivation; or (3) conduct that showed a reckless or callous indifference to the rights of others," with a "sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Modahl v. County of Kern*, 61 Fed. Appx. 394 (9th Cir. 2003). *Respondeat superior* is categorically unavailable. *Id.*

Former Interim Chief Sullivan was not present at the scene on October 4, 2022. (SOF ¶ 252.) The record contains no evidence that former Interim Chief Sullivan personally set in motion, ratified, or was deliberately indifferent to any training policy that caused the alleged violation and Plaintiff has presented no evidence that former Interim Chief Sullivan publicly stated that the officers lacked any type of training.

Moreover, former Interim Chief Sullivan commenced employment with the Phoenix Police Department a mere twenty-two (22) days before the incident involving Plaintiff. (SOF ¶ 253.) There is no evidence of personal culpable action or inaction on the part of former Interim Chief Sullivan and therefore he is entitled to judgment as a matter of law on Count II.

**d. Suing Former Interim Chief Sullivan in His Official Capacity is the Same as Asserting a Claim Against the City.**

An official-capacity claim against former Interim Chief Sullivan is not a claim against him personally. It is in all respects other than name a claim against the governmental entity he represents, and the real party in interest is the City. *See Ky. v. Graham*, 473 U.S. 159, 166 (1985) (holding that "[o]fficial-capacity suits . . . 'generally represent only another way of

pleading an action against an entity of which an officer is an agent,' and that "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). The Ninth Circuit applies that rule directly to municipal officers, holding that "[a]n official capacity suit against a municipal officer is equivalent to a suit against the entity." *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dep't*, 533 F.3d 780, 799 (2008). Thus, where the City is already a Defendant, naming former Interim Chief Sullivan in his official capacity does not create a separate basis for liability or a separate Defendant, but rather is merely another way of pleading the same *Monell* claim against the City itself. *Id.* Accordingly, the official-capacity claim against former Interim Chief Sullivan should be treated as duplicative of, and coextensive with, the claim against the City.

**D. Count IV – Gross Negligence Against the City of Phoenix and Former Interim Chief Defendant Sullivan.**

**1. <u>The record does not support reckless indifference to Plaintiff's safety.</u>**

Under Arizona law, "gross negligence is action or inaction with reckless indifference to the result or the rights or safety of others." *Armenta v. City of Casa Grande*, 205 Ariz. 367, ¶ 20 (App. 2003); *Wilson v. Maricopa County*, 463 F. Supp. 2d 987, 1004 (D. Ariz. 2006). A person is "recklessly indifferent" only if he "knows, or a reasonable person in his position ought to know: (1) that his action or inaction creates an unreasonable risk of harm; and (2) the risk is so great that it is highly probable that harm will result." *Id.* "Gross negligence differs from ordinary negligence in quality and not degree." *Walls v. Ariz. Dep't of Pub. Safety*, 170 Ariz. 591, 595 (App. 1991); *Krish Singh v. City of Phx.*, 2025 U.S. Dist. LEXIS 112716 (D. Ariz. 2025). It must be "wanton" and "flagrant" and "evinces a lawless and destructive spirit." *Id.*

The evidence in the record negates any inference of reckless indifference. The officers responded to a Priority 1 suicide call, observed Plaintiff armed with a karambit knife, and remained concerned about a potentially concealed firearm. (SOF ¶¶ 26, 36, 129–130, 166.) During the approximately nineteen-minute encounter, they repeatedly sought Plaintiff's

cooperation before deploying a Taser and a single stunbag round after he failed to comply with their requests, released his pit bull toward them, made suicidal threats, and became increasingly agitated in a confined hallway. (SOF ¶¶ 79–80, 111–114, 125, 131–133, 137–141, 145–149, 155, 160, 197.) These decisions represent the exercise of professional judgment in a high-risk, rapidly evolving situation, which is precisely the type of "debatable tactical judgment" that Arizona law declines to equate with gross negligence. *Krish Singh*, 2025 U.S. Dist. LEXIS 112716 (holding that officers' failure to tase a suspect, call a crisis officer, or reposition vehicles before a shooting was, at most, ordinary negligence, not gross negligence).

The ballistic shield was used to restrain Plaintiff and prevent access to weapons while the karambit remained around his neck and officers had not ruled out a concealed firearm. (SOF ¶¶ 161–162, 170.) Officers subsequently found a second knife in Plaintiff's pocket. (SOF ¶ 171.) Plaintiff admits that the shield caused his head laceration. (SOF ¶¶ 163–164.) That injury alone does not establish that the officers acted with reckless indifference in attempting to secure an armed subject.

Count IV also fails as to former Interim Chief Sullivan. Former Interim Chief Sullivan was not present during the incident and had commenced employment with the Phoenix Police Department only twenty-two days earlier. (SOF ¶¶ 252–253.) He exercised department-wide oversight through intervening supervisory and command levels and did not directly supervise patrol officers or patrol sergeants in their day-to-day work. (SOF ¶ 256.) The specific misconduct alleged in Count IV concerns the officers' handling of the ballistic shield and failures to intervene during the encounter; those allegations do not establish any personal involvement by former Interim Chief Sullivan in the challenged conduct. (Doc. 24, ¶¶ 210–216.) Nor does his position as Chief establish that he recklessly disregarded a known or objectively apparent risk that substantial harm would probably result.

The Department's use-of-force policy directed officers to assess whether de-escalation was possible and identified tactics including communication, time and distance, information gathering, risk assessment, and coordinated responses. (SOF ¶¶ 223–225.) To establish gross negligence against former Interim Chief Sullivan, Plaintiff must connect a particular act or

omission by him to the injury and demonstrate the requisite reckless indifference. Generalized criticisms of departmental practices and Sullivan's supervisory title do not supply that proof. *See Armenta*, 205 Ariz. 367, ¶¶ 20–23.

The record therefore does not support a finding that the officers' response, or any act or omission attributable to former Interim Chief Sullivan, constituted the wanton and flagrant misconduct necessary to establish gross negligence. Accordingly, summary judgment is warranted on Count IV in favor of the City and former Interim Chief Sullivan.

**E. Count V – Negligent Hiring, Supervision, Retention, and/or Training against the City of Phoenix and Former Interim Chief Defendant Sullivan.**

Arizona law holds employers accountable for the tortious conduct of their employees "if the employer was negligent or reckless in hiring, supervising, or otherwise training the employee." *Hernandez v. Singh*, No. CV-17-08091-PCT-DWL; 2019 WL367994, at *6 (D. Ariz. Jan. 30, 2019). For negligent hiring, supervision, and training claims, "Arizona follows the Restatement (Second) of Agency § 213." *Id*. (internal quotation marks and citation omitted). According to Section 213:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
>
> (a) in giving improper or ambiguous orders of [sic] in failing to make proper regulations; or
>
> (b) in the employment of improper persons or instrumentalities in work involving risk of harm to others[;]
>
> (c) in the supervision of the activity; or
>
> (d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

Restatement (Second) of Agency § 213 (1958).

"For an employer to be held liable for the negligent hiring, retention, or supervision of an employee, a court must first find that the employee committed a tort." *Kuehn v. Stanley*, 91 P.3d 346, 352 (Ariz. Ct. App. 2004). If the threshold tort finding is satisfied, the employer may be liable "not because of the relation of the parties, but because the employer

antecedently had reason to believe that an undue risk of harm would exist because of the employment." *Quinonez for & on Behalf of Quinonez v. Andersen*, 696 P.2d1342, 1346 (Ariz. Ct. App. 1984).

To succeed on a negligent supervision claim, "the plaintiff must show the employer knew or should have known the employee was incompetent and that the employer subsequently failed to supervise the employee, ultimately causing the harm at issue." *Hernandez*, 2019 WL 367994 at *7. To prove negligent training, "a plaintiff must show a defendant's training or lack thereof was negligent and that such negligent training was the proximate cause of a plaintiff's injuries." *Guerra v. State*, 323 P.3d 765, 772 (Ariz. Ct.App. 2014), vacated on other grounds in *Guerra v. State*, 348 P.3d 423 (Ariz. 2015). Importantly, "[a] showing of an employee's incompetence is not necessarily enough; the plaintiff must also present evidence showing what training should have been provided, and that its omission proximately caused the plaintiff's injuries." *Id.* at 772–73.

There is no evidence in the record suggesting that the City of Phoenix or former Interim Chief Sullivan knew or had reason to know that Officers Gitsch or Summerville posed an undue risk of harm. There is no evidence of discipline, prior unconstitutional use-of-force findings, or any other indicator that would have put the City or former Interim Chief Sullivan on notice of a "propensity" for excessive force.

Furthermore, Plaintiff's theory rests on the conclusory assertion that Phoenix police failed to adequately train officers in de-escalation and non-lethal-force techniques. However, as discussed above, Officer Gitsch was CIT-certified and had completed CIT training twice, including a refresher course. (SOF ¶¶ 204, 207.) Officer Summerville had completed stun-bag shotgun training and recertification as recently as April 2022. (SOF ¶ 213.) Wallentine opined that the Phoenix Police Department properly trained both officers. (SOF ¶ 220.)

In addition, Plaintiff has failed to identify any particular module, curriculum, or training practice that was negligently omitted by the City. Without further specificity, Plaintiff cannot satisfy the Arizona requirement that a negligent-training claimant identify the training that "should have been provided." *Lane v. City of Mesa*, 2021 U.S. Dist. LEXIS 266707.

Even accepting Plaintiff's premise that additional training could have been offered, Plaintiff has not demonstrated that any training deficiency was the proximate cause of his injuries. The record shows that CIT-certified Officer Gitsch repeatedly sought Plaintiff's cooperation, offered assistance, and avoided physical contact to prevent escalation. (SOF ¶¶ 45, 109, 111, 132–133.) The officers deployed less-lethal force approximately nineteen minutes into the encounter, after those efforts failed to obtain Plaintiff's cooperation and his agitation increased. (SOF ¶¶ 111–114, 131, 139–141, 145, 155, 160.)

The force used by Officers Gitsch and Summerville resulted from the totality of the circumstances surrounding them, all of which was caused by Plaintiff's actions and failure to cooperate, not from any identifiable gap in training.

As with Count II, former Interim Chief Sullivan had no personal involvement in the hiring, supervision, retention, or training of Officers Gitsch or Summerville that is alleged to have been deficient. He was not present at the scene, and the record contains no evidence tying him to any specific negligent act.

As such, summary judgment on Count V is warranted.

### F. Plaintiff's Punitive Damages Claim Fails.

Plaintiff has asserted a punitive damages against all defendants. (Doc. 24, Prayer for Relief). Punitive damages may be assessed in 42 U.S. C. § 1983 actions only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Castro v. Cty. of L.A.*, 797 F.3d 654, 669-70 (9th Cir. 2015), citing *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983). There is no evidence in the record that any of the officers acted with evil motive or intent or with reckless or callous indifference to Plaintiff's rights. Thus, even if the Court finds that there are questions of fact as to whether one or more of the officers' deployments of non-lethal force were unconstitutional, Plaintiff's entire claim for punitive damages should be dismissed.

The City of Phoenix is immune from punitive damages under 42 U.S.C. § 1983. *See City of Newport v. Fact Concerts, Inc.* 42 U.S. 247, 271 (1981) (holding that "a municipality

is immune from punitive damages under 42 U.S.C. § 1983."). Additionally, under A.R.S. 12-820.04, "[n]either a public entity nor a public employee acting within the scope of his employment is liable for punitive or exemplary damages." Accordingly, even if Plaintiff's punitive damages claim is not dismissed in its entirety, it should be dismissed as to former Chief Sullivan on the state law claims and dismissed as to the City of Phoenix on both the state and federal claims.

**G. Plaintiff Failed to Comply With Arizona's Notice of Claim Statute as to Interim Chief Sullivan and Therefore Plaintiff's State Law Claims Against Him Are Statutorily Barred**

Pursuant to Arizona's notice of claim statute, A.R.S. § 12-821.01:

> Persons who have claims against a public entity, public school or a public employee shall file claims with the person or persons authorized to accept service for the public entity, public school or public employee as set forth in the Arizona rules of civil procedure **within one hundred eighty days after the cause of action accrues**. The claim shall contain facts sufficient to permit the public entity, public school or public employee to understand the basis on which liability is claimed. The claim shall also contain a specific amount for which the claim can be settled and the facts supporting that amount. **Any claim that is not filed within one hundred eighty days after the cause of action accrues is barred and no action may be maintained thereon.**

(emphasis added). This statute applies to any claims brought by a plaintiff under Arizona state law. The Arizona Court of Appeals has held that when a claimant asserts a claim against a public employee whose "conduct giving rise to a claim for damages was committed within the course and scope of employment," the claimant "must give notice of the claim to *both* the employee individually and to his employer." *Crum v. Superior Ct.*, 186 Ariz. 351, 352, 922 P.2d 316, 317 (App. 1996) (emphasis in original); *see also Harris v. Cochise Health Systems*, 215 Ariz. 344, 351, ¶ 25, 160 P.3d 223, 230 (App. 1007). Failure to provide the employee with notice pursuant to the statute "is not cured by actual notice or substantial compliance." *Harris*, 215 Ariz. at 351, ¶ 25, 160 P.3d at 230, *citing Falcon ex. rel. Sandoval v. Maricopa County*, 213 Ariz. 525, ¶ 10, 144 P.3d 1254, 1256 (2006)*; see also Salerno v. Espinoza,* 210 Ariz. 586, 589, ¶ 11, 115 P.3d 626, 629 (App. 2005) (reversing the Court of Appeals and affirming summary judgment in favor of a public entity defendant because the

plaintiff had served only one member of the county Board of Supervisors because it could not be said that this constituted service on the executive officer of the public entity, i.e., the Board of Supervisors, as a whole).

The purpose of the notice of claim statute is to allow the entity ***and*** the employee the opportunity to "investigate and assess their liability, to permit the possibility of settlement prior to litigation and to assist the public entity in financial planning and budgeting." *Crum*, 186 Ariz. at 352, 922 P.2d at 317; *Harris*, 215 Ariz. at 351, ¶ 25, 160 P.3d at 230. A plaintiff's failure to comply with the notice of claim statute bars any claim against the public employee. *Harris*, 215 Ariz. at 351, ¶ 25, 160 P.3d at 230.

To comply with the notice of claim statute for claims against public employees, the notice of claim must be served on the individual employees in accordance with Rule 4.1(d), Arizona Rules of Civil Procedure, which governs service upon individuals. *See* Ariz. R. Civ. P. 4.1(d); *see also Simon v. Maricopa Med. Ctr*., 225 Ariz. 55, 61, 234 P.3d 623, 629 (Ct. App. 2010). The Arizona Court of Appeals has held that leaving a copy of the notice of claim with an individual's employer is insufficient service on the individual under the Arizona Rules of Civil Procedure, even when the individual receives the papers and has actual notice of the lawsuit. *See Melton v. Superior Ct.*, 154 Ariz. 40, 42, 739 P.2d 1357, 1359 (App. 1987).

In this case, Plaintiff needed to file a notice of claim with Interim Chief Sullivan on or before April 3, 2023. Interim Chief Sullivan was never personally served with Plaintiff's notice of claim and does not recall ever seeing it prior to this lawsuit being filed. (Sullivan Declaration at Paragraph 8). Thus, Plaintiff did not file a notice of claim with Interim Chief Sullivan. The statutory period for the notice of claim to be filed with him has passed. As such, all state law claims against Interim Chief Sullivan are statutorily barred and need to be dismissed.

## IV. CONCLUSION.

For the reasons set forth herein, Defendants are entitled to summary judgment on all remaining claims and all claims should be dismissed with prejudice.

DATED this 1st day of October, 2026.

BERKE LAW FIRM, PLLC

By *s/ Anelisa Benavides*
Lori V. Berke
Anelisa Benavides

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Robert T. Mills
Sean Anthony Woods
Mills & Woods Law PLLC
5055 N. 12th Street, Suite 101
Phoenix, Arizona 85014
rmills@millsandwoods.com
swoods@millsandwoods.com

*Attorneys for Plaintiff*

*s/Anelisa Benavides*