# INDEX OF EXHIBITS

## DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

***Stephan Shere v. City of Phoenix, et al.***

**Case No. CV-23-02657-PHX-JJT (MBM)**

| | |
|---|---|
| Exhibit 1 | Declaration of Michael Sullivan |
| Exhibit 2 | Deposition of Stephan Shere |
| Exhibit 3 | Computer-Aided Dispatch Record and Declaration |
| Exhibit 4 | Deposition of Officer Christopher Gitsch |
| Exhibit 5 | Deposition of Lexus Haskins |
| Exhibit 6 | Text Message from Plaintiff to Haskins (COP 000151-000152) |
| Exhibit 7 | Deposition of Sergeant Jacob Lewis |
| Exhibit 8 | Officer Beaver's Body Worn Camera Video (COP 0000035) **[Non-Electronic Exhibit]** |
| Exhibit 9 | Deposition of Officer Eric Summerville |
| Exhibit 10 | Officer Gitsch's Body Worn Camera Video (COP 000037) **[Non-Electronic Exhibit]** |
| Exhibit 11 | Deposition of Officer Alex Beaver |
| Exhibit 12 | Declaration and Report of Defendants' Police Practices Expert, Kenneth R. Wallentine |
| Exhibit 13 | Operations Order 1.5 – Response to Resistance in effect on date of incident (COP 001290-001302) |
| Exhibit 14 | Operations Order 4.15 – Individuals with Mental or Physical Disabilities in effect on date of incident (COP 001311-1318) |
| Exhibit 15 | U.S. Department of Justice withdrawal of June 13, 2024 findings report with respect to the City of Phoenix and the Phoenix Police Department |

| | |
|---|---|
| Exhibit 16 | Video of Plaintiff putting a gun in his mouth (COP 00153) **[Non-Electronic Exhibit]** |
| Exhibit 17 | Officer Summerville's Body Worn Camera Video (COP 00040) **[Non-Electronic Exhibit]** |
| Exhibit 18 | Phoenix Fire Department Report |
| Exhibit 19 | 911 call **[Non-Electronic Exhibit]** |
| Exhibit 20 | Crisis Intervention Team Training Roster May 2008 |
| Exhibit 21 | Declaration of Sabrina Taylor, Crisis Intervention Team Training Coordinator |
| Exhibit 22 | Relevant Portions of Officer Gitsch's Training Transcript and Records |
| Exhibit 23 | Relevant Portions of Officer Summerville's Training Transcript and Records |
| Exhibit 24 | Training Materials |
| Exhibit 25 | Officer Rezac's Body Worn Camera Video (COP 000046) **[Non-Electronic Exhibit]** |
| Exhibit 26 | Radio Traffic Recording (COP 001172) **[Non-Electronic Exhibit]** |
| Exhibit 27 | Photograph of karambit knife (COP 000204) |
| Exhibit 28 | Sgt. Lewis' Body Worn Camera Video (COP 000038) **[Non-Electronic Exhibit]** |
| Exhibit 29 | Photographs of Airsoft Gun (COP 000103-000104) |
| Exhibit 30 | Declaration of Officer Alex Beaver |
| Exhibit 31 | Declaration of Officer Christopher Gitsch |

# EXHIBIT 1

**DECLARATION OF MICHAEL SULLIVAN**

DISTRICT OF COLUMBIA )ss.

I, Michael Sullivan say and attest the following:

1. I am the former Interim Chief of the Phoenix Police Department. I have personal knowledge of the matters stated in this declaration and am competent to testify to them.

2. I commenced employment with the Phoenix Police Department as Interim Chief on September 12, 2022. I served as Interim Chief until June 29, 2025, at which time I separated from employment from the City of Phoenix.

3. In October 2022, the Phoenix Police Department employed approximately 2,600 sworn officers.

4. While I was employed by the City of Phoenix, the Phoenix Police Department's sworn rank structure, in ascending order, consisted of police officer, including patrol officers and detectives; sergeant; lieutenant; commander; assistant chief; executive assistant chief; and chief of police.

5. Within the City of Phoenix Police Department's patrol chain of command, sergeants directly supervised patrol officers, and lieutenants supervised sergeants and their squads.

6. As Interim Chief, I exercised department-wide oversight through intervening supervisory and command levels. I did not serve as the direct, day-to-day supervisor of patrol officers or patrol sergeants, including Officers Christopher A. Gitsch and Eric Summerville or Sergeant Jacob Lewis.

7. I was not present during the October 4, 2022 incident involving Stephan Shere.

8. I was never personally served with Stephan Shere's notice of claim arising from the October 4, 2022 incident, nor do I recall ever seeing it prior to his lawsuit being filed.

9. I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this 1st day of October, 2026.

Michael Sullivan

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Stephan Shere,<br><br>Plaintiff,<br><br>vs.<br><br>City of Phoenix, a governmental entity; Michael Sullivan, Chief of the Phoenix Police Department; Daniel Joseph Snyder, an individual; Alex Beaver, an individual; Christopher A. Gitsch, an individual; Eric Elliot Summerville, an individual; Brittany Bartimoccia, an individual; Jacob A. Lewis, an individual; Jennifer Lorrain Beberniss, an individual; and, John and Jane Does I-X,<br><br>Defendants. | Case No.: 2:23-cv-02657-JJT-ASB |

DEPOSITION OF: STEPHAN SHERE

JANUARY 21, 2026

1:03 P.M. TO 4:19 P.M.

Location: BROENING OBERG WOODS & WILSON
2800 North Central, 16th Floor
Phoenix, Arizona

Reporter: Brandy Harris, RPR

A. Yes.
Q. Okay. And, Stephan, have you taken any medications that might impair your ability to understand or respond to a question?
A. No.
Q. Are you taking any medications that impact your memory?
A. No.
Q. Okay. Have you had any substances that could -- alcohol or other nonprescription medications that could impair your ability to understand or respond to a question today?
A. No.
Q. Okay. Are you taking any medications?
A. Yes.
Q. What are you taking?
A. Lorazepam, propanolol, venlafaxine. That's what I'm currently on today.
Q. Okay. And --
A. I have a longer list, but that's what I'm currently on.
Q. Okay. And what are each of those medications for?
A. Anxiety is -- all three of them are for anxiety. And then the propanolol is also for

anti-adrenaline, but it's also for the anxiety as well. And then the venlafaxine is an antidepressant, but also is for neonephrine [ph] uptake.

Q. What is --

A. So adrenaline.

Q. Okay. How long have you been taking antidepressants?

A. About five years, six years. I think I started in 2020.

Q. How long have you been taking antianxiety medication?

A. Same time.

Q. And what about anti-adrenaline medication? How long?

A. Same time. Everything was prescribed in the same visits.

Q. Okay. And was there something that happened that caused you to go and seek medical treatment that resulted in these prescriptions?

A. Not in an individual event, no. Multiple events over time.

Q. What were the multiple events over time?

A. Family issues, relationship issues, work issues.

Q. Are you still having family issues?

A. Yes.
Q. Okay. What about relationship issues? Are you still having those types of issues?
A. No. I'm not in any relationship. So...
Q. What about work issues? Are you still having work issues?
A. Yes.
Q. And so would it be fair to say that you're still taking those medications to help you cope with the family issues and the work issues?
A. Yes.
Q. Do you take those medications to cope with any other conditions or issues?
A. For the PTSD that I was diagnosed with.
Q. When were you first diagnosed with PTSD?
A. 2020.
Q. And do you have an understanding as to what the basis for your PTSD diagnosis is?
A. Many things I believe. Abandonment; childhood trauma, seeing my -- loss of a father; seeing my sister's father being in a coma in the same year. It's not particularly one event. Multiple events over time.
Q. Stephan, how old are you?
A. 40.
Q. So fair to say that you first were diagnosed

with PTSD when you were about 35, 34?
A. Yes.
Q. Prior to that had you been diagnosed with any kind of mental health conditions?
A. Manic depression maybe.
Q. When were you diagnosed with manic depression?
A. I think maybe -- this one's hard to say. It was when I was a juvenile. So 12 years old would be my best guess.
Q. Were you prescribed medication for that?
A. Yes.
Q. Are you still taking medications for manic depression?
A. No. Now they changed it to major depression.
Q. Major depressive disorder?
A. Yeah.
Q. Okay. And so you're treat -- being treated for major depressive disorder. And you no longer have a diagnosis of manic depression.
A. Yes.
Q. Would it be accurate to say that you were treated for manic depression up until the time your diagnosis was changed to major depressive disorder?
A. No.
Q. Okay. Was there a period of time where you

A. Yes.
Q. Okay. Have -- do you have -- how often do you have panic attacks?
A. Usually a few times a week. They've subsided. But I would say three times a week on average.
Q. When did you first have -- when did you have your first panic attack?
A. Around 30 -- around 31 maybe, 30.
Q. And was there something specific that brought it on?
A. Relationships. The same timing. The same timing as the initial relationships that --
Q. And --
A. -- I was talking about.
Q. -- have you had panic attacks about three times a week since your first panic attack when you were 31?
A. Yeah. For the most part, yes.
Q. Did you ever have more than three panic attacks a week?
A. Yes.
Q. When was that?
A. After the situation on 2022, that made me lose my housing, vehicles, my business. And everything just kind of exaggerated -- exaperated [sic]. And so I started having them multiple times a day.

everyday basis, but I work on an everyday basis. I don't
smoke anymore. I still drink at times.
But those would have been kind of the three
daily activities, if I didn't have a car especially.
When I had a car, I would have went to the gas station,
saw my parents or saw my mom. I considered him my
parents still, going to her house. Go to restaurants,
eat out. You know, obviously go to the store if needed
for Max and to cover myself.
But that day I don't think I went to the store.
I don't know if I had the capability of going to the
store. I might have taken an Uber to the gas station.
Q. What would you have gone to the gas station
for?
A. Just drinks. Soda, drinks, snacks.
Q. Do you recall if you started drinking alcohol
on the 4th before the police came?
A. Yeah.
Q. When?
A. I do not know.
Q. Do you remember how many drinks you had before
the police came on the 4th?
A. I can give you an assumption. Half a bottle of
whisky. The, like, 750 milliliter.
Q. Is that a -- a normal amount for you to drink

in a single day?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Did you have any other alcoholic beverages that day?
A. No.
Q. You mentioned earlier that you were having some panic attacks about how you were going to pay your bills on the 4th.
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Okay. Do you remember how many panic attacks you had that day?
A. Probably all -- the panic attacks I get sometimes last hours. They just, like, don't go away. So --
Q. Do you --
A. -- I can't give you a number. But I know that I took my medication at least three times that day.
Q. Okay. So you recall that you were having panic attacks for at least a long enough period of time that you would have taken that medication three times?
A. Uh-huh.

Q. Is that a yes?
A. Yes.
Q. How often --
A. I'm sorry. I'm going to do my best to make sure I say "yes."
Q. That's okay. It's -- everybody does it; it's very normal. And I'll just keep reminding you.
How often are you allowed to take that medication?
A. Three times a day.
Q. Okay. And what medication is that?
A. Lorazepam.
Q. Okay. And do you have to wait a certain number of hours between taking it?
A. No.
Q. Okay. Can you remember how long you were having a panic attack on the day of the 4th?
A. All day long since the time I woke up. Usually be --
Q. Is there anything else that you did to try and help with the panic attack?
A. Walking, talking to family. But I didn't have any contact with anybody.
Q. Okay. So you weren't able to talk to family on the 4th?

A. Which I found funny. Not that -- not that he threatened the judge, just the small world after all.
Q. It's a small legal community, yeah.
Okay. So you call your sister on October 4th, and she doesn't answer, so then you send her a photo?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Okay. And you mentioned earlier that in the photo you had a toy gun?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Okay. What color was the toy gun?
A. Blue and black.
Q. Why did you have that toy gun?
A. It's a -- it's a -- it's a not a toy gun. It's a def -- it's a toy gun, slash, training weapon for learning how to disarm.
Q. Okay. Fair to say it's designed to look somewhat like a real weapon?
A. Yeah.
Q. Okay. And did your sister know that that was just a training weapon?
A. No.

other room, and I put the phone down and trying -- just tried to calm myself down and separate myself away from it. And then I think she got worried because I didn't answer.

Q. Okay.

A. Well, I know she got worried because I didn't answer at that point.

Q. Okay. And how do you know that?

A. 'Cause then the police showed up afterwards, after she tried to call me back.

Q. Okay. So she try -- she gets the photo from you with the gun at your mouth or at your head. And then she calls you and you don't answer?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. And then after that the police came -- coming is the next thing you remember?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Okay. At the time that you sent your sister that photo, were you thinking about hurting yourself?

A. No.

Q. Okay. Did you communicate to her in any way

that you were not thinking about hurting yourself, in between when you sent her the photo and when the police came?

A. No.

Q. Had you ever tried to hurt yourself before?

A. With her knowledge, no. I don't think so.

Q. Okay. So it sounds like there's two answers to that question. So let me ask it differently.

Had you ever tried to hurt yourself before?

A. Yes.

Q. Okay. Had -- and what did you do to try to hurt yourself before this incident?

A. I've put a rope around my neck before during an argument with my girlfriend.

Q. Okay. Have you tried to hurt yourself on any other occasions?

A. I don't think so.

Q. I'm not trying to trick you. But I did see in your medical records that it sounds like you have attempted suicide previously. Would you agree with that?

A. Just that -- just that one time that I can recall.

Q. With the rope?

A. Yeah.

Q. Okay. In one of your records with Dr. McClure,

teenager. Would that have been the counseling that you received when you were 12 that you told us about earlier?

A. Yes.

Q. Okay. And then after that it says, Endorses two psychiatric hospitalizations as a young teenager for self-harm twice.

A. Yes.

Q. What can you tell me about your psychiatric hospitalizations as a young teenager for self-harm?

A. I don't think I -- one was from -- I think I told you about where I kind of was stupid with threatening myself. And my mom left and I put the knife down.

(Simultaneous speaking.)

Q. That happened when you were a teenager?

A. 12 years old.

Q. Okay. And was that when she first took you to get treatment?

A. Yes. The probation officer told her to bring me to a hospital.

Q. Why were you -- why did you have a probation officer at that time?

A. For joyriding and picking up my friend in my grandma's vehicle.

Q. And you mentioned that you used a knife at that

time?
A. Yes.
Q. Were you threatening your mom with a knife or using it for yourself?
A. For myself.
Q. Did you cut yourself?
A. No.
Q. And what was the other self-harm when you were a young teenager?
MR. WOODS: Form.
THE WITNESS: I'm not sure.
Q. (By Ms. Kokal) And do you recall being hospitalized in a psychiatric hospital?
A. Yes.
Q. Two -- did that happen two times when you were a kid?
A. I got transferred from one location to another.
Q. But it was all one period of hospitalization?
A. I believe so, yeah.
Q. Do you recall how long that was?
A. Two months.
Q. That would have been when you were 12?
A. From St. Luke's to Park Place.
Q. And that would have been when you were 12?
A. Yeah.

Q. Okay. And then on the next line it says, Suicide attempts three times. The last in November 2020 with a rope around his neck but not taking action. That's the one you told me about with your girlfriend?

A. Yeah.

Q. Okay. Prior, in August 2020, in an MVA not requiring medical attention. And that's the one where you just told me you disassociated while driving?

A. Yeah. I didn't really -- that's not a suicide attempt. I was literally maybe even having high anxiety and kind of just losing focus.

Q. Okay.

A. And I lost control of the car. And just -- when I was turning, I turned too hard. And it literally just, like -- you know, like -- like, lost control of it going through traffic.

Q. And were you already receiving treatment for anxiety at that time?

A. No.

Q. Is that was one of the reasons you started seeking treatment for anxiety?

A. Yeah. I was on the phone during that.

Q. Who were you on the phone with when that happened?

A. My mom.

have been -- I think it was three total.
Q. Okay.
A. There might have been another time.
Q. But after each of those times, you were able to move back into your uncle's house?
A. Yes. And I just kept my mouth shut at that point. I didn't say anything.
Q. Okay. We got a little off track. But I want to bring you back to this record that's been marked as Exhibit-1. And we're still on page Shere 000333?
A. Yes.
Q. And after the motor vehicle accident, it says, The first in March 2019, via cutting his arm requiring surgery after a relationship problem?
A. Yep. Actually, I just thought -- that is a time that I did disassociate again.
Q. Okay. And would you consider that to be a suicide attempt?
A. No. But it was a -- it was kind of a self-harm.
Q. And what kind of surgery did you need?
A. Tendons, ligaments, muscle, nerve repair.
Q. Do you recall where you had that surgery done?
A. Ab -- Abrazo Scottsdale.
Q. Did you have to get any other treatment after

that?
A. Physical therapy.
Q. Where did you do that?
A. I don't know. I think it was Banner Physical Treatment [sic]. I'm not positive. I think it was Banner or something.
Q. Okay. Of those three incidents that we just talk about -- the rope; the MVA, the motor vehicle accident; and the cutting your arm -- do you consider any of those to be suicide attempts?
A. The rope. But not a full suicide attempt, no.
Q. Does your sister know about any of those incidents?
MR. WOODS: Foundation.
Q. (By Ms. Kokal) As far as you know? Have you ever talked with her about them, for example?
A. The arm she knows about. I don't know if she knows the circumstances.
Q. Okay. Does she know about the disassociation and the accident in 2020?
A. I don't think so.
Q. Have you ever talked with her about the time that you put the rope around your neck?
A. Nope.
Q. Okay. After your -- you sent that photo to

they're not keep -- basically if they weren't -- keep making false statements to me, why I'm still cooperating with them then. Then I wouldn't think they're assholes. But they kept on making false statements to me, so I didn't trust them.
Q. What are the false statements you think the police were making to you?
A. They told me if they saw that I was okay, they would leave.
Q. Why did you think that was false?
A. Because I showed them I was okay, I came outside, and they did not leave.
Q. So you came outside of your apartment --
A. Uh-huh.
Q. -- to see the police before they said that?
A. Well, they told me to -- at that point they told me -- I believe even at -- they made a comment about I have a knife. I said, "I don't have a knife." I said, "Wait. Yes, I do." And then I put the bag down. I put the knife down. I showed them I had nothing on them.
And as soon as I had that opportunity to show them that I have nothing on them, that's when they shot me with TASERs, bean bags, and split my head open.
Q. Okay. Let's go back to the false statements. So you said that they made false statements that if you

THE WITNESS: Okay.
MS. KOKAL: And maybe a couple of other items. Do you want to take a break, or are you okay to keep going?
THE WITNESS: I'm okay.
MS. KOKAL: Okay.
MR. WOODS: I'd like to take five.
MS. KOKAL: Okay. You can have a break, Sean.
MR. WOODS: Thank you.
(Off the record 3:11 p.m. to 3:26 p.m.)
Q. (By Ms. Kokal) I want to ask you about a couple of other things before we watch the videos.
Do you remember telling the police that you were trained by Blackstone?
A. Blackwater.
Q. Blackwater.
A. Same thing we talked about earlier that I learned from the videos.
Q. Why did you tell them that?
A. I have no idea. Because it was about -- mainly about the -- the knife and disarming and saying that that's why I have the training weapons.
Q. Did you explain to the police that those were just training weapons?
A. No. I didn't have an opportunity to.

Q. Fair to say that if you had come out to talk to the police, you might have had the opportunity to tell them that?

A. No. Because I came out and talked to them.

Q. Okay. Do you recall telling the police that you wanted to be TASED?

A. Out of context, yes. I didn't necessarily say I wanted to be TASED. I told them multiple times, "I don't want to be TASED." But then they continued to escalate the situation from me complying to the point that I just said, "Okay. If you want to TASE me, TASE me."

Q. Do you recall --

A. It wasn't me wanting to be TASED. Definitely not.

Q. Had you ever been TASED before this?

A. No.

Q. Do you recall telling the police that you were thinking about shooting yourself in the head?

A. I remember the statement that they said I said that they are escalating the situation to the point that it make me feels that way.

Q. Do you recall telling the police that you were gonna drop the fucking ax on them?

A. What's that mean?

Q. And that's the knife that you were wearing around your neck?
A. Yes.
Q. At the time that you were wearing it around your neck, would it have looked like this, what's depicted in Exhibit-5?
A. Partially.
Q. Why do you say "partially"?
A. It was covered. The whole blade was covered.
Q. What was the blade covered with?
A. A sheath around my neck.
Q. Did you take the sheath off at some point?
A. Maybe when I put it on the ground. Other than that, no. Never before that.
Q. At the time that this incident happened, do you think that you were intoxicated by alcohol?
A. Yeah.
Q. At the time that this incident, do you think that you were high on marijuana?
A. Probably, yes.
Q. You had testified about a time that you disassociated and walked out into traffic. Do you recall that?
A. Uh-huh.
Q. Is that a yes?

A. Yes.
Q. Did you suffer any other injuries?
A. I had my head split open by their shield.
Q. When you say "shield," what do you mean?
A. A big ballistic shield that they were holding in front of them in one of the videos.
Q. Before you were shot by the TASER, do you recall any of the officers warning you that you were gonna be shot?
A. No. They told me that as long as I come out, they would leave. If I complied with them, they would leave.
Q. Okay. But the question I asked was: Do you recall any of the officers warning you that they were going to fire their TASER?
A. None.
Q. Do you recall any of the officers warning you that they were going to fire a beanbag at you?
A. No.
Q. Let's go back to Exhibit-6. We're gonna turn to -- this page was discussed earlier it's marked HonorHealth c/o CT Corp 00024, which is page 13 of the document. Are you there?
A. Yes.
Q. Do you recall answering questions earlier

# EXHIBIT 3

# City Of Phoenix

The accompanying records and recordings and explanatory material are from the Phoenix Police Department public safety answering point communications facility. This form authenticates 6 pages. This form authenticates 2 recording(s). These documents and tapes pertain to: Department Report number DR 2022-01496803; call receipt; date and time 10/04/2022 at 18:55 hours; caller name Alexis; call origination location address 6800 E Mayo Bl #1308; originating telephone number 6022914285; dispatch time 19:00 hours; arrival time 19:00 hours;

Signed: [signature]

RACHEL CASERTA
Custodian of Records
Communications Bureau
Phoenix Police Department

authentication: PPSB\CroweK
Updated: Wednesday, May 20, 2026

```
(s0p10.0h10.0v0T
Page 1                    PHOENIX POLICE DEPARTMENT
FOR: JELENL             JURISDICTION - PHOENIX POLICE           Thu, Dec-08-2022

CALL: PH22-1496803 CLEARED (R)

               Desk/
Time      Date  Unit    ID
18:55:20 10 04 911            Position:125                                  Phone: [redacted] VERIZON
                              WRLS 800-451-5242
                              18002 N 21ST AVE SE
18:58:18 10 04 W25      A6761  Priority: 1 Received by: 9 911 SYSTEM
                              Initial: 901X SUICIDE ATTEMPT
                                Final: 901X SUICIDE ATTEMPT
                              Reporting: 07407
                              Reporting: 07319
                              Telephone:[redacted]
                              [redacted]
                              Community: PHX County: MC District: 6 Zone: 631
                              Contact: TELEPHONE CONTACT  G1: [redacted] G2:  Sex:   DOB:              AZ
                              [redacted]
18:59:23 10 04 W25      A6761  BROTHER IS THREATENING 901X, SENT PHOTO WITH GUN IN HIS MOUTH
18:59:40 10 04 WD6A     A6635  Call re-directed:T6
18:59:51 10 04 W25      A6761  ![redacted],/
19:00:06 10 04 W25      A6761  GUN APPEARS TO BE A HANDGUN
19:00:06 10 04 WTAC6    A5318  A :631M PT 07407  [redacted]
19:00:06 10 04 WTAC6    A5318  A :631M PT 07319
19:00:06 10 04 WTAC6    A5318  A :631M PT 07407  CONTROL FOR UNIT CHANGED T2
19:00:06 10 04 WTAC6    A5318  A :631M PT 07319  CONTROL FOR UNIT CHANGED T2
19:00:15 10 04 WTAC6    A5318  Call re-directed:
19:00:18 10 04 634I     10370  EN:634I IO 10370  ASSIST:631M     /[redacted]
19:00:18 10 04 634I     10370  EN:634I IO 10441  ASSIST:631M     /[redacted]
19:00:22 10 04 WD6B     A3679  EN:631M PT 07407
19:00:22 10 04 WD6B     A3679  EN:631M PT 07319
19:00:22 10 04 WD6B     A3679  EN:631M PT 07407  Sent to MDT: 631M,Status changed to EN by WD6B
19:00:28 10 04 631G     10919  EN:631G PT 10919  ASSIST:631M     /[redacted]
19:00:28 10 04 WD6B     A3679  Call re-directed:T6
19:00:31 10 04 W25      A6761  TEXT STATED YOULL BE BETTER OFF WITHOUT ME WITH THE PHOTO ATTACHED
19:00:32 10 04 632I     10582  EN:632I PT 10582  ASSIST:631M     /[redacted]
19:00:32 10 04 632I     10582  EN:632I PT 10581  ASSIST:631M     /[redacted]
19:00:32 10 04 WTAC6    A5318  Call re-directed:T6
19:00:34 10 04 WD6B     A3679  EN:63G PS 08247  [redacted]
19:00:39 10 04 WD6B     A3679  Call re-directed:T6
19:00:41 10 04 WTAC6    A5318  Call re-directed:T6
19:01:08 10 04 EHM      A4902  BC'D HOT MON
19:01:17 10 04 W25      A6761  SUBJ HAS THREATENED 901X BEFORE,BUT HAS NVER ATTEMPTED
19:01:42 10 04 WTAC6    A5318  631M BETTER 20?
19:01:42 10 04 WTAC6    A5318  EN:631M PT 07407  BETTER 20?
19:02:00 10 04 634I     10370  EN:634I IO 10370  EXT Q PERS-NAME:[redacted]   G1:[redacted]
                              DOB:[redacted]    SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  TONC:Y  UNIT:634I
19:02:00 10 04 634I     10370  EN:634I IO 10441  EXT Q PERS-NAME:[redacted]   G1:[redacted]
                              DOB:[redacted]    SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  TONC:Y  UNIT:634I
19:02:55 10 04 W25      A6761  COMP BELIEVES HE IS IN BUILDING 1
19:03:03 10 04 W25      A6761  Comp.Name:CHANGED TO:[redacted]
19:03:11 10 04 WTAC6    A5318  63G WHO DOES BRO LIVE WITH,ANY FAMILY
19:03:11 10 04 WTAC6    A5318  EN:63G PS 08247  WHO DOES BRO LIVE WITH,ANY FAMILY
19:03:13 10 04 W25      A6761  Comp.Contact
19:03:42 10 04 633G     10558  EN:633G PT 10558  ASSIST:631G     /[redacted]
19:03:46 10 04 W25      A6761  SUBJ IS NO LONGER RESPONDING TO COMPS TEXTS
(s0p10.0h10.0v0T
Page 2                    PHOENIX POLICE DEPARTMENT
FOR: JELENL             JURISDICTION - PHOENIX POLICE           Thu, Dec-08-2022

CALL: PH22-1496803 CLEARED (R)

               Desk/
Time      Date  Unit    ID
19:03:57 10 04 W25      A6761  BRO LIVES ALONE
19:04:28 10 04 WTAC6    A5318  631G 21 FRO BRO?
```

```
19:04:28 10 04 WTAC6  A5318  EN:631G PT 10919  21 FRO BRO?
19:04:35 10 04 W25    A6761  BRO IS USUALLY COOPERATIVE,STRUGGLES WITH [redacted]
19:04:59 10 04 W25    A6761  [redacted]
19:05:14 10 04 W25    A6761  BROS 21
19:06:03 10 04 WTAC6  A5318  631M [redacted]
19:06:03 10 04 WTAC6  A5318  EN:631M PT 07407  [redacted]
19:06:04 10 04 WTAC6  A5318  A :631M PT 07407
19:06:04 10 04 WTAC6  A5318  A :631M PT 07319
19:06:04 10 04 WTAC6  A5318  A :631M PT 07407  Sent to MDT: 631M,Status changed to A  by WTAC6
19:06:57 10 04 WTAC6  A5318  63G CAN 631M CALL CMP TO GET FURTHER
19:06:57 10 04 WTAC6  A5318  EN:63G PS 08247  CAN 631M CALL CMP TO GET FURTHER
19:07:05 10 04 WTAC6  A5318  631M GATE CODE?
19:07:05 10 04 WTAC6  A5318  A :631M PT 07407  GATE CODE?
19:09:06 10 04 WTAC6  A5318  631M IM TRYING TO CALL CMP?
19:09:06 10 04 WTAC6  A5318  A :631M PT 07407  IM TRYING TO CALL CMP?
19:09:07 10 04 631G   10919  A :631G PT 10919
19:09:12 10 04 WTAC6  A5318  Call re-directed:T6
19:10:06 10 04 634I   10370  EN:634I IO 10370  EXT Q PERS-DL:[redacted]  STATE:AZ  CAD:Y
                             EXTN:Y  EXTD:Y  TONC:Y  UNIT:634I
19:10:06 10 04 634I   10370  EN:634I IO 10441  EXT Q PERS-DL:[redacted]  STATE:AZ  CAD:Y
                             EXTN:Y  EXTD:Y  TONC:Y  UNIT:634I
19:10:26 10 04 634I   10370  Subject:MALE
                             System: NCICReceived at: 7:10 PM

                             MVD.40-01 DR.00723U09.AZ0072300.
                             TXT
                             OLN/[redacted].

                             *** DRIVER DETAILS ***
                             NAME: [redacted]
                             GENDER: Male
                             DATE OF BIRTH: [redacted]
                             HEIGHT: 511
                             WEIGHT: 200
                             HAIR COLOR: BRO
                             EYE COLOR: GRN
                             SSN: [redacted]

                             *** ADDRESS INFORMATION ***
                             RESIDENCE: [redacted]

                             *** DRIVER LICENSE DETAILS ***
                             DRIVER AUTHORIZATION ID: [redacted]
                             DRIVER LICENSE NON-COMMERCIAL CLASS: Class D - From 2022-08-20 To
                             2050-10-03
                             DRIVER LICENSE NON-COMMERCIAL STATUS: Valid
                             ISSUE DATE: 2022-08-20
                             EXPIRATION DATE: 2050-10-03
```



```
               Desk/
Time     Date  Unit   ID
                             *** DRIVER ALIASES ***
                             [redacted]
                             *** DRIVER ALIASES ***
                             [redacted]

                             *** DRIVER ALIASES ***
                             [redacted]

                             *** DRIVER ALIASES ***
                             [redacted]

                             *** DRIVER CONVICTION ***
```

```
                                          CONVICTION DATE: 2019-10-04
                                          ORGANIZATION TYPE: Phoenix Municipal Court
                                          CITATION DATE: 2019-08-16
                                          DRIVER CONVICTION TEXT: 28-695A - Aggressive driving
                                          .
                                          HTTP://162.59.200.85/HOME/INDEX/[redacted]
                                                                     CLICK ON THE WEB ADDR ABOVE

                                          PERSON: [redacted]
                                                       DOB: [redacted]   App. Age:
                                                       Sex: MALE  Race:
                                                   Address: [redacted]
                                                      Apt.: [redacted]
                                                      City: PHOENIX  State: AZ
                                                       Zip: [redacted]
                                                    S.S.N.: [redacted]
                                                 License #: [redacted]State of Issue: AZ
                                                     Build:    Height: 5'11 ft
                                                    Weight: 200 lbs
                                          Eye Color: GRN  Lens Type:
                                                Hair Color: BRO
                                          Query this name
                                          Add person as entity
19:10:38 10 04 WTAC6  A5318  634I INFO C4
19:10:38 10 04 WTAC6  A5318  EN:634I IO 10370  INFO C4
19:11:05 10 04 WTAC6  A5318  63G ANYONE WITH PEPPERBALL OR 40 MM
19:11:05 10 04 WTAC6  A5318  EN:63G PS 08247  ANYONE WITH PEPPERBALL OR 40 MM
19:11:50 10 04 WTAC6  A5318  631M CMP STILL NOT PICKING UP
19:11:50 10 04 WTAC6  A5318  A :631M PT 07407  CMP STILL NOT PICKING UP
19:11:54 10 04 WTAC6  A5318  63G COPIES
19:11:54 10 04 WTAC6  A5318  EN:63G PS 08247  COPIES
19:12:23 10 04 633G   10558  A :633G PT 10558
19:12:36 10 04 WD6B   A3679  NR PEPPERBALL/40MIL 2/6
19:13:21 10 04 634I   10370  EN:634I IO 10370  EXT Q PERS-DL:[redacted]   STATE:AZ  CAD:Y
                             EXTN:Y  EXTD:Y  TONC:Y  UNIT:634I
19:13:21 10 04 634I   10370  EN:634I IO 10441  EXT Q PERS-DL:[redacted]   STATE:AZ  CAD:Y
                             EXTN:Y  EXTD:Y  TONC:Y  UNIT:634I
19:14:00 10 04 WTAC6  A5318  CALL FORWARDED:(EHM,CAN YOU LET CAR958 MON PLS)
19:15:55 10 04 WTAC6  A5318  631M MADE CONTACT WITH SUBJ SAYS NOT 901X,DOESNT WANT HELP,SHUT DOOR ON US
(s0p10.0h10.0v0T
Page 4                    PHOENIX POLICE DEPARTMENT
FOR: JELENL             JURISDICTION - PHOENIX POLICE           Thu, Dec-08-2022

CALL: PH22-1496803 CLEARED (R)

               Desk/
Time     Date  Unit   ID
19:15:55 10 04 WTAC6  A5318  A :631M PT 07407  MADE CONTACT WITH SUBJ SAYS NOT 901X,DOESNT
                             WANT HELP,SHUT DOOR ON US
19:15:56 10 04 WTAC6  A5318  A :63G PS 08247
19:15:56 10 04 WTAC6  A5318  A :63G PS 08247  Sent to MDT: 63G,Status changed to A  by WTAC6
19:19:24 10 04 634I   10370  A :634I IO 10370
19:19:24 10 04 634I   10370  A :634I IO 10441
19:21:14 10 04 WTAC6  A5318  631M 602 291 4285 CMP [redacted]?
19:21:14 10 04 WTAC6  A5318  A :631M PT 07407  602 291 4285 CMP [redacted]?
19:21:29 10 04 WTAC6  A5318  631M GOING TO VM WHEN CALL,MANS VOICE FOR MESSAGE
19:21:29 10 04 WTAC6  A5318  A :631M PT 07407  GOING TO VM WHEN CALL,MANS VOICE FOR MESSAGE
19:21:35 10 04 632I   10582  I :632I PT 10582
19:21:35 10 04 632I   10582  I :632I PT 10581
19:21:35 10 04 632I   10582  I :632I PT 10582  CONTROL FOR UNIT CLEARED
19:21:35 10 04 632I   10582  I :632I PT 10581  CONTROL FOR UNIT CLEARED
19:21:51 10 04 WTAC6  A5318  63G CHK WITH 911 TO SEE IF CMP STILL ON LINE,WE ARE TRYING TO VERIFY IF
                             ALONE
19:21:51 10 04 WTAC6  A5318  A :63G PS 08247  CHK WITH 911 TO SEE IF CMP STILL ON LINE,WE ARE
                             TRYING TO VERIFY IF ALONE
19:22:52 10 04 WTAC6  A5318  631M WEVE TRIED 4 TIMES NOT PICKING UP
19:22:52 10 04 WTAC6  A5318  A :631M PT 07407  WEVE TRIED 4 TIMES NOT PICKING UP
19:23:38 10 04 WTAC6  A5318  634I I ATTACHED MALE,PULL UP RMS TO SEE IF ANY NEW GF'S
19:23:38 10 04 WTAC6  A5318  A :634I IO 10370  I ATTACHED MALE,PULL UP RMS TO SEE IF ANY NEW
```

```
                                GF'S
19:25:03 10 04 WTAC6  A5318  63G CONTACT WITH SUBJ AT FRNT DOOR ARMED BODY ARMOUR TRYING TO TALK HIM TO
                             COME OUT,WE HAVE RIFLE,SHIELD
19:25:03 10 04 WTAC6  A5318  A :63G PS 08247  CONTACT WITH SUBJ AT FRNT DOOR ARMED BODY
                             ARMOUR TRYING TO TALK HIM TO COME OUT,WE HAVE RIFLE,SHIELD
19:25:08 10 04 WTAC6  A5318  CALL FORWARDED:(EHM)
19:25:18 10 04 EHM    A5806  CALL FORWARDED:(WSUPR,SUBJ HAS BODY ARMOR)
19:25:47 10 04 632I   10582  EN:632I PT 10582  ASSIST:631M   /[redacted]
19:25:47 10 04 632I   10582  EN:632I PT 10581  ASSIST:631M   /[redacted]
19:26:14 10 04 WTAC6  A5318  63G FULLY TAC OUT,RESWTRICT CHANNEL
19:26:14 10 04 WTAC6  A5318  A :63G PS 08247  FULLY TAC OUT,RESWTRICT CHANNEL
19:26:52 10 04 WTAC6  A5318  63G CANT CONFIRM ANYONE ELSWE INSIDE,MAKE SURE FIRE NOTIFIED
19:26:52 10 04 WTAC6  A5318  A :63G PS 08247  CANT CONFIRM ANYONE ELSWE INSIDE,MAKE SURE FIRE
                             NOTIFIED
19:27:02 10 04 WTAC6  A5318  63G ONLY UNIT IN ALCOVE,SELF CONTAINED
19:27:02 10 04 WTAC6  A5318  A :63G PS 08247  ONLY UNIT IN ALCOVE,SELF CONTAINED
19:28:07 10 04 WTAC6  A5318  Call re-directed:T6
19:28:31 10 04 WTAC6  A5318  63G REPORT RECENTLY AT APT WITH 101,GET 21,AT DOOR TALKING TO US
19:28:31 10 04 WTAC6  A5318  A :63G PS 08247  REPORT RECENTLY AT APT WITH 101,GET 21,AT DOOR
                             TALKING TO US
19:28:46 10 04 EHM    A5806  (M) FIRE CONTACTING CAR958 TO MONT
19:28:56 10 04 WTAC6  A5318  63G I HAVE STUNBAG,TAZER,SHIELD,AND RIFLE IF WE CAN USE LESS LETHAL WILL DO
19:28:56 10 04 WTAC6  A5318  A :63G PS 08247  I HAVE STUNBAG,TAZER,SHIELD,AND RIFLE IF WE CAN
                             USE LESS LETHAL WILL DO
19:32:11 10 04 ED7A   A6658  EN:751N IO 10243  [redacted]
19:32:36 10 04 WTAC6  A5318  63G STUN BAG /TAZER DEPLOYMENT TAKING HIM INTO CUST
19:32:36 10 04 WTAC6  A5318  A :63G PS 08247  STUN BAG /TAZER DEPLOYMENT TAKING HIM INTO CUST
19:32:37 10 04 EHM    A5806  CALL FORWARDED:(WSUPR,STUNBAG DEPLOYED)
19:34:38 10 04 WTAC6  A5318  63G DEF C4,HES DETAINED,ROLL FIRE,INJURY TO HEAD,1022 IO,UNIT IS C4 NO ONE
(s0p10.0h10.0v0T
Page 5                    PHOENIX POLICE DEPARTMENT
FOR: JELENL             JURISDICTION - PHOENIX POLICE           Thu, Dec-08-2022

CALL: PH22-1496803 CLEARED (R)

                Desk/
Time      Date  Unit     ID
                             INJURED INSIDE
19:34:38 10 04 WTAC6  A5318  A :63G PS 08247  DEF C4,HES DETAINED,ROLL FIRE,INJURY TO
                             HEAD,1022 IO,UNIT IS C4 NO ONE INJURED INSIDE
19:35:08 10 04 WTAC6  A5318  I :751N IO 10243
19:35:22 10 04 WTAC6  A5318  63G CAN UNRESTICT,WILL LEAVE CALL HERE TILL FIRE 23
19:35:22 10 04 WTAC6  A5318  A :63G PS 08247  CAN UNRESTICT,WILL LEAVE CALL HERE TILL FIRE 23
19:35:25 10 04 EHM    A5806  (AM) AMBULANCE: AM,
19:39:44 10 04 WTAC6  A5318  CAR958 FIRE IS 17
19:40:02 10 04 WTAC6  A5318  634I PRETTY GOOD GASH ON HEAD AND COMBATIVE WITH US
19:40:02 10 04 WTAC6  A5318  A :634I IO 10370  PRETTY GOOD GASH ON HEAD AND COMBATIVE WITH US
20:07:14 10 04 WTAC6  A5318  Call re-directed:
20:21:57 10 04 WD6B   A3679  63G 34I CALL ME 2ND 21 LISTED ON CAD
20:21:57 10 04 WD6B   A3679  A :63G PS 08247  34I CALL ME 2ND 21 LISTED ON CAD
20:45:39 10 04 632I   10582  I :632I PT 10582
20:45:39 10 04 632I   10582  I :632I PT 10581
20:45:39 10 04 632I   10582  I :632I PT 10582  CONTROL FOR UNIT CLEARED
20:45:39 10 04 632I   10582  I :632I PT 10581  CONTROL FOR UNIT CLEARED
21:20:04 10 04 631M   07407  A :631M PT 07407  EXT Q PERS-NAME:[redacted]  G1:[redacted]
                             DOB:[redacted]  SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  TONC:Y  UNIT:631M
21:20:04 10 04 631M   07407  A :631M PT 07319  EXT Q PERS-NAME:[redacted]  G1:[redacted]
                             DOB:[redacted]  SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  TONC:Y  UNIT:631M
21:20:20 10 04 WD8    A4453  631M INFO C4
21:20:20 10 04 WD8    A4453  A :631M PT 07407  INFO C4
21:42:05 10 04 631G   10919  I :631G PT 10919
21:42:05 10 04 631G   10919  I :631G PT 10919  CONTROL FOR UNIT CLEARED
21:47:58 10 04 633G   10558  I :633G PT 10558
21:47:58 10 04 633G   10558  I :633G PT 10558  CONTROL FOR UNIT CLEARED
21:49:35 10 04 WD6A   A6635  63G 61J AND SEE IF UNIT CAN 25 615J
21:49:35 10 04 WD6A   A6635  A :63G PS 08247  61J AND SEE IF UNIT CAN 25 615J
21:49:46 10 04 63G    08247  I :63G PS 08247
21:49:46 10 04 63G    08247  I :63G PS 08247  CONTROL FOR UNIT CLEARED
21:55:28 10 04 WD6A   A6635  A :631M PT 07407  TIMER OFF - 631M
```

```
21:55:28 10 04 WD6A   A6635  A :631M PT 07319  TIMER OFF - 631M
21:57:52 10 04 WINFON A4261  Report flag:N TO:Y
21:57:52 10 04 WINFON A4261  Cleared by:CHANGED TO:R
21:57:59 10 04 WINFON A4261  Reporting Officer:CHANGED TO:07407
21:58:01 10 04 WINFON A4261  Call transferred to Records:1496803
22:12:58 10 04 WD6B   A3679  A :634I IO 10370  TIMER OFF - 634I
22:12:58 10 04 WD6B   A3679  A :634I IO 10441  TIMER OFF - 634I
22:19:03 10 04 631M   07407  A :631M PT 07407  EXT Q PERS-NAME:[redacted]  G1:[redacted]
                             DOB:[redacted]  SEX:F  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  TONC:Y  UNIT:631M
22:19:03 10 04 631M   07407  A :631M PT 07319  EXT Q PERS-NAME:[redacted]  G1:[redacted]
                             DOB:[redacted]  SEX:F  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  TONC:Y  UNIT:631M
22:37:12 10 04 631M   07407  Subject:SUSPECT
                             TXT
                             N
                             System: NCICReceived at: 9:20 PM

                             MVD.40-01 DR.00723T6X.AZ0072300.
                             TXT
                             NAM/[redacted],[redacted].DOB/[redacted].
(s0p10.0h10.0v0T
Page 6                   PHOENIX POLICE DEPARTMENT
FOR: JELENL            JURISDICTION - PHOENIX POLICE          Thu, Dec-08-2022

CALL: PH22-1496803 CLEARED (R)

               Desk/
Time      Date Unit   ID

                             *** DRIVER DETAILS ***
                             NAME: [redacted]
                             GENDER: Male
                             DATE OF BIRTH: [redacted]
                             HEIGHT: 511
                             WEIGHT: 200
                             HAIR COLOR: BRO
                             EYE COLOR: GRN
                             SSN: [redacted]

                             *** ADDRESS INFORMATION ***
                             RESIDENCE: [redacted]

                             *** DRIVER LICENSE DETAILS ***
                             DRIVER AUTHORIZATION ID: [redacted]
                             DRIVER LICENSE NON-COMMERCIAL CLASS: Class D - From 2022-08-20 To
                             2050-10-03
                             DRIVER LICENSE NON-COMMERCIAL STATUS: Valid
                             ISSUE DATE: 2022-08-20
                             EXPIRATION DATE: 2050-10-03

                             *** DRIVER ALIASES ***
                             [redacted]
                             *** DRIVER ALIASES ***
                             [redacted]

                             *** DRIVER ALIASES ***
                             [redacted]

                             *** DRIVER ALIASES ***
                             [redacted]

                             *** DRIVER CONVICTION ***
                             CONVICTION DATE: 2019-10-04
                             ORGANIZATION TYPE: Phoenix Municipal Court
                             CITATION DATE: 2019-08-16
                             DRIVER CONVICTION TEXT: 28-695A - Aggressive driving
                             .
                             HTTP://162.59.200.85/HOME/INDEX/[redacted]
                                                          CLICK ON THE WEB ADDR ABOVE
```

```
                              PERSON: [redacted], [redacted]
                                           DOB: [redacted]   App. Age:
                                           Sex: MALE  Race:
                                       Address: [redacted]
                                          Apt.: [redacted]
                                          City: PHOENIX  State: AZ
                                           Zip: [redacted]
                                        S.S.N.: [redacted]
                                     License #: [redacted] State of Issue: AZ
(s0p10.0h10.0v0T
Page 7                    PHOENIX POLICE DEPARTMENT
FOR: JELENL             JURISDICTION - PHOENIX POLICE          Thu, Dec-08-2022

CALL: PH22-1496803 CLEARED (R)

               Desk/
Time      Date Unit   ID
                                         Build:   Height: 5'11 ft
                                        Weight: 200 lbs
                              Eye Color: GRN  Lens Type:
                                    Hair Color: BRO
                              Query this name
                              Add person as entity
01:29:48 10 05 634I   10370  A :634I IO 10370  EXT Q PERS-NAME:[redacted]  G1:[redacted]  G2:M
                              SEX:F  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  TONC:Y  UNIT:634I
01:29:48 10 05 634I   10370  A :634I IO 10441  EXT Q PERS-NAME:[redacted]  G1:[redacted]  G2:M
                              SEX:F  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  TONC:Y  UNIT:634I
01:34:00 10 05 634I   10370  A :634I IO 10370  EXT Q PERS-STATE:AZ  SOC:[redacted]  CAD:Y
                              EXTN:Y  EXTD:Y  TONC:Y  UNIT:634I
01:34:00 10 05 634I   10370  A :634I IO 10441  EXT Q PERS-STATE:AZ  SOC:[redacted]  CAD:Y
                              EXTN:Y  EXTD:Y  TONC:Y  UNIT:634I
01:34:14 10 05 634I   10370  A :634I IO 10370  EXT Q PERS-DL:[redacted]  STATE:AZ  CAD:Y
                              EXTN:Y  EXTD:Y  TONC:Y  UNIT:634I
01:34:14 10 05 634I   10370  A :634I IO 10441  EXT Q PERS-DL:[redacted]  STATE:AZ  CAD:Y
                              EXTN:Y  EXTD:Y  TONC:Y  UNIT:634I
02:00:02 10 05 634I   10370  I :634I IO 10370
02:00:02 10 05 634I   10370  I :634I IO 10441
02:00:02 10 05 634I   10370  I :634I IO 10370  CONTROL FOR UNIT CLEARED
02:00:02 10 05 634I   10370  I :634I IO 10441  CONTROL FOR UNIT CLEARED
02:10:14 10 05 631M   07407  Report: N Founded: N How cleared: R
02:10:14 10 05 631M   07407  I :631M PT 07407
02:10:14 10 05 631M   07407  I :631M PT 07319
02:10:14 10 05 631M   07407  I :631M PT 07407  CONTROL FOR UNIT CLEARED
02:10:14 10 05 631M   07407  I :631M PT 07319  CONTROL FOR UNIT CLEARED
02:10:14 10 05 631M   07407  I :631M PT 07407  CLEARED CASE PH1496803 FOUNDED-N REPORT-N
                              CLEARED BY-R FINAL-901X BOLO-N STUDY FLAG- REM-
                              END OF REPORT
```

# EXHIBIT 4

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Stephan Shere, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>City of Phoenix, a governmental entity; et al.,<br><br>Defendants. | No.: CV-23-2657-PHX-JJT (ASB) |

VIDEOCONFERENCE DEPOSITION OF
OFFICER CHRISTOPHER A. GITSCH

Phoenix, Arizona

August 11, 2026

Prepared by:

Kathryn C. Cannon, CER
Certified Electronic Reporter
CER No. 4929

CERTIFIED TRANSCRIPT

Q. And then Selection: Serial 07319, Employee Name: Gitsch, Christopher A., and then the same serial number, correct?
A. Correct, sir.
10:23:29 Q. Okay. And so the last data entry I have on this is January 13, 2025. Do you see that?
A. I do see that.
Q. Okay. And if we scroll down a little further on page COP 000121, the last entry that -- or the very first 10:23:50 entry, I think, in your training record is February 14, 2001 for basic shotgun and stun bag. Do you see that?
A. I do.
Q. Does that kind of coincide with what you're saying about the academy and --
10:24:03 A. Yeah. Yes.
Q. Okay.
A. Yeah, graduated from the academy in February -- sorry, some of these -- it's been a while. Some of these years start to blend together. But yes, started the 10:24:15 academy in 2000, graduated in '01, and then was on the street later in -- in '01.
Q. Okay. So you were on patrol -- just street patrol at that time?
A. Correct. Correct.
10:24:27 Q. How long were you on street patrol from that time

BY MR. WOODS:
Q. Have you seen this report before?
A. I don't believe so.
Q. Okay. We'll scroll down to what's marked COP 000161. Do you see that?
A. I do.
Q. Okay. Now, on this page, he writes -- I'm just going to highlight it for you, "Officer Gitsch stated that he feared for the other people in the area. Having seen Plaintiff's behavior, he was worried about Plaintiff involving bystanders in his violence," and then in parentheses it says "Gitsch interview." Do you recall telling Mr. Wallentine that?
A. I did.
Q. Okay. Let's go down a little further on that same page. There's a sentence that runs into the next page that says, "When he first saw Plaintiff, Officer Gitsch immediately noted the karambit -- karambit dagger, and he was concerned that the knife was in a position for a quick draw," and then again Gitsch interview in parentheses. Did I read that right?
A. Correct.
Q. Do you know how to pronounce that -- that word?
A. Karambit.
Q. Karambit?

A. Yes.
Q. Okay. Do you recall telling Mr. Wallentine that?
A. So some of this is questions that he asked me. And so, in other words, he -- you know, this wasn't the first information that Mr. Wallentine had regarding this. I wasn't the first person. He had obviously reviewed this case, had reviewed body cam, in my opinion. I guess I don't know that specifically, but in my opinion. And so he was asking me specific questions regarding this, and then I would answer him appropriately.
Q. Okay. So did he ask you whether you saw the karambit dagger?
A. He did.
Q. Okay. And then you responded that you did?
A. Yes.
Q. Did he ask you if you were concerned about it?
A. Yes.
Q. Okay. And then you responded to that question?
A. I did.
Q. Okay. I'm going to scroll a little further, and now we're on 162. He writes, "Both Officer Gitsch and Officer Summerville were very concerned about Plaintiff's bladed posture with his left hand concealed behind the door. Both officers thought that Plaintiff could be holding a gun in his left hand," and in parentheses

there's Gitsch interview, Summerville interview, and Shere 000510, 000514. Do you recall telling Mr. Wallentine this?

A. I do. However, I'm just going to let you know, I don't -- I don't know if he is -- maybe did a typo there and meant Officer Beaver. Because I don't believe Officer Summerville was present when your client was in the position behind the door in that bladed posture.

Q. Okay. Go down to page 168, on number 13 here. He writes, "Officer Gitsch stated that [the] plaintiff 'upped the ante' by releasing the pit bull . . . and saying, 'watch this.'" And he cites to Gitsch interview and to some -- some video and a couple other documents.

Do you recall telling Wallentine that plaintiff upped the ante?

A. I do.

Q. And you recall telling him he upped the ante because he released the pit bull and said "watch this"?

A. Yes.

Q. Do you recall telling him that it greatly concerned you?

A. Yes.

Q. Do you recall telling him that "Near the time of this incident, Officer Gitsch had been involved in rescuing a person who had been mauled by a pit bull and he

was fearful of an attack on the officers"?

A. Yes.

Q. Was that on a police call?

A. It was.

10:47:52 Q. Okay. Do you remember when that happened?

A. I'm -- and, again, I'm just taking a stab in the dark here. So I believe it was within a year prior to this, and it was within three blocks of this incident at another apartment complex on 68th Street.

10:48:33 Q. But it didn't involve Mr. Shere's dog, did it?

A. No.

Q. Okay. At the incident, you had your TASER with you, correct?

A. Yes, sir.

10:49:00 Q. Okay. Down below, Wallentine writes that "Officer Gitsch was a certified CIT officer." Is that correct?

A. That's correct.

Q. What is CIT?

10:49:15 A. It's Crisis Intervention Technique, essentially people that are in mental crisis. It's training to try and de-escalate them and try to get them into a position or a state in which they can receive aid or assistance.

Q. Okay. He writes, "In fact, because he valued

10:49:42 using CIT techniques to de-escalate crisis situations,

Officer Gitsch completed the training course twice and was part of the initial group of officers to be CIT-trained," Gitsch interview in parentheses. Do you recall telling Wallentine that?

10:50:00 A. I did.

Q. Okay. And you have completed the CIT training course twice?

A. I have.

Q. Can you describe what the CIT training course taught you?

10:50:09

A. Yeah. So people go through all kinds of events in their lives. Sometimes this puts them in mental crisis. In that case, sometimes they are unable to act rationally. Sometimes they are suicidal. And this training allows us -- gives us examples and a proper way of talking to people so that we can try and develop a rapport and speak with them in a way in which we can lead them to a conclusion where they are receiving treatment or aid. So that is essentially what CIT is.

10:50:37

10:51:17 Q. Okay. When was the last time you had CIT training?

A. It's probably been more than 10 years, but I -- again, you're -- you're asking me to kind of pull this out of a hat.

10:51:45 Q. If we go back to the first exhibit, page 114 --

10:52:06
10:52:28
10:52:37
10:52:59
10:53:17

this is page COP 000127. Do you see that?
A. I do.
Q. Okay. And at the top of the page, your employee -- the name is there, your name, Christopher Gitsch, Serial Number 7319. And then it says Displaying Course Types: All Courses, correct?
A. Correct.
Q. On August 22, 2019, there's a line item that says "2018-2019 Crisis Support Training - Mandatory." Do you see that?
A. I do.
Q. And the course hours are three.
A. Yes.
Q. Is that part of the CIT training, or was that just something else?
A. I don't know. If I had to take -- it's just three hours. The training itself is -- I believe it was a couple of days. And I know that at least the second time it was out at the Mesa academy is where the training took place. And I believe the lead instructor at that time was Sabrina Taylor with the Phoenix Police Department.
Q. Okay. And you said it took about two days?
A. Correct. So that three hours, I don't think that would be accurate.
Q. Okay. It says "mandatory" there. So in your

A. Yeah, I just -- I just don't know. There's -- there's --

MS. BERKE: I think you guys are talking about two different trainings.

10:54:41 MR. WOODS: Okay.

MS. BERKE: He asked you if the CIT training was mandatory.

THE WITNESS: No, it's not.

BY MR. WOODS:

10:54:50 Q. Do you have to request -- on a training like that for certification, did you have to request approval to attend that training?

A. At least initially. I don't know if that's how it works now. I know there's a very -- and I am not -- I am not the expert on this, and I would suggest maybe getting with the people that run the program to ask them to see if it's changed. But when I first took it, it was certainly by request. The second time I took it, I believe I was notified by the actual officer who started the program in Phoenix that there was available -- there were still available seats, and that he encouraged me to take it as a refresher, and that is what I did. And, again, I believe that that was something I had to request.

Q. Okay. Do you -- so -- just so I can get it straight, do you recall the initial certification process?

Lewis directed that Officer Snyder would then use the shield to assist with the arrest." Did I read that right?
A. Yes.
Q. Wallentine then goes on to say, "Each officer later stated that they understood the directive and they would each make an independent assessment prior to using the less-lethal tools," and then he, in parentheses, says Gitsch interview and Summerville interview. Did I read that right?
A. Yes, sir.
Q. Did you tell Wallentine that you understood the directive and that you would make an independent assessment prior to using the less -- less-lethal tools?
A. Yes.
Q. We're going to go to 177. Wallentine writes that, "Officer Gitsch fired his TASER from approximately 12 feet away after announcing 'TASER, TASER, TASER.'" Did I read that right?
A. Correct.
Q. Is that what happened?
A. I believe so. It's hard to hear because there's a lot going on right in that split second, but I believe you can hear it.
Q. Okay. But do you recall announcing "TASER, TASER, TASER"?

A. That is what the training was at the time. That's no longer what the training is, but that is what the training was at the time.

Q. Down below he writes, "Officer Gitsch fired a

10:59:41 second TASER cartridge, which appeared to result in neuromuscular effect, causing Plaintiff to fall." Did I read that right?

A. Correct.

Q. Did you fire a second TASER cartridge?

10:59:53 A. I did.

Q. Okay. And do you recall seeing a neuromuscular effect on plaintiff?

A. Yeah, so that's -- you know, I believe the neuromuscular effect is the closer to scientific

11:00:15 explanation for what you're seeing. But yeah, lockup. I mean, that is -- that is generally what happened -- that is what happened at this point, at least there was a momentary time where you can see your client go into that neuromuscular effect.

11:00:59 Q. So as we were talking about your incident report, at the very bottom, it says, "While taking Stephan in custody, I suffered a lower back injury which required assistance from other officers in order for me to regain my footing. This entire incident was captured on my body

11:01:18 camera." Did I read that right?

Criteria and Tactical," and the amount of hours is 8. Do you see that?

A. Yes.

Q. Was that CIT training?

11:39:25 A. No.

Q. Okay. Go to the next one, 117. There's an entry from September 8, 2005, description is "Module 2005-2006 Active Shooter Intervention (Crisis Entry), and 2 hours. Do I have that right?

11:39:45 A. Yes.

Q. Was that the CIT training?

A. No.

Q. Go to the next crisis entry, September 8, 2005, Module 2005-2006 Window & Door Breaching (Crisis Entry), 11:40:01 2 hours. Did I read that right?

A. Correct.

Q. Was that the CIT training?

A. No.

Q. The next one, there is a January 14, 2004, entry 11:40:22 for Module 2003-2004 Crisis Communication of 2 hours. Do you see that?

A. Yes.

Q. And did I read that right?

A. Yes.

11:40:34 Q. Was that the CIT training?

A. No.
Q. We looked at this one earlier, 2018-2019 Crisis Support Training - Mandatory of 3 hours. Do you see that?
A. Yes.
11:40:54 Q. Did I read that correctly?
A. Yes.
Q. And that's on page COP 000127, correct?
A. Correct.
Q. Was that the CIT training?
11:41:09 A. I don't believe so. It's -- that one right there, I believe, has something to do with crisis intervention, but I believe that is a mandatory course that was pushed out every year that every officer had to review, take a look at it.
11:41:31 Q. Okay. And now I'm on page COP 137. Do you see that?
A. Yes.
Q. Okay. There's an entry up here at the top, "PG0122-2015 Module Crisis Communicati," and it cuts off
11:41:54 with the "I", but I believe that says -- would be communication, and it says 3 hours. Do you see that?
A. Yes.
Q. Did I read that correctly?
A. Yes.
11:42:09 Q. Was that the CIT training?

11:42:29 A. Again, I don't know if it is or if it isn't. To me, that looks like that might be part of a CIT training. If you notice, there's other things on that page, "Module PTSD Dealing with Tra;" the one that's two above it, "Module Mental Illness." So, again, I don't know.

Q. Okay. And -- and that's -- that's a good point, and that's why I'm asking these questions. That Module Mental Illness says 3 and a half hours, correct?

A. Correct.

11:42:46 Q. Health and Wellness is 1 and a half hours, correct?

A. Yes.

Q. Module Crisis Communicate that we just talked about is 3 hours?

11:42:55 A. Yes.

Q. What is RMS, on the next line?

A. So that would be the records management system, so that would be our old report system.

11:43:12 Q. Okay. And then if I look at these dates, on each of them, it looks like these modules that we're talking about either occurred on August 11, 2015, or August 12, 2015, correct?

A. Yes.

11:43:28 Q. Looking at this one, there's one that says Module Blue Courage, 6 hours. Do you see that?

A. Yes.
Q. When you were dispatched, do you recall the call being coded as a suicide attempt?
A. Yes.
11:53:31 Q. When I look at the final radio code there of 901X, what does that mean?
A. That is for a suicide attempt.
Q. Okay. Do you recall anybody reporting a crime about this dispatch call?
11:53:50 A. No.
Q. Nobody reported a burglary?
A. No.
Q. Nobody reported an assault?
A. No.
11:54:02 Q. Nobody reported that there was a victim involved?
A. Well, no. I mean, there is a victim. The victim would be Mr. Shere.
Q. And what was he a victim of?
A. He was the one that was threatening suicide.
11:54:25 Q. Did he commit suicide?
A. No, but parlance --
MR. WOODS: Sorry, go ahead.
MS. BERKE: Yeah. You can finish what you were saying.
11:54:40 THE WITNESS: Parlance is. But if someone

is suicidal and we go to that location, it's a suicide attempt. That's how it's dispatched, that's just how it is. It's not a check welfare. It's not an assault. It's not a burglary. It's a 901 x-ray.

11:55:02 BY MR. WOODS:

Q. Okay. 901 x-ray corresponding to that 901X, correct?

A. Correct.

Q. When you arrived, did Stephan ever tell you that

11:55:14 he was not going to commit suicide?

A. I don't believe that he did specifically say that.

Q. Okay.

MS. BERKE: And for the record, it appears

11:55:38 that Mr. Shere has joined. I don't know when he did, but he wasn't announced earlier. I don't know.

MR. WOODS: Yeah, I think I forgot that. I think he's been on the whole time. Sorry. One minute here.

11:56:28 THE COURT REPORTER: Mr. Shere, could we go ahead and get your appearance for the record, just confirm that it's you.

MR. SHERE: Yeah, my name is Stephan Shere -- Stephan Ryan Shere, and I am at 17319 North --

11:56:57 no, I'm sorry -- 17444 North 32nd Street in Phoenix,

Arizona 85032.

MS. BERKE: Mr. Shere, have you been on the entire time of the depo?

MR. SHERE: Yes, I've been here the entire time.

11:57:08

MS. BERKE: Okay. Thank you.

THE COURT REPORTER: Thank you.

BY MR. WOODS:

Q. Would you have classified -- I know the call said suicide attempt. But would you, in your CIT training, have classified this as a mental health call?

11:57:26

A. Yes.

Q. Do you know why you were dispatched to this call, like, the underlying reasons that dispatch said it was a suicide attempt?

11:57:45

MS. BERKE: Form. Foundation.

THE WITNESS: Yeah, the call stated that your client had sent a text message to his sister of a picture of a gun in his mouth and with something to the effect of that he was going to kill himself.

11:58:14

BY MR. WOODS:

Q. So before you got there and knocked, you knew that this was a mental health crisis, correct?

A. Yes.

11:58:34

Q. And not a criminal suspect, correct?

A. Yes.
Q. Okay. Do you know what this document is?
A. Well, what I would refer to this as is the CAD printout, computer-aided dispatch of an incident.
12:04:10 Q. Okay. At time 18:58:18, it says Priority: 1 Received by: 911 system, and Initial: 901X suicide attempt, Final: 901X suicide attempt, correct?
A. Yes.
Q. What's a priority 1?
12:04:35 A. So calls are prioritized up their importance. Priority 3 is -- is a low-priority call. It's generally a paper call. Priority 2 is higher, obviously, than Priority 3, but doesn't need to be dispatched immediately. Priority 1 is a call that needs to be handled immediately,
12:05:01 a hot call.
Q. Okay. There's a line item at 18:59:23 that says "Brother is threatening 901X, sent photo with gun in his mouth." Did I read that correctly?
A. Yes.
12:05:17 Q. There's a -- there's a line item at 19:00:06, "Gun appears to be a handgun." Did I read that right?
A. Yes.
Q. Down further, there's a line item at 19:00:31, "Text stated you'll be better off without me with the
12:05:34 photo attached." Is that correct?

A. Yes.

Q. At 19:01:17, it says "Subject has threatened 901X before, but has never attempted." Did I read that right?

A. Yes.

12:05:57 Q. So at least at 19:01:17 on the dispatch, it was reported that he's threatened before but never attempted, correct?

A. Yes.

Q. Now, when these dispatch entries are written, is
12:06:13 this what -- to your knowledge, is this what the dispatcher radioed?

A. Sometimes it is, and sometimes it's -- it's different, sometimes it's more complete, less complete. It -- sometimes they put in shorthand. So it just depends
12:06:34 is the best answer.

Q. Does it ever get sent to your MDT?

A. Yes. You can access it from your MDT.

Q. Okay. So these line items, as they're written here, is this how it would show up on your MDT?

12:06:56 A. You can -- yeah, you can access that.

Q. So, for instance, on this line item at 19:00:22, there's an entry that says "Sent to MDT: 631M, Status changed to EN by WD6B." Did I read that right?

A. Yes.

12:07:17 Q. Do you know what 631M is?

was not suicidal, correct?
A. No.
Q. Okay. Then help me reconcile why it says "says not 901X"?
12:13:04 A. So in specific terminology to try and determine if someone is suicidal, you ask them specifically, "Are you thinking about hurting yourself, thinking about hurting anyone else," to determine danger to self, danger to others. While it says this, he did not specifically
12:13:34 answer the question. I believe he just told us to go away. And the question was met with a question, "Why do you care?"
Q. What's -- sorry, go ahead.
A. No, that's -- that's --
12:13:54 Q. Okay. Did you -- did you write this line item that says 631 "made contact with subject says not 901X"?
A. No, that would have been the dispatcher.
Q. Okay. So you would've been radioing that in?
A. Yes.
12:14:13 Q. Okay. It goes on to say "doesn't want help, shut door on us," correct?
A. Correct.
Q. Okay. And -- and he -- Stephan Shere told you that he didn't want help, and he shut the door on you,
12:14:26 correct?

A. Yes.
Q. Okay. Did you have a warrant for his arrest at that time?
A. No.
12:14:40 Q. Did you have a warrant for entering his apartment at that time?
A. No.
Q. So Stephan was within his rights to shut the door, then, correct?
12:14:54 A. Yeah, within his legal rights, yes.
Q. Okay. What do you mean, "within his legal rights"? Is there another set of rights that you're referencing?
A. Well, based upon just the information that was
12:15:11 given at this point, I have enough to take Mr. Shere to UPC, at the very least. So he wasn't going to be placed under arrest, but he was certainly going to go to UPC just based upon him sending the message with a gun in his mouth and that he was suicidal.
12:15:45 Q. Okay. What's UPC?
A. Urgent Psychiatric Care.
Q. But, again, you didn't have any warrants or anything along those lines to take him to UPC, did you?
A. No.
12:16:03 Q. Okay. And Stephan told you that he doesn't want

want your help. Why are you asking," and shutting the door on us.

Q. At that point, had you seen any of the text messages from the sister -- or from Stephan to the sister?

12:18:09 A. No.

Q. Had you seen any photographs at that point from Stephan to the sister?

A. No.

Q. Stephan was within his rights to refuse help,

12:18:27 correct?

A. No. I would -- I would disagree with that.

Q. So when someone says "I don't want your help" and they shut their door to their private domicile, you don't agree that he was within his rights to do that?

12:18:51 A. Well, he can do it, but -- first of all -- I mean, specifically, we're talking about this incident, right?

Q. Yep.

A. Okay. So based upon the known information at the

12:19:06 time, Mr. Shere is suicidal. Mr. Shere is armed with a handgun, which he has already stuck in his mouth, and which he has sent a -- a message to his sister indicating his intention to kill himself. Mr. Shere has answered the door with another weapon visible around his neck, the

12:19:44 karambit, wearing a tactical vest, some kind of odd hat,

gloves, and his bladed back away from the door to make it think -- to make us think that he is indeed armed with a handgun, which is directly behind that door. So I was a 100 percent certain at that time that Mr. Shere needed help.

12:20:23

Q. And you were going to make sure, no matter what, that Mr. Shere received help. Is that what you're saying?

A. No. There's -- there's a big -- there's a big bunch of space in there with no matter what. We were going to do everything within our power to make sure that Mr. Shere got help. So walking away from the door at that point and, you know, smacking my hands together and saying, "I hope he makes it," that -- that ain't going to work.

12:20:48

Q. Okay.

12:21:05

A. I think everybody deserves more than that.

Q. And if he had never opened the door, how long would you have stayed there?

MS. BERKE: Form. Foundation.

BY MR. WOODS:

12:21:24

Q. You can answer.

A. I -- I don't know that there's a specific answer to that. And ultimately, it would not have been my decision.

Q. So when he shut the door, you stayed there,

12:21:37

request a CIT officer?
MS. BERKE: Foundation.
BY MR. WOODS:
Q. Did you?
12:39:44 A. Well, I am a CIT officer. So no, I did not.
Q. Okay. Did you request a mobile crisis team?
A. No.
Q. At that time, did you have any other options like the Maricopa County crisis line?
12:40:08 A. No.
Q. Did you have that as an option available to you?
A. In this specific incident, no.
Q. Okay. And why not?
A. Because it's not -- we're -- we are speaking with
12:40:30 Mr. Shere. A mobile crisis team is not going to set foot near this place if it is not Code 4. In other words, Mr. Shere is -- is unable to harm himself or anyone else.
Q. Okay. Did you consult with the Maricopa County crisis line?
12:40:57 A. No.
Q. Okay. You -- you know what the operations orders are, correct?
A. Yes.
Q. What -- what are operations orders?
12:41:12 A. It's essentially a rule book.

A. I do.

Q. Okay. I'm going to press play. Let me just -- I'm going to share it real quick and make sure I actually share the sound. Okay. Sorry.

12:45:33 (Video played by Mr. Woods.)

BY MR. WOODS:

Q. Okay. I'm going to pause it at 6:56, which is 19:12:51. As we were watching this, did you see the door handle kind of going up and down?

12:46:09 A. I did.

Q. And at this point, the door was starting to open, correct?

A. Yes.

Q. Okay. I'm going to keep playing.

12:46:18 (Video played by Mr. Woods.)

BY MR. WOODS:

Q. I'm going to pause it for a second at 7 minutes, which is 19:12:55. Was that you that said your brother called?

12:46:30 A. No, that's Officer Beaver.

Q. Okay. Is this Officer Beaver that we can see on the screen at this point?

A. Yes, sir.

Q. And Officer Beaver is holding his handgun to his

12:46:41 right side, correct?

12:47:42

BY MR. WOODS:
Q. Was that you saying that we can't do that?
A. Yes.
Q. Okay.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. Did you hear him say, "I'm not thinking about hurting myself"?
A. I'm not certain if that's exactly what he said.

12:47:54

Q. We'll go back a little bit.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. Okay. So he said the words "I'm not thinking about hurting myself," correct?

12:48:13

A. I think he answered in a hypothetical, in if I say no, I'm not thinking about hurting myself.
Q. Okay. And then he told you to go away, correct?
A. Yes.
(Video played by Mr. Woods.)

12:48:28

BY MR. WOODS:
Q. And then you said "Not going to do that," correct?
A. Yes.
(Video played by Mr. Woods.)

BY MR. WOODS:

Q. So Stephan's in his doorway right now, correct?

A. Yes.

Q. Why -- why didn't you grab him at that point?

12:49:27 A. Well, again, I mean, you're essentially asking a tactical question at this point.

Q. Were you allowed to grab him, from a legal perspective?

A. We are -- we are allowed to detain him from a

12:49:46 legal perspective, even though he's in his domicile. But, again, because we're talking about the petition that we are going to be filling out on him, and he's going to be accepted. Again, with no other information, the fact that he has sent this picture, gun in his mouth, he's clearly

12:50:12 demonstrated suicidal ideations, expressed that to his sister. So -- so that is -- he is going to have to talk to somebody about that.

But the other consideration for not grabbing him is the fact that he's armed, and I'm not going to

12:50:34 push. I'm not going to escalate the situation at this point. I'm trying to de-escalate the situation. So if I can get Mr. Shere to calm down, come out to the hallway, we can have a conversation, hopefully I can convince him that it's in his best interest to go to UPC. And then --

12:50:58 then it becomes collaborative, right? It's not -- it's

not the man telling him he's got to go. It's Mr. Shere also realizing he's got to go for his own self-preservation.

Q. And -- and what if he tells you at that point that, "No, I don't -- I'm not going to go"?

12:51:11

A. Well, again, he needs to. So I'm not going to -- you know, not going to say that -- that he's just -- no matter -- no if, and, or buts about it, he's going, because I know there's other considerations. You know --

12:51:34

Q. Did you ever take him to UPC?

MS. BERKE: I don't think he was done with his answer. I don't know. You can finish it.

THE WITNESS: Well, there's other considerations here. So, you know, how long is it going

12:51:50

to take, how many police resources are we going to do on this -- use on this? Can we get to a situation where we believe that Mr. Shere is not going to harm himself tonight?

Well, we can possibly find some sort of way

12:52:12

to get to a point where ultimately we would walk away. But at this point, no. I mean, if anything Mr. Shere has made it worse with the way that he has answered the door. There's clearly something going on here. The tactical vest, the gloves, he's bladed behind the door. We've

12:52:38

never seen his left arm at this point. I'm -- I was

BY MR. WOODS:
Q. Now that was you speaking, correct?
A. Yes.
Q. And you said, "We'd like to help you if you want help," correct?
12:54:14
A. Yes.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. Okay. And a couple more times in that time frame. I paused at 8:29, which is 19:14:24. Did you hear yourself say "if you want help" multiple times?
12:54:32
A. Yes.
Q. Okay.
(Video played by Mr. Woods.)
12:54:49
BY MR. WOODS:
Q. And then I paused at 8:34. Did you hear yourself say, "If you want help, we can give you help"?
A. Yes.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. I paused at 8:43. Did you hear yourself say, "If you want help, we can give you help"?
A. Yes.
(Video played by Mr. Woods.)

BY MR. WOODS:
Q. And was that you that just said, "We're not leaving"?
A. Yes.
12:55:36 Q. And Stephan said, "Go away," correct?
A. Correct.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. And then at 9 -- I paused at 9:07. But you saw
12:55:46 him shut the door, correct?
A. Yes.
MS. BERKE: Wait. You said 9 -- okay, so 9:07 on --
MR. WOODS: On the video time --
12:55:55 MS. BERKE: -- the player -- the player, not the Axon?
MR. WOODS: Yeah. And on Axon, it says 19:15:01. I'm going to -- I'm going to rewind it just a little bit to 9:01 on the video, which starts at 19:14:56
12:56:07 on the Axon stamp. I'm going to press play.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. Did he shut the door, and -- and did you hear like a scoffing sound?
12:56:25 A. Yes.

said you made contact. You said he says he's not suicidal, and he told you to go away, correct?

A. Yes.

Q. Okay. And no crime had been committed, correct?

13:03:40 A. Correct.

Q. After he closed the door on you, you stayed in the hallway area, correct?

A. Yes.

Q. And you waited until more officers showed up,

13:04:05 correct?

A. Yes.

Q. And you and the other officers stayed in that area talking back and forth with each other, correct?

A. Yes.

13:04:31 Q. Going to share this again. Let me know when you can see it.

A. It's on.

Q. Okay. And we are at 14:16 on the timestamp for the actual video, which corresponds to 19:20:10 on the

13:04:51 Axon timestamp, correct?

A. Yes, sir.

Q. Okay. I'm going to go ahead and press play.

(Video played by Mr. Woods.)

BY MR. WOODS:

13:05:00 Q. And I'm going to stop at 14:17. Do you know who

A. Yes.
Q. Okay. And is that because you need to block the caller ID?
A. Yes.
13:06:11 Q. Okay. And you see that phone number there at the top with the star 67?
A. Yes.
Q. And there's a parentheses 5?
A. Yes.
13:06:21 Q. Does that mean you tried to call the complainant five times?
A. Yes.
Q. But the complainant never answered, correct?
A. He did. There was a male that answered the phone
13:06:34 number that was given when I initially entered the building. I had dispatch say the number to me, because I'd already tried once and couldn't get through. And they gave me this number, which is the number I continued to try. And, again, a male subject did answer and just
13:06:56 basically said "Stop calling here. Stop calling here. Stop calling here."
Q. Okay. So your testimony today is that someone actually answered one of your phone calls?
A. Yes.
13:07:09 Q. And not that it went to a voicemail with a male's

knowledge?
MS. BERKE: Foundation.
THE WITNESS: He was booked.
BY MR. WOODS:
13:12:30 Q. You don't know if he was actually charged with any -- any crimes?
A. Well, I mean, we -- we booked him for seven counts of aggravated assault.
Q. For seven counts of aggravated assault?
13:12:42 A. Correct.
Q. Okay. And why -- why did you book him for seven counts of aggravated assault?
A. Well, he released his dog at one point, which is -- upon saying "watch this." And yes, it is aggravated assault, given the fact that it's in fact an assault. 13:13:04 There's no reason to release his dog and say, "Watch this," other than trying to put us in reasonable apprehension of imminent threat, which is in fact assault, and given the fact we're police officers, it's aggravated assault. 13:13:31
Q. Did you hear him give any commands to his dog?
A. Other than watch this, no.
Q. Okay. Did you -- did you have eyes on the entryway of his apartment when the dog got out?
13:13:54 A. I -- no, I don't believe that I had an angle to

(Video played by Mr. Woods.)
BY MR. WOODS:
Q. Did you hear Stephan say, "Are you going to shoot me?"
13:36:53 A. Yes.
Q. Okay.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. Now, this is your body cam. You came up with your TASER aimed, correct?
13:37:08
A. Yes.
Q. I paused at 18:01, 19:23:56 on the Axon. I'm going to rewind by five -- by six seconds, and I want you to tell me what Stephan has in his hand.
13:37:22 (Video played by Mr. Woods.)
BY MR. WOODS:
Q. I'm paused at 17:59, 19:23:54 on the timestamp. Can you tell me what he has in his hands?
A. I believe that's a backpack, but it's hard to say.
13:37:40
Q. Okay. And at this point, there is a gun trained on Stephan by Officer Beaver, correct?
A. Yes.
Q. And there's also a light shined on Stephan, correct?
13:37:57

you believed it was a backpack, correct?
A. Yes.
Q. Okay. I'm going to press play.
(Video played by Mr. Woods.)
13:57:58 BY MR. WOODS:
Q. Okay. And so you had had your TASER raised, correct?
A. Yes.
Q. And there were some lights, I think I saw a green light and a red light. Let me go back to 18 minutes. 13:58:06
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. Did you see that?
A. No. I'm sorry.
13:58:19 Q. Okay. Yeah, it's kind of hard to see. So I'll go back to 17:53.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. Did you see the two lights?
13:58:32 A. I did.
Q. Okay. There's a green and a red light, right?
A. Yes.
Q. What are those lights?
A. So those are laser pointers. And what that is signifying is the spread of the probes. 13:58:42

Q. Okay. So there's two probes that fire out?
A. Correct.
Q. Okay. I'm going to press play.
(Video played by Mr. Woods.)
13:58:58 BY MR. WOODS:
Q. Okay. And you had heard him say "watch this" right there. Is that right?
A. Yes.
Q. Okay. And then Max the dog comes walking out?
13:59:10 A. Yes.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. You could hear some officers say, "Come here, puppers," and then, you know, a couple of other officers
13:59:28 saying "come here," and then you could hear Stephan saying "come here" as well, correct?
A. I guess I don't know that, because I can't see him. So I'm hearing "come here" multiple times, but other than that, I can't tell you who's saying it.
13:59:46 Q. Okay. I'll go back to 18:02, which is 19:23:57 on the Axon timestamp. But just -- just listen, see if you can discern voices.
(Video played by Mr. Woods.)
BY MR. WOODS:
14:00:06 Q. Did you hear Stephan say, "No, don't go to him.

Come here"?

A. I believe that was him, yes.

Q. Okay. Press play at 18:12, which corresponds to 19:24:07.

14:00:17 (Video played by Mr. Woods.)

BY MR. WOODS:

Q. Pause it at 18:23. Was that you saying, "Just come out here and talk to us," or was that somebody else?

A. Well, I believe I said it the first time, and

14:00:38 then maybe it was Officer Beaver that said it the second time.

Q. Okay. I'm going to press play.

(Video played by Mr. Woods.)

BY MR. WOODS:

14:00:47 Q. And then you hear the officer say "and that way it doesn't turn into a giant kerfuffle"?

A. Correct.

Q. Was that you or was that Beaver?

A. That was me.

14:00:56 Q. Okay.

(Video played by Mr. Woods.)

BY MR. WOODS:

Q. So I'm going to pause it there at 18:56, which corresponds to 19:24:52. You can see Stephan holding a

14:01:35 backpack, correct?

A. Yes.
Q. And he had just asked for his dog to come back, correct?
A. Yes.
14:01:45 Q. Okay. I'm going to press play.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. Now, you saw his other hand there, correct?
A. Briefly, yes. And then it goes back behind the wall.
14:01:56
Q. Okay. But he wasn't holding a weapon, correct?
A. Well, when you could see his hand, no. But he could easily have a gun in his pocket. He could have it in the small of his back. So no, there could be a gun present. And, again, we still have a knife present.
14:02:11
Q. Okay. But, again, there was no weapon in his hand when you just saw it, correct?
A. For that brief moment, there was no weapon in his hand.
14:02:22 Q. Okay. All right. 19 minutes, which is 19:24:55 on Axon. I'm going to press play.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. Now, Stephan said twice there, "Max, come here, buddy," and then, "Max, come here," correct?
14:02:36

tase you"?
A. Yes.
Q. Okay. And we're stopped at 19:21, which is 19:25:15 on Axon. I'm going to press play again.
14:04:55 (Video played by Mr. Woods.)
BY MR. WOODS:
Q. Did you hear yourself say "Pepper ball, we don't want to shoot you"?
A. I heard "don't want to shoot you," and I did hear
14:05:04 "pepper ball," but I'm not certain that I said that.
Q. Okay. I'll back up to 19:18, and I'll just play the whole segment there.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. Hear that?
A. I do hear that, yep.
Q. Okay. So you said "We don't want to tase you. Pepper ball. We don't want to shoot you," correct?
A. Yes.
14:05:27 (Video played by Mr. Woods.)
BY MR. WOODS:
Q. Okay. You heard Stephan say that he wants to be tased, correct?
A. Yes.
14:05:45 Q. Did you hear him say, "I'm not talking about you

guys. I want to go to Axon"?
A. Yes.
Q. Okay.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. I'm going to pause at 19:53, which is 19:25:48. Did you hear Stephan say, "Come here, Max"?
A. Yes.
Q. Okay. I'm going to press play again.
14:06:17 (Video played by Mr. Woods.)
BY MR. WOODS:
Q. Did you hear him say, "Come on, Max" again, "Sir, don't hurt me"?
MS. BERKE: Form.
14:06:30 THE WITNESS: Yes.
MR. WOODS: Okay. 19:58, 19:25:52 on Axon. I'm going to press play.
(Video played by Mr. Woods.)
BY MR. WOODS:
14:06:39 Q. Did you hear him say, "Am I making any threats to you guys?"
A. Yes.
Q. Okay. We're paused at 20 minutes exactly, which is 19:25:55. I'm going to press play again.
(Video played by Mr. Woods.)

A. I think he said shoot me, actually.
Q. We'll go back seven seconds. Let's listen to that again. We're at 24:37. I'm going to press play.
(Video played by Mr. Woods.)
14:19:44 BY MR. WOODS:
Q. You hear him say, "Why? So you can fucking tase me?"
A. Tase me, yes. He said tase that time. He said shoot me earlier.
14:19:51 Q. Press play at 24:44.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. Do you see his hands up in the air?
A. I do.
14:20:08 Q. Okay. So you saw both his hands, correct?
A. I did.
Q. Okay. And he wasn't holding a weapon, correct?
A. No, not right at that moment.
Q. We're at 24:54, and 19:30:48 on Axon. Press
14:20:20 play.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. You see both his hands, correct?
A. I do.
14:20:36 Q. We're at 25:05, 19:30:59, and he just yelled,

"I'm fucking fine," correct?
A. Yes.
Q. Press play.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. Okay. And we're at 25:17, which corresponds to 19:31:11. And you just raised your TASER and shot him, correct?
A. Yes.
14:21:11 Q. And just to be clear, he's not holding a weapon, correct?
A. Correct. There's no weapon in his hands.
Q. And he didn't make any threatening statements towards you, correct?
14:21:22 A. No.
Q. And he didn't make any threatening statements to any of the other officers, correct?
A. No.
Q. But you made the decision to tase him at this
14:21:31 point, correct?
A. I did.
Q. You testified earlier that you just wanted to get him to UPC, correct?
A. Yes.
14:21:40 Q. You also testified that you never submitted a

A. I -- I don't believe she was.
Q. Do you know if the pit bull was related to Max?
A. I had no idea.
Q. Okay. I'll press play again.
14:23:07 (Video played by Mr. Woods.)
BY MR. WOODS:
Q. So at 25:19, which corresponds to 19:31:14, Stephan's falling over, correct?
A. Yes.
14:23:18 Q. Does he have a weapon in his hands?
A. No, just around his neck.
Q. Okay. And -- and to be clear, what -- what kind of knife was that?
A. A karambit.
14:23:29 Q. Okay. Let's press play again at 25:19.
(Video played by Mr. Woods.)
BY MR. WOODS:
Q. You see that the ballistic shield was used on Stephan?
MS. BERKE: Form.
BY MR. WOODS:
Q. Do you see the ballistic shield at all?
A. Yes.
Q. And do you see the officer pushing the ballistic shield down?
14:23:55

A. I see him holding it.
Q. Okay. And then you're -- you're really close to Stephan at this point, correct?
A. Yes.
14:24:05 Q. And you still have that TASER in your hand, correct?
A. I do.
Q. When the cartridge is shot from a TASER and the probes hit someone's body, that causes muscular lockup,
14:24:16 correct?
A. If it works properly.
Q. Okay. In this situation, did it work properly?
A. It did not initially. And then when I fired the second time, there was -- it appeared to be the muscular
14:24:33 lockup, yes.
Q. So you -- you shot him twice with the TASER?
A. Yeah.
Q. When you shoot the TASER, when you pull the trigger, if you keep holding the trigger, does it continue
14:24:47 to give an electrical shock?
MS. BERKE: Form.
THE WITNESS: Yes.
BY MR. WOODS:
Q. You're TASER --
14:24:54 A. Yes.

is what you're saying, correct?
A. Fearing for my life?
Q. Yeah. You charged him with aggravated assault, right?
14:46:35 A. I was fearing that the dog might possibly attack, especially when he says "watch this."
Q. Okay.
A. Yeah.
Q. But you didn't shoot the dog, correct?
14:46:47 A. No. I -- I guess I need to see the dog do something before I'm willing to do that.
Q. But you had said -- let me just pull it up. Give me one minute.
Okay. I'm going to share what we had marked
14:47:26 as Exhibit 2, which is your incident report. You see that on your screen?
A. I do.
Q. Okay. In your incident report, you had written that, "Stephan exhibited a wide range of emotions, being
14:47:50 angry and crying, all within a few moments, telling us he was upset with his family and he didn't like us being outside of his apartment because it was embarrassing him." Did I read that right?
A. Correct.
14:48:01 Q. Is that what you wrote?

A. That is what I wrote.
Q. Okay. And is that -- is that accurate?
A. Yeah.
Q. Okay. You also wrote down here that you believed this to be a direct threat, that Stephan was trying to get his dog to attack officers. Do I have that right?
A. Yeah.
Q. So at the moment that Max came out the door, you believed that it was a direct threat, that the dog -- he was trying to get his dog to attack you?
A. Yes.
Q. And you didn't take any actions to prevent the dog from coming to you guys?
A. No.
Q. Now -- sorry, I didn't mean to close that.
On -- on the incident report, you said that, "He then released his dog towards us saying something to the effect of, 'Let's see what happens.'" Is that right?
A. That is correct.
Q. Okay. But he didn't say that. He said "watch this," at some point on the video, correct?
A. Correct.
Q. Okay. Did he ever say that -- did you ever hear him say something to Max like "attack"?
A. No.

Q. The whole time that we watched on that video, in regards to Max, you only heard Stephan say things like, "Max, come back," correct?
A. Yes.
14:49:57 Q. And that lasted for quite a few minutes, correct?
A. Yes.
Q. And the whole time he was asking for Max, correct?
A. Yes.
14:50:06 Q. And at some point, he was crying, and his words were something along the lines of, "Come here, Max," correct?
MS. BERKE: Form.
BY MR. WOODS:
14:50:19 Q. You can answer it.
A. Yes. I mean -- summary, yes.
Q. So the sum -- the sum total of the charges that -- you said there were seven counts of aggravated assault. Is that right?
14:50:34 A. Right. That's correct.
Q. And the entire basis for that is the fact that Max came out the door?
A. Came out the door, pushed out the door. We watched this. The context here, the entire -- the entire
14:50:52 event has to be taken into context here. So at the time,

yeah, "watch this," and the dog is -- comes out the door, is pushed out the door, yeah, I thought for a split second, he's going to get his dog to try and attack us. Now, that didn't happen, but that doesn't mean that single split second event didn't happen.

14:51:14

Q. And you're talking about context, but you -- you have no idea why he said watch this, right?

A. Well, no. But the only context that you can take from this, from my perspective, is that he's doing this to try and create a situation in which the dog either attacks us or we have to shoot the dog or something like that.

14:51:43

Again, the totality of the circumstances here, you know, we're not having a meaningful conversation with your client. Client's not answering any questions. There's all kinds of questions I would like to ask him.

14:52:06

Q. But the dog just sort of trotted out to you guys, right?

MS. BERKE: Form.

BY MR. WOODS:

Q. You can answer.

14:52:17

A. In that split second, yes.

Q. Okay. And -- and officers were able to hold on to the dog, correct?

A. Yes.

Q. And were calling him things like "good boy" and

14:52:28

A. Search and seizure.
Q. Is there anything else?
A. Go ahead and educate me.
Q. Well, let me ask this. Have you gotten
15:38:32 constitutional law training as part of your training in your history as a Phoenix police officer?
A. Yes.
Q. What -- do you recall any cases that you were trained on?
15:38:50 A. Well, there's all kinds of cases. I guess you're going to have to be more specific.
Q. Do you know Graham v. Connor?
A. I do.
Q. Okay. If I said that the Fourth Amendment also
15:39:01 protects individuals from the use of excessive force, would that refresh your memory?
A. Yes.
Q. And -- and you knew what the Fourth Amendment was prior to this event, correct?
15:39:12 A. Correct.
Q. And so you knew going into this event that everybody has Fourth Amendment protections, correct?
A. I did.
MR. WOODS: Okay. Now I'm done.

A. Yes.
Q. What other crimes was there probable cause to arrest Mr. Shere for?
A. So to be clear, aggravated assault, in my opinion -- the other crimes would be what I would consider lesser-included charges in that. So to -- and to go through the list, first of all, assault. So A.R.S. 12 -- or 13-1203. So was I put in reasonable apprehension of imminent physical threat? Yeah, in that moment that the dog was released, I thought, "Okay, here comes the dog." Again, it was a split second, but I thought that this is going to be to have the dog try to attack us.
Q. Right. But then when it's an assault against a police officer, that's aggravated assault?
A. Correct.
Q. And that's what he was booked into jail --
A. And that's exactly what he was booked into jail.
Q. Right. I'm asking about other crimes.
A. Other crimes. So Phoenix City Code 23-18. So it's opposing the police, it's obstructing, resisting, and opposing the police, essentially.
MR. WOODS: Lori, I'm going to stop this right now. It appears that Officer Gitsch is looking at some document while he's answering.
THE WITNESS: I'll get rid of it. Right

allowed to obstruct, resist, or oppose those functions. I'm compelled by Arizona law to go out and to go make an assessment of Mr. Shere in this case. The assessment was pretty clear that he needed to go to UPC, to urgent psychiatric care. And Mr. Shere was not going to allow us to do that, armed with what we believed to be a gun and two knives.

15:56:27

Q. Okay. And so did he violate Phoenix City Code 23-18?

15:56:48 A. Yes.

Q. How so?

A. Because he's not allowing me to do my function, which is to make an assessment of him. And the assessment is pretty clear without any further information, just based upon what we had in the initial call: He needs to go to urgent psychiatric care. He needs help.

15:57:00

Q. What was his specific conduct that gave probable cause to arrest him for violating Phoenix City Code 23-18?

A. Well, he's not allowing us to go --

15:57:18 MR. WOODS: Form.

THE WITNESS: He's not allowing us to go contact him and detain him and take him to urgent psychiatric care. Clearly he's got the knife around his neck. He's got another knife in his pocket. The picture that he sent to his sister is of a handgun. I never once

15:57:33

saw the small of his back while he was standing out in the hallway until we took him into custody. I still believe he may have had a handgun on his person. And also then releasing the his dog, his pit bull. Again, this is not 15:57:56 someone who's cooperative. This is someone who's opposing what I'm -- what I am trying to do, obstructing me from doing my duty, which is also covered under A.R.S. 13-2402, obstructing governmental operations.

BY MS. BERKE:

15:58:09 Q. And so was there probable cause to arrest him for violating that statute?

A. Yes, and evidence --

MR. WOODS: Form.

THE COURT REPORTER: I'm sorry. Excuse me. 15:58:19 Did you object, Mr. Woods?

MR. WOODS: I did. Form.

BY MS. BERKE:

Q. Okay. What conduct of his gave you probable cause to arrest him for violating A.R.S. 13-2402, 15:58:33 obstructing governmental operations?

A. Well --

MR. WOODS: Form.

THE WITNESS: -- again -- again, it is much the same as PCC 23-18. It essentially says I have a job 15:58:46 to do as a police officer. And acting under the color of

my authority, I am doing that job. I have determined that Mr. Shere needs to go to urgent psychiatric care. He's not willing to go. But the fact that he has sent a picture of a gun in his mouth to his sister saying that he has suicidal ideations, he has to go. He has to go. That is my duty. There's another as well.

15:59:08

BY MS. BERKE:

Q. What do you mean?

A. There's another charge as well, disorderly conduct. While we were there, at least twice, two different people passed through the hallway. So we had to keep people away from their apartments, to direct them away. Clearly, this is disorderly conduct.

15:59:25

If Mr. Shere would've invited us into his home, we would have had a conversation with him, which is what I was hoping would happen, and then we would convince him collaboratively to make the trip to UPC so he could go talk to someone and so he could get help, so he could get psychiatric care.

15:59:44

Q. Well, I'm going to pull up the disorderly conduct statute --

16:00:05

MR. WOODS: Lori? Lori?

MS. BERKE: Yeah.

MR. WOODS: On that Exhibit 13, is that Bates stamped?

16:00:16

Before we get back to your notes, I want to look at the disorderly conduct statute.

And so what exhibit are we at?

THE COURT REPORTER: 13 is what we just marked the report as.

16:01:43

MS. BERKE: Okay. So we're going to have this marked as 14, disorderly conduct.

(Deposition Exhibit 14 was marked for identification.)

16:01:50

BY MS. BERKE:

Q. All right. This is the disorderly conduct statute. Do you see it?

A. Yes.

Q. And so what is it here that you can -- that it's your position there was PC, probable cause, to arrest Mr. Shere for disorderly conduct?

16:02:16

A. Certainly.

MR. WOODS: Sorry. I was on mute.

I did a form objection. Keep going.

16:02:29

THE WITNESS: Sorry.

Certainly, Section A 4, Makes any protracted commotion, utterance or display of the intent to prevent the -- I'm sorry, that's wrong.

Let's see here. Abusive language, gestures, any person present likely to provoke immediate physical

16:02:51

retaliation makes unreasonable noise -- I'm sorry, section 2. I mean, this is an apartment complex. There's -- again, there's various people that are walking through. This isn't just -- we didn't see anyone. There was clearly times on body camera where we see people passing through the hall. So making unreasonable noise. We didn't want to make that noise. We didn't want to have this happen in the hallway. And I'd rather have Mr. Shere invite us into his apartment, we'll have a conversation there. But unfortunately --

16:03:11
16:03:31

BY MS. BERKE:

Q. Well, a conversation could take place outside of his apartment in a tone or at a noise level that's not unreasonable, right?

16:03:43 A. Correct.

Q. So what you're saying is he was making unreasonable noise?

A. Yes.

Q. And it says, "A person commits disorderly conduct if, with intent to disturb the peace or quiet of [the] neighborhood, family or person, or with knowledge of doing so, such person . . . makes unreasonable noise."

16:03:52

A. Yes.

Q. And --

16:04:03 A. Or seriously disruptive behavior.

Could people walk through that portion of the hallway? No, they couldn't, because now we've turned this into a police operation.

Q. Okay. Let's go back to the notes that were in Exhibit 13.

16:04:22

Okay. So the next one you have listed here is threatening or intimidating. Is that what it is?

A. Yeah, that's -- that's part of the assault, though. That's A.R.S. 13-1202.

16:04:53

Q. Okay. And then what's 13-1203?

A. That's the aggravated assault.

Q. Okay. So other than the aggravated -- aggravated assault, it's your testimony that there was probable cause to arrest him for violating Phoenix City Code 23-18, 13-2402, and then the disorderly conduct statute?

16:05:18

A. Yes.

MR. WOODS: Form.

BY MS. BERKE:

Q. All right. There was a reference -- or there was a training session you attended that's in your training record call -- something having to do with Blue Courage, and you said you don't recall ever hearing that. But if that's a training you attended, you probably heard it at one time, correct?

16:06:12

A. Yes.

16:06:29

Q. You just don't recall what it is?
A. No.
Q. Now, when someone is arrested and booked into jail, do they undergo any kind of psychiatric assessment?
16:06:59 A. Yes.
Q. And tell us about that.
A. So the exact services that he would get at UPC, a person who was suicidal gets those same services at the county jail.
16:07:12 Q. Okay. So even though he was booked into jail instead of being transported to UPC, he still received the mental health care that you wanted to get for him?
A. Yes.
Q. You testified earlier that a mobile mental
16:08:01 health -- I don't even know what it is, a provider -- would not come there because it wasn't Code 4. What does that mean?
A. Correct. So in order for them to come on scene and provide assistance, the situation has to be resolved
16:08:20 to the point where they are not going to be placing themselves in any kind of peril. So they're not going to come out there and try and talk to Mr. Shere when he's potentially armed with a gun and two knives, and he's not listening to our commands. Anything could happen at that
16:08:45 point.

Q. What does Code 4 mean?
A. Code 4 means that situation has returned to normal. So there's no -- there's no one in any immediate danger. So --
16:08:56 Q. Does that mean he's been searched for weapons?
A. Correct. Correct. And he's -- yeah, that's the only time that -- that they would come out. They've -- I've never seen them -- and they have flat-out refused to go to some certain situations because they just say
16:09:13 there's a violence potential, and they don't want to be involved in that. They're unarmed.
Q. There were -- there was a lot of questioning when Mr. Shere's attorney was showing you body-worn camera video where at times you could see Mr. Shere's hands, and
16:09:33 there was a time he lifted up his shirt, presumably to show that there was no gun in the front waistband. Do you recall that?
A. I do.
Q. When he lifted up his shirt, did he also turn
16:09:47 around so that you could see the rear waistband?
A. No.
Q. And so did you have any reason to believe he did not have a gun in his waistband in the small of his back?
A. No. I thought that that was a possibility
16:10:08 throughout the entire contact until we actually put

handcuffs on him and searched him.

Q. Is it common for an individual who's armed with a gun to place that gun in the waistband in their back area?

A. That is a common spot to place a weapon, yes.

16:10:40 Q. And Mr. Shere was claiming to be knowledgeable about law enforcement, correct?

A. Yes.

Q. And the fact that he lifted up his shirt and showed the front area was a clear indication he wanted to show you he didn't have a gun stowed there, correct? 16:10:56

A. Yes.

Q. The fact that he didn't turn around and show you the back area, what does that tell you?

A. That he could be concealing that, and that he is doing that intentionally. Not to mention that -- it's not like he stayed in perfect view the entire time. He continued to duck behind the alcove of the entrance to his apartment so that he could have had it in the small of his back, he could have moved it to his pocket, he could have moved it three different places. 16:11:08 16:11:29

And getting back to making reference to law enforcement, at one point, he also made a reference to Blackwater, which is a paramilitary organization that's defunct. Now I think it's Triple Canopy is what it's morphed into. But, you know, they are military operators. 16:11:48

Q. Sure. So when the incident concluded, you found a second knife on him, correct?
A. Yes.
Q. Does that mean that throughout this entire encounter with Mr. Shere, he was armed with a concealed deadly weapon?
MR. WOODS: Form. Foundation.
THE WITNESS: Yes.
BY MS. BERKE:
Q. You were shown video where you described him as being bladed behind the door, you couldn't see his left hand, and you believed he may have had a weapon?
A. Correct.
Q. What kind of weapon did you believe he may have had?
A. At that point, I believed he had a gun.
Q. And is that because he had reportedly sent a picture of himself with a gun to his sister saying he intended to kill himself with it?
A. Yes.
MR. WOODS: Form. Foundation.
BY MS. BERKE:
Q. There was discussion about whether he actually said, "I'm not suicidal," you put out over the radio he says he's not suicidal. Did he actually use those words?

A. He did not. But I was trying to convey what I thought that he wanted us to believe, but that is not what he said.

Q. And at other points in time during this encounter with him, did he say things that led you to believe he was suicidal?

A. Yes.

Q. What did he say?

A. He said, "Go ahead and shoot me." He became extremely animated. Didn't matter. Was having issues with his family. His family didn't care if he was alive.

Q. And he said he didn't have anything to live for, correct?

A. Correct.

Q. Are those the words of someone who's claiming not to be suicidal?

A. No.

MR. WOODS: Form. Foundation.

BY MS. BERKE:

Q. At any point that you were calling that number that you called multiple times, did you believe that was not the correct number?

A. No. That's why I checked to have the number verified twice. I've never had that happen in -- in nearly 26 years, I've never had that happen like that. I

have no idea how that number got -- but, again, it was verified twice. Where the signals got crossed, I have no idea. But I can only go with the information I'm given.
Q. And so every time you called that number, you
16:16:39 believed you were calling the complainant?
A. Yes.
Q. Although Mr. Shere never made any verbal -- Well, strike that.
Although -- Strike that.
16:17:05 When Mr. Shere sent the dog out, the pit bull, what did he say?
A. "Watch this."
Q. Did you interpret that as a threat?
A. Yes.
16:17:31 Q. "Watch this" is not exactly verbatim what you stated in your report that -- in your supplement that he had said, correct?
A. Correct.
Q. Was that intentional?
16:17:46 A. No. I had not had an opportunity to review my body cam when I wrote that report, and I knew that there was the gist of it. But, again, watch this --
Q. And you wrote, "Let's see what happens"?
A. Yes.
16:18:04 Q. In your mind, are those the same?

A. Yes. That is the -- the same connotation is, "Here comes the dog, now we'll see what happens."
Q. Okay. And so when you stated that in your report, you were doing your best to recall exactly what words to use?
16:18:21
A. Yes.
Q. Why were you trying to get the complainant on the phone?
A. We wanted to get more information. First of all,
16:18:42
because I -- I never really got out of the mode of trying to build rapport with Mr. Shere. So I figured if I could speak with the complainant, maybe she could give me some kind of hook, some kind of personal information that I could use to determine if I could develop some kind of
16:19:04
rapport with Mr. Shere to convince him that it was in his best interest to go to UPC with us.
The other thing is I just wanted more information. Have you seen this gun before? Do you know what kind of gun it is? Has he talked about it? Does he
16:19:19
have other weapons? Does he have rifles? Does he have shotguns? Does he have a girlfriend? Could his girlfriend be in the apartment? Just a whole litany of questions. Is the dog aggressive? A whole litany of questions that I would like to have had -- you know,
16:19:37
information's knowledge. Wasn't getting any from

Mr. Shere, wasn't getting any from the complainant. I'm going by my best available information.
Q. And what was your goal throughout this incident?
A. To get Mr. Shere the help that he needed. He clearly needed help.
16:19:54
Q. And to get him safely in custody to go get that help?
A. Yes.
MR. WOODS: Form.
16:20:01
BY MS. BERKE:
Q. And was it your goal to have to use any type of force?
A. No. No. Again, I know this is going to sound disingenuine, but I'm glad Mr. Shere's here today to be able to do this. I just wanted him to live to see another day, and that's ultimately what happened here. You know, if I don't have to use my TASER, if I knock on the door and he says, "I'm having a bad time. My family sucks, and I need to talk to somebody about this," I would gladly take him to UPC. We'd have a conversation. I'd write the petition to UPC, and I would be done instead of this and going through this deposition process now. I would rather not use force on anyone.
16:20:18
16:20:49
Q. When you made the decision to deploy your TASER, what was the goal?
16:21:14

A. To immediately render Mr. Shere incapable of reaching a weapon if he had one. The reason for doing it right then was a couple of things, but Mr. Shere made a habit of ducking behind that alcove numerous times. So he clearly saw that I had the TASER. Initially, the first time he saw the TASER come up, he ducked behind the alcove. So he knew that the TASER option was always there. It was something that -- that could possibly be used. He reacted to the TASER. I get it. I don't want to be tased. It sucks. It hurts.

Q. But at one point, he said he wanted to be tased?

A. He -- he did say that. He did say that. Still don't want to do it to him.

And the other thing, and this is probably the most important, was the fact that he was becoming more agitated. And, in my opinion, he was working himself up to a situation where he was trying to get the courage to either charge at us or, you know, try and quickly pull something out of his bag. How do you retrieve that? Or go back into the apartment, which then we're further complicated.

Q. So -- and if he had made a quick movement to his bag and -- and reached in to get something, a knife or anything, what's the potential of what could have happened?

A. It -- it would have -- in my opinion, it would have turned into a deadly force encounter.

Q. And were you doing everything you could to prevent this incident from turning into a deadly force situation?

16:23:09

A. Yes. Yes. I've never shot anybody. I don't want to. I'm very proud of the fact I haven't had to. And I still haven't had to, so -- and I didn't on this.

Q. Can someone with a gun shoot through a door?

16:23:52

A. Certainly.

Q. And --

MR. WOODS: Form. Foundation.

BY MS. BERKE:

Q. But an apartment door like Mr. Shere's?

16:23:59

MR. WOODS: Form. Foundation.

THE WITNESS: Yes.

BY MS. BERKE:

Q. And so tactically, is that why officers were kind of going around the corner when he went into his apartment, that kind of thing?

16:24:12

A. Yeah, I mean --

MR. WOODS: Form.

THE WITNESS: Tactically, this whole thing being at the end of the hallway like that, was a bad situation.

16:24:25

BY MS. BERKE:
Q. Challenging?
A. Challenging. And not only can it go through the door, it can go through walls, it can go through the floor. It can -- so, you know, Mr. Shere has multiple neighbors.
16:24:32
Again, getting back to the whole previous incident with the pit bull, one of the things that I did in that incident was a mother and daughter were trapped in their own bathroom because this pit bull had mauled the mother and they couldn't escape. So I ended up evacuating the lower floor underneath them and the adjacent apartment next to them in that incident because I was worried that if I was going to have to shoot the dog, where are my rounds going to go?
16:24:53
16:25:14
So, again, I -- I thought this whole thing. I mean, you know, to some degree, officers get paid for what might happen to them. Great. But somebody that's at home, you know, watching TV, the last thing they think is some bullet is going to come through their wall.
16:25:33
Q. And so was one of the concerns about Mr. Shere having the gun that he could shoot it in his apartment and injure or kill another occupant of the building?
A. Yes.
MR. WOODS: Form.
16:25:51

was video played where officers instructed Mr. Shere to come and talk to us with nothing in your hands. Do you recall seeing that video?

A. I do.

16:27:51 Q. And why did officers ask him to come and talk to them with nothing in his hands?

A. Well, because, again, we're mitigating the threat. We want to set the standard immediately that don't bring a weapon to this. We don't want to engage you 16:28:11 with a weapon at all. You don't have a weapon, we can have this conversation. If you bring -- if you inject a weapon into the equation, then we have -- we're getting closer and closer to a deadly force situation. We want to avoid that at all costs.

16:28:31 Q. And in one of the videos, I can't remember if it was you or another officer said, "Let me see your hands." Why was it important to see Mr. Shere's hands?

A. To make sure that he did not have a weapon in his hands.

16:28:48 Q. Because, again, that could cause this situation to turn into a deadly force situation, correct?

MR. WOODS: Foundation.

BY MS. BERKE:

Q. When he was holding the backpack, did that cause 16:29:01 any concern to you?

A. Yes.
Q. Why is that?
A. I believed that he could have the gun in the backpack. And we wouldn't even have to see the gun, he 16:29:14 could just simply raise up the gun -- or the backpack with the gun inside and start shooting. Not to mention just the proximity. I mean, we're approximately 12 feet away. His -- he is going to be able to pull the trigger before we have any chance to react. Reaction is always slower 16:29:42 than the initial event.
Q. What about being 12 feet away from somebody who's armed with the kind of knife that he had hanging around his neck?
A. Again, being 12 feet away, it's -- some people 16:30:01 refer to it as the 21-foot rule. It's not a rule. It's a drill. But studies have shown that a person with a knife can cover 21 feet before an officer can even get out of the holster. So in this case, he would have had to take maybe three steps with a knife in hand and -- before he's 16:30:29 reaching one of us. So yes, unfortunately, again, a bad situation, but created by Mr. Shere.
Q. Tell us about the kind of knife he had around his neck.
MR. WOODS: Foundation.
16:30:48 THE WITNESS: It's a karambit.

weapons. He didn't. He had the knife around his neck. He ended up having a knife in his pocket, which he never bothered to let us know about. There was no reason in any of this to ever think that Mr. Shere wasn't armed with a handgun.

16:35:43

Q. Or another deadly weapon?
A. Or another weapon.
Q. And you knew he was armed with a deadly weapon because you saw it?

16:35:52

A. Yes.
Q. What is your knowledge about pit bulls?
MR. WOODS: Foundation.
THE WITNESS: I just know that obviously -- I mean, they have a reputation, and much of it is deserved, as being unpredictable and being violent. And, at some times, deadly animals. I think that has to do more with their owner and their training, but still, nonetheless, from my own experience, and, again, within three blocks away, and I'm going to say probably within a year of this incident of dealing with the other pit bull, which according to the lady, had never done anything prior to that.

16:36:12

16:36:33

BY MS. BERKE:
Q. So she lived with the pit bull?

16:36:46

A. She lived with the pit bull. I'd have to review

16:37:05 16:37:25 16:37:56 16:38:05

the report. So I'm just going by my own knowledge of this event. But she lived -- her and her daughter lived there with -- I believe it was her boyfriend. They were roommates. Boyfriend was gone. The daughter had attempted to either pet the dog, and the dog started to growl. And she got in between her daughter and the pit bull, and the pit bull attacked her, ended up mauling her arm. She ended up retreating with the daughter into the bathroom of this apartment, where she then called 911. And I was the only one available. I was the only one on scene and went in. And because I thought that she was possibly going to bleed out, and she had horrific injuries.

Q. And so did that indicate to you that this type of dog can be unpredictable?

A. Yes.

MR. WOODS: Foundation.

THE COURT REPORTER: Was that an objection?

MR. WOODS: Yes, I said foundation.

BY MS. BERKE:

Q. And when Mr. Shere's pit bull -- when Mr. Shere released his pit bull into the hallway toward the officers, did you know what that pit bull was going to do?

A. No.

MR. WOODS: Objection. Form.

be pleasant, or is the dog going to react negatively and try to protect Mr. Shere? In which case, now what do we do? He's on the floor. The dog is trying to attack us or protect Mr. Shere. Now how do we effect an arrest?

16:40:12 Q. So just because the dog didn't attack when it initially came out, you still didn't know what it was going to do if it was released?

A. Correct.

Q. At the moment you deployed your TASER -- Or,

16:40:33 strike that.

Prior to deploying your TASER, did you feel that it would have been tactically sound to tell Mr. Shere that you were planning to tase him?

MR. WOODS: Form.

16:41:02 THE WITNESS: 100 percent against that, and for this reason. Context and the prior events are super important to hear. Mr. Shere had ducked behind that alcove, I don't know how many times. 30 times? 40 times? I don't know, a lot. And had reacted previously when I

16:41:22 had raised the TASER, had ducked back behind this alcove. Clearly he knows the TASER is an option for us, and clearly he reacts to it to try to avoid it and try to avoid being put in a position to be tased. So for me to announce, I'm going to telegraph the fact that this is

16:41:46 coming, he's just going to duck back behind the alcove

again.
BY MS. BERKE:
Q. Was there a possibility he would have retreated into the apartment as well?
16:41:56 A. And deeper into the apartment.
Q. Was there also the possibility that if he had the gun in his waistband that he would have drawn that gun and shot at the officers?
MR. WOODS: Form. Foundation.
16:42:10 THE WITNESS: Yes.
BY MS. BERKE:
Q. What were the other possibilities?
A. Giving him to --
MR. WOODS: Form.
16:42:19 BY MS. BERKE:
Q. If you had given him advance warning that you were going to tase him?
MR. WOODS: Form. Foundation.
THE WITNESS: He could have immediately
16:42:28 decided he was going to charge us, could have drawn the knife. He could have pulled out a gun, retreat into the apartment, anything. Again, I -- it got to a point where I believe that, unfortunately, where I thought Mr. Shere was working himself up to a point where he wanted to
16:42:52 possibly provoke suicide by cop by forcing a deadly force

encounter.

BY MS. BERKE:

Q. And so when you made the decision to tase him and not say anything prior to the "TASER, TASER, TASER" that you stated as you were deploying it, was that to prevent this from turning into a deadly force encounter?

MR. WOODS: Form.

THE WITNESS: Yes.

BY MS. BERKE:

Q. And to get him safely into custody so that he could either get the help he needs or -- or get booked into jail and then get the help he needs?

A. That is correct.

Q. Just because he didn't brandish the knife he was in possession of, does that mean that those knives didn't pose a threat to officers?

MR. WOODS: Form. Foundation.

THE WITNESS: They absolutely posed a threat to officers.

BY MS. BERKE:

Q. Did he have easy access to the one around his neck?

A. Yes. By my understanding, all he needed to do was pull it and it would be out of the sheath.

Q. Did you know whether there were other occupants

what you're asking.
Q. Was there a Phoenix City Code charge on that document?
A. No.
16:47:48 Q. Were there any other charges other than an aggravated assault?
A. No.
Q. So there were no lesser-included charges?
A. No.
16:48:02 Q. You -- you testified that the services provided at UPC would be the same services provided at the jail, correct?
A. That is correct.
Q. What -- what jail was Mr. Shere taken to?
16:48:14 A. Maricopa County Jail.
Q. Okay. Do you work for Maricopa County?
A. No.
Q. Do you have access to the list of services that Maricopa County provides?
16:48:25 A. I do not.
Q. How do you know that the services were the same?
A. I know that from having taken the CIT course twice, and it's common knowledge that prisoners are offered psychiatric care when they're in custody.
16:48:46 Q. Okay. And you know for sure that the psychiatric

care that is offered in the Maricopa County jails is the exact same care that's offered at UPC?

A. I couldn't make a statement if it's the exact same care, but they are offered psychiatric care.

16:49:03 Q. Okay. Well, when your attorney was asking you questions, you said that it was the same care that UPC would have given him, so the jail would provide the same care that UPC would provide. Do you remember saying that?

A. Yes.

16:49:16 Q. What services does UPC provide?

A. Well, counseling, therapy. UPC is essentially kind of a clearinghouse for psychiatric care. The way I understand it is people are typically held at UPC for 23 hours or under, and then they are either released to a 16:49:42 different facility or individual -- individualized care, or that they are released to the custody of their own physician in some cases. So I don't know if Mr. Shere had a physician or whatnot, was already under the care. But those are some of the things that they do.

16:50:08 Q. Does Maricopa County jails -- the jail system, do they offer those same exact services? For instance, do they release inmates to their primary physician?

A. Again, you'd have to ask Maricopa County. I don't know.

16:50:27 Q. Okay. So you don't actually know if the services

privilege.
MR. WOODS: Okay. So, again, I'm allowed to ask the question. He's under oath the entire day. So if he's under oath, and you're asking him or you're talking to him, it has to be in open court. And if it's not, then I get to know what the contents of those conversations were.
BY MR. WOODS:
Q. So did you talk about your testimony today with your attorney during breaks?
MS. BERKE: Objection. Attorney-client privilege.
MR. WOODS: Are you instructing him not to answer?
MS. BERKE: Yes, I am instructing him not to answer.
MR. WOODS: Okay. Well, I will bring this issue up with the court then. I have nothing further.

FURTHER EXAMINATION

BY MS. BERKE:
Q. When -- at the time you made your decision to tase Mr. Shere, did you observe him in possession of a deadly weapon?
A. Yes.

Q. And did he have immediate access to that deadly weapon at the time you tased him?
A. Yes.
Q. You mentioned that there were seven victims of the aggravated assault, which was why he was booked into jail on seven counts of aggravated assault, correct?
A. Yes.
Q. And are those victims all listed in the incident report?
A. Yes.
Q. And so it wasn't that he was booked for seven counts of aggravated assault on you?
A. Yeah, no, I'm one person.
MS. BERKE: Okay. That's all I have.
MR. WOODS: I have -- I have no follow-ups.
MS. BERKE: All right. He'll read and sign.
THE COURT REPORTER: All right.
MR. WOODS: Kacie, I'll just take PDF.
(An off-the-record discussion ensued.)
THE COURT REPORTER: We are off the record. The time is 5:16 p.m.
(The deposition was concluded at 5:16 p.m.)



CHRISTOPHER A. GITSCH

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Stephan Shere, )
) CASE NO. 2:23-CV-02657-
Plaintiff, ) PHX-JJT (ESW)
)
vs. )
)
City of Phoenix, et al., )
)
Defendants. )
______________________________)

DEPOSITION OF LEXUS HASKINS

Phoenix, Arizona
July 9, 2026
9:11 a.m.

Prepared by:
SUSAN D. BINGHAM, CR
Certificate No. 50364

Prepared for:
DISTRICT COURT
(Certified Copy)

VERITEXT LEGAL SOLUTIONS
RRF NO. R1061
3101 N. Central Ave, #290
Phoenix, Arizona 85012
Phone: (602) 254-4111
calendar-barteltnix@veritext.com

would just ask that if there's a question pending, you answer before we take a break.

A. Okay.

Q. What is your address?

A. 4119 North 11th Avenue, Phoenix, Arizona 85013.

Q. Is that a house or an apartment?

A. Apartment.

Q. Did you say the apartment number?

A. Unit 3.

Q. And what is your phone number?

A. (480) 882-8740.

Q. What was the area code?

A. (480).

Q. And who is your mother?

A. Dana Andrews.

Q. Who is your father?

A. Scott Haskins.

Q. And do you have any siblings?

A. Stephan Shere.

Q. And is he a half brother?

A. Yes.

Q. You share the same biological mother?

A. Yes.

Q. Are you aware that we took your mother's

call for assistance, and at that time it was calling the police. That's what I thought I should do.

Q. Did you call 911?

A. I think so, yes. Yes.

Q. And what did you report?

A. That my brother needed help, that I didn't know -- I think that's what I said, I think I said he needs help and I don't know what to do and I need somebody to go check on him. I think that's what I said, something along those lines. I said I'm worried and I don't know what else to do.

Q. Do you remember anything else you reported?

A. I think he -- I don't remember. I don't know what I said.

Q. Do you have Stephan saved as an emoji in your phone for his name for your contact for him?

A. No.

Q. Have you ever?

A. No.

Q. As a ghost with a patch over his eye?

A. No -- or yes, I have.

Q. Not a patch over his eye, but like an eye

Q. "Yes"?
A. Yes. Yes.
Q. And do you know what order this is, like is the earliest message at the top and the latest --
A. Yes. Yes.
Q. Okay. So it looks like there is a text message but it's covered up, right, at the top?
A. Yes.
Q. And then you typed to him you need to collect yourself?
A. Yes.
Q. And then he says, "Hopefully Inger shot and die tonight"?
A. Yes.
Q. What did you interpret that to mean?
A. He was feeling like he wanted to die, he wants to die tonight. That's what he says.
Q. Do you know what he meant by "Inger"?
A. I don't know what that means, Inger. I think that's just a mis --
Q. Do you think that means "I get"?
A. Maybe. Maybe.
Q. And then you say, "Why would you want that? Stop"?

I don't know how they were acquired, so, sure, I assume they're a screenshot. I don't know where these came from. This is a conversation that I had with him, but I don't know where they came from, so...

Q. And you have no recollection of this?

A. I don't, I genuinely don't. Looking at it now, I can see that, but before that, they were not in my brain or I did not recall this.

Q. So there's a photograph at the -- well, Exhibit 2 is COP 000152; correct?

A. Correct.

Q. And at the top there's a photograph that Stephan is texting to you of him with a gun in his mouth; correct?

A. Yes.

Q. And then he puts a smile emoji under that; correct?

A. Right.

Q. And then you send him eight separate text messages; correct?

A. Yes.

Q. And you say, "Stephan, stop. That's scary. Don't do that. It's not funny. That isn't funny at all. Seriously, stop it. That's

not okay"; correct?
A. Correct.
Q. What was scary about that?
A. I did not like the image he sent. It was not very funny.
Q. Did that suggest to you that he was threatening to kill himself?
A. It made me nervous to see a gun in his mouth.
Q. Why did that make you nervous?
A. You don't put guns in your mouth.
Q. Why?
A. It's not safe.
Q. You interpreted this as him having an intention to kill himself; correct?
MR. WOODS: Form.
THE WITNESS: I was worried that he was not in the right state of mind.
Q. BY MS. BERKE: And that he might kill himself; correct?
MR. WOODS: Form; foundation.
THE WITNESS: I don't know what his intentions were but I did not like where this was going, so I called the police.
Q. BY MS. BERKE: And you were worried that

It looks to me like I needed to call for assistance, so I did. That is genuinely what I'm saying right now, I was scared for him. I knew he was not in the right state of mind. I did not know what else to do. I don't know what his intentions were.

Q. Are you done?

A. Yes, ma'am.

Q. Okay. So now I'm going to ask my question again and I'd like to get an answer to it.

A. I do not recall. I do not recall how I felt other than worried.

Q. So I'm going to ask my question again and then you can give that answer.

A. Okay.

Q. Were you worried that he might kill himself?

A. I do not recall. I don't recall.

Q. Did he send you a video as well?

A. He may have. I don't remember.

Q. I'm going to have this video marked as Exhibit 3 to your deposition, and it's 30 seconds. It's COP 000153 and I'm going to ask if this is a video you sent to the police.

(Deposition Exhibit No. 3 was marked for

identification.)

(Playing video.)

Q. BY MS. BERKE: Do you remember that video?

A. Kind of. I mean, seeing it now, I see it.

Q. And he is putting the gun in his mouth wearing that black glove; correct?

A. Yes.

Q. And he's pulling on the trigger; correct?

A. Yes.

Q. Did seeing that video that he sent you that evening make you worried he was intending to kill himself?

A. Seeing my brother put a gun in his mouth made me worried that he was not well. I don't know what I thought. I don't know what I thought.

Q. You don't remember if you were worried that he was intending to kill himself?

A. I don't think that's what I thought. I think I was genuinely not sure what else to do.

Q. But you don't believe you thought that you were worried that he was going to kill himself?

A. I don't know what his intentions were. I

and the time on the body-worn camera is 20:12:05.
That's you speaking to the police; correct?
A. Correct.
Q. And you told the police officer that Stephan had previously been diagnosed with anxiety disorder and post-traumatic stress disorder; correct?
A. Yes, correct.
Q. And that he was taking medications for that; correct?
A. Correct.
Q. So you knew at least as of October 4th of 2022 that Stephan had previously been diagnosed with post-traumatic stress disorder; correct?
A. Correct.
(Playing video.)
Q. BY MS. BERKE: So the conversation on Exhibit 4 ends at 12 minutes and 14 seconds, which is 20:19:45 on the body-worn camera video. Do you see that?
A. Yes.
Q. Now, the officer asked you that night if you believed that he was going to kill himself; correct?

A. He did.
Q. And you said yes, you believed he was planning to do that; correct?
MR. WOODS: Form.
THE WITNESS: I don't think I responded like that, but I was worried -- I said exactly what I said to you. I was worried, I didn't know what he was going to do.
Q. BY MS. BERKE: That's not what you said to me, is it?
MR. WOODS: Form.
THE WITNESS: I don't have -- I'm saying what I'm saying. I was worried. I called the police. I saw it escalating. His decisions did not seem right of mind, I guess. If you'd like to replay it so I can rehear it for you, that's fine.
Q. BY MS. BERKE: Yes, I'll replay it for you. We're going to go to 8:05 on the media player, which is 20:15:35 on the body-worn camera, Axon readout.
(Playing video.)
Q. BY MS. BERKE: I think it was before that. Let me back up further.
I'm going to start it at 7:48 on the media player and 20:15:18 on the Axon readout.

(Playing video.)

Q. BY MS. BERKE: So the officer asked you, When you got this message, did you think he was going to do this?

A. Correct.

Q. And you understood that to mean shoot himself; right?

A. Okay. Yes.

Q. Okay. And so now at 8:03 on the media player and 20:15:33 on the Axon readout, I'm going to play what your response was.

A. Okay.

(Playing video.)

Q. BY MS. BERKE: You started out, "Yeah, because..."; correct?

A. Yes, I said yes.

Q. You said, "Yeah, because," and then you go on to explain why you were worried that he was planning to kill himself; correct?

A. The escalation --

Q. Correct?

A. I said yes to the officer's question. I said yes to the officer's question.

(Playing video.)

Q. BY MS. BERKE: And you tell the officer

# EXHIBIT 6

8:20

Stephan- this one >

You need to collect yourself

Hopefully Inger shot and die tonight

Why would you want that

Stop

Today 6:27 PM



Text Message

Cash

8:21

Stephan- this one



😆

Stephan

Stop

That's scary

Don't do that it's not funny

That isn't funny at all

Seriously

Stop it

That's not okay

Text Message

Cash

# EXHIBIT 7

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Stephan Shere, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>City of Phoenix, a governmental entity; Michael Sullivan, Chief of the Phoenix Police Department; Daniel Joseph Snyder, an individual; Alex Beaver, an individual; Christopher A. Gitsch, an individual; Eric Elliot Summerville, an individual; Brittany Bartimoccia, an individual; Jacob A. Lewis, an individual; Charles C. Allen, an individual; Jennifer Lorrain Beberniss, an individual; Amanda Newsum, an individual; and John and Jane Does I-X,<br><br>Defendants. | No.: CV-23-2657-PHX-JJT(ASB) |

DEPOSITION OF SERGEANT JACOB LEWIS

Phoenix, Arizona

August 27, 2026

Prepared by

Kathryn C. Cannon, CER
Certified Electronic Reporter
Certification No. 4929

CERTIFIED TRANSCRIPT

incident with Stephan Shere?
A. Yes.
Q. And -- and you understand that the lawsuit that's been filed is -- is based on the incident and the things
09:42:32 that happened at the scene on October 4, 2022, with Stephan Shere, correct?
A. Yes, sir.
Q. Okay. All right. Were you the scene commander that night?
MS. BERKE: Form.
THE WITNESS: I'm sorry?
BY MR. WOODS:
Q. I mean, I'm using a term called scene commander, but I -- I guess maybe, who was in charge of -- of the
09:42:57 scene at the -- at the incident?
MS. BERKE: And let me just explain to him. So I'll make objections during the deposition. Unless I instruct you not to answer, if you understand the question, you can go ahead and answer.
09:43:11 THE WITNESS: I understand.
MS. BERKE: It's for the record.
THE WITNESS: I was the scene supervisor.
BY MR. WOODS:
Q. Okay. Were there -- were there any other
09:43:19 sergeants on scene that -- that you know of?

A. No, sir.
Q. So was it your job to make tactical decisions that night?
A. Yes, sir.
09:43:34 Q. So it was your job to decide what force options were present?
A. That is part of my job, yes, sir.
Q. Okay. Was it your job to make the decision on whether to walk away from the scene or not?
09:43:53 A. As the scene supervisor, I would say ultimately that decision falls to me.
Q. Okay. What about entering the apartment?
A. Yes.
Q. Do you know who Ken Wallentine is?
09:44:13 A. I think I recognize that name. Is that the use of force expert?
Q. Yes.
A. Okay.
Q. That -- that's -- yeah, that's -- that's the one
09:44:26 that was hired by your attorney. And that -- that brings up another point, I guess. If you ever get to a point where you're going to have to guess at an answer, don't guess, please. We want a clean record. And, you know, you can just say, "I don't know."
09:44:40 A. Yes, sir.

Q. Okay. And it runs through 202, correct?
A. Yes, sir.
Q. Okay. Go back to the top. You can see on the second page that he wrote that he -- under the -- I got it. Okay. Let me start that over.
09:47:52
At the top, it says that he conducted the following interviews, he reviewed the following documents, pleadings, records, and reports. And on the second page, there's interviews of Officer Gitsch, Officer Summerville, and Sergeant Lewis, correct?
09:48:08
A. Yes, sir.
Q. Okay. Apologies. But before I -- I get more into that, I assume you went to the police academy, correct?
09:48:46
A. Yes.
Q. Okay. And I -- I'm making an assumption that over the years, you've received continuing education or trainings, correct?
A. Yes, sir.
09:48:57
Q. How -- how often do you receive continuing education?
A. Yearly.
Q. And -- and what are the hourly requirements?
A. We do a minimum of 40 hours on various trainings.
09:49:16
Q. Do you have any specialized certifications

related to law enforcement?
    A. So I have been a -- shotgun-certified, rifle-certified, HGN-certified -- so horizontal gaze nystagmus -- drug reps- -- recognition expert 09:49:47 certification, search warrant-certified, level two search warrant entry certification, field training certification.
    Q. Okay. How about CIT certification?
    A. No, sir.
    Q. Okay. All right. So -- okay. Tell -- tell me a 09:50:22 little bit about at the time, in 2022, had you ever received any specific training in how to handle suspects with mental health issues?
    A. We've had, throughout the years, various trainings for handling or dealing with mental health 09:50:50 situations, both computer trainings and in-person trainings. I just would not be able to give you the specific names of those trainings or dates.
    Q. Okay. At -- at -- at the time of the incident, what mental health programs or departments were available 09:51:20 to respond to a mental health crisis situation?
            MS. BERKE: Form.
            THE WITNESS: We would typically just use our crisis intervention teams.
BY MR. WOODS:
09:51:38     Q. Right. And what -- are the crisis intervention

teams sworn officers?
A. No.
Q. And I guess I should have said, at the time, were they sworn?
09:51:50 A. No, sir.
Q. Okay. What -- what other options did you, as a sergeant, have available to utilize?
A. I believe, at the time, we did have the CIT training and certification going on. And if -- we had the ability to complete a petition and do a petition for him. 09:52:21
Q. Okay. When you're talking about a petition, you mean a 72-hour-type petition?
A. Yes, like a mental health petition.
Q. Okay. And then -- and if you had -- if you did that to a suspect at the time, you would need to get a judge's order, correct? 09:52:42
A. Yes, sir.
Q. Would the suspect have been detained at a Phoenix jail until that order comes through?
09:52:57 A. Case-by-case specific. If there were criminal charges pending, that could be the case.
Q. Okay. All right. Let's go to page 164. All right. So we're in Wallentine's report. I'm on the bottom of the page, COP 000164, and I'm going to be in section 8. Wallentine writes that "Officers observed that 09:53:51

Plaintiff was armed with at least one knife secure around his neck." Do you see that?
A. Yes, sir.
Q. Do you recall seeing a knife around Stephan
09:54:06 Shere's neck that night?
A. I do.
Q. Okay. The office- -- or Wallentine continues and said that "The presence of these weapons independently elevated the risk level of the encounter, regardless of
09:54:19 whether a firearm was ultimately located." Do you see that?
A. Yes.
Q. Do you agree with that statement?
A. I do.
09:54:30 Q. It says, "Additionally, during the encounter, Plaintiff acknowledged that he possessed a knife . . . stating, 'actually, yeah, I do have a knife already,'" correct?
A. Yes, sir.
09:54:38 Q. Do you remember Stephan saying that?
A. I don't independently recall that.
Q. Okay. It says, "The officers noted the type of knife (a karambit dagger) around Plaintiff's neck," correct?
09:54:51 A. Yes, sir.

Q. Do you recall recognizing it as a karambit dagger that night before Stephan was detained?
A. I do.
Q. Okay. It says, "Sergeant Lewis noted the 09:55:04 karambit knife hanging around Plaintiff's neck. Sergeant Lewis is very familiar with the use of karambit knives and knows of its deadliness." Do I have that right?
A. Yes, sir.
Q. Is that what you told Mr. Wallentine?
09:55:16 A. Yes, sir.
Q. Now, I'm going to go to 174 -- I can just jump there -- at the bottom of the page. And I'm going to hop into this first section, the first sentence that starts on this page. It says, "Sergeant Lewis retrieved a 09:55:51 less-lethal stunbag launcher and a ballistic shield." I read that right?
A. Yes, sir.
Q. Do you -- it -- was that you that retrieved the stunbag launcher and ballistic shield?
09:56:02 A. Yes, sir.
Q. Okay. Were they in your vehicle?
A. The shield was in my vehicle. I don't believe the -- the stunbag was.
Q. Do you recall where you got the stunbag launcher 09:56:19 from?

A. No.
Q. Okay. Were -- at that time, were Officer Gitsch, Officer Beaver, Officer Summerville, and Snyder part of your precinct?
09:56:46 A. Yes, sir.
Q. Were you the direct supervisor of them?
A. No.
Q. Okay. Was anybody on scene part of your -- and -- and let me take a step back because I'm not sure of
09:57:00 the nomenclature here. When you're a sergeant, who do you have underneath you?
A. Typically, between six to ten officers.
Q. Okay. Were any of those six to ten officers at the time on scene?
09:57:19 A. No, sir.
Q. Okay. Were you -- why -- why -- why were you the sergeant that responded?
A. I was covering for another office- -- another sergeant that was off that day.
09:57:32 Q. Okay. On to the next page, 175. This first sentence starts with "Sergeant Lewis had previously directed officers to retrieve a less-lethal stunbag launcher and shield from their patrol cars because he wanted to be prepared with, quote, layers of less-lethal
09:58:01 options, end quote, in hopes of preventing a deadly force

encounter." Did I read that right?
A. Yes, sir.
Q. What did -- what -- do you know what Mr. Wallentine means, that you had previously directed officers to retrieve a stunbag and a shield?
A. I don't.
Q. Do you recall directing officers that night to go and retrieve a stunbag gun and a shield?
A. I don't.
Q. Okay. And that -- that was your decision?
A. Yes, sir.
Q. And -- and -- and you went and did that?
A. So for a point of clarification, I retrieved the shield out of my vehicle. Only sergeants have ballistic shields in their vehicles. I would have directed someone to go get a less-lethal launcher out of their car.
Q. And then you -- you were -- retrieve it to bring to you, and then you bring it upstairs?
A. I never carried the less-lethal launcher up, but I did retrieve the shield.
Q. Okay. It -- it goes on to say that "He re-" -- he being you -- "recognized that the stunbag might not prompt immediate compliance." Did I read that right?
A. Yes, sir.
Q. And -- and what do you mean by that?

A. The stunbag is a pain compliance tool only and is not always a hundred percent effective.
Q. Are stunbags still being used presently?
A. No, sir.
09:59:47 Q. When did that stop?
A. I don't know the exact year or date, sir.
Q. Do you know -- do you happen to know the reason why it -- the stunbags --
A. I can't speak to the reason the city changed over to the 40 millimeter. 10:00:09
Q. And -- and what's the 40 millimeter?
A. It's another less-lethal launcher.
Q. Okay. Wallentine goes on to say -- or write, "He stood behind Officers Summerville and Gitsch and first told Officer Summerville to use the less-lethal stunbag launcher if the opportunity arose so that they could safely detain Plaintiff." Did I read that right? 10:00:27
A. Yes, sir.
Q. Okay. W- -- what does it mean, if the opportunity arose? 10:00:42
A. If there was enough separation from -- with -- from the apartment and the -- the suspect at the time, and Summerville had the opportunity to use the less-lethal launcher in an attempt to gain compliance.
10:01:08 Q. Okay. So no matter what happens -- I'm trying to

understand your order here. Was your order that, no matter what happens, use the stunbag?

MS. BERKE: Form.

THE WITNESS: The -- obviously Officer Summerville would make his own assessment. But yes, the order was for him to use the stunbag if there was enough separation from the apartment.

BY MR. WOODS:

Q. What a- -- what about Gitsch's TASER? Was -- was that order the same?

A. Yes, sir.

Q. So -- so by the point that you -- that the stunbag had been retrieved, your orders to Gitsch and Summerville were to use the less-lethal weapons as soon as Stephan presented himself and there was enough distance?

A. Yes, sir.

Q. Had Stephan committed a crime at that point?

A. Yes.

Q. Okay. Had Stephan committed a crime before any officers contacted him?

MS. BERKE: Foundation.

THE WITNESS: None that I was aware of.

BY MR. WOODS:

Q. Okay. Had Stephan committed a crime when Officer Beaver and Gitsch first contacted him?

Did you have a conversation with your officers about what potential charges to submit?

A. Yes, sir.

MS. BERKE: Form.

10:04:42 THE WITNESS: Yes --

BY MR. WOODS:

Q. When did that -- when did that conversation occur?

A. After Stephan was in custody.

10:04:49 Q. Okay. Do you remember who you spoke with about that?

A. It would have been Beaver, Gitsch, and Summerville.

Q. Do you recall why you and other officers arrived

10:05:35 on scene that night?

A. Yes.

Q. Okay. Did you -- did you write an incident report related to the scene?

A. No, sir.

10:05:47 Q. Okay. Did you ever write a supplement?

A. No, sir.

Q. Why -- why were -- why did you arrive on scene that night?

A. Excuse me. Just due to the serious nature of the

10:06:09 incident.

Q. Okay. And wh- -- what was the serious nature?
A. We had a -- Stephan was armed with a handgun and suicidal.
Q. And how did you know he was armed with a handgun?
10:06:34 A. He sent a text photograph to his sister.
MR. WOODS: Okay. I'm putting up what we'll mark as Exhibit 2. At the top it says "City of Phoenix;" bottom, it says COP 001173, and it runs through 1179.
(Deposition Exhibit 2 was marked for identification.)
BY MR. WOODS:
Q. Do you see that?
A. Yes, sir.
Q. Go to the second page. Have you ever seen a
10:07:12 document that looks like this before?
A. No.
Q. Okay. At the top, it says "Phoenix Police Department Jurisdiction - Phoenix Police, Thursday, December 8, 2022." Do you see that?
10:07:29 A. Yes, sir.
Q. And then under that, it says "Call: PH22-1496803 Cleared." Do you see that?
A. Yes.
Q. There is a time entry down below, 18:55:20 and
10:07:47 then 18:58:18. And over to the right, it says

"Priority: 1, Received by: . . . 911 System, Initial: 901X Suicide Attempt. Final: 901X Suicide Attempt." Do you see that?
A. Yes, sir.
10:08:02 Q. And 901X is the -- is the code for suicide attempt?
A. Yes, sir.
Q. At 18:59:23, there's a line item that says, "Brother is threatening 901X, sent photo with gun in his mouth." Do you see that?
10:08:17
A. Yes, sir.
Q. Does this look like a dispatch log to you?
A. Yes.
Q. Okay. At 19:00:06, it says, "Gun appears to be a handgun." Is that right?
10:08:35
A. Yes, sir.
Q. What was your -- what was your call sign that night?
A. 63 George.
10:08:45 Q. 63 George?
A. Yes.
Q. So if I look at this line right here, 19:00:34, there's an "EN:63G." Was that you?
A. Yes.
10:08:58 Q. Okay. Now we scroll down a little bit. Were

you -- were you -- were you listening to the dispatch that night?
A. Yes.
Q. Okay. So -- so anytime I see like a 631M or a 631G and a statement, such as subject has threatened 901X before, but has never attempted, those types of things would have come across the dispatch radio. Is that right?
A. Yes, sir.
Q. All right. You're -- do you recall hearing that subject has threatened 901X before, but has never attempted?
A. Yes, sir.
Q. At 19:03:11, there is an entry here from "63G Who does bro live with, any family." Do you see that?
A. Yes.
Q. Was that you asking over dispatch?
A. Yes.
Q. Okay. At 19:03:46, "Subject is no longer responding to comps texts." Do you see that?
A. Yes.
Q. And then at 19:03:57, "Bro lives alone." Do you see that?
A. Yes.
Q. Was that dispatch radioing over the dispatch channels that Stephan Shere lives alone?

second time he says, "Come here, buddy," correct?
A. Yes.
Q. Okay. In -- in -- in your experience in that situation where the dog was coming at you aggressively and you shot it and killed it, did the person who sent the dog after you call the dog back?
A. In that -- is your question in that situation? In that --
Q. Yeah. In the one where you had to shoot the dog.
A. No, they did not. But just because he's calling him back does not mean that Max wasn't going to become aggressive with us.
Q. Okay. But again, he was -- he was calling him back within two seconds, correct?
A. Yes.
Q. Okay. Is -- in your opinion, is that the mindset of somebody who has sicced their dog on somebody?
A. I can't speak to his mindset.
Q. But -- but again, within two seconds, he was trying to call Max back, correct?
A. Yes. And I -- and I understand that. But I don't know why he's calling Max back. Maybe he didn't get the initial response from Max that he wanted, so he's going to try again. I -- I -- I don't know. And again, it was very loud in the hallway, and I was in the back, so

I can tell you that I did not hear him calling Max back.
Q. Okay. But again, you never asked Stephan what he meant by "Watch this"?
A. No, I did not.
10:52:06 Q. Okay. Did you know that at some -- and -- and we can watch the video, but you've seen the video. You know at some point Stephan showed that he was dropping this backpack, correct?
A. Yes.
10:52:18 Q. And you know at some point he showed that he had a flashlight in his hand, and that's what he was holding?
A. Yes.
Q. Okay. And you know that he dropped the flashlight as well, correct?
10:52:28 A. Yes.
Q. Okay. And you know -- your attorney is going to ask some questions about this, but I'll ask you. You know that at some point he lifted his shirt to show his waistband, correct?
10:52:40 A. Yeah. Yes.
Q. Okay. And -- and your attorney's going to follow up and say, "Did he show the back of his waistband?" And so that's my question. Did he show the back of his waistband?
10:52:52 A. Not that I recall.

pointed it out. Again, there was crosstalk and a lot of stuff going on in that hallway and him being around that corner.

BY MR. WOODS:

10:57:54 Q. Is -- what kind of de-escalation techniques do you use when you respond to a scene?

MS. BERKE: Form.

THE WITNESS: Again, it's such a case-by-case scenario.

10:58:10 BY MR. WOODS:

Q. Is having a conversation with someone a way to try to de-escalate a situation?

A. Yes.

Q. Have you ever heard the term active listening?

10:58:22 A. Yes.

Q. Is that something that you try to employ when you're having conversations with a suspect?

A. Yes.

Q. Have you ever had a gun pointed at you when you
10:58:44 respond to a scene?

A. Yes.

Q. Did that scare you?

A. Yes.

Q. Why?

10:58:53 A. Because a gun is a deadly weapon and --

THE WITNESS: Yes.
BY MR. WOODS:
Q. Okay.
A. But I would not have contacted crisis in -- in this particular situation, though, because it was not safe for them to respond.
Q. Okay. With -- were there resources available to talk to somebody on a crisis team about techniques to speak with someone in a mental health crisis?
MS. BERKE: Form.
THE WITNESS: In a situation like this, where the subject or suspect is armed, it is not safe. We would use, like, our CIT-certified officers.
BY MR. WOODS:
Q. Okay. And do you know if there was a CIT officer on scene?
A. I believe one of the officers on scene was CIT.
Q. Okay. So it's your testimony that you would not, in that circumstance, contact the crisis line or mobile crisis team, correct?
A. Correct.
Q. Okay. Now, he -- again, we -- we -- we talked about this earlier. When Beaver and Gitsch arrived, Stephan told them to go away, and he shut the door on them, correct?

A. Yes.
Q. Do you -- do you recall asking over the radio if anybody had a pepper ball or 40 millimeter?
A. No.
11:07:14 Q. Okay. What's a pepper ball?
A. It's a -- a launcher that -- that launches a pro- -- a projectile that's filled with a -- an irritant, a powdered irritant.
Q. I -- I keep hearing you saying that the situation
11:08:19 was -- was dangerous, correct?
A. Yes.
Q. Why -- why would you tell Mercedes, after Max had been contained by fellow officers, that you had no problem walking away if you could confirm he was alone?
11:08:49 A. If -- if he was in the apartment alone and there was no -- and there was no additional threat to a third party and he was contained inside of the apartment, we could walk away, write up a petition, submit any pending charges that we may have, long form, and not push the
11:09:09 situation any further. If he was in there by himself.
Q. Okay. Did you ever ask him if he was in there by himself?
A. He was asked.
Q. Do you -- do you recall who asked him?
11:09:29 A. The female officer that's standing there. I know

she asked at one point.
Q. Okay. Do -- do you -- do you remember at what point she asked?
A. I don't.
11:09:43 Q. Did you watch her body cam footage?
A. No, I did not watch her body cam footage.
Q. How do you know that she asked?
A. It's visible on -- it might be my body cam. And I don't have the exact minute for you to go to it.
11:10:02 Q. Okay. But -- but she did ask that?
A. Yes.
Q. Do you recall what the response might have been?
A. He did not respond to it.
Q. Okay. But in any event, if -- if you were -- at -- at that point, your mindset was if you could confirm he was alone that you guys could walk away?
11:10:39
A. Yes. We could walk away, refer it to our CIT squad for additional resources, author a petition, have CIT pick him up, if we could -- if we could confirm he was in the apartment alone.
11:11:01
Q. Go back to Exhibit 1. We're on page COP 000175 of Ken Wallentine's report. We talked about this earlier. Can you see that on your screen?
A. Yes, sir.
11:12:06 Q. "Sergeant Lewis had previously directed officers

to retrieve a less-lethal stunbag launcher and shield from their patrol cars because he wanted to be prepared with 'layers of less-lethal options' in hopes of preventing a deadly force encounter," correct?

11:12:19 A. Yes, sir.

Q. And that's slightly inaccurate because you actually retrieved the shield yourself, correct?

A. Yes.

Q. Okay. I just -- I just wanted to be clear on

11:12:34 that. You said -- he said, "He recognized that the stunbag might not prompt immediate compliance." Is that right?

A. Yes.

Q. Okay. So -- so right up front, you knew that the

11:12:51 stunbag was a less-lethal option that may not provide any type of compliance, correct?

A. I knew that it was a less-lethal option that we could use, and I wanted to have multiple layers of less-lethal.

11:13:15 Q. Okay. He writes, "He stood behind Officers Summerville and Gitsch and first told Officer Summerville to use the less-lethal stunbag launcher if the opportunity arose so that they could safely detain Plaintiff." Is that right?

11:13:31 A. Yes.

Q. "Then he told Officer Gitsch to follow up with the TASER to help safely detain Plaintiff when Officer Summerville fired a stunbag less-lethal projectile," correct?

11:13:41 A. Correct.

Q. Do you know who fired first? Was it the TASER or the stunbag?

A. After watching the video, the TASER fire- -- fired first.

11:13:50 Q. Okay. Was the purpose of using the TASER or the stunbag to -- to end this confrontation quickly?

A. It was -- it was to use a -- a lower level of force so that it didn't get to a deadly force encounter and allow us to safely detain him.

11:14:17 Q. But at -- at the point that he was tased and stunbagged, his hands were in the air, correct?

A. Correct.

Q. And he was still talking with the officers even though he was inebriated and upset, correct?

11:14:32 A. Yes.

Q. So staging the less-lethal options, was it your mindset that you used these less-lethal options to end the confrontation that you perceived quickly?

MS. BERKE: Form.

11:14:54 THE WITNESS: So the -- I staged them for

Q. Do you know if any other officers asked that?
A. No.
Q. And you saw the karambit knife around his neck, right?
11:26:18 A. Yes.
Q. And I think that you told Ken Wallentine that you -- you were familiar with karambit knives. Is that true?
A. Yes, sir.
11:26:28 Q. And you were familiar with them being deadly. Is that true?
A. Yes, sir.
Q. Okay. Do you -- do you recall Stephan ever reaching for his karambit knife during this encounter?
11:26:41 A. No. But it was hanging on -- on a chain around his neck midline, available and accessible by both hands.
Q. Okay. People carry knives on their person, correct?
A. Yes, sir.
11:26:54 Q. Do you ca- -- do you carry a knife on your person?
A. I do.
Q. Do you -- when you're off duty, do you carry one?
A. I do.
11:27:01 Q. Okay. When you're off duty, do you carry a

concealed handgun?
A. I do.
Q. Okay. In -- in Arizona, a concealed handgun is legal, correct?
11:27:12 A. Yes, sir.
Q. Okay. And it's legal to carry a knife on your person within certain limits, correct?
A. Yes, sir.
Q. What's the limit for blade length?
11:27:23 A. I believe it's four inches.
Q. Four inches or lower?
A. Yes, sir.
Q. Okay. So any -- any adult that doesn't have any restrictions, like from a court order or some sort of 11:27:38 crime that they had committed, can carry a knife on their person that's -- with a blade that's four inches or less, correct?
A. Yes. However, karambit is a fighting knife. It's specifically made and designed for, like, hurting, 11:27:55 stabbing, slashing. So it's just not necessarily that it was illegal. It's just the type of knife that it -- that was around his neck makes it that much more dangerous and deadly.
Q. Okay. Right. And you -- you were concerned 11:28:08 about that knife, right?

A. Yes, sir.
Q. So then I go back to the question of, if you were concerned about that knife, why didn't you ask him to take that off of his neck?
11:28:19 A. So that's -- that's not typically something I would ask a suspect to do. Just like if a suspect had a gun in his waistband, I would not ask him to remove it for a variety of reasons. I would not want him to remove the -- remove the knife and/or the gun for fear that
11:28:35 another officer, not hearing my commands, might perceive that as a threat. And then we inadvertently cause a deadly force encounter.
Another reason is, at that time, in the -- in the sheath on the neck, I -- I see it. It's there. I
11:28:50 also don't want to plant an idea of, "Hey, why don't you grab that knife?" So I -- I knew it was there and it was just going to stay there.
Q. Okay. But everybody had their -- I -- well, not everybody. One person had a TASER trained on him,
11:29:04 correct?
A. Yes, sir.
Q. One person had a stunbag gun trained on him, correct?
A. Yes, sir.
11:29:11 Q. There was -- there was a bullet -- a ballistic

BY MR. WOODS:
Q. Did you hear him say that twice? "Did you see me causing any problems with you guys?"
A. Yeah. Now I hear it.
11:49:04 Q. Did you hear the officer say "no"?
A. Correct.
Q. I'm going to press play again.
(VIDEO RECORDING PLAYED.)
BY MR. WOODS:
11:49:22 Q. And he asked it again, correct?
A. Correct.
Q. And then the officer said "no," and then patted him on the shoulder and said, "We appreciate that," correct?
11:49:31 A. Correct.
Q. Okay. Do you -- do you see the blood all over Stephan's head?
A. Yes, sir.
Q. And -- and that's because the shield hit his head, correct? 11:49:41
A. Yes, sir.
Q. And it caused a big gash on his head?
MS. BERKE: Form. Foundation.
THE WITNESS: Yes, I believe it -- I believe it caused the laceration. 11:49:52

BY MR. WOODS:

Q. Okay. And that was prior to him being taken outside, correct?

A. Yes, sir.

11:50:05 Q. Do you know that he was jailed for multiple days?

A. Yes. I know he was arrested and booked into jail.

Q. Do you know if the prosecutor declined to press charges?

11:50:18 MS. BERKE: Foundation.

BY MR. WOODS:

Q. I'm just asking if you know.

A. No, I don't.

Q. Okay. Stephan didn't attack or cause bodily

11:50:39 injury to any officers, correct?

MS. BERKE: Form.

THE WITNESS: Well, I mean, he -- he -- he sicced the dog on us, but him personally, no.

BY MR. WOODS:

11:50:55 Q. Looking back at the video, do you still believe that he sicced the dog on you guys?

A. I still believe that is -- that was his intent.

Q. Okay. And that's despite the fact that within seconds he was calling Max back?

11:51:10 A. Yes.

A. Yes, I do.
Q. Did you ever petition Stephan?
A. No, a petition was not completed.
Q. But you were concerned that he was having a mental health crisis, correct?
A. Yes, sir.
Q. And we talked about that being an option earlier, correct?
A. Yes, sir.
Q. And we saw in the video that you said that you don't know if you're going to get him cleaned up and petition him. Do you remember that?
A. Yes, sir.
Q. But a petition was never entered?
A. He was ultimately booked into jail and there's a screening questionnaire that is completed before someone's booked into jail that specifically addresses mental health. And MCSO has mental health staff on -- on -- on staff. Sorry. They have mental health professionals on staff. So that -- he was booked into jail and -- and would have received the mental health services that he needed there.
Q. Okay. So instead of taking the option that you had to petition him to go to UPC, the decision was made to submit charges for crimes and have the jail take over that

Q. Can you expand on that and tell us what the concern was regarding the weapon situation?
A. Yes. So --
MR. WOODS: Form.
12:00:36 THE WITNESS: -- based on -- based on the call for service, we believed that there would be at least a firearm present. And then he had the karam- -- karambit, so at least one knife. It -- out -- and based on his actions and the way that he was dealing with the
12:00:54 officers, I did not feel that it was safe for us to walk up to him and attempt to detain him. Yeah, walk up and -- and detain him.
BY MS. BERKE:
Q. And so when you made the decision to have
12:01:10 officers use the less-lethal force of the TASER and the stunbag, was that for both officer safety and Mr. Shere's safety?
A. Yes. We had asked Mr. Shere multiple times to just come out to us. Come out, come have a conversation
12:01:28 with us. Come out to us. We'd asked him multiple times for him to come to us, which he refused to do. Needing to end the situation, I made the decision to use the less-lethal to -- for -- for his safety and for our safety to prevent it from escalating further.
12:01:47 Q. So had it been escalating throughout your

encounter with him?
A. Yes.
Q. And did you have concerns that if you did not use this less-lethal force to get him into custody that this could escalate into a deadly force situation?
12:02:02
A. Yes.
Q. And that's what you wanted to prevent?
A. Yes.
Q. What was the probable cause to arrest him for aggravated assault?
12:02:19
A. After -- so in speaking with the officers, the officers that I spoke with, each one of them perceived the same thing. Based on Mr. Shere's behavior and his statement of "watch this" and then sending Max out, all of them took that as a threat, as -- as he was sending Max out to attack the officers. And for the probable cause, each one of them thought that Max was going to attack them. Even though he didn't, they thought that's what was going to happen.
12:02:41
Q. And in your experience as a police officer, do pit bulls frequently attack people when in the past they had been nice dogs?
12:02:57
MR. WOODS: Foundation.
THE WITNESS: Yes. I've actually been on multiple calls with homeowners -- owners, dog owners who
12:03:15

own pit bulls, have had that dog for years and years and years, and it has never shown a sign of -- of aggression, and violently attacks someone.

BY MS. BERKE:

12:03:30 Q. So they're unpredictable?

A. Yes.

Q. And so while, during the course of time that he was out of the apartment, he appeared to be a nice dog, that wasn't known when he was sicced on the officers,

12:03:46 correct?

A. Yes.

MR. WOODS: Form.

BY MS. BERKE:

Q. Would a non-sworn, meaning no- -- non-law

12:04:07 enforcement, officer crisis intervention team have gone into that hallway to communicate with Mr. Shere?

A. No.

MR. WOODS: Form. Foundation.

BY MS. BERKE:

12:04:18 Q. Why not?

MR. WOODS: Same objection.

THE WITNESS: Just due to the -- due to the potential for the vi- -- the violence, the -- the presence of the weapons, they -- they would not go.

BY MS. BERKE:
Q. He was armed with a deadly weapon, correct?
A. He was armed with a deadly weapon, yes, ma'am.
Q. And then even -- or, strike that.
12:04:38 And then once he was placed into detention, you learned that he had a second deadly weapon on him that was a knife, correct?
A. Yes, ma'am.
Q. So even if you or another officer had asked him
12:04:52 to take the karambit off of his neck and throw it somewhere, he was still armed with another deadly weapon?
A. Yes.
Q. Was he at a distance where he could have quickly inflicted serious injury or death on an officer with the
12:05:19 knife he had around his neck?
A. Yes.
MR. WOODS: Foundation.
BY MS. BERKE:
Q. Can you explain that?
12:05:25 A. Yes. So in the academy, they teach you the 21-foot rule. The basic understanding or the basic principle is that a suspect who is armed with an edge weapon or a blunt -- or a blunt instrument will be able to close that 21-foot gap before an officer has the ability
12:05:44 to draw his weapon from his holster and fire.

Q. And so it can happen very quickly?
A. Yes. And even if the officer has the ability to get a round off, it's -- I don't know the exact percentage, but a very high percentage of the time the of- -- the officer is still stabbed, sliced, or struck. It can happen very fast.
12:06:00
Q. And so was it important, knowing he was armed with this deadly weapon, the karambit knife, for there to be lethal coverage as well as the less-lethal coverage?
12:06:23
A. Yes.
Q. And the gun was unaccounted for, so you had to account for the possibility that he may have that gun on his person, too, correct?
A. Yes.
MR. WOODS: Form. Foundation.
BY MS. BERKE:
Q. Or he could have had it in his bag?
MR. WOODS: Form. Foundation.
THE WITNESS: Yes.
12:06:45
BY MS. BERKE:
Q. What was your purpose in retrieving the ballistic shield from your vehicle?
A. It was twofold. One, it provides ballistic protection for firearms, which we believed that he -- that's -- that Stephan had, the presence of the firearm
12:07:03

A. Yes, I remember that.
Q. What does 901X actually mean when it comes out on a call?
A. A suicidal subject.
12:08:40 Q. Okay. So it doesn't necessarily mean someone has committed -- or, I'm sorry -- has attempted to commit suicide?
A. Correct.
Q. It just means you have a suicidal subject?
12:08:50 A. Yes, ma'am.
Q. You testified that the female officer asked if anyone else was present in the apartment and Stephan did not respond, correct?
A. Yes, ma'am.
12:09:19 Q. And so did you -- were you ever able to confirm, prior to his being detained, that there was -- were no other occupants in the apartment?
A. No.
Q. Does the fact that Mr. Shere lives alone mean 12:09:36 that there were no other occupants in that apartment?
A. No. Just because he lives alone does not mean he wouldn't have had visitors or somebody else there.
Q. Or somebody who might be there who is there against their will?
12:09:49 A. Yes.

out of the apartment. And so I wanted to get him detained to prevent a deadly force encounter from happening, whether -- whether Stephan ultimately decided to take his own life or forced a deadly force encounter on one of us.

12:16:25 Q. And was it important to you to get him to a place where he could get any help he needed to address his suicidal condition?

A. Yes.

MR. WOODS: Foundation. Form.

12:17:10 BY MS. BERKE:

Q. You testified earlier that there was probable cause to arrest him for disorderly conduct?

A. Yes, ma'am.

Q. I'm going to show you the disorderly conduct

12:17:21 statute. Do you see it?

A. Yes.

Q. And this is ARS Section 13-2904?

A. Yes.

Q. And what is it that Mr. Shere was doing that gave

12:17:41 you probable cause to arrest him based on this statute?

A. So 13-24- -- sorry -- -2904, a person commits disorderly conduct if, with intent to disrupt the peace or quiet of a neighborhood, family, or person, or with the knowledge of doing so, such person makes any protracted

12:18:07 commotion, utterances, or display with the intent to

prevent it (inaudible.)

So I would say A2 and A3 (inaudible) and A4, just because of -- because of the -- the circumstances that -- coming out, the shouting at the officers, it -- it had gotten to the point where it was disrupting the community and members were coming out to see what was going on. And then even 4, the -- because of the police presence and everything going on, people didn't have the ability to use the hallway, walk through there, gain access to their apartment, freely leave their apartment if they needed to.

Q. And was he making unreasonable noise?

A. Yes.

Q. From the -- Exhibit 2, add notes, sometimes are those notes using shorthand?

A. Yes.

Q. So it's not the exact verbiage that's coming out over the radio, correct?

A. Yes, ma'am.

Q. So when it says "bro," the dispatcher may have said "brother"?

A. Yes, dispatch abbreviates a lot.

MS. BERKE: Okay. That's all I have.

MR. WOODS: Okay. Just a couple of quick follow-ups.

A. Yes, sir.
Q. Rifle?
A. Yes, sir.
Q. And Stephan never made any move for his knife during that time, correct?
12:27:09
A. Correct.
Q. And Stephan's knife was actually holstered on his body, correct?
A. Yes, sir.
12:27:18
Q. Okay. So the opposite existed here. Stephan's weapon was holstered, but the officers' were not, correct?
A. The pres- -- the -- the presence of the weapon is the reason why our weapons are unholstered. And again, we still have a firearm that's unaccounted for.
12:27:40
Q. But he doesn't have anything in his hands, weapon-wise, the entire time you guys are there, correct?
MS. BERKE: Form. Foundation.
THE WITNESS: When both of his hands are visible, I did not see any weapons.
BY MR. WOODS:
Q. Okay. And again, my question is -- was, the only visible weapon that Stephan had was the knife around his neck, correct?
A. Yes, sir.
12:28:04
Q. And it was hanging from a chain, correct?

A. Yes, sir.
Q. And it was holstered in a little sleeve, correct?
A. Yes, sir.
Q. And he never made a move for that, correct?
12:28:18 A. Correct.
Q. And even if he did make a move for that, he would have to pull it out of the holster first, correct?
A. So he -- again, he -- he would just have to pull down 'cause it's just held in there by retention. So he'd 12:28:31 just have to pull down. And again, the 21-foot rule, he'd have the ability to close that distance and stab somebody. Aurora Police -- the Aurora Police Department actually just had an officer stabbed in the throat, I think, three times --
12:28:46 Q. Okay.
A. -- by a suspect with the same thing.
Q. Okay. But -- but your officers on scene have their weapons unholstered, correct?
A. Yes, they did.
12:28:55 Q. Okay. And the 21-foot rule applies when an officer has their weapon holstered, correct?
A. N- -- no. The -- it's -- it is a guideline that if there is a suspect that is armed with a weapon -- with a -- an edge weapon or blunt instrument within 21 -- 12:29:10 within 21 feet, you should have your weapon out and at the

low ready at minimum.

And even at that distance, at 21 feet, the suspect still has the ability to close the distance. And there -- there is a very high percentage that this -- the officer can still be stabbed or slashed or hit. That's even with an unholstered weapon.

12:29:27

Q. Okay. All right. Last thing real quick. Have you ever seen the -- what I'm showing you on the screen, the City of Phoenix open data website?

12:29:48

A. No, I've never looked at this website, sir.

Q. Okay. So -- so this page is called 2025 Calls for Service. And this is the URL and the data set description is the CSV file for each year from 2016 forward containing calls for service. The file for the most recent published year is updated daily by 11 a.m. and includes call -- calls for service from dot, dot, dot. And then down below there's incident numbers, disposition codes, disposition text, final radio code, and final call types. Do you see that?

12:30:04

12:30:21

A. Yes, sir.

Q. In the final radio code, I went ahead and filtered it by 901X. Do you see that?

A. Yes, sir.

Q. And under the text or the final call type, it says suicide attempt, correct?

12:30:30

A. Yes.

MR. WOODS: I -- I don't have anything else.

FURTHER EXAMINATION

BY MS. BERKE:

Q. Was Mr. Shere arrested for any crimes related to a gun?

A. No.

Q. Was he arrested for any crimes related to anything located in a search of his apartment?

A. No.

Q. Are TASERs always successful in stopping a subject?

A. No.

Q. Is there a very high percentage of time that they are not successful?

A. Yes.

Q. Can an officer count on a TASER to stop someone advancing on them with a knife?

A. No, which is exactly why I wanted the layers of less-lethal, especially given the -- there are so many factors with clothing and the probes and how -- that's why I wanted the layers of less -- less-lethal.

Q. The more clothing somebody has on, the more likely it is for the TASER not to work?

A. Yes.

Q. And given how Mr. Shere was dressed, was there a good possibility that a TASER deployment would not work on him?

12:31:55 A. I thought so.

Q. And that's why you also had a stunbag operator there?

A. Yes.

Q. Does a stunbag stop someone advancing on them with a knife? 12:32:03

A. Not always.

MS. BERKE: Okay. I have nothing further.

MR. WOODS: I have no follow-ups.

MS. BERKE: All right. He'll read and sign.

12:32:15 THE COURT REPORTER: Okay.

THE WITNESS: Thank you, sir.

MR. WOODS: Thank you, Sergeant.

THE COURT REPORTER: And I will have some spelling questions. But before we go off the record, are there any transcript orders? 12:32:21

MS. BERKE: Same as yesterday.

MR. WOODS: Same -- same for me, Kacie.

THE COURT REPORTER: Okay.

THE WITNESS: I grew up in Buckeye. Don't ask me how to spell anything. 12:32:30

# EXHIBIT 8

# (NON-ELECTRONIC)

# EXHIBIT 9

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Stephan Shere, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>City of Phoenix, a governmental entity; Michael Sullivan, Chief of the Phoenix Police Department; Daniel Joseph Snyder, an individual; Alex Beaver, an individual; Christopher A. Gitsch, an individual; Eric Elliot Summerville, an individual; Brittany Bartimoccia, an individual; Jacob A. Lewis, an individual; Charles C. Allen, an individual; Jennifer Lorrain Beberniss, an individual; Amanda Newsum, an individual; and John and Jane Does I-X,<br><br>Defendants. | No.: CV-23-2657-PHX-JJT(ASB) |

DEPOSITION OF OFFICER ERIC SUMMERVILLE

Phoenix, Arizona

August 27, 2026

Prepared by

Kathryn C. Cannon, CER
Certified Electronic Reporter
Certification No. 4929

CERTIFIED TRANSCRIPT

MS. BERKE: Just ask perfect questions, and then I won't object.

MR. WOODS: That's right. I'm trying my best.

BY MR. WOODS:

Q. And last -- lastly, if you need a break, just let me know. And if there's a question pending, just answer that question. We'll go to a break. Okay?

A. Sounds good.

13:06:52 Q. All right. So I think I covered this already, but right now your rank is officer. Is that correct?

A. That's correct.

Q. When did you start working at the city of Phoenix Police Department?

13:07:04 A. 2019, October 2019.

Q. Okay. What did you do before that?

A. I worked in education back in Boston.

Q. Okay. Were you -- were you a teacher?

A. The dean of students.

13:07:18 Q. I was a dean of students as well --

A. Nice.

Q. -- years ago.

A. Nice.

Q. Yeah. That's -- that's -- yeah, it's interesting

13:07:26 what happens in education sometimes, right? So what --

tactical gear. Sergeant Lewis advised, if the suspect presents a target, to take a shot at him with the stunbag." Did I read that right?
A. Yes.
13:15:35 Q. What did -- what did Sergeant Lewis tell you about the use of the stunbag that evening?
A. So basically, get the stunbag ready and prepped. And when I have the stunbag ready and prepped, after a few negotiations, if he presented a target, to take the shot.
13:15:54 Q. Okay. And -- and what did -- what -- what is it -- I guess, what -- to you, what does it mean to -- to "present a target"?
A. So from the training of the stunbag, you're -- you're trained to look for the torso area. That's the 13:16:13 ideal place. So I was waiting for a shot at the torso area.
Q. Okay. The shotgun that you used that night with the stunbag, does it allow multiple rounds to be loaded at the same time?
13:16:29 A. That's correct.
Q. Do you recall how many rounds you fired that night?
A. Yes, only one.
Q. Okay. Then it says, "Officers negotiated with 13:16:42 the suspect for several" -- several "minutes. The suspect

then stated to officers to 'Watch this,' and sent his dog Max out to attack officers." Do I read that right?
A. Yes.
Q. It says, "The suspect stepped out and presented himself to officers. Officers observed a black knife around his neck. He began to take off his flashlight and other items on his person." Did I read that right?
A. That's correct.
Q. "The TASER was deployed by Officer Gitsch #7319 and then I fired one single round from the stunbag shotgun towards the suspect's torso area. The suspect began to fall back and eventually fell to his knees. Officers moved up and took the suspect into custody." Is that correct?
A. Yes.
Q. Okay. So everything you wrote in there is accurate, to your knowledge?
A. Yes.
Q. Okay. When you went through the police academy, did -- did you receive constitutional law training?
A. Yes.
Q. Okay. Since the police academy, have you received any updated constitutional law training?
A. Yes.
Q. Okay. How often would you say you received

updated constitutional law training?
A. I don't -- maybe once a -- once a year, twice a year maybe.
Q. Okay. How do you get those updates?
13:18:30 A. We have trainings that we have to adhere to with the department that they send out.
Q. You ever just get email updates on -- on updated case law?
A. No. I don't recall.
13:18:47 Q. All right. I'm going to pull up what we'll mark as Exhibit 2. Do you see that on your screen?
A. Yes.
Q. And at the top, it says, "In the United States District Court, District of Arizona," and in the caption
13:19:03 it says, "Rebuttal Report of Ken Wallentine" -- or Wallentine.
(Deposition Exhibit 2 was marked for identification.)
BY MR. WOODS:
13:19:07 Q. Do you see that?
A. Yes.
Q. Do you know who Ken Wallentine is?
A. Yes.
Q. Who is he?
13:19:17 A. So he works with the law firm, if I'm not

A. I don't recall. It definitely began with 63 because that's the area that we served, the 63 area.
Q. Okay. Would 631G sound accurate?
A. Yes. That -- that could have been, sure.
13:39:06 Q. What -- do you know what the code 901X is?
A. Yes, attempted suicide.
Q. Okay. In your -- in your career since 2019, have you responded to -- to 901X situations more than once?
A. Definitely.
13:39:25 Q. Okay. Is it a -- is it kind of a common occurrence?
A. Yes.
Q. All right. I'm going to put up what I'll mark as Exhibit 4. On the top of this page, it says City of
13:39:56 Phoenix, signed by Rachel Caserta, Custodian of Records.
(Deposition Exhibit 4 was marked for identification.)
BY MR. WOODS:
Q. Do you see that?
13:40:02 A. Yes.
Q. The document -- document says, "This form authenticates 2 recording(s)." Is that correct?
A. Yes.
Q. At the bottom right, it says COP 001173, correct?
13:40:25 A. Yes.

Q. And it runs through COP 001179, correct?
A. Yes.
Q. Have you ever seen this document before?
A. No.
13:40:42 Q. Have you ever seen a document that looks like this before?
A. No.
Q. Okay. At the top of the second page, it says, "Phoenix Police Department, Jurisdiction - Phoenix Police,
13:40:56 Thursday, December 8, 2022." And then it says, "Call PH22-1496803 CLEARED, parentheses, R." Do you see that?
A. Yes.
Q. Okay. And then as you look through it, there's columns again. There's Time entry, Date entry, the
13:41:16 Desk/Unit, ID, and then descriptions. Do you see all that?
A. Yes.
Q. At 18:58:18, Priority ca- -- 1 call received by 911 was put out over dispatch for a 901X suicide attempt,
13:41:36 correct?
A. Yes.
Q. And then "Final," it says, "901X Suicide Attempt," correct?
A. Yes.
13:41:46 Q. Do you remember getting the call that night?

A. No.
Q. Okay. Do you remember, at 18:59:23, hearing the brother's threatening 901X, sent photo with gun in his mouth?
13:42:03 A. Vaguely.
Q. Okay. Do you remember hearing, at 19:00:06, "gun appears to be a handgun"?
A. Vaguely.
Q. Okay. Do you remember dispatching in as 631G to
13:42:22 assist 631M?
A. Yes.
Q. Okay. At 19:00:31, do you remember hearing that a text stated "you'll be better off without me" with a photo attached?
13:42:35 A. Yes.
Q. Okay. Scrolling down a little more. At 19:01:17, do you remember hearing "subject has threatened 901X before, but has never attempted"?
A. Yes.
13:42:47 Q. Okay. Do you remember hearing, at 19:03:11, 63G, who is Sergeant Lewis, saying "who does bro live with, any family"?
A. Yes.
Q. Okay. Do you remember dispatch saying, at
13:43:05 19:03:57, that "bro lives alone"?

Q. Okay. What does the G signify?
A. A single man unit.
Q. Okay. So that night, you were a single unit?
A. Yes.
13:44:37 Q. Okay. You -- we went over your report a little bit ago, and you had said he was very -- Stephan was very belligerent and constantly stating how much he hated police. Do you remember that?
A. Yes.
13:45:03 Q. Okay. Is saying that you hate police a crime?
A. No.
Q. Okay. When you get a 901X call, what -- what is the -- what is your -- what do you want to see happen when you arrive on scene?
13:45:29 MS. BERKE: Form. Foundation.
BY MR. WOODS:
Q. You testified earlier that you've responded to many 901X calls, right?
A. Yes.
13:45:40 Q. You, personally, and also based on your police training, what -- what is your goal when you are dispatched to a 901X call?
MS. BERKE: Form. Foundation.
BY MR. WOODS:
13:45:59 Q. Do you have no goal?

A. Yes, definitely, to preserve --
MS. BERKE: Form. Foundation.
BY MR. WOODS:
Q. You can answer when she objects.
13:46:08 A. So should I proceed? Okay.
MS. BERKE: If you understand.
THE WITNESS: Okay. Yes, to preserve life. To get the person necessary help that they're, you know, crying out for.
13:46:18 BY MR. WOODS:
Q. Okay. Did -- did -- eventually multiple officers, including Officer Bartimoccia, Officer Snyder, Sergeant Lewis, showed up on scene, correct?
A. Correct.
13:47:01 Q. Was Sergeant Lewis your commanding officer on scene?
A. Yes.
Q. Okay. And so you would take direction from him on scene?
13:47:11 A. Yes.
Q. Was he responsible for making tactical decisions?
MS. BERKE: Form.
(Inaudible.)
THE WITNESS: Yes, he was, but everybody on
13:47:30 scene is pretty much responsible for being safe. So that

can encompass everybody that's on scene. Tactics, (inaudible) police work good tactics.

MR. WOODS: Okay. Let me stop this share, share this. I'll show you what I'll mark as Exhibit 5.

(Deposition Exhibit 5 was marked for identification.)

MS. BERKE: Did we have an Exhibit 4?

MR. WOODS: Yeah. It was the CAD report. If I didn't say that, I'm sorry.

13:48:53 MS. BERKE: I thought that was 3.

MR. WOODS: Number 3 was Officer Summerville's training records.

MS. BERKE: Oh, okay. Sorry about that.

MR. WOODS: Yeah. No worries.

BY MR. WOODS:

Q. All right. Let me know when you see that on your screen.

A. Yes.

Q. I'm going to -- at the top, after the exhibit number, there is -- it starts with 13:49:15 BODYCAM_003_Axon_Body_3_Video_2022-10-04_1906_X60329289. Do you see that mouthful?

A. Yes.

Q. And then in the top right, there is a serial number that says X60329289, correct? 13:49:42

A. Yes.
Q. Let me just do one thing here. All right. So this is Officer Gitsch's body cam that starts at 19:05:56 at the top right. Do you see the timestamp?
13:50:10 A. Yes.
Q. Okay. And you watched Officer Gitsch's body cam footage, correct?
A. Yes.
Q. Okay. I'm going to fast forward after the first -- you understand that Officer Beaver and Officer Gitsch had arrived first, correct?
13:50:33
A. Right.
Q. And then we talked about what they said over the radio. Gitsch had said that they made contact, subject's not 901X, and he shut the door on them, correct?
13:50:48
A. Correct.
Q. Okay. And the door gets shut -- I'll start -- I'll -- I'm going to press play at 9:03, which is -- corresponds to 19:14:57, and press play.
(VIDEO RECORDING PLAYED.)
BY MR. WOODS:
Q. I'll pause it there. So the door got shut at, top right, exactly 19 hours and 15 minutes, correct, 19:15?
13:51:25 A. Correct.

BY MR. WOODS:
Q. You can answer.
A. I have no idea. Some bag of some sort. I don't know.
13:55:40 Q. Okay. Other -- other officers have had their depositions taken, and everybody says that Stephan had an open backpack that he kept putting his hand into. Does -- does -- does that fit your recollection?
MS. BERKE: Form.
13:56:00 BY MR. WOODS:
Q. Again, any time -- any time your attorney says "form" or "foundation," you can answer if you know the answer.
A. Okay. Yes. That's what -- yes.
13:56:08 Q. Okay. So you remember him having a backpack?
A. Yes.
Q. And do you remember him putting hands in that backpack?
A. Yes.
13:56:19 Q. Okay. Did you ever tell Stephan to put the backpack down?
A. No.
Q. Did you ever ask Stephan what was in the backpack?
13:56:45 A. No.

Q. Okay. I'm going to go ahead and press play again.

(VIDEO RECORDING PLAYED.)

BY MR. WOODS:

14:03:03 Q. So we're at 24:27. Can you describe what Stephan's doing?

A. So he's lifted up his shirt, but just getting our -- indication that he's not armed. He does have a knife around his neck, and we got intel that he had a gun,

14:03:18 so -- I can't see behind Stephan. So the waistband is a place where people usually hide weapons. So there could be a weapon, you know, behind him.

Q. At this moment, though, he -- he's pulled his shirt up and he's showing the front at least, correct?

14:03:32 A. Yes.

Q. Did you ask him to turn around and show the back?

A. I did not.

Q. Did any other officer that you can remember ask him to turn around and show the back waistband?

14:03:42 A. No.

Q. Were you concerned that there could have been a weapon in the waistband on the back?

A. Yes, definitely.

Q. But you didn't ask him to show the back?

14:03:56 A. No.

BY MR. WOODS:
Q. We're at 24:44. Did you hear Officer Gitsch say that Max is over there with them?
A. Yes.
14:07:09 Q. And then he said "come over here" to Stephan?
A. Yes.
Q. And then Stephan said, "Why? So you can fucking tase me?"
A. That's correct.
14:07:22 Q. Okay. Press play again.
(VIDEO RECORDING PLAYED.)
BY MR. WOODS:
Q. So during this ranting by Stephan, you could see both of his hands, correct?
14:07:50 A. Right.
Q. Is he holding anything in his hands?
A. It does not appear he is.
Q. Okay. And in -- in the entire interaction that you had with Stephan that night, did you ever see him
14:08:04 holding a weapon in his hands?
A. No.
Q. Did Stephan ever make any verbal threats towards any of the officers that night that you can recall?
A. No.
14:08:20 Q. Okay. Did anybody, to your knowledge, ever

the suspect?
MS. BERKE: Form.
BY MR. WOODS:
Q. Such as "put your hands on your head"?
14:10:01 MS. BERKE: Form.
THE WITNESS: Yes.
BY MR. WOODS:
Q. Okay. Have you ever given a suspect a command to get on their knees?
14:10:11 A. Yes.
Q. Have you ever given a suspect a command to lie down on their stomach?
A. Yes.
Q. Have you ever asked a suspect to put their hands behind their back?
14:10:32
A. Yes.
Q. On the night of this incident, did you give a command to Stephan to put his hands on his head?
A. No. In a situation like this, you want the CIT-certified officer to take over. Several different voices for different officers can convolute the scene and make it even more confusing for the person that's in a crisis. So one voice and that voice was Officer Gitsch.
14:10:59
Q. Okay. All right. But I -- I'm asking about you right now. And I -- and I understand the reasoning, but
14:11:17

A. Correct.
Q. And he just yelled, "I'm fucking fine," correct?
A. Correct.
Q. Press play.
14:12:20 (VIDEO RECORDING PLAYED.)
BY MR. WOODS:
Q. We'll stop at 25:16. Officer Gitsch was the individual officer that shot the TASER, correct?
A. Correct.
14:12:41 Q. And he's also the CIT officer?
A. Correct.
Q. And when he shot the TASER, Stephan's hands were in the air, correct?
A. Could be.
14:13:01 (VIDEO RECORDING PLAYED.)
BY MR. WOODS:
Q. Stop at 25:16. Stephan's hands are up in the air, correct?
A. Correct.
14:13:07 Q. I'll press play.
(VIDEO RECORDING PLAYED.)
BY MR. WOODS:
Q. Stop at 25:17. Officer Gitsch shot his TASER, correct?
14:13:14 A. Correct.

Q. I'll press play.
(VIDEO RECORDING PLAYED.)
BY MR. WOODS:
Q. Your -- your fellow officers were able to
14:15:12 successfully, including you, get him in handcuffs, correct?
A. That's correct.
Q. And he wasn't fighting you for that, right?
A. Right.
14:15:22 Q. And in between that, he called for Max again, correct?
A. Correct.
Q. Did you hear him say that he has PTSD?
A. Yes.
14:15:35 Q. Before he was tased, do you remember him telling you that he had PTSD?
A. No.
Q. Okay. Do you remember him saying that he wants to be tased?
14:15:45 A. Yes.
Q. Do you remember him qualifying that and saying not by you guys, but by going down to Axon?
A. Yes.
Q. Okay. So you knew at the time that he wanted to
14:15:58 be tased, but not by you guys, correct?

A. Yes.

Q. Do you recall Stephan sustaining a head injury?

A. Yes.

MS. BERKE: Form.

14:16:16 BY MR. WOODS:

Q. At the moment that you were handcuffing him, did Ste- -- was Stephan bleeding from his head?

A. Yes.

MR. WOODS: Let's go ahead and take a five-minute break. 14:16:28

THE COURT REPORTER: We are -- we are off the record. The time is 2:16 p.m.

(A recess ensued.)

THE COURT REPORTER: We are on the record. The time is 2:23 p.m. 14:23:32

BY MR. WOODS:

Q. When you fired the stunbag, did you issue a warning to Stephan prior to firing it?

A. No.

14:23:47 Q. Did anybody else, that you can recall, issue a warning before?

A. No.

MR. WOODS: All right. I'm going to show what has been marked now as Exhibit 7.

(Deposition Exhibit 7 was marked for

MS. BERKE: Foundation.
THE WITNESS: I do not know.
BY MR. WOODS:
Q. Okay. Did -- that night, did you ask to be listed as a victim of aggravated assault?
MS. BERKE: Form.
THE WITNESS: I don't -- I don't recall.
BY MR. WOODS:
Q. Were you asked by anybody if you would like to be listed as a victim of aggravated assault?
A. I don't recall.
Q. Did anybody ever tell you that you were listed as a victim of aggravated assault?
A. Yes.
Q. When did they tell you that?
A. I think maybe after we got him -- Stephan inside of the car.
Q. All right.
A. There were definitely other charges that we could have pursued, disorderly conduct and interfering with government operations. So it was def- --
Q. I've heard -- I've heard that before. But -- but you didn't pursue those, correct?
A. Well, it's not up to me. It's up to the county attorney to pursue charges. We just arrest people and

A. Yes.
Q. Did he tell you to go away multiple times?
A. Yes.
Q. Did he tell Officer Gitsch and Beaver to go away at the initial contact?
A. Yes.
Q. Did he shut the door on Officer Gitsch and Beaver?
A. That's correct.
Q. Did he keep calling for Max to come back?
A. Yes.
Q. And during that whole time, he -- he kept telling the officers to go away, correct?
MS. BERKE: Form.
THE WITNESS: That's correct.
BY MR. WOODS:
Q. Okay. If someone's intention is to die by suicide by cop, they -- that person would not tell the cops to go away, would they?
MS. BERKE: Foundation. Form.
THE WITNESS: But he was armed the whole time. There was a gun involved on the initial intel that we received that we have not located. And he had a knife around his neck. So that's being armed. He was asked by Officer Gitsch to put down all his weapons and come

Q. Okay.
A. But we had intel that he had a gun in his mouth on a picture that he sent to his sister. So intel --
Q. But you --
14:52:22 A. -- intel drives our thoughts.
Q. But you hadn't seen that picture?
A. I hadn't seen that picture, but I did realize there was possibly a gun in play. So --
Q. Okay.
14:52:30 A. -- that response is going to be a little heightened. If a gun's in play, it's not a regular run-of-the-mill call. You definitely have to mind your Ps and Qs.
Q. Sure. But again, you hadn't seen the picture,
14:52:44 correct?
A. Correct.
Q. Have you seen the picture?
A. I have not.
Q. So you -- so no- -- nobody's ever shown you the
14:53:10 photograph?
A. I have not seen it, no.
Q. In -- in the years this case is pending, you've never seen that?
MS. BERKE: Form.
14:53:21 THE WITNESS: I think I already answered

Q. Do you know if he wore this on a regular basis?
A. I do not. I did not.
Q. I mean, people have their own stylistic choices of what they wear on a day-to-day basis, right?
14:56:00 A. Yeah, that's correct.
Q. Okay. So you didn't have any of that information when you were on scene, correct?
A. Correct. Right.
Q. Going back to Exhibit 7, this Response to
14:56:28 Resistance Report that was entered on October 5, 2022, at 22:03, were you ever interviewed by Lieutenant Jacob Rasmussen?
A. No.
Q. How about Sergeant Jason Winfield?
14:56:42 A. No.
Q. Okay. Have you ever been interviewed by anybody, other than Mr. Wallentine, regarding the incident on October 4, 2022?
A. No.
14:57:06 Q. Is there any fact that hasn't been discussed today that justified you firing the stunbag shotgun?
MS. BERKE: Form.
THE WITNESS: No, not to my knowledge. We had a -- we had a subject that definitely was guilty of
14:57:27 three particular crimes, disorderly conduct, unreasonable

noise. People were coming out. They were disturbed. They were trying to see what was going on. Interfering with government operational procedures and aggravated assault. So he definitely had committed three crimes.

14:57:41 People were coming out, trying to see the disturbance, what's going on, what's going on. We had to, you know, tell them to go back into their apartment, basically trying to give them comfort. They were clearly -- a couple of those guys -- or a -- a woman was 14:57:54 clearly, you know, upset and trying to figure out what was going on with all the loud noise and the screaming that was exhibited by Stephan. Like right -- prior to the stunbag being deployed, he was yelling and screaming. He got louder and louder, so definitely disorderly conduct. 14:58:16 Sure.

BY MR. WOODS:

Q. And yet he was never charged with that?

A. Well, like I said before, that's not up to me. We just arrest people and book them. I don't have any 14:58:25 idea after that.

Q. And, in fact, Stephan had shut the door earlier in the night on Officer Beaver and Gitsch and told them to go away, correct?

A. That's correct.

14:58:35 Q. And then Officer Beaver and Gitsch stayed in the

Q. I'm going to jump to 15:18 and press play.
A. But after the statement --
(VIDEO RECORDING PLAYED.)
BY MR. WOODS:
15:11:17 Q. Did -- did you hear him say that he wanted to go to Axon and get tased?
A. Yes.
MR. WOODS: Okay. All right. I have nothing further.

EXAMINATION

BY MS. BERKE:
Q. Just a moment ago you said "but after the statement," and then you were cut off. What is it that
15:11:34 you were trying to say?
A. Oh. But he already tried to sic his dog on us, so he was definitely trying to put us in harm's way, you know, and not being compliant. Like, a gun was in play. We definitely didn't -- never -- we never located a gun or
15:11:49 he wasn't being up front about, you know, taking off his weapons or -- or presenting his hands.
Q. So when you were talking to him after the incident and after he was safely detained, were you just basically trying to keep him calm?
15:12:06 A. That's correct. Yes.

Q. When he sent the dog out of the apartment toward you, did you -- were you concerned about your physical well being?
A. Definitely. And I thought I was going to get bit by a dog. I'm terrified of dogs, especially of pit bulls. So I was -- I probably wore it pretty well, but I was terrified. I was scared.
Q. You were in apprehension of imminent physical injury?
A. Yes.
Q. And did you feel that he intentionally placed you in apprehension of imminent physical injury?
A. That's correct.
Q. And what led you to believe he intentionally did that?
A. By telling the dog, "Watch this," and siccing the dog on us.
Q. When you get the 901 x-ray -- or 901X call, is it always someone who is actually commit -- trying to commit suicide or attempting to commit suicide?
A. No.
Q. What is it sometimes?
A. So it could be somebody that's probably making the statements, suicidal statements. It could --
Q. Someone who's threatening to?

A. Yes, threatening suicide. Yes.
Q. So just -- it's kind of an all-encompassing code for either someone threatening suicide, someone who's suicidal, or attempting suicide?
15:13:40 A. That's correct.
Q. You testified earlier that your memory of these events was better in 2022, at the time this incident occurred, than it was in 2026. But was the information you provided to Ken Wallentine about that evening's events information you remember?
15:14:04
A. Yes.
Q. When Mr. Shere made the statement, "Watch this," when he sent the dog toward you, what did you interpret what -- "Watch this" to mean?
15:14:25 A. Like we're about to get attacked by a dog.
Q. Like watch this dog attack you?
A. Right. Right. Watch this dog attack me and my partners.
Q. Have you seen a pit bull attack someone before?
15:14:38 A. Yes. Very vicious dogs, got a strong bite force. It's kind of hard to get them -- get them off a person. They lock on any particular thing. So, yeah, I was definitely terrified.
Q. And you saw that before this incident?
15:14:51 A. Yes. I've seen several videos of pit bull

attacks prior to this incident for sure.
Q. Do you remember the video that Mr. Woods showed you where he described Stephan as ranting when he was screaming and yelling in the hallway and carrying on?
15:15:12 A. Yes. Definitely disorderly conduct.
MR. WOODS: Form.
THE WITNESS: Sure.
BY MS. BERKE:
Q. That was disorderly conduct?
15:15:16 A. Yes. Unreasonable noise. He kept getting louder and louder. Like I said, the -- the peace of the residents in that apartment were definitely disturbed.
Q. Did your goal of getting Stephan safely in custody so he could get help for his mental health
15:15:53 situation play any role in your decision to use force?
A. Yes.
Q. Explain that.
A. Like I said, he kept getting louder and louder, getting more aggressive. And we were pretty -- pretty
15:16:07 close. He could have ran at us with a knife behind his back. So I think we used appropriate force to diffuse the situation and get him into custody. And I know from him being booked into jail that it's a -- it's a catch-all. They have mental health services in -- in the jail.
15:16:20 Q. Okay. So you were satisfied that he would get

whatever assessment and care he needed when he was booked into jail?

A. That's correct.

MS. BERKE: I have nothing further.

MR. WOODS: I have no follow-ups.

MS. BERKE: All right. He'll read and sign.

THE COURT REPORTER: Okay.

MS. BERKE: Thank you.

THE COURT REPORTER: And same --

MR. WOODS: Kacie, I'll take PDF.

MS. BERKE: Do you have any questions on spellings?

THE COURT REPORTER: No. Just same transcript orders?

MS. BERKE: Order, yeah.

THE COURT REPORTER: Okay. We are off the record. The time is 3:16 p.m.

(Deposition concluded at 3:16 p.m.)

Eric Summerville #10919

OFFICER ERIC SUMMERVILLE

# EXHIBIT 10

# (NON-ELECTRONIC)

# EXHIBIT 11

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Stephan Shere, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>City of Phoenix, a governmental entity; Michael Sullivan, Chief of the Phoenix Police Department; Daniel Joseph Snyder, an individual; Alex Beaver, an individual; Christopher A. Gitsch, an individual; Eric Elliot Summerville, an individual; Brittany Bartimoccia, an individual; Jacob A. Lewis, an individual; Charles C. Allen, an individual; Jennifer Lorrain Beberniss, an individual; Amanda Newsum, an individual; and, John and Jane Does I-X,<br><br>Defendants. | ) | No. CV-23-2657-PHX-JJT(ASB) |

DEPOSITION OF OFFICER ALEX BEAVER

Phoenix, Arizona

August 25, 2026

Prepared by

Kathryn C. Cannon, CER
Certified Electronic Reporter
Certification No. 4929

CERTIFIED TRANSCRIPT

BY MR. WOODS:

Q. Were there resources available in -- in -- in October of 2022 for -- that you know of -- if you don't know, you don't know -- for dispatch to send out a mental health crisis team, for instance?

13:24:12

MS. BERKE: Form. Foundation.

THE WITNESS: Yes, sir, there -- there would have been. But it would -- the scene would've had to have been secured prior to them coming out.

13:24:22

BY MR. WOODS:

Q. Okay. And there -- there -- what -- what -- what capabilities existed at that time? You said there would have been, but -- so I'm just wondering what -- what those capabilities would have been.

13:24:32

A. There would have been a mobile team. I don't know what their education level is or what their qualifications are. Some kind of some psychiatric type care. Again, I don't know if they're PhDs or they're undergraduates. But they would come out and -- and try to help with that.

13:24:48

Q. Okay. Were they sworn officers, to your knowledge?

A. No, sir.

Q. Okay. So they -- it was a non- -- non-sworn officer team, correct?

13:24:56

A. Yes, sir.
Q. Okay. What else? All right. Let's go to -- Sorry, my mouse is going in and out here.
Do you remember writing a narrative for this incident?
13:29:16
A. Yes, sir, I did -- or I do.
Q. Okay. Having troubles here.
When you -- when you arrived on scene to this dispatch call, what -- what did you do first?
13:30:05
A. I tried to access the building. As I recall, it was a pretty new complex, so it took a few minutes to get in -- into the building -- find the building and get into the building.
Q. Okay. And then when you -- when you -- when you
13:30:20
gained access to the building, what did you do next?
A. Made our way upstairs to the apartment in question.
Q. Okay. And when you made your way upstairs, what did you do next?
13:30:33
A. If I recall correctly, Officer Gitsch knocked on the door. We could hear a dog barking shortly thereafter, kind of somebody fiddling with the lock. You could hear somebody trying to open it. It took a little bit of time for that to open, and then it opened maybe four to six
13:30:49
inches.

Q. Okay. Then did you make contact with Mr. Shere?
A. Yes, sir.
Q. Okay. Now on the screen, I'm on page COP 000021. Do you see that?
13:31:10 A. Yes, sir.
Q. And there -- there's a narrative here that -- that starts with "On October 4, 2022 at 1940 hours AP Stephan Shere was arrested for seven counts of aggravated assault of a police officer after he pushed his pitbull 13:31:25 dog at officers and stated something to the effect of let's see what happens now, period," correct?
A. I do see that, yes, sir.
Q. Did you write that? And the reason I asked that is -- I'll -- I'll move to the next paragraph. It says, 13:31:40 "On October 4, 2022 at 1858 hours, while riding a two-man marked patrol unit with Officer Gitsch, number 7319, we responded to emergency radio traffic of a suicidal subject at 6800 East Mayo Boulevard."
A. Yes, sir. Yep. That would be my report, then, 13:31:59 yes, sir.
Q. Okay. And do you recall writing this?
A. I do.
Q. In this next paragraph that I'm highlighting here --
13:32:34 A. Yes, sir.

(VIDEO RECORDING PLAYED.)

BY MR. WOODS:

Q. Okay. So you heard him say, "Don't talk to my dog"?

13:39:06 A. Yes, sir.

Q. Is that what you were talking about earlier where he -- he -- he had told you in a hostile way not to talk to his dog?

A. Yes, sir.

13:39:16 (VIDEO RECORDING PLAYED.)

BY MR. WOODS:

Q. Okay. So we watched a little over -- right around two minutes, and, you know, it might have been 10 seconds, 20 seconds.

13:41:21 A. Yes, sir.

Q. Was that interaction extremely hostile to you?

A. I -- I -- I would say that's hostile. Somebody who answers the door with one hand behind it, wearing a -- what looks like possibly a bulletproof vest and a -- some

13:41:33 kind of helmet, gloves. Yeah, I -- I would -- I would say it is.

Q. Was Stephan yelling at you?

A. Well, I -- I had somebody -- I waived somebody through and he took offense to that and began cursing and

13:41:51 I -- I would call -- that's pretty close to yelling.

I'm just trying to understand how that sit- -- that interaction was written down that he was extremely hostile. Because to me, when you use the adjective "extremely," I mean, you're reaching, you know, is -- it's the -- the highest levels of hostility. So if I'm making that assumption incorrectly, go ahead and correct me.

13:43:11

A. Yeah, I -- I -- I guess. Is it the most extreme it could've been? No. Was it a normal interaction? No. I termed it as -- as "extremely hostile." I thought that was more hostile than this situation warranted in any way, shape, or form.

13:43:30

Q. Okay. And in what we just watched, did he threaten you?

A. Overtly, no. But wearing a bulletproof vest and a helmet and gloves and keeping one hand behind the door and after sending a picture to your sister with a gun in -- either in your mouth or up to your head, there is risk there.

13:43:45

Q. Okay. But you -- you know after everything played out, he wasn't wearing a bulletproof vest, correct?

13:44:02

A. But -- yeah. At the end of the day, yeah, I -- I -- I understand that's not what it was. It was more of a -- say, a tactical vest at that point. But you don't know that when you're outside the door, you don't know what's inside there. They make them extremely thin now.

13:44:14

MS. BERKE: It sounds like a free car wash is in order.

MR. WOODS: Right? Yeah. They said they rinsed it. So we'll see when we get done.

13:47:31 MS. BERKE: Oh, gosh.

MR. WOODS: I'll go look, but . . .

BY MR. WOODS:

Q. All right. So back to Exhibit 2 here. You wrote that "he told us numerous times to go away and would only

13:47:40 tell us 'it doesn't matter' when asked if he was going to hurt himself," correct?

A. Correct. Yes.

Q. And that's what we saw in the video, right?

A. Yes.

13:47:46 Q. "He would only open the door a small amount and kept one hand hidden behind the door," correct?

A. Yes.

Q. "There was a brindle color pitbull dog behind Stephan as he stood in the doorway," correct?

13:47:57 A. Yes, sir.

Q. "I could see he was wearing a helmet and what appeared to be a 'tactical vest' with a karambit-style knife around his neck." Is that right?

A. Yes, sir.

13:48:08 Q. Okay. Let's go back to Exhibit 3. I'm at 13:56

on the video, which is 19:14:30. Do you see that?
A. Yes, sir.
Q. So -- so you're looking at Stephan. This is your body cam view, right?
13:48:34 A. Yes, sir.
Q. And you -- you -- you wrote that you saw a tactical vest and a karambit-style knife around his neck, correct?
A. Yes, sir.
13:48:46 Q. And you also wrote that he was wearing a helmet?
A. Yes. I -- I -- I believe it was some type of helmet.
Q. Okay. Do -- do you recall, after arresting Stephan, if he was actually wearing a helmet?
13:48:59 A. I don't think he was at that time. I don't know where it went from this lo- -- from here. I don't know if he took it off inside after he closed the door.
Q. Okay. You wrote -- switch back to that. You wrote in the incident report that "He . . . had black
13:49:22 latex gloves on his hands." And then you say, "Stephan became increasingly angry and shut the door"?
A. Correct.
Q. Okay. And on the -- on the video we saw, he didn't yell at you, correct?
13:49:35 A. I would say it was heightened, but yes, it was

just read, it starts with "Several more units arrived to assist . . ." Do you see that?
A. I do, yes, sir.
Q. It says, ". . . to assist us and brought a ballistic shield and a stunbag shotgun with them." Is that right?
A. Yes, sir.
Q. You write, "We set up on the door and were again trying to contact the complainant when Stephan came back out into the hallway," correct?
A. Yes, sir. We were setting -- I -- I -- I may have mistyped there or misspoke there. We were setting up on the door, I -- I believe is the -- the proper term there. We weren't actually set up and ready to go and attempting contact at the time he came back out.
Q. Okay. You wrote that "He was still very hostile and aggressive and was holding a black backpack in one hand." Is that right?
A. Yes. Yes, sir.
Q. You say, "The zipper was open, giving him access to the interior of the bag, but we were unable to see what if anything was in the bag." Is that correct?
A. Yeah.
Q. "Stephan told us to put down the shield and he would put down the backpack as he acted like he was

reaching for something in the bag," correct?
A. Correct.
Q. Okay. Everything that I read so far, is that accurate?
13:54:05 A. Yes, sir.
Q. Okay. You then write, "I had drawn my service weapon and taken a position partially behind a wall."
A. Correct.
Q. Is that correct?
13:54:18 When you say "service weapon," that -- does that mean your handgun?
A. Yes, sir.
THE COURT REPORTER: I didn't -- I'm sorry. I didn't catch your answer to the previous question.
13:54:26 MS. BERKE: And just -- just so that the record's clearer, can you just pause and let him get his full question out, give me an opportunity to object if I feel like there should be an objection, and then respond.
THE WITNESS: Of course. Yes, ma'am.
13:54:39 MS. BERKE: Okay. I think the court reporter will appreciate that.
THE COURT REPORTER: Thank you. And I believe you said yes? "You [wrote], 'I had drawn my service weapon and taken a position partially behind a wall'"?
13:54:48

THE WITNESS: Yes, ma'am.
THE COURT REPORTER: Thank you.
BY MR. WOODS:
Q. Yeah. Yeah. Sometimes we get into a flow back and forth, right? And it -- it's like normal conversation, but sometimes it's really tough for the court reporter, to have that slow down for them. So I'll do -- I'll -- I'll do my best to keep this with pauses as well.
A. Yes, sir.
Q. Okay. So your service weapon was a handgun, correct?
A. Yes, sir.
Q. Was it a 9 millimeter?
A. No, sir. It's a 45 caliber.
Q. Okay. Did it have any attachments, like a scope or a light or a laser or anything like that?
A. Yes, sir, it does have a light.
Q. Okay. You write, "I was at the low ready as we gave Stephan commands which he ignored." Did I read that right?
A. Yes, sir.
Q. What does "low ready" mean?
A. Below the target, I suppose, is what that would mean. Hard to do with a person, I suppose. But lower

than where I would engage if I were to shoot, I suppose, is one way to look at it.
Q. Okay. Is it a -- is "low ready" a term that's used colloquially in the police department?
13:56:03 A. Yes, sir.
Q. Are there other positions, like a mid-ready or a high -- high ready?
A. You know, honestly, I -- I don't think there are. The -- low ready is just where you are until you -- you move into the position if you were going to shoot. 13:56:17
Q. Okay. Okay. And at low ready, are you -- are you kneeling or -- or what -- what does your body positioning look like?
MS. BERKE: Form.
13:56:30 THE WITNESS: Standing, sir.
BY MR. WOODS:
Q. Okay. And -- and so standing with -- with the weapon down?
A. Yeah, maybe -- maybe waist-level-ish. But I would -- I would say angled down is maybe the proper term. 13:56:40
Q. Okay. When -- when you were in that position, was your weapon -- you -- you said that you were partially behind a wall. Was -- was your service weapon behind the wall with you, or was it out in the hallway?
13:56:59 MS. BERKE: Form.

Q. You see Officer Gitsch --
A. Yes, sir.
Q. -- standing -- leaning on that wall, correct?
A. Yes, sir.
13:58:29 Q. And right now you're to the left of and sort of behind Officer Gitsch. Is that correct?
A. Yes, sir.
Q. Okay. In -- in the -- in the report, you wrote that "Officer Gitsch was to my left with a TASER 13:58:40 attempting to speak with Stephan." And we talked about your body being partially obscured. So I'm going to go to the right over here. Is this the area that you were staged in the low ready position?
A. Yes, sir.
13:58:54 Q. Okay. So you were behind this wall, partially obscured?
A. Yes, sir.
Q. Okay. And -- and just for the record, that's on the right side of the video screen. There's a -- there's 13:59:04 a wall that ends. You then wrote, "This went on for several minutes until Stephan pushed his pitbull dog toward officers and stated, 'Let's see what happens now.'" And then let's see what happens now is in quotes, correct?
A. Yes, sir.
13:59:27 Q. Do you -- do you recall when you wrote this

narrative?
A. It would've been sometime that night, after this.
Q. Okay. You then wrote, "This was clearly an attempt to threaten or scare the officers with the idea the dog may" -- I assume you meant "attack"?
A. Yes, sir.
Q. Okay. You then wrote, "The dog, 'Max' trotted through the officers and approached me."
A. He did.
Q. "He sniffed my leg and then stood next to me in a confused state," correct?
A. Correct. Yes, sir.
Q. You then wrote, "I was directed by Sergeant Lewis, who was on scene, to move back and give my spot to an officer with a stunbag," correct?
A. Yes, sir.
Q. And then you wrote, "I stepped back and holstered my weapon as I no longer had a clear view of the suspect. I took the dog by the collar and moved him away from the other officers and found him to be friendly," correct?
A. Yes, sir.
Q. Okay. Was Max friendly?
A. He appeared to be. When -- he got a little amped up when the TASER went off and tried to pull around that corner, and I just held on to him.

Q. Okay. And did you continue watching that all the way through Stephan being taken into custody?
A. Yes, sir.
Q. Okay. Back to Exhibit 2, back to the incident report. You wrote, "Stephan still had the karambit knife around his neck and was found to have a second knife in his pocket." Is that correct?
A. Yes, sir.
Q. Okay. You then wrote, "He was removed to a waiting patrol car and the fire department was dispatched to our location to assess and treat Stephan," correct?
A. Correct.
Q. You then wrote, "I walked the dog back into the apartment and noticed numerous pills laying on the floor. These turned out to be psychological medication prescribed to Stephan," correct?
A. Correct.
Q. You also wrote that "There was also an empty bottle of Maker's Mark whiskey on the counter," correct?
A. Yes, sir. Correct.
Q. And then, "Officer Bartimoccia number 10558 located a black handgun, which she believed was an airsoft gun, in a bedroom which was being used for an office," correct?
A. Correct. Yes, sir.

Q. Okay. Now, what -- what's -- what's CAD?
A. I -- honestly I don't know if -- if it's an acronym or not, but it is the -- the computer system that lists basically everything that comes in on the call.
Q. Okay. So let -- let's look at this one. On this page, there is a time of 18:58:18, correct?
A. Yes, sir.
Q. It says, "Priority: 1 Received by: 9 911 System," correct?
A. Yes, sir.
Q. "Initial" was "901X Suicide Attempt." "Final" is "901X Suicide Attempt," correct?
A. Yes, sir.
Q. This is -- this is around the time you got the dispatch call, correct?
A. Yes, sir.
Q. Okay. At 18:59:23, it says, "Brother is threatening 901X, sent photo with gun in his mouth," correct?
A. It does, yes, sir.
Q. Was that information that you received as you were responding?
A. Yes, sir.
Q. Okay. At 19:00:06 hours, it says, "Gun appears to be a handgun," correct?

A. Yes, sir.
Q. Is that information you received as you were responding?
A. Yes, sir.
14:38:59 Q. Down below, at 19:01:17, it says, "SUBJ" -- I assume that means "subject" -- "has threatened 901X before, but has never attempted," correct?
A. Yes, sir.
Q. Is that information that you had received on your
14:39:16 way to responding to this scene?
A. Yes, sir, it would have been.
Q. Okay. Down below, on the bottom of this page at 19:03:57, there's -- there's a line item that says, "Bro lives alone." Do you see that?
14:39:32 A. I do.
Q. Would that have been information that you would have received on your way to responding to this incident?
A. Yes, sir.
Q. Next page, 19:04:35, it says, "Bro is usually
14:39:46 cooperative, struggles with" redacted. Do you see that?
A. Yes, sir.
Q. Would that have been information you would have received on your way to the scene?
A. Yes, sir. It would have been on the call.
14:39:59 Q. Okay. We're going to go a little further.

A. Yes.
Q. Okay. What is a karambit knife?
A. So my understanding is it's more made for fighting than anything else. It's -- it's just an (inaudible.) But it's -- it's design. It's the -- it's difficult to remove from a hand because it has a finger-hold that you put it inside your fist. And then it's -- it's a fighting knife.
Q. That can cause serious injury or death?
15:53:08 A. Absolutely.
Q. So it's a deadly weapon?
A. Absolutely.
Q. And he had it around his neck?
A. Yes, ma'am.
15:53:14 Q. And hanging on something?
A. Some type of, like, chain around his neck, yes, ma'am.
Q. And so was that readily available for him to use?
A. Yes, ma'am.
15:53:23 Q. And did that pose a danger for officers?
A. Absolutely, yes, ma'am.
Q. Does it take much time for an individual who's the distance that he was from you and your colleagues to stab one of you with that knife, if he so desired?
15:53:45 A. Actually, with that distance, I believe that he

could probably get to us faster than we could draw and fire.
Q. Okay. There are -- so when he sicced the dog out on you and you held the dog by the collar, why were you holding it by the collar?
A. So I have some control. That's why I was behind it, I was trying to keep the controls.
Q. When he sicced the dog on you, did you feel threatened?
A. Absolutely.
Q. Why is that?
A. I've been on several calls with pit bulls where they've attacked people. I don't know this dog. When the owner is putting out that kind of vibe, that oftentimes amplifies the -- the animals as well. What I heard was somebody releasing the dog. What -- now, the dog didn't do anything. Great. Perfect. That's exactly what we want.
But you don't know that the second it happens. It's -- it's not a five-minute later deal for me to go, "okay." It's immediate. So it's as soon as I heard that -- that -- that gives me pause. I am in fear at that point.
Q. And you heard him -- you were in fear that the dog might harm you?

A. Or someone else, yes, ma'am.
Q. And you heard him say, "Watch this," on the video, right?
A. I did, yes, ma'am.
15:55:03 Q. And in your report you said with quotes that he had said, "Let's see what happens"?
A. That's what I remember, yes, ma'am.
Q. Okay. So did you intentionally misstate what he had said?
15:55:12 A. No, ma'am.
Q. If it wasn't entirely accurate, was that just a mistake?
A. Yes, ma'am.
Q. When he says, "Watch this," do you interpret that
15:55:23 as threatening?
A. Absolutely.
Q. Why -- why do you interpret that as threatening?
A. As soon as I see that do- -- him saying, "Watch this," and I see that dog, just the very first second, to
15:55:33 me, that's immediately that -- that dog has been turned out in order to kind of level the playing fields.
Q. And what kind of dog was this?
A. American Pit Bull Terrier.
Q. Commonly referred to as a pit bull?
15:55:45 A. Yes, ma'am.

Q. And in your experience as a police officer, have you had incidents where pit bulls have seriously injured individuals?

A. Yes, ma'am.

15:55:56 Q. Can you give us an example?

A. We had one that had gotten out. They didn't really secure it. There was a -- about an 80-year-old woman picking up cans at Barrios Unidos Park. I don't know exactly what happened. The call came in and a -- a

15:56:10 guy was driving through there and the -- the lady was down.

Again, she was about 80, and the dog had ripped -- basically ripped her -- scalped her, if you will. It had -- there was bone showing, and the dog was

15:56:21 basically attacking her. That gentleman jumped out of his truck with a piece of PVC and was keeping the dog at bay. We ended up having to shoot the dog. It wouldn't -- it wouldn't go. It -- when we got there, we tried to drive it off and it wouldn't (inaudible) started to re-approach

15:56:36 us and the -- and the lady. And my partner at the time shot the dog.

Q. In your experience, are pit bulls unpredictable?

A. Yeah. I -- I would say pit bulls are and many dogs are. In fact, I think that -- especially when their

15:56:50 owners -- they feel that their owners are in danger, I

think that they can certainly turn on a dime.

Q. And so, although once you had the dog for several minutes and found it to be a sweet dog, when you initially int- -- interacted with the dog, did you know what that dog was going to do?

A. No, ma'am.

Q. And did you have serious concerns what it might do?

A. When it came out of the apartment, absolutely.

Q. And did you -- Or, strike that.

When he sicced the dog on you, was that a crime?

A. Yes, ma'am.

Q. What was it?

A. Aggravated assault.

Q. How was it an assault?

A. So the apprehension of that dog attacking us. So I -- if I walk up and hold my fist up like I'm going to punch you, that's an assault. So the apprehension of the assault is the assault.

Q. Causing someone to be in fear for -- of harm?

A. Yes, ma'am.

Q. And then when it's an assault and it's on a police officer, that makes it an aggravated assault?

A. Yes, ma'am.

I don't have anything to live for"?
A. Yes, ma'am.
Q. Is that consistent with someone saying that they're not suicidal?
16:01:00 A. No.
Q. Is it consistent with someone who is suicidal?
A. Yes, ma'am.
MR. WOODS: I didn't get it in there, but I'm going to have a foundation objection there.
16:01:13 BY MS. BERKE:
Q. And is that based on your experience as a police officer?
A. Yes, ma'am.
Q. When Mr. Shere pushed the dog out and you then
16:01:41 had to hold onto its collar, did that prevent you from doing other things that you would have been doing in this situation as a police officer?
MR. WOODS: Form.
THE WITNESS: Yes, ma'am. Once I -- once I
16:01:55 got ahold of the dog, I felt like I couldn't let it go and help anybody do anything else.
BY MS. BERKE:
Q. And so it basically took you out of service?
A. Yes, ma'am.
16:02:05 MR. WOODS: I just want to make sure that my

gas can full of gas in their apartment? A legitimate re- --

MR. WOODS: For- --

THE WITNESS: No --

MR. WOODS: -- form.

THE WITNESS: -- not when you have a porch, no.

MS. BERKE: Can we go to Exhibit 4?

MR. WOODS: I'm getting paralegal pay for

16:16:53 this, right? All right. Tell me where.

MS. BERKE: Lovely assistant. If you could go to Exhibit 4, toward the beginning.

MR. WOODS: Assuming here?

MS. BERKE: Right there. Let me see. So

16:17:18 this is Exhibit 4, Bates page -- scroll up -- Bates page COP 001174.

BY MS. BERKE:

Q. And do you see the dispatcher puts out over the radio at 18:59:23 that "Brother is threatening 901X,"

16:17:39 meaning suicide, correct?

A. Correct.

Q. And it says that he sent a photo with gun in his mouth, correct?

A. Correct.

16:17:49 Q. And then a few seconds later at 19:00:06, it

states, "Gun appears to be a handgun," correct?
A. Correct.
Q. And then if you go down to 19:00:31, the dispatcher states that his "text stated you'll be better off without me with the photo attached," correct?
A. Correct.
Q. And so what do you interpret that statement to mean when it's accompanied by a photo of someone putting a gun in their mouth?
A. I interpret that to mean that he is suicidal --
Q. And that intends to kill himself?
A. -- and he has the means to do it and he intends to do it.
Q. Okay. And then if you go down to 19:01:17, it states that he had previously threatened to commit suicide, correct?
A. Correct.
Q. And then if you go down to 19:03:46, it states, "Subject is no longer responding to complainant's texts," correct?
A. Correct.
Q. And is that a concern?
A. It is.
Q. Why is that?
A. Typically people that are suicidal and they quit

on scene said to Stephan Shere, "Do you have any weapons," correct?

A. Not that I recall, no, sir.

Q. Okay. So this wasn't a suicide by cop situation, was it?

A. I think it could certainly go that way with the weapons that he had on.

Q. That's not my question. This was not a suicide by cop situation, was it?

MS. BERKE: Form.

THE WITNESS: I guess I don't know how to answer that because I -- it's a fluid situation that can very quickly change. He -- he was extremely upset. He was crying at times, he was yelling at others. He was mad at times, he was sad at others. He's wearing a vest that looks like a bulletproof vest. He's wearing what appears to be tactical gear. He's got a knife hanging around his neck. And he has made threats to family members about -- with a gun in his mouth and threatening to kill himself.

So can that situation change in the blink of eye? It absolutely can. So tasing him and stunbagging him before we get to that stage is a much better option than getting to that stage. And I think that's where we ended up.

A. It can, yes, ma'am.
Q. Did using the TASER and the stunbag accomplish the goal of getting Mr. Shere safely in custody without having to use deadly force?
17:07:02 A. It did.
Q. And was Mr. Shere's level of agitation increasing at the time this less-lethal force was used on him?
A. Yes, ma'am. I'd say it was going up and down quite a bit throughout the thing, but I think we were
17:07:22 ramping up.
Q. And do you believe that, had that force not been used, it could have evolved into a deadly force situation?
A. Yes, ma'am.
MS. BERKE: That's all I have.
17:07:36 MR. WOODS: I don't have any follow-ups.
MS. BERKE: All right. We'll read and sign.
THE COURT REPORTER: Okay. And before we go off the record, are there any transcript orders?
MR. WOODS: Yeah. I'll take PDF, Kacie.
17:07:46 Thank you.
THE COURT REPORTER: Okay.
MS. BERKE: Yes. PDF with index.
THE COURT REPORTER: Okay.
MS. BERKE: And then where should I email
17:07:55 these two exhibits?

# EXHIBIT 12

**DECLARATION OF KENNETH R. WALLENTINE**

STATE OF UTAH )
) ss.
County of Salt Lake )

I, Kenneth R. Wallentine, say and attest the following:

1. I was a law enforcement officer for 44 ½ years and served as the Chief of Police of the West Jordan, Utah Police Department for seven years until my retirement on January 2, 2026. I am also an expert in the area of police practices and procedures.

2. My qualifications are described in detail in my Curriculum Vitae, which is attached hereto as **Exhibit A**.

3. I was retained as an expert witness by Berke Law Firm PLLC in the case of *Stephan Shere v. City of Phoenix, et al*., in the United States District Court for the District of Arizona, No. 2:23-cv-02657-PHX-JJT.

4. I was asked to provide my expert opinions regarding the Defendant officers' response to the reported suicidal threat involving a firearm at Stephan Shere's apartment on October 4, 2022, including their de-escalation efforts, tactics, and use of force to detain him, and whether that force was reasonable and consistent with generally accepted law enforcement policies, practices, and training. My evaluation considers the totality of the circumstances from the perspective of a reasonable officer on the scene, based on the information available to the officers at the time.

5. After reviewing the relevant records provided to me, I prepared an expert report pursuant to Fed. R. Civ. P. 26(a)(2), which is dated May 14, 2026, and is attached

hereto as **Exhibit B.** It contains a complete statement of my expert opinions as of that date and the basis and reasons for those opinions. My opinions have not changed.

6. I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this 1st day of October, 2026.

Kenneth R. Wallentine

# EXHIBIT A

Ken Wallentine
3330 West Signal Peak Drive, #RP318
Taylorsville, Utah 84129
krwallentine@gmail.com

*Curriculum vita summary*

- Chief of police from 2005-2026
- Investigations Bureau Chief 2002-2005
- Law enforcement officer since 1982
- Past-president, Utah Chiefs of Police Association
- Chair of Salt Lake County Officer-Involved Critical Incident Investigations Teams
- Member, Utah Commission on Criminal & Juvenile Justice
- Board of Advisors, Association of Force Investigations
- Licensed attorney since 1990
- Author of American Bar Association criminal procedure guidebook
- AELE Certified Litigation Professional
- Advanced Force Science Specialist®
- Certifications include: POST Firearms Instructor, TASER® Instructor, Excited Delirium and Sudden Death Investigation Instructor, LAPD Force Investigation Division Officer-Involved Shooting Investigation

Disclosure information for Fed. R. Civ. P. 26
September 1, 2026

*Employment*

I retired as the Chief of the West Jordan (Utah) Police Department, where I oversaw all police operations and investigations. I became certified as a law enforcement officer and as a corrections officer in the State of Utah in 1982. I was formerly employed with the Utah Attorney General, where I served as the Chief of Law Enforcement. I continue service as a certified officer in the State of Utah as a Reserve Special Agent for the Utah Attorney General Investigation Division.

After a period in private legal and consulting practice, I was a Supervisory Special Agent with the Utah Attorney General Investigation Division, where I developed a statewide use of force training initiative and coordinated officer-involved shooting investigations and other special investigations. I also serve in a consultation role as Senior Legal Advisor for Lexipol, the nation’s leading provider of law enforcement risk and policy management resources.

I formerly served as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah. I also supervised the police service dog training and certification program for the State of Utah. I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.

My duties included direct supervision and command of various investigative units and agents throughout the State of Utah, supervising law enforcement officers, forensic specialists, and technicians. I commanded the State of Utah Child Abduction Response Team. I commanded the State of Utah Officer-Involved Fatality Investigation Team. I was a member of the Board of

Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations. In 2010, Governor Herbert selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

*Law enforcement teaching experience and certifications*

I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability.

I am a certified POST Firearms Instructor, and have served as the lead instructor for POST Firearms courses. I am certified by the Force Science Research Center as a Force Science Analyst® and an Advanced Force Science Specialist®. I am a former certified TASER® Instructor. I am a certified Excited Delirium and Sudden Death Investigation Instructor. I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation. I am certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems. I am a Certified Litigation Professional, certified by the Americans for Effective Law Enforcement.

*Legal practice*

I am an attorney admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I recently achieved emeritus status as a retired attorney and I no longer practice law. I am a former Chief Deputy County Attorney and a former Utah Attorney General designated special prosecutor. I am a Master of the Bench of the American Inns of Court, Inn One, where I also served as the past-President of the Inn of Court. I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities. I was formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety.

I served two terms as Commission Chairman of the Salt Lake County Peace Officer Merit Service Commission, appointed by the Salt Lake County Mayor and the Mayors of the various municipalities that comprise the Unified Police Department of Greater Salt Lake County. In that capacity, I directed the commission that oversees the hiring, promotion, discipline and termination of all sworn officers of the Salt Lake County Sheriffs Office, Salt Lake County Protective Services Office and the Unified Police Department. I currently serve as a member of the Salt Lake County Criminal Justice Advisory Council.

I was the longest serving member of the Utah Board of Mandatory Continuing Legal Education, an independent committee serving on behalf of the Utah Supreme Court. I was first appointed in 1996 and was reappointed several times by the Chief Justice to serve through 2016.

*Consultation practice*

In addition to my primary employment, I consult and provide expert witness opinions on police procedures, and use of force issues. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and

screening practices, use of force, and police pursuit policies.

I am the co-founder of a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs Association and various state law enforcement agencies. These policies serve as a model for all Utah public safety agencies. I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies. I have serve as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States. I also serve as an expert witness for the United States Department of Justice Office of Civil Rights in police corruption and use of force prosecutions.

*Professional activities and organizations*

I participate and serve in a number of community and professional capacities. I am the immediate Past-President of the Utah Chiefs of Police Association. I represented the Utah Chiefs of Police Association on the League of Cities and Towns Listen, Love, Learn Task Force, creating strategies for police reform and relations with communities of color. I am a founding member of First Steps to More Trust, an initiative to join young persons in the BIPOC community with young public safety professionals in leadership training and community engagement. In 2021, I was recognized by D.A.R.E. America as the "Law Enforcement Executive of the Year." In 2022, I was named as the major city "Utah Police Chief of the Year" by the Utah Chiefs of Police Association. Also in 2022, upon nomination of the Attorney General, I was named as the "Utah Public Safety Officer of the Year" by the Utah Best of State Foundation. In 2026, I was recognized with a Lifetime Achievement Award for public service in the state of Utah, and recipient of the First Responder of the Year award by the NAACP Salt Lake City Branch for decades of service in advancing civil rights.

I am the former Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah. I had direct command of Officer-Involved Critical Incident Investigations Team IV. I am the past-Chair of the Salt Lake County Law Enforcement Administrators and Directors Association. I served on the Salt Lake County Criminal Justice Advisory Council. I currently serve on the Use of Force Standards and the K9 Standards Committees of the Utah Peace Officer Training and Standards Division, statutorily charged with articulating the standards for use of force by police officers and deployment of police service dogs. I am a member of the Statewide Information and Analysis Center Governance Board.

Other professional activities include serving as a member of the Utah Commission on Criminal & Juvenile Justice and a member of the Utah Behavioral Health Master Plan Executive Committee. I serve on the Board of Directors of the Institute for the Prevention of Sudden In-Custody Death. I am also a member of the Board of Advisors, Association of Force Investigations, former member of the Board of Directors of Crisis Intervention Team Utah, Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, member of the K9 Section of the Utah Peace Officers Association, member of the United States Police Canine Association, Gold Life Member and past member of the board of directors of the NAACP, Salt Lake City branch, and board member and co-Chairman of the Utah Law Enforcement Legislative

Committee.

I served as a gubernatorial appointee to the Council on Peace Officer Standards and Training. I am a former member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University. I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

*Publication history*

I have previously published a number of other professional articles, many of which have been subjected to peer review. My most recent book, *Preparing for an Active Shooter Threat*, was published in June 2020 by Blue360 Media. Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, 2nd edition, was published in 2020 by the American Bar Association Publishing Division. It is a treatise on public safety and criminal procedure. *The K9 Officer's Legal Handbook*, 3rd ed., was published in February 2019.

My other published works include: *An Officer's Legal Obligation to Intervene*, Police Chief, V. 90, No. 5 (2023); *An Outward Mindset Powering Multicultural Policing,* Police Chief, V. 89, No. 4 (April 2022); *Mitigating Suicide Threat Response Risks*, Police Chief, V. 86, No. 3 (2019); *Avoiding a Peer Support Pitfall*, Police Chief, V. 85, No. 3 (2018); *Avoiding a Peer Support Pitfall*, Police Chief, V. 85, No. 3 (2018); *Should I Stay or Should I Go?*, POLICE, October 2017, *Hill v. Miracle: Adapting the Graham Standard to Non-Criminal Interventions*, Police Chief (August 2017): 18–19; *Armstrong v. Village of Pinehurst: Training and Policy Implications for Police*, Police Chief, V. 83, No. 6 (2016); *Supreme Court Decision Casts Doubt on Hotel Registry Ordinances*, Police Chief, V. 81, No. 10 (2015); *Body Worn Cameras: Plan Before Your Office Buys In*, The Sheriff (June 2015).

*Litigation history*

I have testified and/or provided depositions in the following cases (limited to the past four years):

*Kidd v. Kilbourne, et al.* No. 3:23-cv-00067, United States District Court for the Eastern District of Kentucky, 2026. Deposition testimony given on behalf of Plaintiff. Subject matter: use of force.

*Fuller v. City of Devils Lake, et al.*, No. 3:24-cv-00130, United States District Court for the District of North Dakota, 2026. Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Ring v. City of Chandler, et al.,* 2:24-CV-00630-SPL, United States District Court for the District of Arizona, 2026. Deposition testimony given on behalf of defendants. Subject matter: use of force.

*Johnson v. Perry County, et al.,* No. 6:24-CV-061-CHB, United States District Court for the Eastern District of Kentucky, 2026. Deposition testimony given on behalf of plaintiff. Subject matter: use of force.

*Taylor v. Jacksonville Police Officers,* No. 3:24-cv-00835-TJC-SJH, United States District Court

for the Middle District of Florida, 2026. Deposition testimony given on behalf of defendants. Subject matter: use of force.

*Stacy v. Grindstaff*, No. 5:24-cv-05171-TLB, United States District Court for the Western District of Arkansas, 2026. Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Bassford v. City of Mesa, et al.*, No. 2:22-cv-00572-JAT-ESW, United States District Court for the District of Arizona, 2026. Trial testimony given on behalf of defendants. Subject matter: wrongful arrest.

*Cellona v. County of Santa Barbara*, No. 25-CV-1503, United States District Court for the Central District of California, 2026. Deposition testimony given on behalf of defendants. Subject matter: use of a less-lethal projectile.

*Cassody v. Rink & Bishop*, No. 24-cv-00595-SLP, United States District Court for the Western District of Oklahoma, 2026. Deposition testimony given on behalf of defendants. Subject matter: mental illness accommodation, wrongful death.

*Valle-Ramos v. City of Orlando, et al.*, No. 6:24-CV-01276-CEM-DCI, United States District Court for the Middle District of Florida, 2026. Deposition testimony given on behalf of defendants. Subject matter: wrongful conviction.

*Wilson v. Burris*, No. CIV-24-539-D, United States District Court for the Western District of Oklahoma, 2025. Deposition testimony given on behalf of defendants. Subject matter: use of a police service dog.

*Parra-Cota v. City of Phoenix, et al.*, No. 2:23-cv-02305-SPL-MTM, United States District Court for the District of Arizona, 2025. Deposition testimony given on behalf of defendants. Subject matter: unreasonable force during arrest, mental illness accommodation, gas delivery.

*Jane Doe v. County of Santa Barbara*, No. 2:24-cv-04334-MEMF-SK, United States District Court for the Central District of California, 2025. Deposition testimony given on behalf of defendants. Subject matter: sexual misconduct.

*Davis v. Allen*, No. 3:21-CV-00565-WMC, United States District Court for the Western District of Wisconsin, 2025. Trial testimony given on behalf of defendants. Subject matter: excessive force by police, improper use of police service dog.

*United States v. Amiri, et. al,* No. 23-CR-269-JSW, United States District Court for the Northern District of California, 2024, 2025. Trial and Grand Jury testimony given on behalf of plaintiff. Subject matter: excessive force by police, improper use of police service dog.

*State of Alaska v. Miller*, No. 3KN-24-00808CR, District Court for the State of Alaska, 2024. Grand jury testimony given on behalf of plaintiff. Subject matter: unreasonable force during arrest, improper use of police service dog.

*Simmons v. City of Edmond, et al.*, No. CIV-24-97-J, United States District Court for the Western District of Oklahoma, 2024. Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Herndon v. City of Clinton, et al.*, No.: CIV-23-86-F, United States District Court for the Western District of Oklahoma, 2024. Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Barrick v. Clardy et al.*, No. CIV-23-129-JFH-GLJ, United States District Court for the Eastern District of Oklahoma, 2024. Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Estate of Duval v. United States of America et al.*, No. 2:20-CV-01206, United States District Court for the District of Arizona, 2024. Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Adams v. City of Cedar Rapids, et al.*, No. 1:21-cv-0005, United States District Court for the Northern District of Iowa, 2024. Trial testimony given on behalf of defendants, subject matter: use of police service dog.

*State v. Hoover*, No. 191400190, Fourth District Court for the State of Utah, 2024. Trial testimony given on behalf, subject matter: criminal homicide.

*Huff v. City of Eufaula, et al.*, No. 18-cv-22 EFM United States District Court for the Eastern District of Oklahoma, 2024. Deposition testimony given on behalf of defendants, subject matter: wrongful death.

*Camba Ponce v. United States of America*, No. 4:22-CV-00012-DC-DF, United States District Court for the Western District of Texas, 2024. Deposition testimony given on behalf of defendants, subject matter: use of police service dog.

*Saddlers v. City of Lakeland,* No. 8:22-cv-2127-CEH-JSS, United States District Court for the Middle District of Florida, 2023. Deposition testimony given on behalf of defendants, subject matter: use of police service dog.

*Faucheaux v. City of Provo*, No. 100401999, Fourth District Court for Utah County, 2023. Deposition testimony given on behalf of defendants, subject matter: wrongful death.

*Strong v. City of Naples*, No. 2:22-cv-00318, United States District Court for the Middle District of Florida, 2023. Deposition testimony given on behalf of defendants, subject matter: wrongful arrest.

*Nazario v. Gutierrez & Crocker*, No. 2:21-cv-00169, United States District Court for the Eastern District of Virginia, 2023. Trial testimony given on behalf of defendants. Subject matter: police use of force.

*McGlaughlin v. State of Arizona et al.*, No. 2:21-cv-01410-SRB, United States District Court for the District of Arizona, 2022. Deposition testimony given on behalf of defendants. Subject matter: police use of force.

*Ely v. County of Santa Barbara, et al.*, No.: 2:20-cv-06549 DMG, United States District Court for the Central District of California, 2022. Trial and deposition testimony given on behalf of defendants. Subject matter: police use of force.

*Castro v. State of Arizona*, Case No. 2:18-cv-00753-SRB, United States District Court for the District of Arizona, 2022. Trial and deposition testimony given on behalf of defendants. Subject matter: police use of force.

*Glass v. Robinson*, No. CV-19-04883-PHX-SMB, United States District Court for the District of Arizona, 2022. Trial testimony given on behalf of defendants. Subject matter: police use of force.

*Celestin v. City of Ocoee*, NO: 6:21-cv-00896-RBD-EJK, United States District Court for the Middle District of Florida, 2022. Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Coleman v. City of Tempe*, No. 2:17-cv-02570 PHX DLR, United States District Court for the District of Arizona, 2022. Trial testimony given on behalf of defendants. Subject matter: police use of force.

*Consultation and Expert Witness fees, effective through December 31, 2026*

For matters which progress beyond an initial brief consultation, I charge $325.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony, with a minimum fee of $2,000.00 for deposition or court testimony. I bill for actual travel expenses and a travel fee of $1,200.00 per day/part-day for travel to western states and $2,000.00 per day/part-day outside western states. Unless airline tickets are pre-paid by the client, I travel only with tickets purchased as fully refundable fares.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Stephen Shere, Plaintiff, | : | No. 2:23-cv-02657-JJT-ESW |
| vs. | : | Rebuttal Report of Ken Wallentine |
| City of Phoenix, et al., Defendants. | : | |

The following report of Ken Wallentine is submitted in rebuttal to Mark Hafkey's report after reviewing the following documents, pleadings, records, and reports, and conducting the following interviews:

Incident Report

Plaintiff's Second Amended Complaint

Order on Motion to Dismiss

City of Phoenix's Fourth Supplemental Disclosure Statement

Deposition of Stephan Shere

Report of Mark Hafkey

Body worn camera recordings of responding officers: COP 000035, COP 000037, COP 000041, COP 000042, COP 000043, COP 000044, COP 000045, COP 000046, COP 000047, COP 000048, COP 000049, COP 000050, COP 000051, COP 000052, COP 000053, COP 000054, COP 000055, COP 000056, COP 000057, COP 000058, COP 000059, COP 000060, COP 000061, and COP 000062

Interviews of Officer Gitsch, Officer Summerville, and Sergeant Lewis

Training records for Officer Gitsch and Officer Summerville

Video and text messages Stephan Shere sent to his sister

Ken Wallentine states as follows:

I. In the instant matter I have relied upon the documents, pleadings, records, photographs, videos, reports, interviews, and statements previously described. I have formed a number of opinions based upon the aforementioned, as well as my experience, education, and familiarity with professional standards, accepted law enforcement practices, actions, inactions, tactics, and techniques that are used with a degree of consistency, and professional publications. I understand that police practices experts are generally prohibited from intruding upon the Court's role as stating the applicable law and instructing the jury on the law, or the trier of fact's role in determining the facts. My statements are intended to provide background and explanation as to how officers are trained, instructed, guided, evaluated, and held accountable in their actions or inactions in performance of their duties, and how I have instructed and evaluated officers.

My opinions expressed in this report are to a reasonable degree of scientific certainty and/or to a reasonable degree of professional certainty within contemporary standard law enforcement practice, considering potentially case-relevant current law enforcement guidance and accountability standards. Opinions herein were developed using one or more qualitative and/or quantitative research methodologies, in addition to my knowledge, skill, experience, training, education, and/or review of literature. My methodology and processes are consistent with professional methodologies and experiential-based practices for conducting analyses of such incidents. A summary of my opinions, and a brief summary of the circumstances known or

reported to me upon which those opinions are based, are set forth herein as follows.

**Abbreviated summary of reported events:**

On October 4, 2022, Phoenix Police officers responded to a welfare check involving Stephan Shere ("Plaintiff"). Plaintiff's sister, Lexus Haskins, reported that he had sent a photograph and video depicting himself with a black handgun in his mouth and expressing suicidal intent (Shere 000497, 000510).

Officers arrived at Plaintiff's apartment complex and proceeded to his third-floor unit, where Officers Alex Beaver and Christopher Gitsch made initial contact with Plaintiff at his apartment doorway. Plaintiff opened the door to a small degree, with his left hand concealed behind the door (Shere 000510, 000514), causing officers to be concerned that Plaintiff was holding a gun behind the door (Shere 000515, Gitsch interview, Summerville interview). Officers could see a brindle color pit bull behind the door (Shere 000497).

Officer Gitsch told Plaintiff, "we would like to help you" (COP 000035 at 19:14:10). "If you want help, we can give you help" (COP 000035 at 19:14:37). "Just come out here and talk to us. Your sister's obviously concerned about you. She's calling us. That way it doesn't turn into a giant kerfuffle. Come on" (COP 000035 at 19:24:18).

Plaintiff was wearing all black clothing, including a tactical-type vest, with a karambit knife[1] hanging around his neck in a scabbard[2] (Shere 000492, 000497, 000510). Plaintiff was also wearing a black helmet and black latex gloves (Shere 000497). He told officers that he had tactical training, "I've been trained by fucking the people that are [inaudible] what's it called?

[1] A karambit is a handheld dagger-type knife featuring a distinct, deeply inwardly curved sharp blade, typically paired with a finger ring. This type of knife is intended to be used in close quarter fighting and it is particularly effective at slashing, stabbing, and hooking flesh.

[2] Plaintiff had a second knife located near his chest area, but the officers did not see it until later.

You guys are familiar with fucking what's on Blackwater, right?"[3] (COP 000035 at 19:25:30).

Officers described Plaintiff as "very intoxicated and extremely hostile" (Shere 000510, 000514). Plaintiff told officers that it did not matter if he was thinking of harming himself (Shere 000497). Plaintiff became agitated and closed the apartment door (Shere 000510).

Plaintiff exhibited fluctuating emotional behavior, going from calm but hostile conversation, to loud angry outbursts, to loud angry weeping (Shere 000515). Officers remained positioned outside the apartment while attempting to communicate with him (Shere 000510). Plaintiff was verbally hostile in response to the officers' efforts to communicate with him. He told them: "Fuck you guys. Fuck you guys. Fuck you guys" (COP 000035 at 19:24:25), "Fuck you. What are you doing? You going to shoot me?" (COP 000035 at 19:23:44).

Over the course of several minutes, officers attempted to encourage Plaintiff into a position that would allow for a safe detention. Additional officers brought a ballistic shield and a less-lethal impact projectile shotgun (Shere 000510). Plaintiff moved partially into the hallway, continued yelling, and made large arm movements (Shere 000510). Plaintiff was holding a backpack in one hand. The zipper was open, but officers could not see what was in the backpack (Shere 000510).

During the encounter, Plaintiff pushed his pit bull dog into the hallway and said, "watch this" (COP 000035 at 19:24:04, Shere 000510, 000515). Although the dog did not attack, the officers reasonably perceived the act as a potential threat given Plaintiff's statement, the confined environment, and his ongoing non-compliance (Shere 000515, 000518). Officer Beaver took the

[3] Blackwater (now defunct) was a private mercenary firm (also referred to as private military companies and security contractors) founded by former U.S. military personnel, widely known in the law enforcement and military communities, and criticized for its methods and actions during the Iraq War.

dog by the collar and moved away from the door (Shere 000510).

At that point, Officer Gitsch deployed a TASER from approximately 12 feet away after announcing a second time, “TASER, TASER, TASER” (COP 000035 at 19:31:12, Shere 000514, 000515). An officer had already called out a TASER warning several minutes earlier (COP 000037 at 19:25:00). The initial probe deployment did not appear to be effective (Shere 000515). Officer Elliot Summerville fired a single less-lethal impact projectile at Plaintiff’s torso (Shere 000514). Officer Gitsch fired a second TASER cartridge, which resulted in neuromuscular effect, and Plaintiff fell against the wall and to the floor (Shere 000515).

As Plaintiff fell, officers moved in to control him. Because Plaintiff still had knives on his person and the location of his gun was still unknown, Officer Joseph Snyder used a ballistic shield to pin him against the wall and ground to prevent access to those weapons (Shere 000515). During this process, Plaintiff’s head was unintentionally struck by the shield as officers attempted to gain control. The contact occurred in the course of rapidly securing Plaintiff, who was still armed and non-compliant.

Officers secured Plaintiff’s hands behind his back and placed him in handcuffs (Shere 000516). When officers entered Plaintiff’s apartment, they saw numerous pills scattered on the floor and an empty Maker’s Mark whiskey bottle on the counter (Shere 000511). An officer observed in plain view an Airsoft-type gun that had been painted black (Shere 000511, 000518). The gun was modeled after a Beretta M9 handgun and strongly resembled an actual firearm (Shere 000511).

Plaintiff was examined by paramedics, then transported to the hospital for medical evaluation. He was subsequently cleared by the hospital for booking and was booked into the Maricopa County Jail.

**Discussion and opinions:**[4]

a. **The officers' response to Lexus Haskins' call for service at Plaintiff's apartment was consistent with accepted law enforcement policies, practices, and training.**

1. Officers responded to this incident because they were dispatched to investigate a reported suicidal threat involving a firearm, which, under accepted police practices, requires immediate investigation and intervention. The information provided by Plaintiff's sister, Lexus Haskins, to police was not vague or speculative. Rather, Haskins reported that Plaintiff had sent her a photograph depicting himself with a handgun in his mouth, along with a message indicating that she and other family members would be "better off without him" (Shere 000511, Shere 000497). This information constituted a specific and credible threat of imminent self-harm involving a deadly weapon. Under these circumstances, officers are trained that such reports present an urgent risk to life and require prompt verification and intervention. Officers are not trained to disregard or minimize this type of information, even if the subject later denies suicidal intent. Plaintiff told the officers: "I don't care about dying" and there was "nothing to live for" (COP 000037 at 19:29:08-19:29:15). He also exclaimed: "I'll shoot myself in the fucking head (gesturing with finger pistol). I don't give a fuck" (COP 000037 at 19:30:24). These statements were consistent with the suicide threat reported to police by Plaintiff's sister.

---

[4] The Second Amended Complaint does not contain any claims for unlawful arrest or unlawful search. As such, those issues are not addressed herein except to the extent relevant to the objective reasonableness of the force employed.

2. Consistent with accepted police practices, the responding officers were required to make contact with Plaintiff to determine whether he was in fact suicidal, whether he had access to a firearm, and whether there was an imminent risk of harm to himself or others. Officers proceeded to Plaintiff's apartment and attempted to establish contact for that purpose (Shere 000511–000510). Officers are not trained to discount such threats or to accept a subject's denial at face value, particularly where a firearm is involved.[5] Plaintiff told officers that whether he was thinking about harming himself "doesn't matter" and he repeatedly refused to engage with them or answer basic safety-related questions (COP 000035 at 19:13:07, Shere 000510). Police officers are taught that such responses do not eliminate the risk created by a prior, credible suicidal threat–particularly one involving a firearm. Instead, such responses are signs of a more credible threat.

3. Officers responding to a reported suicidal subject–particularly one believed to be armed–are trained to locate the individual and attempt to assess their condition directly, including whether the subject is suicidal and whether weapons are present. That is what occurred here, as officers responded to the residence and attempted to communicate with Plaintiff at his apartment door (Shere 000510, 000511). Officers are trained that a suicidal subject with access to a weapon may

[5] Plaintiff's deposition testimony documents a history of mental health issues, including diagnoses of PTSD, anxiety, and depression, for which he was prescribed medication at the time of the incident (Shere depo. p. 8-10). While officers did not have access to Plaintiff's mental health history at the time, the reported conduct and statements were consistent with a person in crisis and/or in a state of intoxication, reinforcing the need for continued investigation rather than disengagement.

rapidly shift from self-directed harm to outward violence, creating an imminent, unpredictable, and potentially lethal risk to officers and others. Plaintiff was in an apartment with typical wallboard construction. Bullets pass easily through such walls. Officer Gitsch stated that he feared for the other people in the area. Having seen Plaintiff's behavior, he was worried about Plaintiff involving bystanders in his violence (Gitsch interview). Officer Summerville was likewise worried about the risk to people in the apartment building, saying that the officers were obligated "to protect the innocents" in the area (Summerville interview).

4. Officers are trained to attempt to resolve such encounters through communication whenever feasible. The officers responding to Plaintiff's apartment repeatedly attempted to engage him in conversation using words that demonstrated caring and empathy. They explained why they were there and encouraged him to cooperate with their efforts to address Haskins's complaint and to help Plaintiff (Shere 000510). For example, officers told Plaintiff, "we would like to help you," and "if you want help, we can give you help," while encouraging him to come out and talk with them (COP 000035 at 19:14:10-19:14:37). The officers also told him numerous times that they did not want to hurt him. At the same time, officers must account for the reported presence of a gun. The officers had reliable information that Plaintiff had a firearm and had held it in his mouth. The officers also observed additional risk indicators, including the karambit dagger knife hanging around his neck and his refusal to comply with commands (Shere 000497, 000510). When he first saw Plaintiff, Officer Gitsch immediately noted the karambit dagger, and he was concerned that the knife was in a position for a

quick draw (Gitsch interview). Officers are not permitted to disregard these risks or place themselves in a vulnerable position based solely on the subject's assurances. Both Officer Gitsch and Officer Summerville were very concerned about Plaintiff's bladed posture with his left hand concealed behind the door. Both officers thought that Plaintiff could be holding a gun in his left hand (Gitsch interview, Summerville interview, Shere 000510, 000514).

5. Where a subject is non-compliant and potentially armed, officers are trained to maintain containment, request additional resources, and prepare and deploy appropriate less-lethal tools while continuing efforts to gain compliance. The officers did exactly that, including calling for additional units and deploying a ballistic shield and less-lethal tools (Shere 000510).

6. At the time of dispatch, officers were responding to Haskins's report that Plaintiff had threatened suicide while displaying what appeared to be a firearm (Shere 000511, Shere 000497). Upon arrival, officers attempted to verify Plaintiff's condition and assess whether he remained a danger to himself or others (Shere 000510-000511). However, during the initial doorway contact, officers observed several factors that reasonably increased their threat assessment.

7. Plaintiff opened the door to a small degree, with his left hand concealed behind the door (Shere 000510, 000514). Officers were unable to see that hand and, given the prior report of a firearm, reasonably considered the possibility that Plaintiff was holding or had immediate access to a weapon right behind the door or possibly tucked into his waist or backpack (Shere 000510, 000515). Officers were not required to visually confirm the presence of a firearm before acting on a

credible report that Plaintiff had recently possessed a firearm. The uncertain location of the firearm increased–not decreased–the risk to officers. Officers are trained that the inability to see a subject's hands–particularly where a firearm has been reported–is a significant officer and public safety concern. Officers told Plaintiff to show his hands, stating, "let me see your hands," reflecting their concern about a potential weapon (COP 000035 at 19:23:43). Even when a subject's hands appear momentarily visible, the presence of nearby weapons, prior concealment, and access to containers such as a backpack continue to present an immediate threat, as weapons can be accessed and deployed in fractions of a second. Officers are trained that concealed hands present an immediate risk because a subject can rapidly produce and use a weapon with little warning. Officers are not trained to rule out the possibility that Plaintiff was unarmed before taking steps to address the risk presented by the reported firearm and concealed hand. Research in human performance demonstrates that a subject can initiate a threatening action, such as drawing a handgun from the waistband and firing the gun, more quickly than an officer can perceive and respond, due to the time required for perception, decision-making, and physical reaction. In practical terms, a subject can draw and use a weapon before an officer can perceive the threat and respond defensively.[6] In other words, "action beats

[6] An officer anticipating a possible threat and holding their handgun in a high ready position (weapon held extended just below the officer's line of sight) will raise and fire a single defensive round in average response time 83ms (83/100ths of one second). This average time was calculated with subject officers responding to unequivocal visual stimuli signaling a simulated threat in the simplest and clearest laboratory conditions where the officers were prepared, knowledgeable about the study, and held the firearms at the ready as they were fully prepared to react, without any external distracting stimuli. Perception and reaction times in actual street

reaction" both as a matter of physics and human performance.

8. Officers observed that Plaintiff was armed with at least one knife secured around his neck (Shere 000492). The presence of these weapons independently elevated the risk level of the encounter, regardless of whether a firearm was ultimately located. Additionally, during the encounter, Plaintiff acknowledged that he possessed a knife (Shere 000510), stating, "actually, yeah, I do have a knife already" (COP 000035 at 19:26:46). The officers noted the type of knife (a karambit dagger) around Plaintiff's neck (COP 000037 at 19:23:29). Sergeant Lewis noted the karambit knife hanging around Plaintiff's neck. Sergeant Lewis is very familiar with the use of karambit knives and knows of its deadliness (Lewis interview). Police officers are repeatedly instructed that an individual who is visibly armed and refusing to comply presents a potentially lethal threat, particularly in a confined space such as an apartment hallway.

9. A common component of police training discussing distance, reactionary gap, and threat assessment is referred to as the "21-foot principle." Officers are commonly taught at academy basic training programs that they should draw a handgun and prepare to defend themselves when an assailant is threatening use of a blunt weapon or edged weapon within 32 feet, assuming no intervening barrier, and a

---

encounters are certain to be greater than in the pristine laboratory conditions which pose no real threat to the test cohort members. Bushey, J., Dicks, N., Dysterheft, J., Lewinski, W., *Ambushes Leading Cause of Officer Fatalities – When Every Second Counts: Analysis of Officer Movement from Trained Ready Tactical Positions*. Law Enforcement Executive Forum. 15 (2015); Dysterheft, J., Hudson, W., Lewinski, W., *Police Officer Reaction Time to Start and Stop Shooting: The Influence of Decision-Making and Pattern Recognition*. Law Enforcement Executive Forum. 14 (2014).

suspect's apparent ability to move.[7] Controlled trials have shown that a suspect standing nine feet from an officer can charge at the officer and be close enough to reach out and slash the officer with a standard blade edged weapon in just over one-half second. Starting just five feet away, a determined forward-moving assailant can stab and/or slash an officer with his extended arm in one-third second.[8] Although the officers appear to have been wearing ballistic vests, that offered little protection against a stab thrust or a slash.[9]

10. Officers further observed that Plaintiff was dressed in all black clothing, including gloves, and appeared to be wearing tactical-style gear, including black gloves, a tactical-type vest, and helmet (Shere 000497, Shere 000510). Officer Summerville described Plaintiff as wearing "fake body armor" (Summerville interview). While clothing alone is not determinative, such presentation,

---

[7] The research supporting the 21-foot principle showed that an assailant armed with a short-handle edged weapon, standing 21 feet from an officer is able to stab and/or slice the officer with the edged weapon before the officer is able to draw and fire his or her handgun more than 50% of the time and that even those officers who are able to fire are still very likely to be stabbed or sliced. More recent research suggests that the minimum distance from a suspect with a knife that an officer should be prepared to shoot is 32 feet. *A Scientific Examination of the 21-foot Rule*. Sandel, W. L., Martaindale, M. H., & Blair, J. P. (2020). Police Practice and Research, 22(3), 1314–1329; *The 21-Foot Principle Clarified* (2018) Tueller, D. & Wallentine, K.

[8] Dysterheft, J.L., Lewinski, W.J., Seefeldt, D.A., Pettitt, R.W., 2013. *The influence of start position, initial step type, and use of a focal point on sprinting*. Int. J. Exerc. Sci. 6 (4). These findings are consistent with my own observations gleaned from having administered the Tueller Drill with several hundred deputies, troopers, wildlife officers, and police officers, including nearly two hundred trials in a timed and controlled testing environment.

[9] Untrained persons often mistakenly assume that ballistic body armor, capable of slowing and stopping a high-speed bullet from penetrating, will also stop a knife attack delivered at a slower speed. Stab and slash resistant armor uses different materials and composition than ballistic bullet resistant body armor. Stab vests, such as those worn by correctional officers, are markedly different from ballistic vests in design and function.

combined with weapons and erratic behavior such as that displayed by Plaintiff, reasonably contributed to the officers' concern that Plaintiff may be preparing for confrontation or otherwise acting in a manner inconsistent with a routine welfare check.[10]

11. During the officers' conversation at Plaintiff's doorway, his behavior was inconsistent and emotionally volatile. Officers described Plaintiff as highly agitated and hostile, with behavior consistent with possible impairment[11] (Shere 000510, 000514). This presentation further contributed to officers' assessment that Plaintiff was unpredictable and that the situation could escalate rapidly. Plaintiff repeatedly refused to answer basic questions regarding his safety, stating that whether he intended to harm himself "doesn't matter," and directing officers to leave (Shere 000510). This type of response is not a denial and does not reduce the concern created by Haskins's report that Plaintiff had sent a photograph of himself with what appeared to be a handgun in his mouth along with a statement suggesting suicidal intent (Shere 000511). Rather, an answer such as "doesn't matter" is ambiguous and evasive, reflecting a refusal to engage with officers in

---

[10] Officers observed containers of chemical substances identified as chloride and fluoride compounds in Plaintiff's bedroom closet, along with multiple gallons of gasoline stored in a container in the living room. While some chloride- and fluoride-based products can have legitimate household or maintenance uses, the presence of such substances in bulk quantities, particularly when stored inside a residential living space, is notably atypical and presents potential safety concerns. Gasoline, in particular, is a highly flammable substance that is generally stored in garages or exterior areas due to the risk of ignition, fire, and the accumulation of hazardous vapors. The combination of these materials within the residence, when considered alongside Plaintiff's behavior and statements, reasonably contributed to officers' concern that Plaintiff presented a risk of harm to the officers and others nearby.

[11] Officers saw an empty bottle of Maker's Mark whiskey in plain view on Plaintiff's kitchen counter (Shere 000511).

assessing his safety. Officers know that in crisis situations, individuals frequently minimize or deflect when asked directly about self-harm, and such non-committal responses are recognized in law enforcement practice as increasing uncertainty, not resolving it. When considered in the totality of the circumstances–including the prior suicidal communication, the reported presence of a firearm, Plaintiff's visible possession of the knife in a sheath hung from his neck, and his ongoing non-compliance–this statement reasonably heightened officers' concern and led them to reasonably conclude that Plaintiff posed a danger to himself and/or others.

12. Plaintiff also refused to engage in any meaningful conversation and asserted that he had no obligation to speak with officers (Shere 000510). Officers are trained, and understand by experience, that non-engagement combined with prior suicidal threats and visible weapons increases unpredictability, making it more difficult for officers to assess intent and safety and to control the situation. As the encounter continued, Plaintiff made statements and engaged in conduct that further heightened concern, including expressing hostility toward officers, indicating a willingness to be tased, and pushing his dog into the hallway while stating, "watch this" (COP 000035 at 19:24:04, Shere 000510, 000515). Plaintiff stated, "I actually want to be tased," reflecting further erratic and unpredictable behavior (COP 000035 at 19:25:23). Plaintiff repeatedly directed profanity at officers, including "Fuck you guys. Fuck you guys. Fuck you guys" (COP 000035 at 19:24:25), "Fuck you. What are you doing? You going to shoot me?" (COP 000035 at 19:23:44), while refusing to engage in conversation. Plaintiff

also made statements reflecting a disregard for his own safety, including "I don't care about dying" and there's "nothing to live for" (COP 000037 at 19:29:08–19:29:15). While Mr. Hafkey characterizes Plaintiff as calm and coherent, the body-worn camera recordings reflect repeated profanity, angry outbursts, emotional volatility, statements expressing disregard for his own safety, and a desire not to live, all of which are inconsistent with a stable or non-threatening presentation.

13. Officers could see a brindle color pit bull behind the door (Shere 000497) and several officers perceived that the presence of the pit bull was a threat (Shere 000492, 000511, 000515, 000518). Officer Gitsch stated that Plaintiff "upped the ante" by releasing the pit bull (Gitsch interview) and saying, "watch this" (COP 000035 at 19:24:04, Shere 000510, 000515). This greatly concerned Officer Gitsch. Near the time of this incident, Officer Gitsch had been involved in rescuing a person who had been mauled by a pit bull and he was fearful of an attack on the officers (Gitsch interview). Officer Summerville feared that the dog would attack him and the other officers and that he would need to use force against the dog. He stated that he knew that pit bulls could be aggressive and have fierce bites. He explained that when Plaintiff sent the dog out, it forced him to shift his focus and divert his attention away from Plaintiff (Summerville interview). Pit bull dogs are commonly regarded as capable of aggressive behavior and causing serious injury, particularly in close quarters. This general reputation, combined with the unpredictable nature of any unrestrained dog, reasonably heightens an officer's perception of potential risk when such a dog is

introduced into a tense encounter. Although the dog did not attack, pitbulls can be unpredictable and this action reasonably appeared to officers as an attempt by Plaintiff to introduce an additional uncontrolled variable into an already volatile situation. Officer Beaver took the dog by the collar and moved the dog down the hall, away from Plaintiff's apartment (Shere 000510). The relevant issue is not hindsight consideration of whether the dog ultimately attacked, but whether Plaintiff's act of releasing the dog into the hallway during a tense police encounter reasonably increased the risk and unpredictability of the situation.

14. The encounter occurred at the threshold of a third-floor apartment in a multi-unit apartment complex, with officers positioned in a hallway outside Plaintiff's door (Shere 000510-000511). This environment is tactically significant because a confined hallway limits officers' ability to disengage, reduces reaction time, increases the danger posed by edged weapons, and significantly restricts available cover and movement. Under these conditions, an armed, non-compliant subject presents a substantially elevated risk to the officers and to bystanders and residents of nearby apartments, compared to an encounter occurring in an open or more controlled environment.

15. I disagree with Mr. Hafkey's opinion that Plaintiff was not committing a crime. The officers were investigating a reported suicidal threat involving a firearm. While a welfare check may not be, in itself, a criminal investigation, the information known to officers and the behaviors observed by officers reasonably constituted criminal conduct, including aggravated assault by sending his pit bull toward the officers while saying, "watch this" (COP 000035 at 19:24:04, "let's

see what happens now" (Shere 000510, 000515),[12] disorderly conduct[13] by engaging in seriously disruptive behavior, making unreasonable noises, including loudly and repeatedly shouting profanity, or other offenses involving the use or threatened use of a weapon.[14] Additionally, Plaintiff's refusal to comply with lawful commands during an active police investigation further contributed to the seriousness of the situation. A subject's refusal to comply with such commands may constitute resistance and significantly increases the risk faced by officers. Officers are not taught that they must definitively establish a specific criminal charge before taking action. Rather, they were entitled to rely on the credible report of a firearm-related threat and the evolving circumstances they encountered. Officers are not trained to rule out innocent explanations or

---

[12] Arizona Revised Statutes § 13-1204 provides that a person commits aggravated assault if the person commits assault with a deadly weapon or dangerous instrument. Under Arizona Revised Statutes § 13-1203, a person commits assault by: (1) intentionally, knowingly or recklessly causing any physical injury to another person; or (2) intentionally placing another person in reasonable apprehension of imminent physical injury; or (3) knowingly touching another person with the intent to injure, insult or provoke such person. An assault against a police officer is an aggravated assault. Arizona Revised Statutes § 13-1204(8)(a).

[13] Arizona Revised Statutes § 13-2904 provides that a "person commits commits disorderly conduct if, with intent to disturb the peace or quiet of a neighborhood, family or person, or with knowledge of doing so, such person: 1. Engages in fighting, violent or seriously disruptive behavior; or 2. Makes unreasonable noise; or 3. Uses abusive or offensive language or gestures to any person present in a manner likely to provoke immediate physical retaliation by such person; or 4. Makes any protracted commotion, utterance or display with the intent to prevent the transaction of the business of a lawful meeting, gathering or procession; or 5. Refuses to obey a lawful order to disperse issued to maintain public safety in dangerous proximity to a fire, a hazard or any other emergency; or 6. Recklessly handles, displays or discharges a deadly weapon or dangerous instrument."

[14] Arizona Revised Statutes § 13-1202(A)(2) prohibits threatening or intimidating by word or conduct to "cause, or in reckless disregard to causing, serious public inconvenience." Officers blocked other residents from using the common hallway in order to maintain safety in the area around Plaintiff's apartment (COP 000035 at 19:29:26).

definitively establish a specific criminal offense before taking reasonable steps to control a potentially dangerous situation.

16. The officers were also assessing Plaintiff's statements and conduct in light of the criteria for a mental health detention (COP 000037 at 19:38:34). Plaintiff's statements, reported suicide threat, the conduct observed by the officers, and his refusal to engage in a safety assessment were consistent with an individual who may pose a danger to himself. Under Arizona Revised Statute § 36-525, officers are authorized to initiate an emergency mental health detention when there is reasonable cause to believe a person poses a danger to self or others, based on credible reports and observed behavior–factors the officers were actively assessing in this encounter.

17. In evaluating the reasonableness of the officers' actions, the factors set forth in *Graham v. Connor*[15] are instructive, including the severity of the circumstances confronting officers, whether the subject posed an immediate threat to the safety of officers or others, and whether the subject was actively resisting or refusing to comply with lawful commands. In forming my opinions, I have considered each of these factors from the perspective of a reasonable officer on the scene, based on the totality of the circumstances known to the officers at the time. I have assessed whether the officers' actions were consistent with accepted police practices and training based on what they knew and reasonably perceived at the time of the encounter, rather than on information learned after the fact or through hindsight reconstruction of events.

---

[15] *Graham v. Connor*, 490 U.S. 386 (1989).

18. In addition to his express suicide threat, Plaintiff posed a significant threat to the officers trying to help him and to others in the area. Officers were confronted with a subject who had reportedly displayed a firearm in a suicidal context, whose access to that firearm remained unknown, and who was visibly armed with multiple knives, including the deadly karambit dagger. Plaintiff concealed his hands during portions of the encounter, refused commands, and engaged in erratic and volatile behavior, including statements indicating disregard for his own safety. In addition, Plaintiff introduced an unrestrained dog into the confined hallway, further increasing unpredictability. Under the totality of the circumstances before them, the officers reasonably perceived a substantial and immediate threat of harm, particularly given the limited space and reduced reaction time associated with the hallway environment.

19. Plaintiff was actively resisting officers' efforts to control the situation and to address his conduct. He refused repeated commands to exit his apartment, declined to engage in meaningful communication, and resisted officers' attempts to resolve the encounter voluntarily. Even when partially visible, Plaintiff continued to move within the threshold area, handle objects, and maintain access to weapons. Officers are trained that active resistance does not require physical assault. Non-compliance, refusal to follow lawful commands, and actions that impede officers' ability to safely control a situation all constitute forms of resistance recognized in law enforcement training and practice.

20. It is my opinion, based on the totality of the circumstances known to the officers at the time, that the situation escalated from a reported suicidal threat to a high-

risk encounter involving an armed, non-compliant, and unpredictable subject in a confined space. This escalation was driven by several key factors, including the prior report of a firearm, Plaintiff's concealment of his hands during initial contact, the presence of multiple knives on his person, his refusal to comply or engage with officers, and his erratic and volatile behavior. Additional risk was introduced by Plaintiff's actions involving his dog and the presence of unknown items in a backpack, all occurring within the confines of a narrow hallway environment with other residents likely in close proximity. It is my opinion that these combined factors would reasonably require officers to transition from a welfare-check posture to a heightened safety and control posture, including the use of containment and exclusion of nearby residents (Shere 000511), the deployment of additional resources, and preparation for using less-lethal or lethal force if necessary.

b. **The force used to detain Plaintiff by the defendant officers was consistent with accepted law enforcement policies, practices, and training.**

1. The body-worn camera recordings and officers' reports reflect that the officers engaged in sustained and deliberate efforts to de-escalate the situation and obtain voluntary compliance before resorting to force. Consistent with this approach, officers attempted to establish rapport and resolve the situation through communication, repeatedly advising Plaintiff that they were there to help and encouraging him to come out and speak with them. Despite Plaintiff's hostility, profanity, and refusal to engage, officers maintained their efforts to communicate, used time and distance, and avoided rushing at Plaintiff. At the same time, they

appropriately prepared for a potential escalation by requesting additional resources and equipping themselves with less-lethal tools in hopes of avoiding a deadly force encounter. Sergeant Lewis retrieved a less-lethal stun bag launcher and a ballistic shield (COP 000037 at 19:19:12; Shere 000511), Officer Summerville was equipped with an impact projectile shotgun (Shere 000514), and Officer Gitsch had his TASER (Shere 000514, 000515). Officers attempted to position Plaintiff in a manner that would allow for a safe detention while continuing efforts to gain voluntary compliance. Their decision to utilize less-lethal options—despite the presence of a knife, the uncertainty surrounding the reported firearm, and Plaintiff's refusal to drop the bag that they believed could contain the gun—demonstrates a measured and restrained approach consistent with accepted law enforcement training. Officer Gitsch was a certified CIT officer. In fact, because he valued using CIT techniques to de-escalate crisis situations, Officer Gitsch completed the training course twice and was part of the initial group of officers to be CIT-trained (Gitsch interview). Officer Summerville had also received training in de-escalating crisis situations (Summerville interview). In choosing to close distance and employ less-lethal tools under these conditions, officers accepted increased personal risk in an effort to avoid a potentially lethal outcome.

2. Plaintiff moved partially into the hallway. He continued yelling and making large arm movements (Shere 000510). Plaintiff was holding a backpack with unknown contents in one hand and was standing in what appeared to be a "horse" stance, consistent with martial arts training (COP 000037 at 19:24:47). The zipper was

open, but officers could not see what was in the backpack, prompting continued concern about the location of the gun that Plaintiff had earlier reportedly aimed at his head (Shere 000510). Sergeant Lewis had previously directed officers to retrieve a less-lethal stun bag launcher and shield from their patrol cars because he wanted to be prepared with "layers of less-lethal options" in hopes of preventing a deadly force encounter (Lewis interview). He recognized that the stun bag might not prompt immediate compliance. He stood behind Officers Summerville and Gitsch and first told Officer Summerville to use the less-lethal stun bag launcher if the opportunity arose so that they could safely detain Plaintiff (Lewis interview, COP 000038 at 19:26:38). Then he told Officer Gitsch to follow up with the TASER to help safely detain Plaintiff when Officer Summerville fired a stun bag less-lethal projectile (Lewis interview, COP 000038 at 19:26:38). Mindful that Plaintiff had the karambit knife around his neck and that the firearm had not been located, Sergeant Lewis directed that Officer Snyder would then use the shield to assist with the arrest. Each officer later stated that they understood the directive and they would each make an independent assessment prior to using the less-lethal tools (Gitsch interview, Summerville interview).

3. Immediately prior to the use of force, Plaintiff emotionally cried out, "are you going to shoot me? Go for it. I'll shoot myself in the fucking head (gesturing to his head with finger pistol). I don't give a fuck," further escalating officers' concern regarding imminent harm and the likelihood that he had a gun as previously reported (COP 000037 at 19:30:24). Plaintiff also reached into the bag

that was hanging across his chest (COP 000037 at 19:30:08). The officers asked Plaintiff to put down the bag. Plaintiff told the officers to put down the ballistic shield (COP 000035 at 19:26:30). He told them, "Put down your shield and I'll put down my bag" COP 000035 at 19:28:02. Officers told him that they would not put down the shield, and Plaintiff responded, "I'm not going to put down my bag" (COP 000035 at 19:28:05). Even though Plaintiff did not pull anything from the bag, Plaintiff's reach into the bag and his refusal to put it down would prompt an officer to be concerned that Plaintiff might have a weapon within reach inside the bag. Officers are not required to wait until a subject reaches for or begins to use a weapon before acting to prevent harm, particularly where the subject has demonstrated access to weapons, reportedly has a gun, voiced a willingness to use the gun, and the situation is rapidly evolving.

4. At the time Officer Gitsch fired his TASER, Plaintiff had refused repeated commands to come out of the apartment and speak with officers, had demonstrated erratic and hostile behavior, and had acknowledged possession of the knife that officers could see in the neck scabbard (Shere 000510; COP 000035 at 19:26:46). Officers were well aware of the reliable report that Plaintiff had access to a firearm, the location of which remained unknown to the officers (Shere 000511). In fact, just moments before, Plaintiff threatened to "shoot himself in the head" (COP 000037 at 19:30:24). Officers are taught that the use of a TASER is appropriate where a subject is non-compliant, armed or reasonably believed to be armed, and presents a risk of harm to himself or others. In this case, the TASER provided a less-lethal option intended to safely incapacitate

Plaintiff temporarily to safely detain him and prevent escalation to a more dangerous confrontation. It is my opinion that Officer Gitsch's use of the TASER was consistent with accepted police practices and training.

5. Officer Gitsch fired his TASER from approximately 12 feet away after announcing, "TASER, TASER, TASER" (COP 000037 at 19:31:11, Shere 000514, 000515). An officer had already called out a TASER warning several minutes earlier (COP 000037 at 19:25:00). Officers provided verbal warnings associated with the deployment of less-lethal force, and in any event, the rapidly evolving circumstances did not require additional delay associated with giving a warning where doing so would increase risk. The initial probe impact did not appear to be effective (Shere 000515). Officer Summerville fired a single impact projectile at Plaintiff's torso (Shere 000514). Officer Gitsch fired a second TASER cartridge, which appeared to result in neuromuscular effect, causing Plaintiff to fall (COP 000037 at 19:31:13, Shere 000515). Plaintiff claimed that the TASER had no effect on him at all. He stated, "The TASER didn't even fucking hurt" (COP 000049 at 20:02:35). "It didn't fucking hurt, it didn't fucking do anything" (COP 000049 at 20:02:42).

6. Even assuming, for the sake of argument, that Plaintiff did not hear or appreciate the TASER warning, additional or more prolonged warnings would not have been tactically appropriate under these circumstances. Officers were attempting to maintain Plaintiff in a position where he could be safely detained. Further warning or delay would have created a substantial risk that Plaintiff would retreat back into the apartment, where the reported firearm was believed to be located

and where officers could not safely monitor or control his actions. Such a retreat would have increased the risk to officers and any potential occupants, as well as to Plaintiff. In addition, the encounter itself functioned as an ongoing warning. Officers repeatedly advised Plaintiff that they did not want to hurt him and directed him to comply. Plaintiff referenced the TASER and stated that he had training, reflecting an understanding of police tactics and the likely consequences of continued non-compliance. Under these circumstances, Plaintiff would have reasonably understood that failure to comply could result in the use of less-lethal force.

7. TASER devices are specifically designed to temporarily incapacitate a subject through neuromuscular effects, allowing officers to safely control individuals who are actively resisting or who present a threat of harm. When discharged from a distance, the TASER device uses compressed nitrogen gas to propel two probes which are attached to the TASER by wires. The wires are easily broken away from the probe or anywhere along the wire. The TASER probe wires are extremely thin. They are only 127 microns (millionths of a meter) or approximately 0.005 inches in diameter. The probe wires have a tensile strength of one and one-half to two pounds, meaning that very little force is needed to break them. Only if both probes make contact with a person, closing the electrical circuit does the TASER device deliver a small electric current through the wires into the person. The TASER electronic control device is designed to override the person's central nervous system and briefly incapacitate the person's neuromuscular control.

8. The exclusive use of a TASER to detain Plaintiff and prevent him from drawing one of his knives or another weapon would have been inconsistent with the officers' training and inconsistent with the training recommended by the TASER manufacturer. When TASERs work, they are effective less-lethal tools. However, the TASER device is not a perfectly reliable tool that offers universal success when deployed. That was demonstrated here, where the first set of probes that were deployed were ineffective. In my own police agency, our use of force instructors estimate that the TASER device is ineffective or only partially effective in approximately 40% of deployments. The Los Angeles Police Department frequently uses TASER devices. The LAPD's research shows an even higher failure rate; the TASER was effective in only 53% of deployments.[16] Officers who have used TASERs know that TASER devices may fail or be only partially effective in a significant number of deployments. The deadly risk of a failed TASER shot is that Plaintiff could reach Officer Gitsch holding his TASER (or one of the other officers) and slash or stab him and even grab his holstered firearm well before Officer Gitsch could drop or holster the TASER, draw his firearm, and fire defensive shots.[17] A TASER is simply not a completely reliable

[16] Los Angeles Police Department, Use of Force Year End Review 2019, p. 329. "In 2019, TASER activations were effective 307 times during Non-Categorical Use of Force incidents, which represented 53% of the 574 total activations. This accounted for a 3% decrease, compared to 56% in 2018. When compared to the aggregate percentage of effective TASER activations from 2015 through 2018 of 55%, 2019 experienced a 2% decrease. Historically, from 2015 through 2019, TASER activations were effective 2,743 times of the 4,982 total activations, or 55%."

[17] Detective Duncan observed that Officer Wagner did not have time to transition to his handgun, noting that Ring could have easily reached Officer Wagner with the knife before he could drop (or holster) the TASER and draw his firearm (COC Ring 000086). I concur.

means of stopping an imminent edged-weapon attack at close range, or a gunshot.

9. The coordinated use of multiple less-lethal tools in rapid succession is consistent with modern law enforcement training, particularly where initial force options may be ineffective or unreliable and the subject presents an ongoing threat. Nearly contemporaneously with Officer Gitsch firing his TASER, Officer Summerville fired a single less-lethal stun bag projectile at Plaintiff's torso (COP 000037 at 19:31:12, Shere 000514). Police practice and training regarding 12-gauge impact munitions, including stun bag projectiles, consistently instructs officers to aim at large muscle groups, including a subject's torso. The purpose of this targeting doctrine is to reduce the likelihood of serious injury while still producing sufficient pain compliance or neuromuscular disruption to stop active aggression or flight.

10. Stun bag projectiles are designed to deliver a controlled, non-lethal impact force intended to gain compliance and stop a subject's actions without resorting to deadly force. At the time the stun bag impact round was fired, Plaintiff had continued to escalate the encounter. He made statements such as "I'll shoot myself in the fucking head" while gesturing, immediately prior to Officer Summerville firing the stun bag projectile (COP 000037 at 19:30:24). Plaintiff remained armed with knives, had refused all commands, and was moving in and out of the officers' view while handling objects, including a backpack, and the bag and knife around his neck (COP 000037 at 19:29:59–19:30:19). Plaintiff subsequently told officers, "I didn't feel the bean bag at all" (COP 000049 at 20:02:29).

11. It is my opinion that the use of a stun bag projectile to detain Plaintiff was consistent with accepted police practices and training that authorizes such force where a subject poses a threat of harm to himself and/or others and less intrusive measures, such as persuasion and commands, have failed. It is my further opinion that firing a stun bag projectile to disrupt Plaintiff's ability to act, gain compliance, and allow officers to safely take him into custody was consistent with police practices and training. Importantly, the use of the impact projectile occurred in conjunction with other less-lethal options and was part of a coordinated effort to control a rapidly evolving and high-risk situation.

12. Body-worn camera video recordings show that even after falling, Plaintiff still had immediate access to his weapons. As he fell backward into the corner, he appeared to be reaching toward the karambit knife swinging from his neck (COP 000037 at 19:31:13). He fell right next to the bag that he had removed from his neck and tossed to the floor. The bag was large enough to conceal the as-yet-unlocated gun (COP 000037 at 19:30:19).

13. Officers are trained to use available tools–including a ballistic shield–to quickly control the subject's movement, separate the subject from weapons and/or create distance from weapons, and safely restrain the individual. Officer Snyder's use of the shield to pin Plaintiff was a control technique, not a separate or independent use of force, and was directly related to the need to prevent Plaintiff from accessing weapons during the handcuffing process. Given that Plaintiff remained armed, the location of the gun was still unknown, and Plaintiff had demonstrated resistance and unpredictability, immediate physical control was necessary. The

officers' actions were consistent with training that emphasizes rapid control of armed subjects following less-lethal deployment to prevent re-engagement or escalation of force. It is my opinion that Officer Snyder's use of the ballistic shield to pin and control Plaintiff during the arrest was consistent with accepted police practices.

14. It is my opinion that each force tool used in this incident–the TASER, the impact projectile, and the use of the ballistic shield for control–was applied in response to specific, articulable threats presented by Plaintiff and each use of a force tool was consistent with accepted law enforcement practices. The force used was a coordinated, purpose-driven response to safely resolve a high-risk encounter involving an armed and non-compliant individual.

15. Officers took Plaintiff's dog back into his apartment as they checked for any other occupants. The officers quickly became concerned about the dog being able to eat the pills that were spilled around the floor (COP 000035 at 19:34:08). An officer placed the dog in a room, after checking the room for dangers to the dog and providing the dog with a bowl of water. As the officers entered the main room of the apartment, they saw a large can of gasoline and expressed concern that Plaintiff would have lit a fire with the can of gas (COP 000035 at 19:34:44). The can of gasoline–a highly unusual item for an apartment residence–in the living room area contributed to the officers' concerns about Plaintiff's violent intentions (COP 000035 at 19:38:28).

16. After Plaintiff was handcuffed, officers walked him to a patrol car. Plaintiff began forcefully banging his face into the metal bars on the patrol car window,

stopping only when an officer physically held him against the car seat (COP 000046 at 19:39:41). The officers called for paramedics, who assessed Plaintiff and transported him to the hospital.

c. **The Phoenix Police Department properly trained the defendant officers.**

1. Officer Gitsch began his public safety service as an officer with the Phoenix Police Department, graduating from the Arizona Regional Police Academy in February 2001. Officer Gitsch has continuously held an active certification as a trained law enforcement officer issued by the Arizona Peace Officer Standards and Training Board. He held an active certification and did so at the time of this incident. The Phoenix Police Department could reasonably rely upon Officer Gitsch's status as holding active certification to indicate that he had been properly trained under Arizona Peace Officer Standards and Training Board's physical, mental, and moral fitness standards and that he completed basic peace officer training curriculum. Moreover, his continuing status as an actively certified peace officer indicated that he was not subject to disciplinary action by the Arizona Peace Officer Standards and Training Board for any misconduct.

2. In addition to basic police training and mandatory annual in-service training courses, Officer Gitsch completed specialized training, including Active Bystandership for Law Enforcement, Crisis Support Training, Communication in Volatile Incidents, Interpersonal Communications, Suicide Awareness, Crisis Communications, Police Response to People with Disabilities, and Crisis Intervention Team (CIT) certification (twice). Officer Gitsch is also qualified as an instructor for the police department's Mental Illness and Involuntary Pick-Up

Orders and Mental Illness/Developmental Disability courses.

3. Officer Summerville began his public safety service as an officer with the Phoenix Police Department, graduating from the Phoenix Police Academy in March 2020. Officer Summerville has continuously held an active certification as a trained law enforcement officer issued by the Arizona Peace Officer Standards and Training Board. He held an active certification and did so at the time of this incident. The Phoenix Police Department could reasonably rely upon Officer Summerville's status as holding active certification to indicate that he had been properly trained under Arizona Peace Officer Standards and Training Board's physical, mental, and moral fitness standards and that he completed basic peace officer training curriculum. Moreover, his continuing status as an actively certified peace officer indicated that he was not subject to disciplinary action by the Arizona Peace Officer Standards and Training Board for any misconduct.

4. In addition to police basic training and mandatory annual in-service training, Officer Summerville completed specialized training including Active Bystandership for Law Enforcement, and Integrating Communication, Assessment, and Tactics.

5. The Active Bystandership for Law Enforcement (ABLE) program, which reflects widely accepted modern policing practices, places a strong emphasis on de-escalation through communication, patience, and coordinated officer response. These principles are consistent with the officers' actions in this case, where they used time, distance, and repeated communication in an effort to resolve the encounter without resorting to force.

6. Police departments routinely rely upon Peace Officer Standards and Training certification as a threshold indicator of suitability for hiring and retention of an officer. This is particularly true in Arizona and a number of other states where a law enforcement agency is mandated by state law (Arizona Rev. Stat. § 41-1828.01) to report any violation of peace officer rules of conduct to the state's certifying agency. Reliance on current active certification and current employment as a peace officer in making hiring and retention determinations is consistent with accepted police practices, policies and training.

**CONCLUSION**

Based on my review of the available materials, including the police reports, body-worn camera recordings, deposition testimony and interviews, it is my opinion that the actions of the defendant officers were consistent with accepted police practices and training.

Officers responded to this incident because they were dispatched to investigate a credible report that Plaintiff had threatened suicide while displaying a firearm (Shere 000511; Shere 000497). Police training and practices provide that such a report requires immediate investigation and intervention to preserve life. Officers are trained that they cannot disregard or minimize a reported suicidal threat–particularly one involving a firearm–and must make reasonable efforts to locate the individual, assess the risk, and ensure safety. These circumstances must be evaluated as they reasonably appeared to officers at the time, not based on information learned after the fact.

When officers contacted Plaintiff, he partially opened the door while concealing one hand, was visibly armed with multiple knives, refused to comply with commands, and engaged

in erratic and hostile behavior (Shere 000510, 000497). He declined to answer basic safety questions, stating that whether he intended to harm himself "doesn't matter," and repeatedly directed officers to leave (Shere 000510; COP 000035 at 19:13:07). Plaintiff further made statements reflecting disregard for his own safety, including that he did not care about dying and had nothing to live for (COP 000037 at 19:29:08–19:29:15).

Under these circumstances, officers were no longer dealing with a routine welfare check, but with an armed, non-compliant, and unpredictable subject in a confined hallway environment in a large apartment complex. The presence of edged weapons, the unknown location of a reported firearm, and Plaintiff's refusal to comply created a substantial risk of sudden escalation. Officers appropriately attempted to resolve the situation through various de-escalation techniques, including communication, repeatedly offering assistance and encouraging Plaintiff to engage voluntarily (Shere 000510; COP 000035 at 19:14:10–19:14:37). When those efforts failed, officers appropriately transitioned to a containment and control posture consistent with their training and accepted police practices.

The force used to detain Plaintiff was measured, coordinated, and consistent with accepted practices. The TASER and impact projectile were deployed as less-lethal options to quickly incapacitate Plaintiff and prevent escalation to a potentially lethal confrontation. The subsequent use of the ballistic shield to control and pin Plaintiff was a necessary and appropriate technique to prevent access to weapons and safely secure him in handcuffs. Body-worn camera footage reflects that even after falling, Plaintiff remained in close proximity to a knife and officers continued to warn each other to "watch his knife" as they moved in to restrain him (COP 000037 at 19:31:13–19:31:18).

In evaluating the officers' actions, I have considered the rapidly evolving nature of the

encounter and the information available to them at the time, rather than applying hindsight. Officers were required to make decisions in real time while confronting an armed and resistant individual in a confined space. Consistent with police training and accepted police practices, officers are not required to wait until a subject uses a weapon before taking action to prevent harm.

It is my opinion that the officers' actions were consistent with accepted police practices and training. Their response reflected a progression from attempted communication and de-escalation to the use of less-lethal force and physical control, all directed toward resolving a high-risk situation while minimizing the risk of serious injury or death to Plaintiff, the officers, and others in the vicinity.



Ken Wallentine
May 14, 2026

II. In reaching my opinions in this matter, I have relied upon my training and experience in public safety acquired throughout my career. A summary of my qualifications, publications, litigation history, and fee schedule are recited in the attached exhibits.

III. The observations and opinions stated herein are based on the materials provided to me for consideration and are preliminary insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with objective evidence, that were provided to me. The

opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by Plaintiff's experts, further investigation, and/or further witness interviews. I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or diagrams, video, and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, videos, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or drawings created to better illustrate the aforementioned documents. The exhibits, testimony aids, or list of references used as a summary of, support for, and/or graphic depiction or illustrative description, summary, or synopsis for the information, statements, summaries, and opinions in this report specifically include, but are not limited to, each (or any compilation, synopsis, summary, demonstrative, illustration, or graphic) pleading, document, statement, deposition, diagram, photograph/image, report, citation, reference, paper, book, illustration, graphic, chart, drawing, diagram, table, PowerPoint® slide, set, and/or deck, picture, image, and/or video in this report, referenced or cited in this report, or included in any of the references to this report. These may be utilized as exhibits, and/or explanatory or demonstrative aids to support deposition and/or trial testimony, or for any other purpose. These exhibits specifically include any illustrative evidence such as visual presentation of computer-generated slides and visual images projected onto a screen or charts, graphs, or illustrations created to better illustrate the aforementioned exhibits. I reserve the right to create, use, and utilize PowerPoint and other graphics and illustrations, and/or compilations as exhibits at deposition, trial, or for any other purpose after submission of this report.

**Exhibit A**

**My qualifications as an expert in this subject matter include the following:**

I am a law enforcement officer in the State of Utah. I became certified as a law enforcement officer in the State of Utah in 1982. I am the recently retired Chief of the West Jordan (Utah) Police Department, where I oversaw all police operations and investigations. I am the immediate past-Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah. I was formerly employed with the Utah Attorney General, where I served as the Chief of Law Enforcement. After a period in private practice, I was employed as a Special Agent with the Utah Attorney General Investigation Division, where I coordinated a statewide use of force training initiative and coordinated officer-involved shooting investigations and other special investigations. I also serve in a consultation role as Senior Legal Advisor for Lexipol, the nation's leading provider of law enforcement risk management resources.

I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah. I also supervised the police service dog training and certification program for the State of Utah. I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.

My duties included direct supervision and command of various investigative units and agents throughout the State of Utah, supervising law enforcement officers, forensic specialists, and technicians. I commanded the State of Utah Child Abduction Response Team. I

commanded the State of Utah Officer-Involved Fatality Investigation Team. I am a former member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations. In 2010, Governor Herbert selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

I currently serve on the Use of Force Standards and the K9 Standards Committees of the Utah Peace Officer Training and Standards Division, articulating the standards for use of force by police officers and deployment of police service dogs. I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability. I am certified by the Force Science Research Center as a Realistic De-Escalation Instructor, a course certified by the International Association of Directors of Law Enforcement Standards and Training. I am a certified POST Firearms Instructor, and often served as the lead instructor for POST Firearms courses. I am certified by the Force Science Research Center as a Force Science Analyst® and an Advanced Force Science Specialist®. I am a former certified TASER® Instructor. I am a certified Excited Delirium and Sudden Death Investigation Instructor. I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation. In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems. In 2022, I was certified by the Institute for the Prevention of Sudden In-Custody Death in the application and

use of spit restraint devices.

I am a licensed attorney, having practiced law since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am a former Chief Deputy County Attorney and a former Utah Attorney General designated prosecutor. I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court. I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities. I was formerly on the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety.

In addition to my primary employment, I consult and provide expert witness opinions on police procedures, and use of force issues. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I have served on several International Association of Chiefs of Police Policy Center working groups and presently serve on the Search Warrants policy working group. I am a consultant to the Utah Risk Management Mutual Association, the state’s largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies. I am the co-founder of a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs’ Association and various state law enforcement agencies. These policies serve as a model for all Utah public safety agencies. I am the author of a number of model policies for law enforcement agencies and have

provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies. I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

I participate and serve in a number of community and professional capacities. Professional activities pertinent to law enforcement include serving as the president of the Utah Chiefs of Police Association. I am a member of the Board of Governance of the Statewide Information and Analysis Center, Utah's unified intelligence fusion center. I represented the Utah Chiefs of Police Association on the League of Cities and Towns Listen, Love, Learn Task Force, creating strategies for police reform and relations with communities of color. I was a founding member of First Steps to More Trust, an initiative to join young persons in the BIPOC community with young public safety professionals in leadership training and community engagement.

The National Association for the Advancement of Colored People awarded the distinguished first responder award in 2026 in recognition of my work in advancing civil rights in my state. In 2021, I was recognized by D.A.R.E. America as the "Law Enforcement Executive of the Year." In 2022, I was named as the "Utah Police Chief of the Year" by the Utah Chiefs of Police Association. Also in 2022, upon nomination of the Attorney General, I was named as the "Utah Public Safety Officer of the Year" by the Utah Best of State Foundation. I am the immediate past-Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah. I formerly had direct command of Officer-Involved Critical Incident Investigations Team IV, a multi-agency specialty investigations team. I am the immediate past-Chair of the Salt Lake County Law Enforcement Administrators and

Directors Association. I am a member of the Board of Directors of the Institute for the Prevention of Sudden In-Custody Death, member of the Board of Advisors, Association of Force Investigations, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, former member of the International Association of Law Enforcement Firearms Instructors, member of the United States Police Canine Association, former member of the Board of Directors of Crisis Intervention Team Utah, Past-President of the Utah Peace Officers Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member of the Utah Law Enforcement Legislative Committee. Other professional activities include serving as a member of the Utah Commission on Criminal & Juvenile Justice and a member of the Utah Behavioral Health Master Plan Executive Committee.

I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training. I am a former member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University. I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

I am a Senior Legal Advisor for Lexipol. In that capacity, I have assisted in the drafting and review of use of force, investigative procedures, identification protocols, and other policies in current use by more than 8,000 public safety agencies in the United States.

**Exhibit B**

*Publication history*

I have previously published a number of other professional articles, many of which have been subjected to peer review. My most recent book, *Preparing for an Active Shooter Threat*, was published in June 2020 by Blue360 Media. Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, 2nd edition, was published in 2020 by the American Bar Association Publishing Division. It is a treatise on public safety and criminal procedure. *The K9 Officer's Legal Handbook*, 3rd ed., was published in February 2019.

My other published works include: *An Officer's Legal Obligation to Intervene*, Police Chief, V. 90, No. 5 (2023); *An Outward Mindset Powering Multicultural Policing*, Police Chief, V. 89, No. 4 (April 2022); *Mitigating Suicide Threat Response Risks*, Police Chief, V. 86, No. 3 (2019); *Avoiding a Peer Support Pitfall*, Police Chief, V. 85, No. 3 (2018); *Avoiding a Peer Support Pitfall*, Police Chief, V. 85, No. 3 (2018); *Should I Stay or Should I Go?*, POLICE, October 2017, *Hill v. Miracle: Adapting the Graham Standard to Non-Criminal Interventions*, Police Chief (August 2017): 18–19; *Armstrong v. Village of Pinehurst: Training and Policy Implications for Police*, Police Chief, V. 83, No. 6 (2016).

*Litigation history*

I have testified and/or provided depositions in the following cases (limited to the past four years):

*Cellona v. County of Santa Barbara*, No. 25-CV-1503, United States District Court for the Central District of California, 2026. Deposition testimony given on behalf of defendants. Subject matter: use of a less-lethal projectile.

*Cassody v. Rink & Bishop*, No. 24-cv-00595-SLP, United States District Court for the Western District of Oklahoma, 2026. Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Valle-Ramos v. City of Orlando, et al.*, No. 6:24-CV-01276-CEM-DCI, United States District Court for the Middle District of Florida, 2026. Deposition testimony given on behalf of defendants. Subject matter: wrongful conviction.

*Wilson v. Burris*, No. CIV-24-539-D, United States District Court for the Western District of Oklahoma, 2025. Deposition testimony given on behalf of defendants. Subject matter: use of a police service dog.

*Parra-Cota v. City of Phoenix, et al.*, No. 2:23-cv-02305-SPL-MTM, United States District Court for the District of Arizona, 2025. Deposition testimony given on behalf of defendants. Subject matter: unreasonable force during arrest, mental illness response, gas delivery.

*Jane Doe v. County of Santa Barbara*, No. 2:24-cv-04334-MEMF-SK, United States District Court for the Central District of California, 2025. Deposition testimony given on behalf of defendants. Subject matter: sexual misconduct.

*Davis v. Allen*, No. 3:21-CV-00565-WMC, United States District Court for the Western District of Wisconsin, 2025. Trial testimony given on behalf of defendants. Subject matter: excessive force by police, improper use of police service dog.

*United States v. Amiri, et. al*, No. 23-CR-269-JSW, United States District Court for the Northern District of California, 2024, 2025. Trial and Grand Jury testimony given on behalf of plaintiff. Subject matter: excessive force by police, improper use of police service dog.

*State of Alaska v. Miller*, No. 3KN-24-00808CR, District Court for the State of Alaska, 2024. Grand jury testimony given on behalf of plaintiff. Subject matter: unreasonable force during

arrest, improper use of police service dog.

*Simmons v. City of Edmond, et al.*, No. CIV-24-97-J, United States District Court for the Western District of Oklahoma, 2024. Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Herndon v. City of Clinton, et al.*, No.: CIV-23-86-F, United States District Court for the Western District of Oklahoma, 2024. Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Barrick v. Clardy et al.*, No. CIV-23-129-JFH-GLJ, United States District Court for the Eastern District of Oklahoma, 2024. Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Estate of Duval v. United States of America et al.*, No. 2:20-CV-01206, United States District Court for the District of Arizona, 2024. Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Adams v. City of Cedar Rapids, et al.*, No. 1:21-cv-0005, United States District Court for the Northern District of Iowa, 2024. Trial testimony given on behalf of defendants, subject matter: use of police service dog.

*State v. Hoover*, No. 191400190, Fourth District Court for the State of Utah, 2024. Trial testimony given on behalf, subject matter: criminal homicide.

*Huff v. City of Eufaula, et al.*, No. 18-cv-22 EFM United States District Court for the Eastern District of Oklahoma, 2024. Deposition testimony given on behalf of defendants, subject matter: wrongful death.

*Camba Ponce v. United States of America*, No. 4:22-CV-00012-DC-DF, United States District Court for the Western District of Texas, 2024. Deposition testimony given on behalf of

defendants, subject matter: use of police service dog.

*Saddlers v. City of Lakeland*, No. 8:22-cv-2127-CEH-JSS, United States District Court for the Middle District of Florida, 2023. Deposition testimony given on behalf of defendants, subject matter: use of police service dog.

*Faucheaux v. City of Provo*, No. 100401999, Fourth District Court for Utah County, 2023. Deposition testimony given on behalf of defendants, subject matter: wrongful death.

*Strong v. City of Naples*, No. 2:22-cv-00318, United States District Court for the Middle District of Florida, 2023. Deposition testimony given on behalf of defendants, subject matter: wrongful arrest.

*Nazario v. Gutierrez & Crocker*, No. 2:21-cv-00169, United States District Court for the Eastern District of Virginia, 2023. Trial testimony given on behalf of defendants. Subject matter: police use of force.

*McGlaughlin v. State of Arizona et al.*, No. 2:21-cv-01410-SRB, United States District Court for the District of Arizona, 2022. Deposition testimony given on behalf of defendants. Subject matter: police use of force.

*Ely v. County of Santa Barbara, et al.*, No.: 2:20-cv-06549 DMG, United States District Court for the Central District of California, 2022. Trial and deposition testimony given on behalf of defendants. Subject matter: police use of force.

*Castro v. State of Arizona*, Case No. 2:18-cv-00753-SRB, United States District Court for the District of Arizona, 2022. Trial and deposition testimony given on behalf of defendants. Subject matter: police use of force.

*Glass v. Robinson*, No. CV-19-04883-PHX-SMB, United States District Court for the District of Arizona, 2022. Trial testimony given on behalf of defendants. Subject matter: police use of

force.

*Celestin v. City of Ocoee,* NO: 6:21-cv-00896-RBD-EJK, United States District Court for the Middle District of Florida, 2022. Deposition testimony given on behalf of defendants. Subject matter: wrongful death.

*Coleman v. City of Tempe,* No. 2:17-cv-02570 PHX DLR, United States District Court for the District of Arizona, 2022. Trial testimony given on behalf of defendants. Subject matter: police use of force.

**Exhibit C**

**Methodology and Process:** My opinions in this matter are stated to a reasonable degree of professional certainty and are based upon my training, education, and experience in law enforcement practices. I rely on over four decades of experience in policing, including service as a police executive, attorney, and risk manager, as well as my experience in policy development, training, and the evaluation of police practices.

In forming my opinions, I conduct a comprehensive review of the materials provided in the case, including reports, witness statements, audio and video recordings, photographs, and other relevant evidence. From these materials, I develop an understanding of the facts, sequence of events, and the circumstances confronting the involved officers.

I then evaluate the officers' actions based on my knowledge, training, and experience, and in light of generally accepted law enforcement practices, training, and applicable policies.

My analysis focuses on the totality of the circumstances and the perspective of a reasonable officer at the time of the events. In doing so, I identify key decision points and assess the information reasonably available to the officers at each stage of the encounter. I evaluate whether the officers' actions were consistent with accepted law enforcement practices and whether those actions were objectively reasonable under the governing legal standards.

Consistent with established principles governing the evaluation of police conduct, my analysis does not rely on hindsight. Instead, it considers the rapidly evolving, uncertain, and dynamic circumstances officers are often required to confront, including the need to make decisions in real time based on incomplete and developing information.

Where appropriate, I consider relevant legal authority, professional literature, and training materials to ensure that my opinions are consistent with contemporary law enforcement

standards and practices.

This methodology reflects the approach commonly used by police practices experts in analyzing incidents, evaluating officer conduct, and forming professional opinions.

**Exhibit D**

*Consultation and Expert Witness fees, effective December 31, 2025 through December 31, 2026*

For matters which progress beyond an initial brief consultation, I charge $325.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony, with a minimum fee of $2,000.00 for deposition or court testimony. I bill for actual travel expenses and a travel fee of $1,200.00 per day/part-day for travel to western states and $2,000.00 per day/part-day outside western states (contiguous to or west of Utah). Unless airline tickets are pre-paid by the client, I travel only with tickets purchased as fully refundable fares.

# EXHIBIT 13

1. **GENERAL INFORMATION**

A. Sanctity of Life – The Department respects the dignity of all persons and recognizes the sanctity of human life, rights, and liberty.

B. Duty to Intervene – All employees **will** intervene when they know or should know another employee is using unreasonable force.

- All employees will immediately report excessive force verbally to a supervisor.

C. The policies of the Department are set forth as follows:

- Physical force
- Less-lethal force
- Deadly physical force
  - * Officers are trained to utilize deadly physical force when it is necessary to prevent serious physical injury or death to self or a third party as defined in state law.
- Lethal weapons and equipment

D. Sworn employees and affected civilian employees will be trained and instructed in these policies before employing any of the weapons, tactics, or techniques.

- Affected civilian employees include police assistants (Transit Unit/Downtown Operations Unit (DOU)/patrol), municipal security guards, and detention officers.

E. Only Department-issued or approved weapons, equipment, and irritants will be authorized.

F. Employees will assess situations to determine if de-escalation is possible, and if so, employ appropriate tactics to include verbal and less lethal tools to reduce the potential need to use force or to reduce the level of force needed.

2. **DEFINITIONS**

| | |
|---|---|
| **A. Reasonable Belief** | • When the facts and circumstances cause a reasonable and prudent law enforcement officer to act or think in a similar way under the circumstances |
| **B. Less-lethal Force** | • Is a tactic when properly applied has minimal or no risk of causing death |
| **C. Deadly Physical Force** | • Any tactic or response to resistance that creates a substantial risk of causing death or serious physical injury, such as the use of a firearm |
| **D. Serious Physical Injury** | • A bodily injury that creates a reasonable risk of death, causes serious and permanent disfigurement, or results in long term loss or impairment of the functioning of any bodily member or organ |
| **E. Excessive Force** | • The application of an unreasonable amount of force in a given incident based on the totality of the circumstances |
| **F. Types of Resistance** | • Psychological Intimidation - Non-verbal cues indicating subject's unwillingness or threats through attitude, appearance, and physical readiness<br>• Verbal Non-Compliance - Verbal responses indicating unwillingness or threats<br>• Passive Resistance - Physical actions that do not prevent an officer's attempt to control<br>• Active Resistance - Physical actions that attempt to prevent an officer's control, but do not involve attempts to harm the officer<br>* Based on this definition, solely running from officers does not constitute active resistance.<br>• Active Aggression - Physical actions of assault<br>• Aggravated Active Aggression - Deadly physical force encounter |

2. **DEFINITIONS** (continued)

| | |
|---|---|
| **G. Response Options** | The option used is determined by the totality of the circumstances.<br><br>• Presence - Identification of authority<br>• Verbal Direction - Commands of direction or arrest<br>    * Includes the use of a long range acoustic device (LRAD)<br>• Soft Empty Hand Control and Restraining Devices - Techniques that have a minimal chance of injury to include control holds, arm bars, and pressure points.<br>    * Restraining Devices - Handcuffs, Ripp restraint, ankle cuffs, shackles<br>• Tripping/Tackling - Physical technique used to stop a subject from running<br>• Pointed Gun at Person (PGP) - When a firearm is pointed in the direction of a person<br><br>**NOTE**: [1]Drawing from the duty belt, a slung rifle or shotgun, or displaying a firearm at the low ready does not constitute a PGP incident.<br>[2]For the purpose of a PGP incident, a stunbag shotgun is not designated as a firearm due to the fact it's proper use is considered less-lethal force.<br><br>• Irritants - Oleoresin capsicum (OC), 2-Chlorobenzylidene malononitrile (CS), and Pava Powder (PepperBall)<br>• Conducted Electrical Weapons (CEW): for example, Taser<br>• Intermediate Control Techniques - Techniques that have a probability of injury<br>    * Hard Empty Hand Control<br>    * Impact Weapons<br>    * Stunbag Shotgun<br>    * Canine (K9) Application<br>    * 40MM Launcher<br>• Deadly Physical Force |
| **H. De-Escalation/ Escalation Strategies** | De-escalation is defined as an employee/s intent to resolve an incident as safely as possible to protect the public and all persons involved by reducing the danger through the use of tactics, techniques, and force options.<br><br>**NOTE**: This can include communicating with subjects and utilizing time and distance to increase the possibility of reducing or eliminating the need for force.<br><br>• Employees will assess situations to determine if de-escalation is possible, and if so, employ appropriate de-escalation tactics to reduce the potential need to use force or to reduce the level of force needed.<br>    * If force is necessary, employees will assess each incident to determine, based on policy, training, and experience, which response to resistance option will de-escalate the situation, bring the situation under control, and reduce the probability of harm or injury to any involved persons.<br>    * When practical, employees will collect information about the incident, assess risks, request resources, and coordinate a response.<br>    * It is acceptable and prudent to use elevated tone and intense language that is not personalized to the individual, but rather a tactic to be used to enhance the de-escalation process.<br>    * When tactically sound, employees may relocate to a position of advantage that offers cover or allows for greater distance to consider other force options.<br>• With de-escalation strategies, there are three possible resolutions, and, in each case, the scene has been de-escalated if the subject no longer poses a danger to the public, innocent persons, and employees.<br>    * The subject submits and elects to be taken into custody.<br>    * Some form of coercion, including verbal negotiations and less-lethal force, is used and the subject submits or can safely be taken into custody, decreasing the need for further force applications.<br>    * The situation has been escalated by the subject's actions to the point of extreme violence, likely to result in death or serious physical injury of innocent persons/employees to the point that lethal force must be used to de-escalate the situation. |

3. **GENERAL POLICY**

A. It is the policy of the Department to use a reasonable amount of force to conduct lawful public safety activities.

B. The response option employed will be reasonable and based on the totality of circumstances.

(1) Employees involved in a response to resistance incident have the responsibility of providing the facts and circumstances they believe justified the response to resistance by completing the necessary reports, memorandums, etc.

(2) Circumstances that may govern the reasonableness of using a particular response option include, but are not limited to:

(a) Graham v. Connor (US Supreme Court 490 US 386 (1989))

- The severity of the crime
- Whether the subject poses an immediate threat to the safety of officers or others
- Whether the subject is actively resisting arrest or attempting to evade arrest by flight

(b) Above are the three primary bullet points, but the Supreme Court recognizes other factors can be taken into consideration:

- Totality of the circumstances
- Environment/bystanders
- Reasonableness

**NOTE:** The reasonableness of a particular response to resistance must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

(c) Safety Priorities

(i) Hostages
(ii) Innocents/civilians
(iii) Law enforcement
(iv) Suspect/subject

(d) Conditions

(i) Suspect – Known violence potential/criminal history/behavior/armed or access to weapons
(ii) Venue – structure/vehicle/open area
(iii) Environment – Geography/backdrops/innocent citizens/traffic

(3) Employees need to consider the following when responding to resistance:

(a) Ability - Does the subject have the apparent physical means to cause harm?

- Employees must also evaluate his/her ability to handle the threat posed by the subject.

(b) Opportunity - The circumstances are such that the subject has the apparent ability to harm the employee/s or others.

- Distances, barriers, and opportunities for both the subject/s and employee/s should be taken into account.

(c) Jeopardy - Is the subject causing an imminent and immediate threat to the employee/s or others?

- Denotes actions, cues, or indicators demonstrated by the subject.

3. B. (3) (d) Preclusion - All other alternatives have been reasonably considered and cannot be employed in a safe manner based on the totality of the circumstances the employee/s or others are facing.

C. Medical Treatment - Employees are responsible for requesting medical treatment for subjects against whom force was used.

- Any time there is an injury, or an alleged injury, as a result of force used by Department personnel, **employees will**:

  * Examine any person claiming injury and render first aid, if necessary.
  * Request medical personnel to respond to the scene, if appropriate.
  * Immediately notify a supervisor.

D. Employees who are directly involved in applying force on a subject will be relieved, as soon as practical, by another officer not directly involved in the response to resistance incident, for the care and custody of the subject.

E. The techniques taught by the Department's proficiency skills instructors will be used when practical.

4. **RESPONSE OPTIONS**

A. Presence - Presence is established through identification of authority.

- The presence of a K9 at a scene falls under this parameter.

B. LRAD – Please see Downtown Operations Unit (DOU) Bureau Manual for further information.

C. Soft Empty Hand Techniques and Restraining Devices - These techniques have a minimal chance of injury.

(1) Control and restraint techniques include, but are not limited to:

- Wrist locks
- Joint locks
- Pressure points
- Handcuffing (metal, plastic, or soft restraint devices)
- Restraining devices such as Ripp restraints, ankle cuffs, and shackles (transport use only)
- Smear technique
- Harness and Control techniques

**NOTE**: Many of these tactics may involve placing a subject on the ground to assist in better control and to minimize injury to the subject as well as the employee.

(2) Employees **will not** restrain subjects with their legs behind their back (hog-tying).

(3) Spit Sock

(a) Due to inherent health risks, officers may deploy a Department approved 'spit sock' when dealing with a subject who is, or is threatening to, spit on officers or others involved in the immediate incident.

(b) Refer to Operations Order 4.55, Less Lethal Tools and Regulations, section 2.

D. Tripping/Tackling – Techniques not taught through defensive tactics instruction but are physical techniques used to stop a subject from running.

4. E. Pointed Gun at Person (PGP) - A firearm is pointed in the direction of a person.

**NOTE**: [1]Drawing from the duty belt, a slung rifle or shotgun, or displaying a firearm at the low ready does not constitute a PGP incident.
[2]For the purposes of a PGP incident, a stunbag shotgun is not designated as a firearm due to the fact it's proper use is considered less-lethal force.

F. Irritants

(1) May be used in situations ranging from passive resistance to aggravated aggression; to maintain officer safety, the use of the irritant is a reasonable response to resistance, non-compliance, or dangerous/threatening behavior.

(2) The totality of the circumstances, not just the incident at the time, will be considered when deciding to utilize this system.

| | |
|---|---|
| **(a) Oleoresin Capsicum (OC) Spray** | May be used when reasonable and justified in the following situations:<br>• To prevent the possibility of injury to an officer or another person<br>• To ward off threatening dogs or other animals<br>• In tactical building entries, such as search warrants<br>• To subdue a person who is:<br>* Threatening or attempting physical harm to himself or another<br>* Resisting an arrest<br>* Rioting<br>* Interfering with an arrest<br>When any irritant has been utilized, the deployment will be documented in an Incident Report (IR) and a Response to Resistance (RTR) report will be generated only if the subject displays a severe or abnormal reaction to the irritant.<br>When the circumstances justifying the use of OC spray no longer exist, OC spray will immediately be discontinued.<br>Mark 9 Canister<br>• Supervisors may direct an officer to deploy the Mark 9 canister when reasonable to do so. |
| **(b) Pava Powder (PepperBall II Launcher)** | Pepperball may be utilized in the following manners:<br>• When objectively reasonable and justified to subdue a person, who is:<br>* Displaying psychological intimidation<br>* Verbally non-compliant<br>* Displaying passive resistance<br>Area Saturation<br>• When a PepperBall has been utilized during an area saturation technique, the deployment should be documented in an IR and an RTR report will be completed only if the subject displays a severe or abnormal reaction to the Irritant.<br>• If, during an area saturation deployment, the person is inadvertently struck with PepperBall due to actions beyond the control of the operator, an RTR report will be completed by a supervisor and will be documented under the standards of an area saturation. (i.e. psychological intimidation, verbal non-compliance, passive resistance, etc.)<br>Direct Impact<br>• Refer to Direct Impact Munitions |
| **(c) Tactical Irritants** | Detailed training, deployment procedures, and tactical considerations are found in the Tactical Support Bureau (TSB) and DOU Manuals. |

4. G. Conducted Electrical Weapon (CEW) - Use is considered a less-lethal tactic.

| | |
|---|---|
| **(1) Guidelines For Use** | • CEWs may be used in situations where distance is necessary to maintain officer safety and the use of CEWs is a reasonable response to resistance, non-compliance, or dangerous/threatening behavior.<br>• The totality of the circumstances, not just the incident at the time, will be considered when deciding to utilize this system.<br>• When the circumstances justifying the use of a CEW no longer exist, the CEW will immediately be discontinued.<br>• CEWs will not be used for any of the following:<br>    ∗ Coercion or intimidation<br>    **NOTE**: A warning Arc combined with the proper verbal warning may be used in situations that would likely result in a justified deployment of the CEW.<br>    ∗ Against a subject who would be in danger of falling from a significant height<br>    ∗ When subjects are near flammable liquids and gases<br>• If it is determined an extended cycle is necessary to control a combative suspect, explain the circumstances regarding the decision in the IR.<br>• Only apply the number of cycles reasonably necessary to safely approach the restrain the subject.<br><br>Non-Target Areas<br>• Head, neck, female breast, and groin<br><br>Probe Deployment Ranges for Patrol<br>• Maximum range 25 feet<br>• Close quarter cartridge preferred range 4-8 feet<br>• Stand Off cartridge preferred range 11-22 feet |

H. Intermediate Control Techniques - Techniques that may result in injury.

| | |
|---|---|
| **(1) Hard Empty Hand Techniques** | These include but are not limited to:<br>• Closed fist strikes<br>• Hammer fist strikes<br>• Palm-heel strikes<br>• Impact pushes<br>• Kicks<br>• Knee strikes<br>• Elbow strikes<br>• Strikes to the head and face<br><br>Guidelines for Use<br>• Areas to avoid are the throat, spine, sternum, and kidneys.<br>• Hard empty hand techniques may be used when facing the active aggression level of resistance.<br>• When the circumstances justifying the use of hard empty hand techniques no longer exist through the use of applied de-escalation strategies, hard empty hand techniques will immediately be discontinued.<br>    ∗ Employees still may use reasonable force to maintain control and protect themselves from danger. |

4. H. Intermediate Control Techniques (Continued)

| | |
|---|---|
| **(2) Impact Weapons** | Expandable Baton<br><br>**NOTE**: Side-handle and straight batons are prohibited for use or carry by employees.<br><br>• Impact weapon strikes may be used when facing the active aggression level of resistance.<br>• When the use of the impact weapon is warranted, employees will attempt to strike large muscle group areas and nerve motor points where there is minimal chance of permanent injury.<br>• Employees will not purposely strike or jab suspects with an impact weapon on the head, neck, sternum, spine, lower abdomen, groin, or kidneys unless faced with a deadly force situation.<br>• When the circumstances justifying the use of impact weapons no longer exist, the use of impact weapons will immediately be discontinued. |
| **(3) Flashlights** | • Flashlights are not designed as impact weapons; however, a flashlight may be used as an impact weapon if a baton is not readily available.<br>• Employees will not purposely strike or jab subjects with a flashlight on the head, neck, sternum, spine, lower abdomen, groin, or kidneys unless faced with a deadly physical force situation. |
| **(4) Canines (K9s)** | K9s are considered a less-lethal force option.<br><br>• K9s will not be used for control of crowds or in any circumstances where a strong potential exists for discrediting the Department.<br>• K9s may be used to search for or apprehend felony subjects when the public or officer safety is threatened sufficiently to justify this level of force.<br>• K9s may be used to search for misdemeanor subjects; however, the animal will remain on lead unless officer safety is threatened.<br><br>Procedures for Deploying K9s<br><br>• Whenever time and circumstances permit, a verbal warning will be given to a subject before releasing the K9 to conduct a search.<br>• An announcement identifying police authority and giving directions to the subject should be made in addition to stating the K9 will be released if the subject fails to comply.<br>• Detailed procedures for K9 use are found in Operations Order 5.3, Specialized Investigations and Assistance, and the TSB manual. |
| **(5) Direct Impact Munitions** | This policy applies to the following impact munition launchers:<br><br>* Stunbag Shotgun<br>* 40MM Launcher<br>* PepperBall Launcher (Impact Strikes)<br>* 37MM (TSB approved only)<br><br>* Direct Impact Munitions may be used in situations ranging from passive resistance to aggravated aggression; where distance is necessary to maintain officer safety and the use of a Direct Impact Munition is a reasonable response to resistance, non-compliance, or dangerous/threatening behavior:<br><br>* The totality of the circumstances, not just the incident at the time, will be considered when deciding to utilize this system.<br><br>• They are not intended to resolve phase two barricades, but rather can be used to alter environments (vehicles/structures) to enhance officer safety, public safety, and improve tactical advantage<br>• When practical, prior to direct munitions usage in phase one barricade situations, the shift commander will consult with a TSB supervisor to ensure best plan of action.<br>• The utilization of direct impact munitions is in compliance with the departments de-escalation policies and standards. (section 1.5.2.H of this order) |

4. H. Intermediate Control Techniques (Continued)

| | |
|---|---|
| **(5) Direct Impact Munitions** (continued) | Target Areas<br>• Arms<br>• Buttocks<br>• Lower abdomen<br>• Legs<br>• Back, excluding the spinal cord area from the base of the skull to the tailbone<br><br>Non-target Areas<br>• Head<br>• Chest<br>• Spine<br>• Neck<br><br>**NOTE:** Shots to non-target areas can result in fatal or serious injury.<br><br>Considerations<br>• Stunbag rounds should not be fired through mediums, such as glass or chain link fences, because the bag may tear, and lead shot may be released.<br>• Optimal ranges for:<br>  * Stunbag shotgun has no minimum distance with an effective range between five (5) feet and 20 yards.<br>  * 40MM has no minimum distance, with an effective range of 5 yards up to 50 yards.<br>  * PepperBall has no minimum distance, with an effective range of 2 yards up to 16 yards.<br><br>Additional Information<br>• For specific guidelines reference the stunbag shotgun, refer to Operations Order 4.25, Firearms Regulations.<br>• For specific guidelines reference the 37mm direct impact munitions, refer to the TSB manual. |

I. Deadly Physical Force

| | |
|---|---|
| **(1) Guidelines** | Employees may use deadly physical force under the following circumstances:<br>• When such force is reasonable to protect themselves or a third person from another's use, or threatened use, of deadly physical force.<br>• To prevent the escape of a subject whom the employee has probable cause to believe has committed an offense involving the infliction or threat of serious physical injury or death and is likely to endanger human life or cause serious injury to another unless apprehended without delay.<br>• In situations where the employee must overcome or prevent an attack the employee reasonably believes would produce serious physical injury or death to the employee or another person.<br>  * When the use of techniques taught by the Department's proficiency skills instructors is not practical under the circumstances, the employee may resort to any reasonable method to overcome the attack.<br>  * The use of chokeholds, strangleholds, or any other method of inhibiting air or blood flow to the brain is prohibited unless the situation has risen to the level of a deadly physical force encounter.<br>• When the circumstances justifying the use of deadly physical force no longer exist, deadly force will immediately be discontinued through the utilization of de-escalation strategies.<br>  * Employees still may use reasonable force to maintain control and to protect themselves from danger. |

4. I. Deadly Physical Force (continued)

**(1) Guidelines** (continued)

Employees may use deadly physical force under the following circumstances: (continued)

- Deadly force is utilized as a last resort when other measures are not practical under the existing circumstances.
- The intentional use of a police vehicle against a subject on foot will be considered a use of deadly force.
- Employees **will not** attempt to deliberately collide with other vehicles or use a police vehicle to force **any** vehicle off the roadway.

  **EXCEPTION**: Employees trained in the precision immobilization technique (PIT) maneuver and assigned to the Airport Bureau on Airport grounds, TSB, or dignitary protection officers when needed as part of their duties.

Use of Firearms

- In addition to the guidelines listed above, employees will discharge firearms in connection with police activities only, and in accordance with the following policies, whether on or off duty.
- Employees will not unnecessarily draw or display any firearm, or carelessly handle a firearm.

  **NOTE**: When a firearm is pointed in the direction of a person, employees will notify a supervisor and ensure the incident is documented in an IR.

- Warning shots **will not** be fired.
- When the shooting of a subject appears imminent, employees will, if practical, issue a verbal warning.
- Firearms will not be used under circumstances in which a substantial and unjustifiable risk of injury or death to bystanders exists
- Firearms will only be used to kill an animal posing an immediate danger to the employee or the public when other means of protection are impractical.

Vehicles

- Employees will not shoot from a moving vehicle or at a moving vehicle for the sole purpose of disabling it.
  - * Exceptions to this policy, although rare, could be considered:
    - o Under extreme, life-threatening circumstances when a threat has been posed to employees or the public, by means other than the vehicle itself, and when all other means necessary have been exhausted.
    - o To prevent an apparent act of terrorism when the vehicle is being used as a weapon of mass destruction.
- Employees will not deliberately place themselves in the path of a moving vehicle or one capable of immediate movement.
  - * This is generally considered tactically unsound unless executed as part of a tactical plan intended to enhance safety.
- Exigent circumstances must exist before an employee may reach or lean into a running vehicle with the driver's seat occupied.
  - * When it is safe to do so, placing a police vehicle directly in front and rear of the subject vehicle provides an extra margin of safety.

Notifications

- Employees who discharge any firearm will make a verbal report to a supervisor as soon as practical.
- The employee's bureau/precinct commander or the duty commander will be advised of the weapon discharge incident.
- Firearms training, lawful target practice, and lawful hunting are exempt from this paragraph.

5. **NOTIFICATIONS OF AND REPORTING RESPONSE TO RESISTANCE INCIDENTS**

A. Employees will notify/contact a supervisor of a response to resistance incident as outlined below in section 5.B.

**NOTE**: Supervisors will respond to all response to resistance incidents requiring a Response to Resistance report (see sections 5.B and 5.C of this order for more information).

B. Reporting Guidelines - Employees will document the use of each response option as outlined below:

| | |
|---|---|
| **(1) Officer Presence**<br><br>**Verbal Persuasion, Negotiation, or Command**<br><br>**Soft Empty Hand and Restraining Devices** | Document the following as required in IRs:<br>• Officer presence<br>• Verbal persuasion, negotiation, or commands used (includes the use of an LRAD)<br>• Soft empty hand and restraining devices<br><br>Reporting requirements when injury or alleged injury occurs:<br>• A supervisor will be contacted as soon as possible and will respond to the scene.<br>• An IR will be completed with the response to resistance details explained in the Narrative section to include how any injuries were sustained.<br>• If **no** injury is visible, this will also be documented.<br>• Supervisors will complete a Response to Resistance report. |
| **(2) Tripping/ Tackling** | Reporting requirements for **all** incidents involving tripping/tackling:<br>• A supervisor will be contacted as soon as possible and will respond to the scene.<br>• An IR will be completed with the response to resistance details explained in the Narrative section.<br>• Supervisors will complete a Response to Resistance report. |
| **(3) Pointed Gun at Person (PGP)** | Reporting requirements for a PGP incident:<br>• A supervisor will be contacted as soon as practical.<br>• If multiple employees point their guns at a person, only one (1) report is necessary and the notified/on-scene supervisor will be responsible for coordinating the documentation.<br>• Supervisors will enter all PGP incidents in Blue Team (a Response to Resistance report is not required).<br><br>**NOTE**: Supervisors will ensure **only one** (1) PGP entry is completed per incident to document all required information.<br><br>PGP reporting only applies to lethal tools and does not to any of the following:<br>• Stunbag Shotgun<br>• 40MM Launcher<br>• PepperBall Launcher<br>• Other less lethal tools |
| **(4) Irritants** | Reporting requirements for **all** incidents involving the use of Irritants:<br>• A supervisor will be contacted as soon as practical.<br>• An IR will be completed with the use of the chemical agent documented in the Narrative section.<br>• Supervisors will complete a Response to Resistance report **only when subjects display a severe or abnormal reaction to the chemical**.<br><br>PepperBall<br>• Irritants used only to alter an environment does **not** require an IR or RTR report.<br><br>**NOTE:** Irritants applied direct impact to a subject will be documented in an IR and an RTR report will be completed. |

5. B. Reporting Guidelines (continued)

| | |
|---|---|
| **(5) CEWs** | Reporting requirements for **all** incidents involving a CEW:<br>• A supervisor will be contacted as soon as practical and will respond to the scene.<br>• The CEW will be downloaded immediately prior to the completion of the Response to Resistance report.<br>• Supervisors will complete an Event Information Log for CEWs, available online at www.evidence.com for those with appropriate access, which will be saved electronically and attached to the Response to Resistance report.<br>• Supervisors will complete a Response to Resistance report which will include the following:<br>∗ Serial number of CEW used<br>∗ Number of times deployed<br>∗ Distance of the subject from the operator/s who deployed the CEW<br>∗ Effectiveness and result of use<br>• An IR will be completed with the response to resistance details explained in the Narrative section including the reason for the CEW deployment and target and impact areas. |
| **(6) Intermediate Control Techniques** | Reporting requirements for **all** incidents involving intermediate control techniques:<br>• A supervisor will be contacted as soon as practical and will respond to the scene.<br>• An IR will be completed with the response to resistance of details explained in the Narrative section<br>• Supervisors will complete a Response to Resistance report.<br>K9s<br>∗ All Department K9 injury incidents will be investigated and documented by a K9 Unit supervisor using the standard bite report format.<br>∗ The K9 Unit supervisor will also complete the Response to Resistance report.<br>Direct Impact Munitions - The Narrative section of the IR will include the following:<br>∗ Reason for the shooting (also to be documented in the Response to Resistance report)<br>∗ Weapon/s used (also to be documented in the Response to Resistance report)<br>∗ Number of shots fired<br>∗ Target and impact locations<br>∗ Distance of the subject from the officer/s that fired<br>∗ Effectiveness and result of use<br>• If a subject sustains a serious injury from a direct impact munitions shooting incident, see section 6.B of this order for detailed procedures. |
| **(7) Deadly Physical Force** | • See section 6 of this order for investigation and documentation procedures. |

C. Response to Resistance Report

(1) Supervisors will conduct a fact-finding investigation which will be documented in a Response to Resistance report if such a report is required as outlined above in section 5.B.

(a) A Response to Resistance report will not be completed on prisoner injuries occurring prior to police arrival or by means other than by police employees.

- Refer to Operations Order 7.1, Prisoners, for required documentation.

(b) When possible, audio record witness statements which will be attached to the Response to Resistance report as an “Image.”

5. C. (1) (c) Digital photographs will be taken of any injuries which will be processed/stored as outlined in Operations Order 8.1, Evidence, Impounding, and Property.

(d) Supervisors will review every body-worn camera (BWC) video that documents/ captures the response to resistance incident and ensure:

- "Response to Resistance" is manually added (marked in the BWC Category dropdown menu) to the video.
- An Axon BWC marker is placed at the time the response to resistance started.

(e) No additional paperwork is required unless unusual circumstances exist.

(2) Supervisors will submit the initial Response to Resistance report within seven (7) days of notification of the incident.

(3) Response to Resistance reports will be submitted up to commander approval within 30 days of initiation of the report.

6. **SHOOTINGS AND OTHER CRITICAL RESPONSE TO RESISTANCE INCIDENTS**

A. Required Reports - Supervisors will complete the following reports:

- Shooting Investigation, if applicable (see section 6.E below of this order for information on completing the shooting investigation)
- Response to Resistance Report (if required; see section 6.B. below of this order)

B. Investigation and Reporting Responsibilities

| | |
|---|---|
| **(1) Shootings and Other Response to Resistance Incidents Resulting in Death or Serious Injury** | All shootings and other response to resistance incidents resulting in death or serious injury involving employees of this Department will be investigated concurrently by the following:<br>• Professional Standards Bureau (PSB) - Completes the Response to Resistance report<br>• Involved employee's supervisor – Initial fact finding, crime scene worksheet, etc.<br>• Violent Crimes Bureau (VCB)/Homicide Unit<br><br>**EXCEPTION**: Incidents listed in the following sections will be investigated accordingly. |
| **(2) Non-Injury Accidental Discharges** | • For non-injury accidental discharges not involving a police action occurring on duty, the employee's supervisor will investigate the incident<br>• For non-injury accidental discharges not involving a police action occurring off duty, an on duty supervisor will investigate the incident and will forward the information to the employee's supervisor to complete an investigation. |
| **(3) Accidental Discharge Involving Police Action** | • If an accidental discharge occurs while the employee is performing a police function and a citizen or subject is in close proximity, such as attempting to arrest a subject, PSB will conduct the investigation and complete the Response to Resistance report. |
| **(4) Shootings Involving Animals** | • For shootings involving animals occurring on duty, the employee's supervisor will investigate the incident (a Response to Resistance report is not required). |

C. Notifications - The highest ranking officer at the scene will notify the PSB commander, VCB commander, and the Legal Unit.

6. D. Handling of Involved Employee's Firearm

(1) When employees are involved in an incident in which their firearm was discharged and the incident is investigated by PSB, the involved employees will release their firearm to the investigator.

- Employees will be issued another firearm by PSB investigators prior to going off shift or returning to duty.

E. Shooting Investigation

(1) The written report will include the following pre-narrative information:

| | |
|---|---|
| **Investigating Supervisor** | Name, serial number, duty assignment, work days and hours |
| **Employee Involved** | Name, serial number, duty assignment, work days and hours |
| **Synopsis** | |
| **Reason for Shooting** | Injured animal, accidental discharge, etc. |
| **Occurred** | Location, date, and time |
| **Employee's Prior Use of Force Incidents and Dispositions** | |
| **Weapon Used** | Make, model, caliber, ownership and type of ammunition |
| **Number of Shots Fired/ Impact Locations/ Backdrop Description** | |
| **Injuries or damage** | Description of any animals involved and name, address, etc., of owner of damaged property/injured animals |
| **Witnesses** | |
| **Photos/Latent Print Examiner** | Name of the employee who took the photographs |
| **IR Numbers of Other Related Investigations** | |
| **Details of Investigation** | Narrative |

(2) As soon as possible (after the scene investigation has been completed), the PSB Investigations Unit lieutenant will be contacted to obtain a PSB shooting incident control number.

- If the incident occurs during non-business hours, the investigating supervisor will contact PSB at the beginning of the next business day to obtain the control number.
- The control number will be included in the subject portion of the memorandum in addition to any other title information.

(3) All pertinent documents, including photographs, will be attached to the investigative report.

(4) Evidence in the form of bulk items (guns, shell cases, etc.) will not be forwarded.

(5) Supervisors will make no recommendations other than referring the matter to the Critical Incident Review Board.

F. Routing of the Response to Resistance Investigation

(1) Incidents Investigated by PSB - The PSB commander will forward a copy of the PSB report to the employee's assistant chief and Critical Incident Review Board chairperson.

(2) Incidents Investigated by the Employee's Supervisor - The completed Response to Resistance report (if required; see section 6.B. above of this order) and shooting investigation will be forwarded through the employee's chain of command in Blue Team to the involved employee's commander.

**NOTE**: For shootings involving animals, the investigation will be forwarded to the employee's assistant chief who will forward the investigation to the Critical Incident Review Board chairperson (see Operations Order 3.18, Discipline Policy & Review Boards for more information).

# EXHIBIT 14

1. **GENERAL INFORMATION**

   A. The Department is committed to providing holistic service options to all members of our community, including persons with mental or physical disabilities, in a manner consistent with our obligation to ensure the protection of constitutional rights and the safety of all.

   B. A person with a disability **and** the care giver of the person with a disability may be overly stressed and **both** may need support.

   C. Mercy Care is the Regional Behavioral Health Authority (RBHA) for Maricopa County and contracts with a variety of community agencies to provide both crisis services and longer-term outpatient services for behavioral and physical health needs.

   - Law-enforcement and community members may contact the Maricopa Crisis Line at 602-222-9444 or 1-800-631-1314, 24 hours a day/7 days a week, for assistance with persons in crisis and in locating resources.

   D. When patrol officers are on a call where a person appears to be in crisis because of a mental illness, a Crisis Intervention Team (CIT) officer may be requested to assist.

2. **RECOGNIZING PERSONS WITH A MENTAL ILLNESS**

   A. A person who is not acting or reacting normally to a situation may have a mental illness. Examples may include, but are not limited to:

   - Reporting or acting as if they see, hear, feel, taste, or smell things that are not real
   - Believing things that are impossible or are not based in reality
   - Feelings of intense depression, euphoria, paranoia, or anxiety
   - Thoughts of suicide
   - Disorganized thoughts and speech

   B. Many physical disabilities and medical conditions may seem like a mental illness and can be difficult to tell apart from a mental illness without medical testing.

   - If possible, officers should attempt to gather statements from on-scene witnesses to rule out:

     * Dementia
     * Intellectual disability
     * Diabetic shock
     * Epilepsy
     * Terminal illness
     * Anti-social (criminal) mindset

   C. When interacting with mentally ill subjects, officers should be aware individuals may be a danger to themselves and/or others.

3. **DISPOSITION OF ADULTS WITH A MENTAL ILLNESS** (See section 5 of this order for disposition of juveniles with a mental illness.)

   A. In general, if a minor crime has occurred (does not include domestic violence (DV) related crimes), treatment should take precedent over minor charges including misdemeanor warrants for nuisance charges where the victim is the government (see Operations Order 4.10, Arrest, Non-Service of Warrants, for more information).

   - Officers should assess the totality of the circumstances (including the best interest of the community) and utilize their best judgment as to the appropriate disposition [arrest and book the person or, with their supervisor's approval, transport the person to a facility for treatment (see the appropriate section below (4.C. through 4.E.) for transporting information)].

3. B. If the appropriate disposition for a minor crime is to arrest and book the person, or if a more serious crime or DV crime has occurred, officers will proceed with the arrest and booking

**NOTE**: It is important that violent offenders do not escape criminal punishment and are not transported to a facility where they can further victimize other patients and staff.

(1) When completing the booking process, officers should check all the appropriate boxes on the Form IV (Release Questionnaire form).

(2) Officers will advise jail personnel of the subject's unstable mental health condition.

(3) The Maricopa County Sheriff's Office (MSCO) jail is a screening agency with psychologists on staff.

(4) See Operations Order 7.2, Transporting Prisoners, for information on transporting prisoners in wheelchairs.

C. If the appropriate disposition for a minor crime is to transport the person to a facility for treatment or if no crime has occurred, and the person:

(1) Is a danger to themselves or someone else, officers should detain the person for involuntary treatment per Arizona Revised Statute (ARS) 36-525.

(a) Officers must fill out a petition/application for emergency admission outlining all three of the following:

- The person is a danger to themselves or others
- This danger is due to a mental illness
- This person is unwilling or unable to get treatment voluntarily

(b) Officers will email the petition/application (or it may be delivered in person) to one of the three below screening agencies and then transport the person to the facility.

(i) The Urgent Psychiatric Care Center (UPC) located at 1201 South 7th Avenue, Phoenix, Arizona, 85007, 602-416-7600, coppetitions@connectionshs.com.

(ii) The Recovery Response Center (RRC) located at 11361 North 99th Avenue, Suite 402, Peoria, Arizona, 85345, 602-636-4605, rrcp.petitions@riinternational.com.

(iii) The Community Psychiatric Emergency Center (CPEC) located at 358 East Javelina Avenue, Mesa, Arizona, 85210, 480-507-3186, coppetition@cbridges.com.

(2) Is not a danger to themselves or someone else and is willing to go voluntarily with officers for treatment, officers may transport the person to one of the three screening agencies listed above in section 4.B.(2)(a) or one of the below Community Bridges locations.

(a) Central City Addiction Recovery Center (CCARC) located at 2770 East Van Buren Street, Phoenix, Arizona, 85008

(b) West Valley located at 824 North 99th Avenue, Avondale, Arizona, 85323

(c) East Valley Addiction Recovery Center (EVARC) located at 560 South Belleview, Mesa, Arizona, 85204

**NOTE**: The person may prefer a different private facility where they normally receive treatment, but the facility may not be able to accommodate them without an appointment.

3. C. (3) Is not a danger to themselves or someone else, but transport is not appropriate, officers are encouraged to contact the Maricopa County Crisis Line and speak to a supervisor.

(a) The supervisor can suggest options and/or send out a mobile team.

- Mobile teams can assist with anyone from juvenile delinquents to elderly patients with dementia if the situation is not dangerous, and the person will voluntarily talk with the mobile team.

(b) The supervisor cannot share health information unless there is an emergency, but they can make suggestions based on what is in the Maricopa County Crisis Line's records.

4. **DISPOSITION OF JUVENILES WITH A MENTAL ILLNESS**

| | |
|---|---|
| **A. Juvenile Has NOT Committed A Crime** | • Juveniles **cannot** be petitioned.<br>• Officers **should** call the Maricopa Crisis Line (602-222-9444) to request assistance for juveniles who appear to be suffering from a mental illness<br>• The Maricopa Crisis Line can assist the parent/guardian with a treatment plan and locations where the juvenile can be taken by the parent/guardian for mental health services.<br>* If restraining the juvenile is necessary, the Fire Department may be requested to transport the juvenile (they are trained in using soft restraints).<br>• Below are the Phoenix locations where a parent/guardian, or **with parental consent**, the Fire Department can take a juvenile experiencing a mental health crisis:<br>• St. Luke's Behavioral Health<br>1800 East Van Buren Street<br>Phoenix, Arizona 85006<br>602-251-8535<br>Juveniles ages 5 thru 17<br>• Phoenix Children's Hospital<br>1919 East Thomas Road<br>Phoenix, Arizona 85016<br>602-933-0990<br>Juveniles 12 and under |
| **B. Juvenile Has Committed A Crime** | • In general, if a minor crime has occurred (does not include domestic violence (DV) related crimes), treatment should take precedent over minor charges including misdemeanor warrants for nuisance charges where the victim is the government.<br>* Officers should assess the totality of the circumstances (including the best interest of the community) and utilize their best judgment as to the appropriate disposition [arrest and detain the juvenile or, with their supervisor's approval, call the Maricopa Crisis Line to request assistance].<br>• If the appropriate disposition for a minor crime is to arrest and detain the juvenile, or if a more serious crime or DV crime has occurred, see Operations Orders 4.10, Arrest, and 4.18, Juvenile Procedures. |

5. **MENTAL HEALTH ORDERS OF DETENTION (FOR ADULTS ONLY)**

A. Members of the community may request involuntary treatment of an adult by submitting a petition/application to a screening agency.

B. There are two different types of mental health orders (listed below) and each has specific procedures/responsibilities (as listed in the following appropriate sections).

- Emergency Mental Health Order of Detention
- Non-Emergency Mental Health Orders (NEMHO) of Detention

C. Emergency Mental Health Orders of Detention – Requested when the subject is an immediate threat/danger to themselves or someone else.

5. C. (1) Per ARS 36-524, any person with knowledge of the facts requiring emergency admission may go to a screening agency and submit a petition/application for an emergency mental health order of detention for someone else.

- The petition/application is reviewed by a mental health admitting officer who will deny or accept the petition/application.

  * Mental Health Admitting Officer - A psychiatrist or other physician or psychiatric and mental health nurse practitioner with experience in performing psychiatric examinations who has been designated as an admitting officer of the screening agency by the person in charge of the screening agency.

(2) Pursuant to ARS 36-525, if a petition/application is accepted, officers will be required to serve the petition/application and bring the person to the facility listed on the petition/application.

(3) Procedures/responsibilities for applications/petitions submitted by someone other than an on-scene police officer:

| | |
|---|---|
| **(a) Mental Health Admitting Officer** | • Will telephone and then email the emergency mental health pick-up order to the Communications Bureau |
| **(b) Communications Bureau** | • Upon receiving a request for an emergency mental health pick-up order, a mental health transport call (918T) will be created and dispatched.<br>• The emergency mental health pick-up order will be broadcast over the radio to the responding officers' supervisor.<br>• The emergency mental health pick-up order will be emailed to the responding officer's and their supervisor's City email. |
| **(c) Police Officers** | • Prior to picking up the named individual, officers will validate the emergency mental health pick-up order by reviewing the order emailed to the officer.<br>• Officers will contact the Maricopa County Crisis Line and request any available information regarding violence potential, weapons, patient history, what has worked in the past, and any other circumstances<br>• Emergency mental health orders will be treated procedurally like a misdemeanor arrest warrant.<br>• After verification of the order, officers will make a reasonable effort to apprehend and transport the individual to the nearest urgent psychiatric care center.<br>• If the order does not contain an address or contains the address of a third party and entry is denied, a search warrant is required and may be written based on the information specified in the order.<br>• Forcing entry into a person's residence or third-party residence should be considered a last resort and officers are encouraged to communicate with the person in order to reach a successful outcome.<br>• Pursuant to ARS 36-525, officers shall take reasonable precautions to safeguard the premises and the property thereon to prevent unauthorized access, such as shutting and locking the front and rear doors, unless the premises/property is in the possession of a responsible relative or guardian.<br>• If the named individual is suicidal, officers should impound for safekeeping any firearms the individual owns to ensure the individual has no means of hurting themself or others if/when they return (see Operations Orders 8.1, Evidence, Impounding, and Property, for impounding procedures).<br>* When searching for the individual's firearms/s, officers should keep the search reasonable by only searching for any outstanding, accessible firearm/s.<br>o Officers should **not** rummage through the home or engage in a top-to-bottom search for the firearm/s. |

5. C. (3) Procedures/responsibilities for applications/petitions submitted by someone other than an on-scene police officer: (Continued)

| | |
|---|---|
| **(d) Police Officers** (Continued) | **NOTE**: Officers may also relinquish the firearm/s to the responsible relative or guardian who takes possession of the premises/ property.<br><br>• Officers will complete a Field Interview (FI) noting whether or not the contact was successful, summarizing the details, and noting the name of the admitting officer and the doctor (if one was involved).<br>∗ Select FI as the "Offense Description" and Comm Community Engagement Bureau for "Offense Element 1" and FI, Community Engagement Bureau, Mental Health- Transport for "Offense Element 2."<br><br>• Officers will not provide additional security for the individual once at the urgent psychiatric care center.<br>• Officers will provide accessible services to qualified persons with disabilities. |

D. Non-Emergency Mental Health Orders (NEMHO) of Detention - Requested when the subject is not dangerous but is still in need of treatment and will not, or cannot, consent.

(1) Generally, a petition/application for a NEMHO is completed by a mental health professional, but a community member may also complete a petition/application if assisted by an EMPACT mobile team.

- An EMPACT mobile team can be requested by calling the Maricopa Crisis Line.

(2) A petition/application for a NEMHO is reviewed and signed by a Superior Court judge at Desert Vista Hospital and takes a few days to complete.

- Once the petition/application is accepted, the court will transfer the original paperwork to one of the three screening agencies.

(3) Procedures/responsibilities for non-emergency mental health orders (NEMHOs):

| | |
|---|---|
| **(a) Screening Agency Court Coordinator** | • Will email the NEMHO to the Communications Bureau<br>• Ensure the petitionee (subject named on the NEMHO) is still non-compliant with treatment<br>• Has current information (within the last 20 minutes) on the location of the petitionee<br>• Will call Crime Stop with the above information and request a call for service |
| **(b) Communications Bureau** | • Upon receiving a NEMHO call for service, a Communications supervisor will verify the:<br>∗ NEMHO has been received<br>∗ Name of the petitionee is the same as the subject named on the call for service<br><br>• Create a mental health transport call (918T), add notes to the call detailing the NEMHO was received, and dispatch the call to the first available precinct patrol officer or CIT officer<br>• The NEMHO will be emailed to the responding officer's and a supervisor's City email. |

5. D. (3) Procedures/responsibilities for non-emergency mental health orders: (Continued)

| | |
|---|---|
| **(c) Police Officers** | • Prior to contacting the named petitionee, officers will review the NEMHO and verify it by calling the screening agency listed on the NEMHO.<br>• After verification of the NEMHO, officers will make a reasonable effort to take the petitionee into custody and transport him/her to the screening agency listed on the NEMHO.<br>* Officers are authorized to take the petitionee of an NEMHO into custody against his or her will; however, if officers are denied entry, the situation will <u>not</u> be treated as a barricade and officers will go back into service.<br>• Upon delivery of the petitionee to the screening agency, officers will sign the original Return of Order as the "detaining officer", to include the date and time the NEMHO was served.<br>• The completed Return of Order will be left with the screening agency.<br>• Will complete an FI noting whether or not the contact was successful and summarizing the details.<br>* Select FI as the "Offense Description" and Comm Engagement Bureau for "Offense Element 1" and FI, Community Engagement Bureau, Mental Health- Transport for "Offense Element 2." |

6. **<u>STATE HOSPITAL PATIENTS</u>**

| | |
|---|---|
| **A. State Hospital Patients - Escapees** | • A mentally ill person who has escaped from the State Hospital may be returned directly to the State Hospital.<br>* Recommitment proceedings are not necessary<br>* This includes intoxicated patients<br>• When the escapee is located, State Hospital staff should be notified at 602-220-6100 so they can make proper transportation arrangements.<br><u>Serious Crime</u><br>• A State Hospital escapee who has committed a serious crime will be booked directly into jail.<br>**<u>EXCEPTION</u>**: If the escapee has violent or suicidal tendencies, they **<u>will be</u>** returned to the State Hospital.<br>• The arresting officer will be responsible for notifying the State Hospital of the custody.<br>• Information regarding the person's leave status from the State Hospital will be placed in the arrest record.<br>• If a missing person report has been filed, an Incident Supplement will be completed. |

7. **<u>ADDITIONAL INFORMATION</u>**

A. <u>Additional Resources</u> - Refer to Operations Order 4.8, Referral Agencies.

B. <u>Emergency Calls To Mercy Care Serious Mental Illness (SMI) Clinics</u>

(1) Several clinics are staffed with psychologists and social workers who may request officers respond to keep the peace and/or transport an individual to a screening agency.

(a) Officers will perform peacekeeping duties as needed.

**<u>NOTE</u>**: Staff usually only calls police after the situation has escalated; therefore, a crime may have been committed and making an arrest may be the appropriate response.

7. B. (1) (b) If transporting an individual is requested, responding officers will handle the transport in the same manner as an emergency mental health order of detention listed in section 6.C of this order **ensuring** a **mental health admitting officer** has authorized the transportation under emergency conditions.

**NOTE**: Psychologists at the clinics are not presently designated as mental health admitting officers and have no authority to order the police to take custody of a mental health patient.

8. **DOCUMENTATION/REPORTING**

A. An Incident Report (IR) will be completed if a crime has occurred.

- Ensure "Mental Problem" is selected from the "VP" (violence potential) drop-down box in the Suspect section.
- Pertinent facts regarding the person's behavior will be described in the IR Narrative.

B. If no crime has occurred, an FI will be completed.

(2) To document general mental health information:

- Select FI as the "Offense Description" and Comm Engagement Bureau for "Offense Element 1" and FI, Community Engagement Bureau, Crisis Intervention for "Offense Element 2."

(2) To document a mental health transport or attempted transport:

- Select FI as the "Offense Description" and Comm Engagement Bureau for "Offense Element 1" and FI, Community Engagement Bureau, Mental Health- Transport for "Offense Element 2."

  * The subject's behavior, potential for violence, or any other factor that would serve as investigative intelligence should be documented in the FI Narrative.

**NOTE**: Complainants will be informed at the time of the request that the report is for information only and no follow-up will be provided by the Department.

9. **COMMUNICATING WITH HEARING/SPEAKING IMPAIRED**

A. Employees must furnish appropriate auxiliary aids and services: for example, note pads, written materials, and qualified interpreters, when necessary to ensure effective communication.

(1) If the employee is unable to communicate with the individual using a note pad or other means of communication, then a qualified interpreter is required.
(2) In situations where a report is taken, and the employee communicates with the individual in writing, the written communication shall be treated as evidence, scanned and attached to the IR as a "Document", and then impounded.

B. Individuals with an impairment have the right to choose the auxiliary aid of his or her choice, unless the means chosen would result in a fundamental alteration in the service, program, or activity, or create an undue financial burden on the Department.

C. When the services of a qualified interpreter are necessary, but the employee cannot wait for a qualified interpreter to arrive, a clear, accurate, and through investigation will be conducted and an IR will be submitted.

9. C. (1) Officers may proceed with the interrogation using a notepad when:

- Exigent circumstances do not permit a delay in the interrogation of the suspect.
- An interpreter cannot be located within a reasonable time.
- Written communications between the officer and subject were effective in conveying and understanding the Miranda rights, and the suspect specifically declines the opportunity to communicate through an interpreter.

D. If an in-custody suspect cannot effectively be advised of their Miranda rights using written communication, a qualified interpreter shall be called to the scene prior to any interrogation.

(1) If the suspect cannot be effectively advised of their Miranda rights, even after a qualified interpreter is called to the scene, officers **<u>should not</u>** question the suspect.

(2) The name of the interpreter and that assistance was requested will be documented.

# EXHIBIT 15

**U.S. Department of Justice**

Civil Rights Division

HKD:AMW:JG:AD
DJ 207-8-16

*Assistant Attorney General*
*950 Pennsylvania Ave, NW - RFK*
*Washington DC 20530*

May 21, 2025

*Via email to* Julie.Kriegh@Phoenix.gov
Julie Kriegh
City Attorney
200 W. Washington St.
Phoenix, Arizona 85003-1611

re: Investigation of the City of Phoenix and the Phoenix Police Department

Dear Ms. Kriegh:

I am writing regarding the Justice Department's June 13, 2024 findings report with respect to the City of Phoenix (City) and the Phoenix Police Department (PPD). The current Justice Department does not have faith in the previously reported findings in this case. Accordingly, the findings report is withdrawn in its entirety.

We understand that the City and PPD have already begun a series of reforms to it local law enforcement and PPD's community interactions. We commend the City and PPD to complete any voluntary reforms that the City and PPD deem necessary without mandated federal intervention. To the extent that technical assistance to PPD could support this effort, we suggest that you seek voluntary technical assistance through the Justice Department's Community Oriented Policing Services (COPS) Office. Information on collaborative reforms from COPS Office is available at https://cops.usdoj.gov/collaborativereform.

Sincerely,

Harmeet K. Dhillon
Assistant Attorney General